# EXHIBIT 3

OSBORN
MALEDON

A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

The Phoenix Plaza
21st Floor
2929 North Central Avenue
Phoenix, Arizona 85012-2794

P.O. Box 36379
Phoenix, Arizona 85067-6379

Telephone      602.640.9000
Facsimile      602.640.9050

1    Diane M. Johnsen, 007634
     John L. Blanchard, 018995
2    Ronda Fisk, 022100
     OSBORN MALEDON, P.A.
3    2929 North Central Avenue, Suite 2100
     Phoenix, Arizona  85012-2794
4    (602) 640-9000

5

6    Attorneys for National Board of Medical Examiners,
     Federation of State Medical Boards of the United States, Inc.,
7    Educational Commission for Foreign Medical Graduates

8
                    IN THE UNITED STATES DISTRICT COURT
9
                        FOR THE DISTRICT OF ARIZONA
10

11   Ralph E. Krolik, M.D.,                )    No. CV05-0315 PHX FJM
                                           )
12                       Plaintiff,        )    **DECLARATION OF JOSEPH E.**
                                           )    **BERNIER, Ph.D., IN SUPPORT**
13   vs.                                   )    **OF DEFENDANT'S**
                                           )    **OPPOSITION TO MOTION**
14   United States Medical Licensing       )    **FOR PRELIMINARY**
15   Examination, a joint program of the   )    **INJUNCTION**
     Federation of State Medical Boards of the )
16   U.S., Inc., and the National Board of )
     Medical Examiners; Federation of State )
17   Medical Boards of the U.S., Inc., National )
18   Board of Medical Examiners, and       )
     Educational Commission for Foreign    )
19   Medical Graduates,                    )
                                           )
20                       Defendants.       )
                                           )
21   _____

22          I, Joseph E. Bernier, Ph.D., having been duly sworn, hereby depose and say:

23          1.      I hold a Doctorate in Philosophy ("Ph.D.") in Counseling Psychology

24   from the University of Minnesota.

25

26

2.      I currently am the Assistant Director for Training & Clinical Evaluation at University Counseling Center of the State University of New York at Albany, where I specialize in the assessment and treatment of adolescents and adults with learning disabilities and other psychiatric conditions.

3.      In addition to my practice assessing and treating patients, I also am an expert on learning disabilities and the Americans with Disabilities Act ("ADA"), and I serve as a consultant and consultant examiner to national, state and local organizations, including the National Board of Medical Examiners ("NBME" or "the Board"), on issues related to learning disability determinations, test accommodations and other disability-related matters.

4.      I am a licensed psychologist in New York State (#005849-1).  I am recognized as a qualified Health Service Provider in Psychology by the Council for the National Register of Health Service Providers in Psychology.

5.      I have published numerous journal articles, book chapters and a book entitled Diagnosis of Learning Disability in Adulthood (Allyn & Bacon, 2003).  A copy of my curriculum vitae is attached hereto as Exhibit A.

6.      In submitting this report, I rely on documentation submitted by and on behalf of Dr. Ralph E. Krolik as part of his November 4, 2003 application for special accommodations (the "Application") while taking the United States Medical Licensing Examination ("USMLE").  I also rely on my own personal knowledge of the field of Clinical Psychology, Learning Disabilities, and my 29 years of clinical

1   and teaching experience at the State University of New York at Albany and other

2   institutions of higher education.

3           7.      In January 2004 the NBME asked me to review the documentation

4   submitted by and on behalf of Dr. Krolik and provide my opinion as to whether it

5   supported a diagnosis of disability and whether special accommodation was justified.

6   The documentation I reviewed in connection with Dr. Krolik's Application included

7   psychological reports submitted by Grant Butterbaugh, Ph.D., dated December 3 and

8   December 19, 2003, and Dr. Krolik's report cards from 1950 to 1960.  Dr.

9   Butterbaugh's reports repeatedly made reference to a psychological evaluation that

10  was performed by a Dr. Hoblet in 1998; however, a copy of that report was not among

11  the documents provided for review.

12          8.      It appeared to me during my review that ADHD was the primary

13  condition for which Dr. Krolik was seeking modified testing, although he was also

14  said to be diagnosed with Reading Disorder and Developmental Motor Coordination

15  Disorder, the last described by Dr. Butterbaugh as "mild handwriting and drawing

16  deficits."  Dr. Krolik was also identified as displaying mood and personality

17  disorders.  My review of the documentation focused upon Dr. Krolik's alleged

18  reading and handwriting problems notwithstanding the fact that handwriting is not a

19  skill required to take the USMLE.

20          9.      In performing my review of the data submitted in support of Dr.

21  Krolik's reading disorder,  I analyzed Dr. Krolik's scaled scores from the Nelson

22  Denny Reading Test-Form G ("NDRT-G").  Dr. Krolik's scaled scores on this test are

average and above average when compared to the average teenager and young adult, the group used to standardize the Nelson Denny Reading Test. In fact, even more compelling evidence of "normal" reading ability is evident in Dr. Krolik's percentile ranking. Dr. Krolik's percentile scores on the NDRT-G are average and above average when compared to *individuals with a college education*. He performed within the average range on Comprehension, which is a timed, multiple-choice test of reading skill or reading proficiency. He achieved a percentile score at the 20th percentile on this index. The universally accepted view in psychology and other scientific fields defines average as the middle 68 percent of the bell curve or between the 16th and 84th percentiles. Dr. Krolik's Comprehension score at the 20th percentile would therefore argue against the idea that he is a disabled reader or timed-test taker as a result of reading problems when the tests involve written multiple-choice items.

10.    Dr. Krolik's Reading Rate on the NDRT-G indicates a reading rate, when measured by a single one-minute sample of behavior, of about 279 words per minute. This is better than we would expect from someone who is reading for the purpose of remembering ideas in order to pass a multiple-choice test. Moreover, at the 69th percentile, Dr. Krolik's Reading Rate score is average for college-educated individuals. Therefore, from a functional perspective, Dr. Krolik does not appear to be severely limited or functionally impaired in reading.

11.    From a diagnostic perspective, Dr. Krolik's reported test data appear to reflect exceptional basic reading processes or word attack skills. In addition to the NDRT-G, Dr. Krolik was also administered portions of the Woodcock Johnson-

4

Revised Tests of Achievement (WJ-R). Dr. Butterbaugh stated that Dr. Krolik achieved a percentile score at the 95th percentile, a superior performance, when *compared to others at his age* on the WJ-R Word Attack test, thereby giving evidence that the widely recognized "core" impairment in reading disorder is absent in his case. Further, Dr. Krolik obtained a percentile score at the 87th percentile, which is above average *for college-educated persons*, in Reading Vocabulary on the NDRT-G.

12. In short, the test evidence suggested that Dr. Krolik quite skillfully (accurately) identified written words. Further, he was said to have achieved average to above-average scores on critical specific reading-related cognitive abilities such as listening comprehension, picture naming, and controlled verbal fluency. Dr. Krolik's average Reading Rate performance, in comparison to college-educated persons, on the NDRT-G also contributed to the impression of adequate performance on basic reading-related tasks.

13. In his report, Dr. Butterbaugh emphasized a discrepancy in Dr. Krolik's performance in listening comprehension and reading comprehension, with listening comprehension being the stronger of the two. However, differences among an individual's cognitive abilities are common. The occurrence of these differences alone is *not* diagnostic of a learning disability, especially when, as in this case, the discrepant scores (i.e., listening and reading comprehension) are average and above.

14. I also reviewed report cards from 1950 through 1960 that Dr. Krolik submitted. By definition, learning disorders are developmental conditions that first manifest in some objective way during childhood. Report cards are frequently used to

document or provide evidence of early difficulties. Dr. Krolik's grade reports

demonstrated that, on the whole, he performed no better or worse in reading

comprehension than he did in most other academic subjects. He seemed to get off to

a slow start in reading, performing "below average" in comprehension for the better

part of the first grade. However, by the end of the first grade, Dr. Krolik was making

normal and expected progress in reading, which apparently continued for the most

part in subsequent grades. This anecdotal information would not support the

contention that he suffers from a reading disability.

15.     The anecdotal data concerning Dr. Krolik's purported writing

difficulties are similar. As a first-grade student, he received quarterly grade reports

showing normal progress in printing and handwriting. With few exceptions, he

apparently continued to display expected progress in handwriting as he continued

through grade school. In fact, as a student in the sixth grade, he displayed "very

good" and "excellent" progress in his handwriting according to his grade reports.

16.     Further analysis of Dr. Krolik's report card grades shows that he was

assessed by his teachers to be "average" or "above average" in reading (in "reading

with understanding") in 16 of the 20 marking periods for which we have his grades.

He was graded as "below average" during four marking periods (three of these during

first grade). In the area of handwriting, Dr. Krolik's teachers evaluated him to be

"average" or "above average" or "excellent" in 18 of 20 marking periods, and as

"below average" in two of the 20 marking periods for which we have grade reports.

In short, Dr. Krolik was graded as an average or better reader 80% of the time during

elementary school and average or better in handwriting 90% of the time.  These results belie Dr. Butterbaugh's conclusion of early impairment in reading or handwriting.

17.    Dr. Butterbaugh reported in his evaluation that "obvious graphic-motor impairments were noted on both handwriting and complex design copying tasks."  He then added in reference to Dr. Krolik, "His handwriting is probably adequate compared to many other people because inconsistent or impaired graphic-motor impairments are not uncommon, especially amongst professionals."  Evidently, Dr. Butterbaugh did not see Dr. Krolik as severely limited with respect to handwriting. Moreover, Dr. Krolik achieved average scores on the WAIS-III tests that require fine motor skills, namely Digit Symbol (scaled score 11, 65th percentile) and Block Design (scaled score 10, 50th percentile).

18.    In addition, because administration of the USMLE does not require handwriting and other complex motor activities, the discussion of Dr. Krolik's motor coordination diagnosis seems irrelevant.

19.    In summary, based on my evaluation of the documentation submitted by and on behalf of Dr. Krolik in late 2003, which I evaluated in early 2004, I reported to the NBME that I was unable to recommend that the Board should provide Dr. Krolik with modified testing conditions on the basis of purported reading and motor coordination disorders.  I concluded that a diagnosis of learning disability was not supported by the documentation, and that an accommodation was not supported or

justified by the documentation.  A true and correct copy of my report to the NBME,

dated January 12, 2004, is attached hereto as Exhibit B.

20.   I noted in my January 12, 2004, report to the NBME that Dr. Krolik's

performance on the NDRT-G provided compelling evidence that he is not a disabled

reader under the DSM-IV or ADA.  In fact, as noted above, he scored within the

average range *when compared to college-educated persons* when required to read and

comprehend written text and answer multiple-choice questions based on the text

under time constraints.  Further, according to his elementary school report cards, by

the end of the first grade, Dr. Krolik was making normal and expected progress with

regard to reading comprehension and the development of handwriting skills.  He

continued to demonstrate appropriate progress during most marking periods

thereafter.  Those grade reports tended to show in a general way that on balance, he

was no better and no worse a reader than he was in any other academic area.  The

same appeared to be true with the development of his handwriting skills.  In fact, Dr.

Krolik's elementary school teachers graded him as average or better in reading and

handwriting in 8 out of 10 marking periods (reading) and in 9 out of 10 marking

periods (handwriting) between 1950 and 1956.  The *contemporary* test evidence does

not reflect impairment in critical specific reading-related cognitive skills.

Notwithstanding the discrepancy between his reading and listening comprehension

abilities, Dr. Krolik demonstrated average reading comprehension.

21.   The NBME has asked me to prepare this report for the Court in

connection with Dr. Krolik's Motion for a Preliminary Injunction.  In submitting this

8

report, I reviewed again the documentation provided by or on behalf of Dr. Krolik in support of his Application in late 2003. I have also reviewed his Motion for Preliminary Injunction and the exhibits accompanying that motion.

22.    My opinion with respect to Dr. Krolik's Application and diagnosis remains the same as the opinion I gave in 2004. For the reasons recounted and clarified above, I conclude that he does not suffer from any reading-related disorder or disability, in comparison to the general population. It is my professional opinion that the documentation provided by or on behalf of Dr. Krolik does not adequately support a finding of a disability based on reading or other learning disability and is therefore insufficient to warrant the grant of special accommodations on the USMLE.

23.    In his reports and correspondence, Dr. Butterbaugh repeatedly objected to what he asserts is the Board's requirement that applicants provide evidence of diagnosis or treatment of a learning disorder from childhood. He argued that Dr. Krolik completed much of his education before the proliferation of knowledge about learning disabilities and therefore to expect Dr. Krolik to produce the results from early diagnostic studies would be inappropriate. In my opinion, Dr. Butterbaugh misunderstands the central issue here. The NBME does not require documentation of an early diagnosis or label. However, learning disorders are developmental disorders that emerge during childhood. Learning impairment manifests in classroom performance and is reflected in report cards and other such markers. Dr. Krolik's early report cards, as detailed above, do not evidence reading impairment or impaired handwriting. Indeed, evidence of childhood learning impairment does not come from

diagnostic studies alone.  In fact, a prudent examiner would raise questions about the validity of poor diagnostic test scores without concurrent evidence of concrete problems in "real life" academic activities.

24.    Finally, I offer a comment on Dr. Butterbaugh's stated "strong objection" to the relevance of the use of "scaled scores" for the NDRT-G described above.  In his December 2003 report, Dr. Butterbaugh acknowledged that given Dr. Krolik's scaled scores on the NDRT-G, he was no longer advocating that a Reading Disorder justified Dr. Krolik's application for test accommodations.  Dr. Butterbaugh, however, appeared to contend that scores based on grade-based norms should be used or could be used to diagnose a learning disability.  Dr. Butterbaugh's position appears to deviate from the generally accepted standards employed to diagnose learning disorders as set forth in the Diagnostic and Statistical Manual of Mental Disorder-Fourth Edition (DSM-IV, 1994, 2000) and widely used to inform the diagnostic decisions of psychological practitioners.  In order to qualify for diagnosis under DSM-IV, one must first demonstrate achievement test scores (in this case, in reading) that are "significantly below that expected given the person's chronological age" (DSM-IV-TR, 2000).  Reading test scores that are significantly below those of others at the person's age are, by definition, below average scores on test measures that are "scaled" or standardized according to age.  On the other hand, "scaling" test scores according to grade level means that one compares the subject's performance to others who have completed the same school grade.  However, when the goal is to diagnose a learning disorder, an individual's psychoeducational test results are properly assessed

1    by comparing his or her scores to others of the same age, not to others who have

2    completed the same grade level in school.

3        25.    The reasoning behind this principle is easily demonstrated in this case.

4    According to Dr. Butterbaugh, Dr. Krolik's reading test scores should be compared to

5    those of all persons who have achieved post-graduate degrees, as has Dr. Krolik. That

6    population by definition is more likely to have higher-than-average reading abilities.

7    Certainly, one whose reading performance falls short in comparison to that group of

8
9    elite readers should not for that reason be diagnosed as "learning disabled."

10        26.    By contrast to Dr. Butterbaugh's view, the more appropriate manner of

11   "scaling" for diagnostic purposes, especially when evaluating adults for learning

12   disability, is to use age-based norms, by which the subject's test scores are compared

13   to others of roughly the same age. The scaled scores on the Nelson Denny Reading

14   Test were determined by "pooling" the results from individuals in grades 10 through

15   14, meaning older teenagers and young adults. Therefore, one's scaled score on this

16
17   particular reading test is a measure of his or her standing relative to the general

18   population of teens and young adults. In my opinion, the Nelson Denny scaled scores

19   comes closer to the generally-accepted "average person from the general population"

20   standard used when evaluating disability than does the test's percentile scores. The

21   average range for scaled scores on the Nelson Denny Reading Test is 175 to 225. In

22   this particular case, according to Dr. Butterbaugh, Dr. Krolik earned a Reading

23
24   Comprehension scaled score, performed under timed conditions, of 213, which is an

25   average score. His Reading Rate scaled score of 218 is also average. Dr. Krolik's

26

Reading Vocabulary score, also measured under time constraints, is 252, a score that is well above the score achieved by the average teenager and young adult reader.

27.     In the end, Dr. Butterbaugh's objection to the use of scaled scores on the Nelson Denny Reading Test is not pertinent because Dr. Krolik displayed average or better reading skills on the Nelson Denny Reading Test when compared to other college-educated persons (using percentile scores) *and* also to the average teenager and young adult reader from the general population (using scaled scores).

28.     Finally, the NBME has to my knowledge long required that educational tests must be reported and analyzed using age-based norms.  I disagree with Dr. Butterbaugh's apparent assertion that the NBME's request in this particular case that Dr. Krolik's test scores should be reported based on age-based norms was in any way applied "retroactively."  The request for scores to be reported in age-based terms is a manifestation of an attempt by the Board to solicit necessary and appropriate information from examinees.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 9 day of August, 2005.

Albany NY 12203                Joseph E. Bernier, Ph.D.

INDEX OF EXHIBITS TO
DECLARATION OF JOSEPH E. BERNIER, PH.D.
IN SUPPORT OF DEFENDANT'S OPPOSITION
TO MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT A          Curriculum Vitae of Joseph E. Bernier, Ph.D.

EXHIBIT B          Joseph E. Bernier, Ph.D.'s Report to NBME dated 1/12/04

# EXHIBIT A

JOSEPH E. BERNIER, Ph.D.
University Counseling Center
University at Albany
State University of New York
Albany, New York 12222
(518) 442-5800
E-MAIL: jbernier@uamail.albany.edu

## VITA

## EDUCATION

Ph.D. (1976)   University of Minnesota, Minneapolis, Minnesota Program: Counseling Psychology, APA Approved (Supporting Area: School Psychology)

B.A. (1973)   Westfield State College, Westfield, Massachusetts Major: Psychology Minor: Special Education

## PSYCHOLOGY LICENSURE

New York (awarded 1978)

## CERTIFICATION

Health Service Provider in Psychology
Council for the National Register of Health Service Providers in Psychology
(awarded 1983)
New York State Office of Vocational & Educational Services for Individuals with
Disabilities -Approved Neuropsychological Examiner

## PRESENT POSITION

Psychologist and Assistant Director for Training and Evaluation Services
University Counseling Center
University at Albany
State University of New York
Albany, NY 12222 (1991-present)

Provide clinical and developmental psychological services to university students and consult with staff and student groups as appropriate.  Coordinate, supervise and personally provide clinical / psychological and psychoeducational assessment services provided through the University Counseling Center, including the evaluation of learning disorders and other neurodevelopmental conditions compromising academic performance.  Function as a consultant / liaison to the University's Disabled Students Services Office.  Coordinate and manage all facets of advanced practicum, post practicum, and pre-doctoral internship training programs at UCC.  Direct the development of an APA approved pre-doctoral internship at the University Counseling Center. Participate in University related committee work.  Tenure awarded 1997.

Joseph E. Bernier, Ph.D.                                                    2

## CONSULTANTSHIPS

Office of Test Accommodations, National Board of Medical Examiners, Market Street
Philadelphia, PA   (1998-present)

Critically review psychological documentation provided by medical students who seek
disability status and testing accommodations on the national medical licensing under
the ADA.

Northeastern Association for the Blind at Albany Washington Avenue, Albany, NY
(1978-present)

Conduct comprehensive psychological and neuro-psychological evaluations of blind and
multi-handicapped rehabilitation clients and consult with staff on case management/
programming.

Consultative Examiner, NYS Office of Temporary and Disability Assistance/Division of
Disability Determinations (2000 - Present).  Conduct psychological and neuro-
psychological examinations on children and adults who seek disability benefits.

Independent Medical Examiner, Forest Hills IPA, Forest Hills, New York. (2003-present)
Perform consultative psychological and neuropsychological examinations for FHIPA
client groups.

## INDEPENDENT PRACTICE

Psychologist, independent practice specializing in psychodiagnostic services and
psychoeducational / neuropsychological evaluations of children, adolescents, and adults
(1978-present)

Office Location:
5 Pine West Plaza, Suite 508
Washington Avenue Extension
Albany, New York 12205
(518) 452-4232

## PAST POSITIONS

Psychologist, Four Winds Hospital, Saratoga Springs, New York (1 988-1991)

Joseph E. Bernier, Ph.D.                                                              3

> Psychologist on the College Service inpatient unit doing intensive, individual psychotherapy, group therapy, family treatment, psychological testing (College Unit and adult units), admissions, and case management.   Performed psychodiagnostic and neuropsychological evaluations for all in-patient units as part of the Psychological Testing Service.

Psychologist & Director, Psychological Counseling Center, Siena College, Loudonville, New York (1987-1988).

> Administered a college psychology and counseling service that offered a range of clinical services to students, faculty, and college employees.   Provided clinical supervision to professional staff-. 6 clinicians, including psychology interns, counselors, and psychiatry residents.   Personally performed psychodiagnostic evaluations, learning disability assessments, short and long-term psychotherapy, career counseling, clinical consultation with Student Affairs and Health Services Staff.

Psychologist & Director, Psychological Counseling Service, The College of St. Rose, Albany, New York (1980-1987)

> Developed a college psychology service.   Personally provided a variety of clinical psychological services to students and members of the college community, including psychodiagnostic services, learning disability evaluations, individual and group psychotherapy, crisis intervention, career counseling, outreach programs, consultation to Student Affairs staff and clinical supervision of psychology interns and medical residents.

Assistant Professor, Department of Counseling Psychology and Student Development State University of New York at Albany, Albany, New York (1 976-1980)

> Teaching and clinical supervision of doctoral and masters psychology students, advising graduate students and conducting/supervising research.

Faculty Clinical Associate, University Counseling Service, State University of New York at Albany, Albany, New York 12222 (1976-1980)

> Provided individual psychotherapy to college students.

Visiting Assistant Professor, Faculty of Education, University of Western Ontario London, Ontario, Canada (Summer 1976)

> Taught graduate level counseling course.

Joseph E. Bernier, Ph.D.                                                                                      4

Psychology Intern, ("Captive Internship") Deliberate Psychological Education Program
Department of Psychoeducational Studies, University of Minnesota and Freemont
Community Health Center / Freemont Connection, Minneapolis, Minnesota
(1974-1976)

>    Psychotherapist for adults, children, and families; outreach and training for inservice
>    counselors and teachers to implement developmental models of primary prevention and
>    psychological growth, conducting psychological and psychoeducational evaluations with
>    children and adolescents.

Psychotherapist, Walk-in Counseling Center, Minneapolis, Minnesota (1975-1976)

>    Individual short-term psychotherapy with adults in a community walk-in clinic..

Psychology Clerkship, Marcy Open School and Tuttle School Minneapolis, Minnesota (9/73-6/75)

>    Provided psychological / psychoeducational evaluations, psychological counseling with
>    elementary-aged children and parents; consultation with teachers; implemented programs
>    with children aimed at primary prevention.

## PUBLICATIONS

Flanagan, D., Keiser, S. Bernier, J., and Ortiz, S. Diagnosis of Learning Disability in Adulthood, Boston, Allyn and Bacon (2003).

Sue, D. W., Bernier, J. E., Durran, A. Feinberg, L., Pederson, P., Smith, E. J., and Vasquez, Nuttal, E. (1982) Position Paper: Cross Cultural Counseling Competencies. The Counseling Psychologist, 45-52.

Grand, S. A., Bernier, J. E., and Strohmer, D. C. (1982). Attitudes Towards Disabled Persons as a Function of Social Context and Specific Disability. Rehabilitation Psychology, 27 (3), 1965-1974.

Bernier, J. E. (1981). Families, Children, and Change: An application of Ecological Psychology. Counseling and Values, 25 (2), 85-100.

Bernier, J. E. (1980). Training and supervising counselors: Lessons Learned from Deliberate Psychological Education. Personnel and Guidance Journal, 59 (1).

Sprinthall, N. A., and Bernier, J.E. (1970).  Ego and Cognitive Development for Teachers: A Neglected Arena.  Chapter for T. Hennessey (Ed.).  Values/Moral Education, Paulist Press, New York.

Bernier, J. E. (1978).  Developmentally based teacher education: A pilot project.  Texas Tech Journal of Education, 5 (2).

Sprinthall, N.A., and Bernier, J. E. (1978).  Moral and Cognitive Development of Teachers.  New Catholic World, (1 324), 179-184.

Bernier, J. E. (1977).  Psychology of Counseling Curriculum: A follow-up study.  The Counseling Psychologist, 6 (4), 18-21. (Co-author: Kenneth Rustad; Reprinted in Whitely, J. (Ed.), Developmental Counseling and Teaching, Monterey, California: Brooks/Cole).

Bernier, J. E. (1977).  The new contraception program: A psychological perspective, Chapter for C. Garfink and H. Pizer, The New Birth Control Program.  New York-Bolder.

Bernier, J. E. (1976).  Active-listening Skills for Staff Development - A Workbook.  St. Paul, Minnesota: Minnesota Department of Education.

Bernier, J. E. (1976).   A psychological education intervention for teacher development. Unpublished doctoral dissertation, University of Minnesota.

## SELECTED POSTGRADUATE TRAINING

*Highlights of continuing education in neuropsychology, clinical and personality assessment, and brief psychological interventions. A comprehensive list is available upon request.*

Rorschach Workshops "Annual Rorschach Workshop", Presenter: John E. Exner, et. al., Asheville, NC, 4 days, 21 credit hours,  September 2003

"Neuropsychology of the Civilized Mind", Presenter: Elkhonon Goldberg, Ph.D., Cape Cod Institute, 5 days, 15 credit hours, July 2002

"Rorschach Comprehensive System: Update and Advanced Interpretation", Presenter: Barry Ritzler, Ph.D., Rorschach Workshops, three days each, May 2001 and May 2004, Albany, NY

"Violence Risk and Threat Assessment", Presenter: J. Reid Meloy, Ph.D., Specialized Training Services, Inc., (San Diego, CA), two days, June 2000, Albany, NY

"Advanced Interpretation of the Comprehensive System Rorschach", Presenter: Barry Ritzler, Ph.D.  LIU/Rorschach Workshops, three days, June 2000, Albany, NY

"The Comprehensive System Rorschach: Advanced Interpretation", Presenter: Barry Ritzler, Ph.D., LIU/Rorschach Workshops, three days, May 1999, Albany, NY

"Rorschach Alumni Workshop", Presenters: John E. Exner, Ph.D., & Irving Weiner, Ph.D., Rorschach Workshops, Asheville, NC, three days, September 25-28, 1997, 21 CE Credits

"Integrating Rorschach and Neuropsychological Assessment", Presenters: Anthony Sciara, Ph.D., & Jeffrey Barth, Ph.D., Rorschach Workshops, Asheville, NC, three days, May 1996, 21 CE credits

"Two's Company, Three's Allowed: Psychopharmacology for Therapists", Presenter: J. Hullett, MD, Value Behavioral Health, Inc., April 1996, Scotia, NY

"Forensic Issues for the Practicing Clinician", Presenter: Alan M. Goldstein, Ph.D., PANNY, March 1996, Albany, NY, 3 CE credits

"Neurodevelopmental Assessment", Presenter: Janet Holmes-Bernstein, Ph.D., Einstein Institute, Einstein College of Medicine, five days, July 1995, 15 CE credits

"Training Models for Brief Psychodynamic and Solution-Oriented Therapy", Presenter: Elenor Bossie, Ph.D., ACCTA, Truckee, CA, October 1994, 1.5 CE credits

"Developmental Psychopathology", Presenter: Sir Michael Rutter, MD, Einstein Institute, Einstein College of Medicine, July 1993, five days, 15 CE credits

"The Comprehensive System Rorschach: Advanced Interpretation", Presenter: John E. Exner, Ph.D., Einstein Institute, Einstein College of Medicine, July 1992, five days, 15 CE credits

"Short-term Anxiety Provoking Psychotherapy", Presenter: Peter Sifneos, MD, Stratton VA, April 1992, Albany, NY

"Time-Effective Psychotherapy", Presenter: Simon Budman, Ph.D., Value Behavioral Health, Winter 1992, Albany, NY

"Short-Term Dynamic Psychotherapy", Presenter: Habib Davenloo, MD, two days, May 1991, Syracuse, NY, 14.5 CE credits

"Brief & Emergency Psychotherapy", Presenter: Leopold Bellak, MD, December 1987, New York, NY

"Myers Briggs Type Indicator Workshop for Career Professionals", Adirondack Community College, two days, December 1987, Glens Falls, NY

"Adolescent Treatment", Presenter: Derek Miller, MD, Einstein Institute, Einstein College of Medicine, five days, 15 CE credits

Joseph E. Bernier, Ph.D.                                          7

"Adult Neuropsychology", Presenter: Arthur Benton, Ph.D., Einstein Institute, Einstein College of Medicine, five days, 15 CE credits

"Disorders of Personality", Presenter: Theodore Millon, Ph.D., one day, May 1985, 6 CE credits

"The Neuropsychological Evaluation of School-aged Children", Presenter: Lawrence C. Hartlage, Ph.D., one day, November 1984, Albany, NY, 6 CE credits

PROFESSIONAL AFFILIATIONS

Member, American Psychological Association (APA)
Member, Association of Counseling Center Training Agents
Member, Society for Personality Assessment

REFERENCES
Furnished upon request.                                    4/20/2005

# EXHIBIT B

Krolik ID# 0-546-768-3

## Joseph E. Bernier, Ph.D.

Licensed Psychologist

5 Pine West Plaza, Suite 508
Washington Avenue Extension
Albany, New York 12205

(518) 452-4232

January 12, 2004

<u>CONFIDENTIAL</u>

J. Abram Doane, MA, JD
Manager, Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

Re: KROLIK, Ralph Elliot
ID: 0-546-768-3

Dear Mr. Doane:

I have reviewed the documentation that was provided by and on behalf of Dr. Ralph E. Krolik in support of his request to receive double testing time and paper and pencil administration of Step 2. It appears that ADHD is the primary condition for which Dr. Krolik is seeking modified testing, although he has also been diagnosed with Reading Disorder and Developmental Motor Coordination Disorder, the last described by Dr. Butterbaugh as "mild handwriting and drawing deficits". Dr. Krolik is also identified as displaying mood and personality disorders. My review concerns this man's alleged reading and handwriting problems. An evaluation of his purported difficulties in attention and self-control is left to a consultant who is more expert than I am in the ADHD field. I will also defer on the psychiatric diagnoses to a consultant who specializes in that area.

Dr. Krolik is a foreign medical school graduate (1996) who also has a degree in pharmacy from the University of New Mexico (1969). It appears that he was first formally diagnosed with ADHD and LD in 1998. He is described as having problems in the timely completion of reading assignments. Reading comprehension is considered to be deficient, requiring him to repeatedly read text.

Among the numerous documents contained in this individual's case file, the updated psychological reports produced by Grant Butterbaugh, Ph.D. on December 3rd and December 19th (2003), in conjunction with report cards from 1950 to 1960, appear to be the most relevant materials as concern the LD diagnoses. Dr. Butterbaugh repeatedly made reference to a psychological evaluation that was performed by a Dr. Hoblet in 1998; however, a copy of this report was not among the documents provided for review.

1

Having reviewed the materials regarding the purported reading and handwriting disorders, I am unable to recommend that the Board provide Mr. Krolik with the accommodations that he has requested given the supporting evidence that is contained in his file.

First, Dr. Krolik's Nelson Denny Reading Test-Form G scaled scores are average and above average when compared to the general population of test takers. He clearly performed within the average range on Comprehension, which is a timed, multiple-choice test of reading skill or reading efficiency. He achieved a scaled score of 213 on this index. His Comprehension score would argue against the idea that he is a disabled reader or timed test taker as a result of reading problems when the tests involve written multiple-choice items. His Reading Rate scaled score of 218, which is also an average score, indicates a reading rate, when measured by way of a single one-minute sample of behavior, of about 279 words per minute. This is better than we would expect from someone who is reading and trying to remember the ideas conveyed in the text. From a functional perspective, Dr. Krolik does not appear to be severely limited or functionally impaired in reading.

From a diagnostic perspective, the test data reported appears to reflect intact basic reading processes or decoding skills. For example, Dr. Butterbaugh indicated that Dr. Krolik had achieved a standard score of 124, a superior performance, on the WJ-R Word Attack test. Further, Dr. Krolik obtained an above average score in Reading Vocabulary on the NDRT-G (scaled score of 252). In short, the test evidence suggests that Dr. Krolik quite skillfully (accurately) identified written words. Further he is said to have achieved average to above average scores on critical specific reading-related cognitive abilities such as listening comprehension, picture naming, and controlled verbal fluency. Dr. Krolik's average Reading Rate performance on the NDRT-G also contributes to the impression of adequate performance on basic reading-related tasks.

In his reports, Dr. Butterbaugh emphasized the discrepancy in performance in listening comprehension and reading comprehension with listening the stronger of the two. However, differences among cognitive abilities is common and the occurrence of these differences alone is not diagnostic of LD, especially when, as in this case, the discrepant scores (i.e., listening and reading comprehension) are average and above.

Dr. Krolik provided his report cards from 1950 through 1960 to document his difficulties in reading. What impressed me however by these grade reports is that, on the whole, he performed no better nor worse in reading comprehension than he did in most other academic subjects. He seemed to get off to a slow start in reading, performing "below average" in comprehension for the better part of the first grade. However, by the end of the first grade, Dr. Krolik was making normal and expectable progress in reading, which apparently continued for the most part in subsequent grades. This anecdotal information would not support the contention of reading disability.

The anecdotal data as concerns Dr. Krolik's purported writing difficulties is similar. As a first grade student, he received quarterly grade reports indicating normal progress in

2

Krolik ID# 0-546-768-3

printing and handwriting. With few exceptions, he apparently continued to display expectable progress in handwriting as he continued through grade school. In fact, as a student in the sixth grade, young Dr. Krolik displayed "very good" and "excellent" progress in his handwriting according to these grade reports.

In his evaluation, Dr. Butterbaugh reported that "obvious graphic-motor impairments were noted on both handwriting and complex design copying tasks". He then added, "His handwriting is probably adequate compared to many other people because inconsistent or impaired graphic-motor impairments are not uncommon, especially amongst professionals". Evidently, Dr. Butterbaugh does not see Dr. Krolik as severely limited with regards to handwriting. It is also important to note that he achieved average scores on the WAIS-III tests that require fine motor skills, namely Digit Symbol (11) and Block Design (10).

Having commented on the purported difficulties in handwriting, we should keep in mind that handwriting and other complex motor activities are not attributes that are all that relevant to the Board examinations. In some respects, the discussion of the motor coordination diagnosis is academic.

In summary, I am unable to recommend that the Board provide Dr. Krolik with modified testing conditions on the basis of purported reading and motor coordination disorders. This individual's performance on the NDRT-G provides compelling evidence that he is not a functionally impaired reader. He scored well within the average range when required to comprehend written text and answer multiple-choice questions based on the text under time constraints. His elementary school report cards indicate that by the end of the first grade, Dr. Krolik was making normal and expectable progress with regards to reading comprehension and in his development of handwriting skills. He continued to demonstrate appropriate progress during most marking periods thereafter. These grade reports tend to indicate that on balance he was no better and no worse a reader than he was in any other academic area. The same appears to be true with respect to the development of his handwriting skills. The contemporary test evidence does not reflect impairment in critical specific reading-related cognitive skills. Dr. Krolik demonstrated average reading comprehension, the discrepancy between his reading and listening comprehension abilities notwithstanding.

Joseph E. Berniol, Ph.D.
Licensed Psychologist

---

Examinee: KROLIK, Ralph E.          ID: 0-546-768-0          Exam: USMLE Step 2

Diagnosis of LD is not supported by the documentation and accommodation is not supported or justified.

Case review Hours: 4.0          Case Conference Hours: 0.0

3