July 8, 2005

Re: Affidavit regarding Krolik v. NBME
U.S. District Court for the District of Arizona
No. CV-05-0315 PHX/FJM

Jeanne Cameron Washburn, Esq.
Domenici Law Firm, P.C.

Ms. Washburn:

At your request, I have written this affidavit regarding your client, Dr. Ralph Krolik, whose request for reasonable testing taking accommodations was denied despite his "substantial limitations" in learning, as I describe in my reports, in the context of NBME disability evaluation and eligibility guidelines, as well as scientific research and clinical practice standards. The outline of my affidavit is as follows:

# Table of Contents for Dr. Grant Butterbaugh's Affidavit re: Dr. Ralph Krolik v. NBME

I.   **Summary of Affidavit** (page 2)

II.  **Records Reviewed** (page 3)

III. **Evaluator Qualifications** (page 4)

IV.  **Legal, Historical, Scientific, and Clinical Questions about the NBME Evaluation Requirements** (page 5)

**Section 1. Questions about Disability Laws and DSM-IV Mental Disorders** (p 5)
   a. *Disability Laws and Disability Definitions* (page 5)
   b. *DSM-IV Diagnostic Concepts, Criteria and Disability Definitions* (page 6)
   c. *Comparability Between Disability Laws and the DSM-IV* (page 8)
   Table 1. Disability Laws Compared to DSM-IV (page 11)

**Section 2. Questions about Chronology of ADHD Diagnoses, Disability Laws, and Dr. Krolik's Life Events** (p 12)
   a. *Chronology of ADHD Diagnosis and Dr. Krolik's Life Events* (page 12)
   b. *Chronology of Disability Laws and Dr. Krolik's Life Events* (page 12)
   Table 2. Chronology of ADHD as a Diagnosis, Disability Laws, and Dr. Krolik's Life Events (page 13)
   c. *Specific Objections* (page 14)
   Table 3. ADHD Diagnostic Criteria (DSM-IV) (page 17)

**Section 3. Questions about Scientific Research & Clinical Practice Standards** (p 16)
   a. *NBME Disability Evaluation Requirements Exceed Clinical Practice and Research Standards* (page 17)
   b. *Current Scientific Evidence and Unresolved Professional Controversies about DSM-IV ADHD Diagnostic Criteria* (page 21)
   Table 4. Comparison of Standardized Adult ADHD Rating Scales (page 24)
   Table 5. Chronology of Dr. Krolik's Life Events and Third-Party Reports of "Some" Plausible ADHD Impairments (page 28)

**Section 4. Questions about NBME Requirements & Dr. Butterbaugh's Reports** (p 34)
   Table 6. NBME Requirements, DSM-IV ADHD Criteria, Research Criteria, and Dr. Butterbaugh's Reports (page 44)

**Section 5. Incomplete Documentation Letter from Mr. Doane of the NBME, dated 11-10-03, and Dr. Butterbaugh's Responses** (p 48)

**Section 6. Denial of Request for Accommodations Letter from Mr. Doane of the NBME, dated 2-3-03, and Dr. Butterbaugh's Responses** (p 55)



## I. SUMMARY OF AFFIDAVIT

In the opinion of this evaluator, the National Board of Medical Examiners (NBME) and its employee, Mr. J. Abram Doane, MA, JD, Disability Services Manager, have arbitrarily imposed disability evaluation and test-taking accommodation eligibility requirements that are not operationally or otherwise specifically defined, are not knowable, or therefore, reasonable, and that

1) are neither required by disability laws nor by the official diagnostic and statistical manual of mental disorders (DSM-IV, APA 1994);

2) a.   require "objective historical documentation" of childhood ADHD diagnostic symptoms, criteria, and impairments when it is not possible for some qualified individuals with disabilities to provide such documentation, because they were born and educated prior to the official introduction of, and appropriate professional training about, ADHD diagnostic criteria, evaluation methods, and treatment services;

   b.   require "objective historical documentation" of childhood and young adult diagnostic and disability eligibility as well as receipt of accommodation services when it is not possible for some individuals to provide such documentation, because they were born and educated prior to the passage of disability laws and related legal definitions, such as "disability," "exceptionality," "functional impairments," "substantial limitations," and "reasonable accommodations;"

3) have no scientific basis, given the lack of conclusive scientific evidence and consensus about the reliability and validity of the child-oriented DSM-IV diagnostic criteria in the diagnosis of ADHD in adults regarding diagnostic age-at-onset, symptom, and functional impairment criteria; indeed, the NBME documentation requirements exceed current clinical practice and research standards as evident in empirical studies of adult ADHD published in well-respected, peer-reviewed scientific journals;

4) a)   have resulted in a clinically indefensible denial of Dr. Ralph Krolik's diagnosis with adult ADHD, as well as denial of his disabling impairments or limitations in one major life activity of learning; the denial of the ADHD diagnosis and eligible disability; which, therefore, resulted in denial of his request for reasonable test-taking accommodations that are routinely provided to qualified individuals with disabilities during educational and professional certification evaluations;
   b)   have resulted in a clinically indefensible denial of Dr. Ralph Krolik's request for reasonable test-taking accommodations to access public accommodations; the NBME has not provided conclusive scientific or financial evidence that the NBME suffers "undue hardship" in providing reasonable test-taking accommodations that the NBME publicly implies that are already provided to other qualified individuals with disabilities; finally, the NBME has not provided any conclusive scientific evidence that providing these commonly available test-taking accommodations "substantially or fundamentally alters" the meaning or use of the STEP exams.

## II. RECORDS REVIEWED:

As stated in my original report (dated 2-23-01) and revised evaluation report (dated 12-19-03), I reviewed the following unusually extensive records provided by Dr. Ralph Krolik:

- Drs. Wurzlow and Hoblit's evaluation reports (and Dr. Hoblit's raw test data)

- Dr. Ralph Krolik's elementary school report cards with teacher comments and secondary and post-secondary educational transcripts

- Dr. Ralph Krolik's NBME STEP test score reports

- Dr. Ralph Krolik's letters to and from NBME staff

- Dr. Butterbaugh's contemporaneous phone call notes on 12-09-03 with Mr. Doane of the NBME

## III. EVALUATOR QUALIFICATIONS:

To summarize my professional qualifications, as required by the NBME disability evaluation guidelines: I completed coursework with two authorities in clinical neuropsychology: Byron Rourke, Ph.D., an expert in childhood learning disabilities at the University of Windsor, Windsor, Ontario; and Thomas van den Abell, Ph.D., an expert in adult neuropsychology at Western Michigan University, Kalamazoo, MI. I received predoctoral and postdoctoral training in clinical neuropsychology and clinical psychology with Kenneth Adams, Ph.D., and others at Henry Ford Hospital, Detroit, MI, and postdoctoral training in clinical neuropsychology with Stanley Berent, Ph.D., Bruno Giordani, Ph.D., and others at the University of Michigan, Ann Arbor, MI. For nearly 20 years, I have taught, supervised, or consulted with, physicians, medical students, residents, and fellows; psychologists, psychology students, and psychology interns; and educators. My professional teaching and expertise includes various topics about differential diagnosis, developmental consequences, treatment, and neurological bases of genetic, congenital, and acquired neurological or psychiatric disorders, including ADHD and Learning Disorders.

I am a licensed clinical neuropsychologist/psychologist who has routinely evaluated adult medical, dental, nursing, and law students, as well as licensed professionals who had known or suspected disorders of learning. In my clinical experience, these students and professionals may be substantially limited in demonstrating their "true" professional knowledge and skills when faced with lengthy, complex exam questions on classroom or national professional exams, unless they receive extra test-taking time accommodations. Despite their need for exam accommodations, these same students earn comparable faculty evaluations to their peers in practice settings in regard to their professional knowledge and skills.

Currently, I am an Associate Professor of Clinical Psychiatry at Louisiana State University Health Sciences Center, School of Medicine at New Orleans. I teach medical students, residents, fellows, and other health professionals as well as conduct neuropsychological and psychological research, including research in ADHD. I am Director of Neuropsychology for the LSUHSC Epilepsy Center of Excellence. My recent teaching duties have included teaching functional neuroanatomy classes to senior adult psychiatry residents, the neurobiology of ADHD to adult psychiatry residents, and serving as Director of the Pediatric Neuroscience Seminar for child psychiatry fellows at the LSUHSC School of Medicine. I also teach classes on functional neuroanatomy, neurodevelopment, ADHD, learning disorders, language disorders, autistic spectrum disorders, epilepsy, traumatic brain injury, Tourette's Syndrome, obsessive-compulsive disorders, and other disorders. Additionally, I am a faculty member in the Division of Law and Psychiatry, in which I teach adult psychiatry residents.

Previously, I was an Assistant Professor and Director of the Adolescent Trauma Recovery Program at the University of Maryland School of Medicine in Baltimore, MD. I have also served as Neuropsychology and Psychology Coordinator at Children's Hospital in New Orleans. Please see my attached vitae (including my recent testimony in federal cases) or contact me for any further details about my professional qualifications.

## IV. LEGAL, HISTORICAL, SCIENTIFIC, AND CLINICAL QUESTIONS ABOUT THE NBME EVALUATION REQUIREMENTS:

### Section 1. Questions about Disability Laws and DSM-IV Mental Disorders

In this section, disability definitions and concepts are reviewed, as well as DSM-IV Mental Disorders concepts and criteria.

- *Disability Laws and Disability Definitions*

The Rehabilitation Act of 1973 (PL 93-112), as amended in 1978, is believed to be the first civil rights law for the disabled, extending the Civil Rights Act of 1964. The Rehabilitation Act, as initially written, included requirements for reasonable accommodations for physical or mental limitations of disabled persons, including the "appropriate adjustment and modification of examinations." The Americans with Disabilities Act of 1990 (PL 101-336) extended these civil rights protections to the private sector, adopting aspects of prior disability law and its civil rights protections, to cover public accommodations provided by private companies, such as examinations.

As listed in Table 1, these laws define disability as **a physical or mental impairment that substantially limits one or more major life activities**. Disabilities may include persons who have "a record of such impairment, or persons who are "regarded as having such an impairment." A major life activity includes, but is not limited to, caring for one's self, walking, seeing, hearing, speaking, breathing, working, performing manual tasks, and learning.

Under Title I of the ADA, "a qualified individual with a disability is defined as a person who is qualified to perform a job with or without reasonable accommodations." Under Title III of the ADA, "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodations by any person who own leases (or leases to), or operates a place of public accommodation."

"Reasonable accommodations" are required to eliminate discriminatory social or other kinds of barriers for the disabled. "Reasonable" is defined by "undue hardship" and/or "readily available" factors in the context of employment (Title I) and/or public accommodations (Title III). In this context, the NBME, the private company that produces and administers the STEP exams, has apparently conceded that "reasonable test-taking accommodations" (e.g., extra test-taking time or testing in a quiet distraction-free room) are "readily achievable" and can be provided without "undue hardship" for the NBME. Indeed, the NBME has published on its website a series of ever-changing disability evaluation and documentation requirements and instructions about how STEP exam applicants should request test-taking accommodations. However, most NBME requirements lack any objectively or operationally defined criteria meeting either for disability or test-taking accommodations, although the DSM-IV ADHD criteria are frequently referenced.

It is important to state that this evaluator is not aware that the NBME has published any conclusive scientific evidence that providing reasonable accommodations "fundamentally" or "substantially" alters the value or meaning of the STEP exams. If, as can only be assumed, the NBME actually does already provide reasonable test-taking

accommodations to qualified individuals with eligible disabilities, then Dr. Krolik's case may simply question whether or not the NBME's evaluation and test-taking accommodation eligibility requirements are 1) "reasonable," in the context of relevant historical, legal, scientific, and clinical practice standards, and 2) have been adequately met in Dr. Krolik's case.

Of course, the more fundamental scientific and legal question related to professional certification examinations such as the STEP is whether the NBME has published conclusive scientific evidence that the STEP exams and their cut-off (passing) scores can reliably and validly differentiate "competent" from "incompetent" physicians (e.g., Hafferty & Gibson 2003) without discriminating against qualified individuals with disabilities.

- *DSM-IV Diagnostic Concepts, Criteria, and Disability Definitions*

It is essential to have some understanding of the *Diagnostic and Statistical Manual-IV*, (American Psychiatric Association, 1994), to which the NBME frequently refers in their disability evaluation guidelines. The DSM-IV, an official publication of the American Psychiatric Association, represents one of a series of ever-changing manuals of the clinical classification of mental disorders.

1. Although ADHD and many other mental disorders are believed to represent neurobiological disorders, DSM-IV does not distinguish between mental disorders and general medical conditions or disorders, because:

> "It should be recognized that these [mental disorder and general medical condition] are merely terms of convenience and should not be taken to imply that there is any fundamental distinction between mental disorders and general medical conditions, that mental disorders are unrelated to physical or biological factors or processes, or that general medical conditions are unrelated to behavioral or psychosocial factors or processes." (page xxv)

2. DSM-IV specifically requires the presence of distressing or disabling symptoms and impairments in order to differentiate mental disorders from normal developmental or daily fluctuations in behaviors, emotions, or thinking skills.

> "In DSM-IV, **each of the mental disorders is conceptualized as a clinically significant behavioral or psychological syndrome or pattern that occurs in an individual and that is associated with present distress (e.g., a painful symptom) or disability (i.e., impairment in one or more important areas of functioning) or with a significantly increased risk of suffering death, pain, disability, or an important loss of freedom** [emphasis added]. In addition, this syndrome or pattern must not be merely an expectable and culturally sanctioned response to a particular event, for example, the death of a loved one. Whatever its original cause, it must currently be considered a manifestation of a behavioral, psychological, or biological dysfunction in the individual. Neither deviant behavior (e.g., political, religious, or sexual) nor conflicts that are primarily between the individual and society are mental disorders unless the deviance or conflict is a symptom of a dysfunction in the individual, as described above." (pages xxi-xxii)

3.  It is important to emphasize that DSM-IV explicitly states that the symptoms of mental disorders must cause distress or impairment in social, occupational, or other important areas of functioning. Thus,

> "The definition of *mental disorder* [italics in original] in the introduction to DSM-IV requires that there be clinically significant impairment or distress. To highlight the importance of considering this issue, the criteria sets for most disorders include a clinical significance criterion (usually worded "... causes clinically significant distress or impairment in social, occupational, or other important areas of functioning"). **This criterion helps establish the threshold for the diagnosis of a disorder in those situations in which the symptomatic presentation by itself (particularly in its milder forms) in not inherently pathological and may be encountered in individuals for whom a diagnosis of "mental disorder" would be inappropriate** [emphasis added]." (page 7)

4.  DSM-IV does not require or recommend specific tests or methods of measurement, but does explicitly acknowledge the essential role of the clinical judgment of qualified professionals in the diagnosis and evaluation of the severity and impact of symptoms and impairments associated with mental disorders, as discussed in a section entitled **Use of Clinical Judgment:**

> **"DSM-IV is a classification of mental disorders that was developed for use in clinical, educational, and research settings. The diagnostic categories, criteria, and textual descriptions are meant to be employed by individuals with appropriate clinical training and experience in diagnosis. It is important that DSM-IV not be applied mechanically by untrained individuals. The specific diagnostic criteria included in DSM-IV are meant to serve as guidelines to be informed by clinical judgment and are not meant to be used in a cookbook fashion** [emphasis added]." (page xxiii)

5.  DSM-IV provides a complex multi-faceted model of clinical evaluation based on:

> "(a) "multiaxial" assessment system, [which] involves an assessment on several axes, each of which refers to a different domain of information that may help the clinician plan treatment and predict outcome. There are five axes included in the DSM-IV multiaxial classification:
>
> | | |
> |---|---|
> | Axis I | Clinical Disorders |
> | | Other Conditions That May Be a Focus of Clinical Attention |
> | Axis II | Personality Disorders |
> | | Mental Retardation |
> | Axis III | General Medical Conditions |
> | Axis IV | Psychosocial and Environmental Problems |
> | Axis V | Global Assessment of Functioning |
>
> **The use of the multiaxial system facilitates comprehensive and systematic evaluation with attention to the various mental disorders and general medical conditions, psychosocial and environmental problems, and level of functioning that might be overlooked if the focus were on assessing a single presenting problem** [emphasis added]. A multiaxial system provides a convenient format for organizing and communicating clinical information, for

capturing the complexity of clinical situations, and for describing the heterogeneity of individuals presenting with the same diagnosis." (page 25)

ADHD and Reading Disorders are included under Axis I in the DSM-IV. Personality Disorders, such as Antisocial Personality Disorder, are included under Axis II. Medical disorders or conditions, such as Traumatic Brain Injury, Spina Bifida, or Leukemia are included under Axis III. Environmental stressors are represented on Axis IV. Axis V, the Global Assessment of Functioning, is discussed directly below.

6.   DSM-IV instructs qualified professionals to use clinical judgment in evaluating each individual's overall functioning across multiple areas of functioning and multiple settings. Thus, DSM-IV states that:

> Axis V is for reporting the clinician's judgment of the individual's overall level of functioning. ... The reporting of overall functioning on Axis V is done using the Global Assessment of Functioning (GAF) Scale. ... **The GAF Scale is to be rated with respect only to psychological, social, and occupational functioning. ... The GAF Scale is reported ... [as a] rating from 1 to 100** [emphasis added]." (page 30)*
>
> *Author's Note: On the GAF, 100 represents the highest functional level (i.e., the absence of any functional impairment) and 1 represents the lowest functional level (i.e., the presence of total functional impairment).

Qualified professionals are instructed to rate an individual's overall functioning across multiple settings and different areas and different levels of functioning on Axis V.

- *Comparability between Federal Disability Law and the DSM-IV*

There is some comparability regarding disability concepts as defined in federal disability laws and DSM-IV (APA, 1994), the official classification manual of mental disorders to which the NBME evaluation guidelines so often refers. However, It is very important to note several important distinctions between federal disability laws and DSM-IV, such as:

1.   Disability laws do not provide a list of diagnoses that are eligible disabilities. However, DSM-IV does require that the symptoms of mental disorders cause age-inappropriate disability or distress arising from mental disorders to differentiate symptoms from normal or developmentally expected behaviors, emotions, or cognitive skills.

The clinical relevance of an individual experiencing greater "disability" than self-perceived "distress" is evident in Dr. Krolik's case, as he was not as aware of his own ADHD symptoms as would be expected. Nevertheless, he has been disabled by his clinically significant ADHD impairments, as was clinically observed during his prior psychiatric evaluations and my current evaluation, as well as reported by his spouse of nine years (who at the time of my evaluation was a licensed physician and general psychiatry resident). Indeed, his spouse also provided third-party reports of Dr. Krolik's clinically significant past chronic and current ADHD impairments in social and school settings on widely used standardized adult ADHD diagnostic rating scales (see Table 5 on page 25).

2.     Disability laws require substantial limitations in at least one "major life activity," a term that is not explicitly addressed by the DSM-IV manual, but that appears to be comparable to areas of psychological, social, and occupational (academic) functioning, as assessed using clinical judgment on Axis V and some other standardized measures.

3.     Disability concepts, such as "substantial" or "limitations," have not been explicitly translated into "mild," moderate," or "severe" levels of clinical significance of symptoms or impairments of mental disorders, such as ADHD. However, the diagnosis of mental disorders does require that symptoms and impairments are distressing or disabling in order to differentiate symptoms and impairments of mental disorders from normal fluctuations in behaviors, emotions, or thinking skills, as mentioned.

4.     Disability laws do not explicitly require childhood onset of disability or documentation of childhood onset of disabilities, except when legally relevant, such as in cases of individuals who have records of past impairment, but have no current impairments or disabilities. However, it is well known that ADHD and other learning disorders are often chronic, lifelong mental disorders for many affected individuals that vary in severity according to the nature and complexity of social, learning, and work demands.

5.     Disability laws do not require or recommend specific tests or methods of measurement in the determination of different kinds and severities of substantial limitations of major life activities. Federal court rulings have not been consistent, as "substantial limitations" have been interpreted in very different ways, according to whether an individual is limited in at least one major life activity in comparison to:
- an average person,
- an average "comparable" peer, or
- an individual's other, presumably stronger mental aptitude such as measured intelligence.

Some DSM-IV mental disorders, such as Reading Disorder, require "clinically significant" reading impairment that is discrepant from an individual's estimated general aptitude as represented by comparison to the expectations based on an individual's chronological age, measured intelligence, educational achievement, and/or "developmental level." Clinically significant ADHD diagnostic symptoms or impairments must be discrepant in comparison to expectations based on an individual's "developmental level." This diagnostic criterion exists to avoid over-diagnosing ADHD in children with mental retardation, for example, whose inattentive and overactive behaviors are consistent with expectations based on developmental "age" but not chronological "age."

Thus, disability is typically evaluated with regard to each individual's functional status in comparison to different standards, as variously defined by disability laws, court rulings, and/or official DSM-IV diagnostic criteria.

6.     Disability laws and NBME guidelines do not require specific tests or methods of measurement of various areas of functioning. However, it is important to note that DSM-IV explicitly justifies the use of clinical judgment by qualified professionals in the evaluation of an individual's overall level of psychological, social, or occupational functioning. Note that this is an assessment of an individual's overall level of functioning

across multiple areas of functioning and across multiple settings. Unfortunately, there is no explicit professional consensus about the translation of Global Assessment of Functioning ratings into legal concepts such as "substantial limitations." Nevertheless, the diagnosis of ADHD and other mental disorders using DSM-IV does require that symptoms cause clinically significant **"distress or disability in social, occupational, or other important areas of functioning** [emphasis added]" (page 7; DSM-IV, APA 1994).

Indeed, occupational or academic areas of functioning appear to be generally comparable to the major life activities of work, learning, and communicating (i.e., speaking, listening, reading, writing, etc.), as referenced in disability laws. In DSM-IV, ADHD diagnostic criteria require **"some"** impairment in two or more settings, as well as require clinically significant impairment in social, academic, **or** work functioning [emphasis added]" (page 7).

7. Disability laws aspire to protect the civil rights of qualified individuals with disabilities by eliminating discriminatory social or other kinds of barriers through reasonable accommodations at work or in public places or services. DSM-IV was not conceived to protect the civil rights of individuals with mental disabilities. Therefore, DSM-IV does not specifically define or discuss many legal concepts or definitions, such as "qualified individuals with disabilities" or "reasonable accommodations."

Regarding Title III, it is interesting to recognize that individuals with physical disabilities are not subjected to the extensive intrusions into their private lives personal health, mental health, educational, and family lives, yet they routinely receive reasonable accommodations, such as wheelchair ramps, spacious and adapted restroom facilities. By contrast, individuals with mental disabilities, such as Dr. Krolik, are subjected to extensive intrusions into their private personal lives, yet are not eligible for common test-taking accommodations. This qualified professional is at a loss to explain such unequal differences in treatment.

The opinion of this evaluator is that Dr. Krolik meets DSM-IV diagnostic criteria for ADHD, meets various definitions of disability, and, therefore, meets eligibility criteria for receiving reasonable test-taking qualifications.

In the following sections, this evaluator will discuss, document, and argue that the NBME disability evaluation and accommodation eligibility requirements are "unreasonable" and are presented as "received scientific fact," without appropriate acknowledgment of the well-known current lack of conclusive scientific evidence and consensus about the reliability and validity of the DSM-IV ADHD diagnostic criteria for the diagnosis and evaluation of ADHD in adults, such as Dr. Krolik.

**Table 1. Disability Laws Compared to DSM-IV.**

| Federal Disability Laws | DSM-IV (APA 1994) |
|---|---|
| **Disability Definition:** | **Disability Definition:** |
| • a physical or mental impairments that <u>substantially limits one or more of the major life activities</u> | • not specifically defined or cited, but…<br>• Mental Disorder is defined as "a clinically significant behavioral or psychological syndrome or pattern that occurs in an individual and that is associated with present distress (e.g., a painful symptom) or disability (i.e., *impairment in one or more important areas of functioning*) or with a significantly increased risk of suffering death, pain, disability, or an important loss of freedom." (page 7) |
| • a record of such impairment (but not now impaired), or | • not specifically defined or cited |
| • being regarded as having such an impairment (but not impaired) | • not specifically defined or cited |
| **Major Life Activity Definition:** | **Major Life Activity Definition:** |
| defined as including, but not limited to: caring for oneself, walking, seeing, hearing, speaking, learning, breathing, working, and performing manual tasks | • not specifically defined or cited, but …<br>• Axis V is based on by clinician's judgment of the individual's overall level of …psychological, social, and occupational functioning [i.e., excludes physical functioning] (page 30) |
| **"Substantially Limits" Definition:** | **"Substantially Limits" Definition:** |
| • <u>impairment is substantially limiting, based on its effect on that individual's life activities</u> | • not specifically defined or cited, but …<br>• DSM-IV requires "<u>clinically significant distress or impairment in social, occupational, or other important areas of functioning</u>." (page 7) |
| **Otherwise Qualified Definition:** | **Otherwise Qualified Definition:** |
| • defined in context of employment as a person must be "qualified to perform job with or without reasonable accommodations" | • not specifically defined or cited |
| **Reasonable Accommodations Definition:** | **Reasonable Accommodations Definition:** |
| • defined using "<u>undue hardship</u>" or "<u>readily achievable</u>" standards in context of "employment" or "public accommodations" | • not specifically defined or cited |

## Section 2.  Questions about Chronology of ADHD Diagnoses, Disability Laws, and Dr. Krolik's Life Events

*a. Chronology of ADHD Diagnosis and Dr. Krolik's Life Events*

The NBME required Dr. Krolik to provide "objective historical documentation of substantial limitation of learning…" and "…objective records validating your history of impairment." (see Mr. Doane's letter to Dr. Krolik dated 11-10-03 in Section 5).

In my initial and revised evaluation reports and letters to the NBME, I attempted to comply with all published as well as unpublished NBME requirements, as noted in Section 6, starting on page 56. I also clearly expressed my objections to the NBME policy that naively required "adequate documentation" of impairments or limitations symptoms from Dr. Krolik, who was born in 1944 and started first grade in 1950, almost two decades before the American Psychiatric Association first introduced the precursor diagnosis to ADHD (called "Hyperkinetic Reaction of Childhood (or Adolescence)") in DSM-II in 1968. Obviously, as I discuss below, Dr. Krolik was educated before the dissemination of professional and parental knowledge about ADHD and other learning disorders as well as decades before the availability of special educational, psychological, and medical diagnostic and treatment services were available.

As is evident in Table 2 (see next page), the first official manual of mental disorders, DSM-I (APA, 1952), did not include any precursor diagnosis to ADHD. When DSM-I was published, Dr. Krolik was in second grade. The APA officially introduced the first precursor diagnosis to ADHD, "Hyperkinetic Reaction of Childhood (or Adolescence)," in DSM-II (1968). Dr. Krolik was a 25-year-old adult when he graduated from undergraduate pharmacy school, one year after the introduction of this precursor diagnosis to ADHD. Of course, as a 25-year-old adult, Dr. Krolik was already "too old" in 1968 or 1969 to meet criteria for this precursor diagnosis to ADHD.

It is noteworthy that Dr. Krolik graduated from pharmacy school 11 years before the introduction of the official diagnosis of "Attention Deficit Disorder (with or without Hyperactivity)" was published in 1980 (*DSM-III*); 18 years before the introduction of the diagnosis of "Attention-Deficit/Hyperactivity Disorder" published in 1987 (*DSM-III-R*); and 25 years before the introduction of the diagnosis "ADHD" with several subtypes in 1994 (*DSM-IV*); and 31 years before the introduction of the most recent *DSM-IV-Text Revision*, published in 2000.

*b. Chronology of Disability Laws and Dr. Krolik's Life Events*

As is also evident in Table 2, Dr. Krolik completed his elementary and secondary education in Winnipeg, Manitoba (Canada). He subsequently moved to the United States, served in the US military, earning a Purple Heart, and then graduated from undergraduate pharmacy school at the University of New Mexico in 1969, 4 years before the passage of Section 504 of the Rehabilitation Act of 1973; 6 years before passage of the Education of All Handicapped Children in 1975 (PL 94-142), which did not include ADHD as a covered exceptionality; 21 years before the passage of the Americans with Disabilities Act and the Individuals with Disabilities Education Act (IDEA) in 1990; and 22 years before the Secretary of the US Department of Education stated in 1991 that ADHD should be considered as an exceptionality under Other Health Impaired in IDEA.

**Table 2. Chronology of ADHD Diagnoses, Disability Laws, and Dr. Krolik's Life Events**

| Year | Chronology of ADHD as Diagnosis and of Disability Laws | Dr. Krolik's Life Events |
|---|---|---|
| 1944 | | Year of birth in Winnipeg, Manitoba |
| 1950 | | Year started first grade at the age of 6 |
| 1952 | DSM-I published; no precursor diagnosis to ADHD included | |
| 1962-1964 | | U.S. military service |
| 1965-1969 | | Attended undergraduate pharmacy school |
| 1968 | DSM-II published, introduction of precursor diagnosis to ADHD diagnosis, "Hyperkinetic Reaction of Childhood (or Adolescence)" | |
| 1969 | | Year graduated from undergraduate pharmacy school as a 25-year-old adult, who was ineligible to be diagnosed with a childhood or adolescent mental disorder |
| 1973 | Rehabilitation Act of 1973, Section 504 (PL 93-112)—Defined "disability" and mandated reasonable accommodations for qualified persons with eligible disabilities | |
| 1975 | Education of All Handicapped Children Act of 1975 (PL 94-172)—mandated special education for children with eligible disabilities | |
| 1980 | DSM-III published, includes ADD subtypes either with or without hyperactivity | |
| 1987 | DSM-III-R published, includes ADHD (inattentive subtype eliminated) | |
| 1990/1997 | Individuals with Disabilities Education Act (PL101-476--reauthorization of the 1975 special education law, as amended by PL105-17), IDEA Improvement Act (PL108-446) passed in 2004; no regulations published yet); ADHD is not mentioned as a covered exceptionality | |
| 1990 | Americans with Disabilities Act of 1990 (PL 101-336)—provided legal protection to qualified persons with eligible disabilities | |
| 1991 | US Department of Education (Office of Special Education) rules that ADHD should be covered under IDEA as part of the "Other Health Impaired" exceptionality | |
| 1994 | DSM-IV published, includes ADHD, with several subtypes | |
| 1996 | | Year graduated from medical school, after successfully completing all requirements |

c. Specific Objections

My specific objections are as follows:

1.  The NBME documentation requirements presume that mental health, medical, and educational professionals in the 1950's would have been able to reliably and validly observe, diagnose, and treat, as well as document the onset and course of childhood ADHD symptoms and functional impairments, prior to the introduction in 1968 of the first official precursor diagnosis to ADHD. Of course, there were no reliable and valid tests or methods of measurement of either the nonexistent precursor diagnosis to ADHD or the nonexistent diagnosis of ADHD at that time.

   Since Dr. Krolik's parents are deceased and thus could not complete standardized retrospective rating scales of Dr. Krolik's childhood behavior and learning, Dr. Krolik provided the only available objective documentation about his childhood behavior and academic performance: namely, his teachers' comments on his elementary and secondary school report cards, as will be discussed later. Ideally, his parents' reports would have been better measures of his childhood ADHD symptoms and impairments than his report cards. However, as will be evident in Table 6 in Section 4, Dr. Krolik's elementary school teachers' comments referred to his inconsistent academic functioning consistent with "some" typical and plausible childhood ADHD classroom learning impairments at school.

2.  The NBME requires that Dr. Krolik provide objective documentation about his adult ADHD symptoms and functional impairments from his undergraduate college and pharmacy school professors. His professors, however, would not and could not have documented Dr. Krolik's mental status, as they: 1) do not routinely evaluate student classroom behavior and learning abilities when grading students (unlike elementary school), and 2) are not qualified mental health or educational professionals specifically trained to reliably and validly observe, identify, diagnose, and document diagnostic symptoms and functional impairments related to the childhood precursor diagnosis to ADHD. Of course, this latter diagnosis was not applicable to adults when it was introduced, based on scientific understanding at that time. Of course, there were also no reliable and valid tests or methods of measurement of the precursor diagnosis to ADHD nor the current diagnosis of ADHD during the Dr. Krolik's childhood. As will be evident in Table 6 in Section 4 (page 36), the third party reports of Dr. Krolik's college study partner, Mr. Jack Sona, are consistent with "some" typical and plausible adult ADHD learning impairments at college.

3.  The terms "impairment" and "substantial limitation" as used by the NBME are recent technical legal concepts defined in recent federal disability rights laws and court rulings, and did not have meaning beyond standard dictionary definitions prior to passage of these laws. The NBME presumes that mental health, medical, and educational professionals in the 1950s could have known about and documented legal distinctions that did not even exist until the passage of federal disability rights laws in the 1970s and 1990s.

4.  It is heartening that Mr. Doane and the NBME conceded in the letter to Dr. Krolik, dated November 10, 2003, that the requested "objective and historical documentation" of his "childhood development" may be "impossible" to obtain (See Mr. Doane's letter dated November 10, 2003 in Section 5, starting on page 48).

However, this evaluator would ask Mr. Doane, NBME staff, and unnamed ADHD experts (to whom Mr. Doane refers in his letter dated 2-3-03, shown in Section 6, page 55) to please describe or explain the "possible" evidence-based mechanism by which mental health, medical, and educational professionals or parents in the 1950s and 1960s could have validly identified, diagnosed, treated, accommodated, as well as appropriately documented mental health evaluations, educational diagnostic evaluations, and instructional accommodations or services that did not exist throughout Dr. Krolik's childhood and early adult education.

It is important to remind readers that even Dr. Krolik's undergraduate pharmacy school professors in the 1960s could not have been any more knowledgeable than were Dr. Krolik's elementary and secondary school teachers to reliably and validly observe ADHD diagnostic criteria, or to diagnose or accommodate ADHD impairments at that time. Indeed, most college professors in 2005 are not any more knowledgeable or qualified to reliably and validly identify or diagnose ADHD or other learning disabilities. These functions continue to be performed by qualified professionals.

Finally, the scientific reliability and validity of evaluating any individual's medical, mental health, and educational history based on available medical, mental health, and educational records is not known. Given the profound advances in disability laws, special education, and mental health during Dr. Krolik's life, there is even less known, if that is possible, about the reliability and validity of using whatever medical, mental health, and educational records of any specific individual adult to determine his or her childhood medical, mental health, and educational conditions or disorders.

Nevertheless, this evaluator reviewed Dr. Krolik's available, third-party documentation and found "some" plausible clinical indicators of ADHD learning impairments in elementary school and college. As will be discussed, this evaluator obtained third-party reports from his spouse of significant ADHD impairments as well.

This evaluator explicitly acknowledges the well-known and inevitable limitations of current scientific knowledge and the lack of professional consensus about the best measurement methods or specific tests in the diagnosis of adult ADHD. And, as will be also discussed, the NBME evaluation requirements exceed scientific research and clinical practice standards.