**#3 d v.** relevant psychosocial history and interventions

**Response**. Dr. Krolik's parents died prior to my evaluation and thus could not be interviewed to complete a comprehensive evaluation of Dr. Krolik's childhood psychosocial history. Thus, Dr. Krolik's relevant psychosocial history was assessed and reported as best as possible.

The NBME did not note any deficiency in this evaluator's psychosocial history.

**#3 d vi.** academic history

**Response:** Dr. Krolik's parents died prior to my evaluation and thus could not be interviewed to complete a comprehensive evaluation of Dr. Krolik's childhood academic history. However, Dr. Krolik's elementary school teachers' comments on his report cards were consistent with "some" childhood ADHD diagnostic criteria. See Table 5.

The NBME did not note any deficiency in this evaluator's academic history.

**#3 d vii.** review of psychoeducational test reports to determine if a pattern of strengths and weaknesses is supportive of attention or learning problems

**Response:** This evaluator reviewed all available past psychoeducational test reports and raw test data in Dr. Krolik's medical and educational records. Drs. Wurzlow and Hoblit did not appear to comply with NBME evaluation requirements, but did provide interesting clinical information that this evaluator discussed in reports or letters.

The NBME did not note any deficiency in this evaluator's review of prior evaluation test reports, and I revised my report on 12-19-03 to comply with requests regarding test standard scores regarding reporting standard scores.

**#3 d viii.** evidence of impairment in several life settings (home, school, work, etc.) that significantly restricts one or more major life activity

**Response:** Prior to, during, and after my evaluation, Dr. Krolik was impaired or had a history of impairment in three settings: namely, the clinical setting, school setting, and home/social setting.

Furthermore, all third-party sources reported "some" possible or probable past clinically significant symptoms and impairments across elementary, undergraduate pharmacy school (see teacher comments, college study partner's comments), as well as definite chronic and pervasive ADHD symptoms and impairments in social settings (see rating scale results of his spouse, and clinical setting based on clinical observations of both Dr. Wurzlow and the current evaluator). Thus, Dr. Krolik's attentional and organizational-related impairments were definitely disrupting his learning and home/social major life activities prior to, during, and after my evaluation.

The NBME did not acknowledge this evaluator's discussion of third party reports (interviews and standardized ADHD diagnostic rating scales) regarding Dr. Krolik's impairments.

**#3 d ix**. relevant employment history

**Response:** Dr. Krolik's relevant employment history was reported by Dr. Wurzlow and this evaluator. Dr. Krolik and this evaluator considered obtaining employer or supervisor evaluations of his work functioning, but this would have required a clinically unnecessary and unwarranted disclosure of Dr. Krolik's personal health information. Furthermore, this information and personal health-related information is not necessarily required under disability laws, DSM-IV criteria, or NBME requirements. We considered this to be unnecessary as Dr. Krolik's evaluation results documented "some" functional impairments in the clinical/testing, social/home, and school settings based on the clinical judgment of this evaluator using all available clinical information.

The NBME did not acknowledge this evaluator's discussion of Dr. Krolik's functional impairments in clinical, home, and school settings.

**#3 d x.** description of current functional limitations relative to educational settings and to USMLE that are presumably direct result of problems with attention

**Response:** This evaluator documented various clinically significant or substantially limited learning impairments due to inattention or mental organizational or inhibitory related impairments. Dr. Krolik has a history of an inability to complete STEP exams and to consistently sustain his concentration, attention, and comprehension during lengthy exams. His difficulties were noted in other settings as mentioned.

The NBME did not acknowledge this evaluator's s\description of Dr. Krolik's functional limitations in school–related settings or in learning in general, but Mr. Doane and the NBME did acknowledge that ADHD is a developmental disability.

**#3 d xi.** Discussion of differential diagnosis, including alternative or co-existing disorders that may confound the diagnosis of ADHD

**Response:** Dr. Krolik was previously diagnosed with and treated for ADHD by a Board Certified Psychiatrist, Dr. Gayle Wurzlow, in 1998. This evaluator confirmed the diagnosis of ADHD and noted other disorders after considering other possible differential and alternative diagnoses, as discussed in my evaluation reports and letters.

While this evaluator and Dr. Wurzlow disagree with Mr. Doane, NBME staff, and unnamed ADHD experts about whether Dr. Krolik has ADHD and/or has disabling impairments, the NBME did not make written note of any deficiencies in the format of this evaluator's discussion of differential diagnoses.

**Requirement #4**: Relevant Assessment Batteries

**#4 a.** IQ tests

**Response:** Dr. Krolik completed WAIS-III IQ testing in 1998 with Dr. Hoblit, with IQ results ruling out inadequate intelligence as an explanation for Dr. Krolik's impaired learning. Therefore, there was no clinical justification for IQ retesting, given the stability of such IQ results. Furthermore, IQ retesting was not requested by Mr.

Doane in either his letter dated 11-10-01 or during this evaluator's phone conversation with Mr. Doane on 12-19-03.

The NBME did not note any unresolved deficiency in this evaluator's use of previously administered IQ test results to rule out inadequate intelligence as an explanation for Dr. Krolik's impaired learning. Dr. Krolik's Full Scale IQ standard score (113; mean = 100 ± 5 [sd]) was about two standard deviations higher than his NDST Reading Comprehension stanine score (3; mean = 5 ± 2 [sd]). Consistent with some court rulings as well as with DSM-IV diagnostic criteria for Reading Disorder, Dr. Krolik meets the criteria for Reading Disorder. However, due to the changing and unpublished requirements of the NBME regarding the reporting of NDRT scores, this evaluator had to drop Reading Disorder as one basis for Dr. Krolik's eligibility for an ADA disability and reasonable accommodations.

**#4 b.** Memory tests

**Response:** Dr. Krolik was administered and completed several frequently used standardized, norm-referenced measures of learning and memory to assess whether he had any objective learning or memory impairments.

The NBME did not make written note of any deficiency in this evaluator's learning and memory tests, results, or conclusions. However, it is unknown why the NBME ignored this evaluator's test results as evidence of Dr. Krolik's learning disability as he performed significantly below average as compared to his peers in the general population on standardized learning and memory tests.

**#4 c.** Attention tests

**Response:** This evaluator discussed neuropsychological results regarding Dr. Krolik's attention and behaviors during the evaluation in prior reports. At this time, no test is considered to represent a "gold standard" in the diagnosis of ADHD.

The NBME did not note any unresolved deficiency in this evaluator's choice of attentional-related tests or results, although the NBME dismissed this evaluator's diagnostic conclusions.

**#4 d.** Assessment checklists or surveys

**Response:** Dr. Krolik and his spouse completed assessment checklists and mental health measures in both my evaluation and in prior evaluations.

The NBME did not make any written note any unresolved deficiency in this evaluator's choice of ADHD- and other diagnostic-specific and disability-related tests.

**Requirement #5:** Identification of DSM-IV Criteria

**#5 a.** Childhood ADHD symptoms and impairments;

**Response:** The presence of "some" plausible childhood ADHD inattention and hyperactivity/impulsivity symptoms and impairments were discussed, as evident in his elementary school records and third-party reports about his behavior at home by

his cousin, Mr. Gerald Krolik, in this evaluator's original and revised reports and letters.

The NBME acknowledged that objective historical documentation may be "impossible to obtain." However, the NBME did not subsequently make any written note of what explicit evidence would satisfy this requirement.

**# 5 b.** Current ADHD symptoms have been persistent or present for at least the past 6 months;

**Response:** Dr. Krolik's ADHD symptoms and impairments were "clinically significant" and were also reported to be present for more than the last 6 months, according to the third-party report of his spouse, a licensed physician and adult psychiatry resident at the time of my evaluation, who completed standardized, norm-referenced ADHD diagnostic rating scales. His spouse's T-scores (a type of standard score) on one norm-referenced ADHD diagnostic rating scale indicated substantial limitations that would be seen in less than 5-10% of his peers in the general population.

In 1998, clinically significant ADHD inattention and hyperactivity-inattention symptoms and impairments were also identified and used to diagnose Dr. Krolik with adult ADHD by Dr. Gayle Wurzlow, a Board Certified Psychiatrist.

The NBME did not subsequently make any written note of any deficiency in the standardized ADHD rating scales that this evaluator used.

**# 5 c.** Impairments from symptoms present in two or more settings (school, work, home);

**Response:** Dr. Krolik's ADHD symptoms and impairments were clinically significant and reported in family, social, and educational settings, according to the third-party reports of his spouse, a licensed physician and adult psychiatry resident at the time of my evaluation, who completed standardized adult ADHD diagnostic rating scales. Again, his spouse of 9 years reported substantial limitations in the major life activity of learning across social, clinical, and school settings that would be seen in less than 5-10% of adults in the general population.

The NBME did not make written note of any format deficiencies in this evaluator's clinical summary, but disagreed with this evaluator's diagnostic conclusion.

**Requirement #6**: Documentation must include a specific diagnosis;

**Response:** Using the DSM-IV multiaxial system, this evaluator documented Dr. Krolik's ADHD and other diagnoses on Axis I and II, and possible history of other medical disorders on Axis III, as well as environmental stressors on Axis IV, and overall functioning on Axis V, using the multiaxial (5 axis) system of DSM-IV, as well as other associated diagnostic disorders.

Dr. Krolik's prior medical records revealed that he had been previously diagnosed with, and received medication treatment for, adult ADHD in 1998 by Dr. Gayle Wurzlow, a Board Certified Psychiatrist.

The NBME did not make written note of any deficiencies in this evaluator's diagnostic documentation, except that the NBME disagreed with this evaluator's diagnostic conclusions.

**Requirement #7**: Clinical summary must be provided;

**Response:** My evaluation reports and letters regarding Dr. Krolik included my clinical summaries of his neuropsychological strengths and weaknesses as well as my differential diagnostic conclusions, disability eligibility conclusions, and recommended disability test-taking accommodation conclusions.

The NBME did not make written note of any deficiency in the format of this evaluator's clinical summaries, except for rejecting this evaluator's clinical conclusions regarding Dr. Krolik's diagnoses, disability status, and recommended accommodations.

**Requirement #8:** Each recommended accommodation must include a rationale;

**#8 a.** Describe impact of ADHD on specific major life activity

**Response:** This evaluator considered all available clinical information in the evaluation of the presence, chronicity, and pervasiveness of Dr. Krolik's symptoms and impairments of ADHD and other mental disorders as well as Dr. Krolik's eligibility as disabled and for reasonable test-taking accommodations.

The NBME disagreed with this evaluator's conclusions about his ADHD, ADA-related disability, eligibility for reasonable test-taking accommodations.

**#8 b.** Describe past accommodations or explain why no accommodations was used and why needed at this time.

**Response:** It would have been "impossible," to quote Mr. Doane and the NBME, for Dr. Krolik to provide "objective documentation" of either ADHD diagnostic criteria or related disability-related accommodations. Once again, both the precursor diagnosis to ADHD and disability laws did not exist during the time when Dr. Krolik was in elementary school through his undergraduate education (between 1950 and 1969). Dr. Krolik has had difficulty completing the STEP exams in the allotted time.

**#8 c.** Address the intensity and frequency of symptoms and whether these behaviors constitute an impairment in a major life activity.

**Response:** Using many of the same specific tests and evaluation methods that were recommended by the NBME, this evaluator used clinical judgment and evidence from all available records, clinical interviews, test observations, test results, as well as general scientific and clinical knowledge about mental disorders, to conclude that Dr. Krolik had clinically significant ADHD symptoms and impairments that were not consistent with normal behavior. Dr. Krolik was observed during testing to exhibit current clinically significant ADHD symptoms and impairments. His spouse of nine years also rated him on standardized adult ADHD diagnostic rating scales as exhibiting both chronic, pervasive, and current clinically significant ADHD symptoms and impairments across school and home and other social settings.

The NBME apparently ignored or did not acknowledge all documentation and clinical evidence from clinical records, interviews, test observations, test results, and third-party reports on either standardized ADHD rating scales (i.e., Dr. Krolik's spouse of 9 years) or in clinical interviews (i.e., with Dr. Krolik's older cousin and college study partner).

It is remarkable that under these case-specific circumstances that Mr. Doane, NBME staff, nor the unnamed ADHD experts ever directly evaluated Dr. Krolik, but determined that Dr. Krolik did not meet ADHD diagnostic criteria. Nevertheless, this evaluator used NBME-recommended tests or methods as well as other widely used, standardized diagnostic-specific or general mental health survey measures.

**Table 6.  NBME Requirements, DSM-IV ADHD Criteria, Research Criteria, and Dr. Butterbaugh's Reports**

| | NBME Requirements | DSM-IV Criteria | Research Criteria (varies) | Dr. Butterbaugh's Reports re: Dr. Ralph Krolik, with objections |
|---|---|---|---|---|
| 1. | Testing by qualified diagnostician | Presumed | Presumed | Documented in letters |
| 2. | Testing must be current | Presumed | Presumed | Documented in reports, but see IQ testing comments below, with objections |
| 3. | **Evidence verifying childhood ADHD symptoms and impairments that:** | "Some" impairment by 7 years old | No scientific consensus about age of onset (AOC) | Documented in reports and records, with objections |
| a. | Began in childhood based on: school transcripts, report cards, teacher comments, tutoring evaluations, job assessments, and the like | Not required | Not required | Documented in reports and records, with objections |
| b. | Have been chronic and pervasive | Not required, Persistent symptoms for 6 months | Not required, persistent symptoms for 6 months | Documented in reports and records, with objections |
| c. | … and impair functioning in two or more settings | Not required | Not required | Documented in reports, with objections |
| d. | consist of more than patient self-report … such as third party sources | Not required | Not required | Documented in reports and records, with objections |

| | NBME Requirements | DSM-IV Criteria | Research Criteria | Dr. Butterbaugh's Reports re: Dr. Ralph Krolik, with objections |
|---|---|---|---|---|
| e. | Should include: | | | |
| i. | Ongoing ADHD behavior that significantly has impaired function | Presumed | Presumed | Documented in reports and records |
| ii. | developmental history | Presumed | Presumed | Documented in reports, with objections |
| iii. | Family history of ADHD and other difficulties deemed relevant | Not required | Not required | Documented parents' deaths, precluding verifiable history of family medical history, with objections |
| iv. | Relevant medical or medication history | Presumed | Presumed | Documented in reports, with objections |
| v. | Relevant psychosocial history and interventions | Presumed | Presumed | Documented relevant history, with objections |
| vi. | Academic history | Presumed | Presumed | Documented in reports, with objections |
| vii. | Review of psycho-educational test reports to determine if a pattern is supportive of learning problems | Presumed | Presumed | Documented in reports, with objections |
| viii. | Evidence of impairment in several life settings (home, school, work, etc.) and significantly impairs one or more major life activity | Presumed | Presumed | Documented in reports and records, with objections |
| ix. | Relevant employment history | Presumed | Presumed | Documented in reports, with objections |

| | NBME Disability Evaluation Requirements | DSM-IV Criteria | Research Criteria | Dr. Butterbaugh's Reports re: Dr. Ralph Krolik, with objections |
|---|---|---|---|---|
| x. | Description of current functional limitations relative to educational setting and to USMLE that are presumably direct result of problems with attention | Not applicable | Not applicable | Documented in reports |
| xi. | Discussion of differential or alternative diagnosis | Presumed | Presumed | Documented in reports |
| 4. | **Relevant Assessment Batteries** | | | |
| a. | IQ tests | Not required | Not required | Documented in reports, with objections and qualifications |
| b. | Memory tests | Not required | Not required | Documented in reports |
| c. | Attention tests | Not required | Not required | Documented in reports |
| d. | Diagnostic checklists and general mental health tests | Not required | Not required | Documented in reports, with objections |
| e. | Standard scores for all normed measures | Not required | Not required | Documented in reports, with objections |

| | NBME Disability Evaluation Requirements | DSM-IV Criteria | Research Criteria | Dr. Butterbaugh's Reports re: Dr. Krolik, with objections |
|---|---|---|---|---|
| 5. | **Identification of DSM-IV Criteria** | | | |
| | Childhood ADHD symptoms and impairments | Presumed | Presumed | Documented in reports, with objections |
| | Current ADHD symptoms present for at least past 6 months | Presumed | Presumed | Documented in reports |
| | Impairments from symptoms in 2 or more settings | Presumed | Presumed | Documented in reports |
| 6. | **Documentation of ADHD Diagnosis** | Presumed | Presumed | Documented in reports |
| 7. | **Documentation of Clinical Summary** | Not required | Not required | Documented in reports |
| 8. | **Rationale for Accommodations** | | | |
| a. | Per ADHD symptoms per current request for each accommodation | Not required | Not required | Documented in reports |
| b. | Documentation of past accommodations | Not required | Not required | Documented in reports/letters, with objections and update |
| c. | Documentation that symptoms do not reflect normal developmental behavior | Presumed | Presumed | Documented in reports |

comprehensive documentation. The Guidelines may be accessed on the National Board of Medical Examiners website at www.nbme.org. Click on "The United States Medical Licensing Examination (USMLE)," then choose "USMLE Accommodations for NBME Step I and Strep 2 Applicants."

We will place your request for accommodations on hold until we receive additional documentation. Please send this information to:

USMLE Disability Services
3750 Market Street
Philadelphia, PA 19104

You may fax your material to 215-590-9422 and please call 215-590-9869 to verify receipt.

If you do not plan to submit more information and would like your registration released, please fax a statement to that effect to 215-590-9422 and call 215-590-9869 to confirm receipt. If you have any other questions, please contact Disability Services at 215-590-9869.

Sincerely,
xx
J. Abram Doane, MA, JD
Manager, Disability Services
JAD/ay"


**NBME Citation #5i:** "In order for us to properly evaluate your request for accommodations, your documentation should include a current comprehensive psychoeducational battery..." and "A comprehensive evaluation should also assess *current achievement in academic skill areas* [emphasis in the original]."

**Response:** Mr. Doane subsequently withdrew his citation about the currency of my test results during our phone call on 12-19-03 after I reminded Mr. Doane that Dr. Krolik's test results were current, as both my original and revised evaluation reports were dated in within 3 years of the date of my evaluation of Dr. Krolik, consistent with NBME guidelines.

Dr. Krolik completed WAIS-III IQ testing in 1998 with Dr. Hoblit, with IQ results ruling out inadequate intelligence as an explanation for Dr. Krolik's impaired learning. Therefore, this evaluator argued with Mr. Doane that there was no clinical justification for IQ retesting, given the generally stable test-retest of IQ results. IQ retesting was not requested by Mr. Doane in either his letter dated 11-10-01 or our phone conversation on 12-19-03.

The NBME did not subsequently make any written note of any deficiency in either the "currency" or "comprehensiveness" of this evaluator's reports.

**NBME citation #5ii:** "…containing *age-based standard and/or scaled scores* [emphasis in the original] for all tests and subtests administered."

> **Response:** Please note my revisions and objections to Mr. Doane and the NBME in my revised report and letter dated 12-19-03.
>
> This evaluator includes a legend based on the quantitative deviation of all neuropsychological and psychoeducational test scores, regardless of the type of standardized test scores. Thus, the meaning of quantitative test scores corresponds to verbal strengths and weaknesses. In my revised report dated 12-19-03, I provided T-scores on the Conners Adult ADHD Rating Scale that indicated that Dr. Krolik's wife of 9 years reported Dr. Krolik's ADHD impairments exceeded all but 5 or 10% of his peers in the general population. This represents a substantial limitation, not a minor functional impairment, in learning in at least school and social/home settings, as reported by his wife, a licensed physician and general psychiatry resident at the time of his evaluation.
>
> The NBME recommends the use of the Nelson-Denny Reading Test (NDRT) in its evaluation guidelines that are published on the NBME webpage. The NDRT is one of the very few reading comprehension tests that yield norm-referenced standard scores for efficiency or automaticity of reading.
>
> However, please note that the tables recommended by the NDRT test authors (Brown et al 1993) contain "grade-based" (not "age-based") norm-referenced scores. I originally used the "grade-based" norm-referenced table to produce NDRT standard scores in my original evaluation report. Thus, when these "grade-based" norm-referenced standard scores were used to evaluate whether a discrepancy existed between Dr. Krolik's below average NDRT reading comprehension and those of his education-comparable (i.e., grade-based) peers or, alternatively, between his below average NDRT Reading Comprehension stanine score (3; mean = 5; standard deviation = 2) reading skills and his Full Scale IQ standard score which was nearly one standard deviation above average (FSIQ = 113). Such discrepancy-based definitions serve as the basis for the DSM-IV diagnostic criteria for a Reading Disorder.
>
> I objected to Mr. Doane that the NBME failed to publish the specific location of the relevant norm-reference table in the test materials, manual, or technical report to be used to produce the "age-based standard and/or scaled scores" that the NBME requested. To obtain information of the specific location of the table to be used in producing the "age-based standard and/or scaled scores," this evaluator had to obtain unpublished information about the appropriate norm-reference table by directly calling Mr. Doane at the NBME.
>
> **After calling Mr. Doane at the NBME, I was able to locate the NDRT normative table that he requested. However, Mr. Doane was in error as to where the table was actually located, because it was not in the NDRT *Directions for Administration* (or test manual), as Mr. Doane had stated; rather, this evaluator located the requested table in the separate NDRT *Technical Report*.**
>
> **Further, Mr. Doane was also in error as to what type of standard scores this normative table produces: it is based on pooled or combined "grade-based"**

**norm-referenced sample, so it cannot yield the age-based standard scores requested by Mr. Doane.**

The table from which the requested standard scores for the NDRT was neither provided on the NBME website for evaluation at the time of my 2001 evaluation nor was this information included in Mr. Doane's letter dated 11-10-03. This evaluator was very surprised that the location of this table is still not (as of June 2005) provided on their website, despite this evaluator's recommendation to Mr. Doane on 12-19-03 that the NBME include the location of this table for obtaining these specific NDRT standard scores on the NBME website.

When Dr. Krolik's scores were compared to the unpublished, but requested standard NDRT reading scores, he no longer met the DSM-IV diagnostic criteria for Reading Disorder. This evaluator can only wonder about how many other NBME letters of denial for test-taking accommodations have been sent to medical students whose evaluators have attempted to comply with NBME evaluation requirements without knowing where or how to obtain requested standard scores on this useful reading test.

Mr. Doane also requested that "age-based standard or scaled scores for all tests and **subtests** administered" be provided (page 1, emphasis added).

Please note that my revised report provided the requested IQ subtest scores (12-19-03, page 3) after I objected to Mr. Doane by phone on 12-19-03 about the requirement to report IQ subtest scores. On that date, I made objections by phone and in my revised written report that IQ subtest scores are neither necessary (see DSM-IV ADHD diagnostic criteria, shown in Table 2) nor valid measures of the diagnosis of ADHD (see page 297, Barkley 1998).

The NBME did not subsequently note any deficiency in this evaluator's reporting of IQ or other test standard and/or scaled scores. However, Mr. Doane, NBME staff, and unnamed ADHD experts did not either acknowledge or consider Dr. Krolik's spouse's third-party reports on widely used, standardized ADHD diagnostic rating scales. Indeed, his wife of 9 years completed all available adult ADHD rating scales with results consistent with adult ADHD, clinically significant impairment for the past 9 years, and obviously clinically significant social/home and learning impairments. Consistent with research findings reviewed above, Dr. Krolik under-reported his past and current ADHD impairments, as compared to this evaluator and his wife. As his parents are deceased, their third-party reports regarding Dr. Krolik's childhood behaviors cannot be determined.

**NBME citation #5iii:** "and a detailed explanation of how those test results, along with academic history and level of current functioning, support a diagnosis."

**Response:** This current evaluator obtained clinically significant third-party reports of chronic and pervasive clinically significant ADHD impairments by Dr. Krolik's spouse of 9 years, who completed well-known and widely used standardized ADHD diagnostic rating scales. At the time of my evaluation, Dr. Krolik's wife was also a licensed physician and a general psychiatry resident.

Further, in my evaluation report of 2-23-01, I also noted Dr. Krolik's prior diagnosis and medication treatment of ADHD in 1998 by Dr. Gayle Wurzlow, a Board Certified Psychiatrist. I also noted that Dr. Pamela Hoblit, a licensed clinical psychologist, did not clearly obtain self-reports of clinically significant ADHD impairments from Dr. Krolik.  Nevertheless, Dr. Hoblit did not conclusively rule out adult ADHD (see page 1). Neither Drs. Wurzlow nor Hoblit appeared to attempt to comply with the NBME's recommended evaluation tests or methods of measurement, although these licensed professionals provided relevant clinical information.

**NBME citation #5iv:** "Furthermore, your evaluator should identify your specific functional limitations and provide an explanation of how the recommended accommodations will reduce the impact of those identified functional limitations on the testing activity."

> **Response:** This evaluator discussed in the original and revised reports and letters the clinical basis for concluding that Dr. Krolik has adult ADHD, an eligible disability, and met eligibility for reasonable test-taking accommodations. For example, Dr. Dr. Krolik did not complete prior STEP exams, did not learn by reading in college according to Mr. Sona (his college study partner), and did not achieve academic success consistent with his perceived potential, according to his elementary school teachers' comments on report cards. Finally, unbeknownst to this evaluator at the time of evaluation, Dr. Krolik had requested and received test-taking accommodations in medical school.

**NBME citation #5v:** "Furthermore, since learning disorders are developmental disorders that usually emerge during childhood, it is important to **provide objective historical documentation of substantial limitation in learning throughout your development** including any evaluations that were conducted throughout your elementary and/or high school years" [emphasis added]. You should provide objective records validating your history of impairment such as previous evaluations, grade reports, reports from parents, teachers, tutors or other past treatment providers. Even if it is impossible to obtain such records from your elementary and high school education, it should be possible to obtain transcripts from college and medical school as well as feedback from college and medical school faculty."

> **Response:** In my initial and revised evaluation reports and letters to the NBME, I attempted to comply with all published and unpublished NBME requirements. I also clearly expressed my objections to the NBME policy that naively required "adequate documentation" of impairments from Dr. Krolik, who was born in 1944 and started first grade in 1950. However, the American Psychiatric Association did not officially introduce the precursor diagnosis to ADHD (called "Hyperkinetic Reaction of Childhood (or Adolescence)") in DSM-II in 1968. Obviously, as I discuss below, Dr. Krolik started school about two decades before there was dissemination of professional and parental knowledge about ADHD and other disorders of learning as well as decades before special educational, mental health, and medical diagnostic evaluation and treatment (e.g., remedial tutoring) services were available.
>
> As discussed previously in Section II of this affidavit, the first official manual of mental disorders, the DSM-I (APA, 1952), did not include any precursor diagnosis to ADHD. When DSM-I was published, Dr. Krolik was in second grade. Dr. Krolik was a 25-year-old adult when he graduated from undergraduate pharmacy school, one

year after the official introduction of this precursor diagnosis to ADHD. It should be emphasized as a 25-year-old adult, that Dr. Krolik was already "too old" in 1968 or 1969 to meet criteria for this first precursor diagnosis to ADHD. Further, Dr. Krolik graduated from pharmacy school 11 years before the introduction of the official diagnosis of "Attention Deficit Disorder (with or without Hyperactivity)" was published in 1980 (*DSM-III*); 18 years before the introduction of the diagnosis of "Attention-Deficit/Hyperactivity Disorder" published in 1987 (*DSM-III-R*); and 25 years before the introduction of the diagnosis "ADHD" with several subtypes in 1994 (*DSM-IV*); and 31 years before the introduction of the most recent *DSM-IV-Text Revision*, published in 2000.

As also discussed in Section II of this affidavit, Dr. Krolik completed his elementary and secondary education and subsequently graduated from undergraduate pharmacy school in 1969, 4 years before passage of Section 504 of the Rehabilitation Act of 1973; 6 years before passage of the Education of All Handicapped Children in 1975 (PL 94-142); 21 years before the 1990 passage of the Americans with Disabilities Act and the Individuals with Disabilities Education Act (IDEA); and 22 years before the Secretary of the US Department of Education explicitly stated in 1991 that ADHD should fall under IDEA as part of the exceptionality, Other Health Impaired.

Some of these childhood academic impairments referred to by Mr. Doane were appear in a classic text by Dr. Russell Barkley and colleagues (1998), who reviewed prior research on childhood academic impairments of clinic-referred adults with ADHD. However, **in contrast to the NBME, Barkley (1998) noted that these associated childhood academic impairments appeared in only a minority of adults with ADHD:**

"Adults diagnosed with ADHD seem to share a similar likelihood of problems in academic functioning at some time during their schooling, as was found in children having ADHD followed over development. **Between 16% and 40% of clinic-referred adults have repeated a grade, in keeping with the figures reported for ADHD children discussed earlier in this chapter (Barkley et al., 1996b; Biederman et al., 1993; Murphy & Barkley, 1996b). Up to 43% have also received some of form of extra tutoring services in their academic histories to assist them with their schooling (Biederman et al., 1993). Barkley et al. (1996b) found that 28% of their young adult sample had received special educational services; a figure about that found in hyperactive children followed to young adulthood but still higher than normal.** [emphasis added] Consistent with these studies, Roy-Byrne et al. (1997) also found clinic-referred adults with ADHD to have significantly greater frequency of achievement difficulties in school, grade retentions, and special educational services. A history of behavioral problems and school suspensions is also significantly more common in clinic-referred adults with ADHD than in clinical control groups (Murphy & Barkley, 1996b). **Yes, young adults with ADHD seen in clinics are far more likely to have graduated high school (92%) and attended college (68%) than are clinic-referred children with ADHD followed to adulthood (Barkley et al., 1993), for whom the high school graduation rate is only about 64% (see earlier). Some studies indicate that clinic-referred adults with ADHD may have less education than non-ADHD adults seen at the same clinic (Roy-Byrne et al., 1997), a finding**

**consistent with adult follow-up of ADHD children (Mannuzza et al., 1993). Others, in contrast, have not found this to be the case (Murphy & Barkley 1996b)."** [emphasis added] (page 214)

While Barkley (1998) notes that Biederman et al. (1993) reported that 43% of adults who required childhood tutoring, it is also important to note that this rate indicates a that a minority of adults diagnosed as adults with ADHD <u>do not</u> have a history of childhood tutoring.

Further, legally mandated remedial tutoring or special education services were not even available until 1975 when the Education for All Handicapped Children Act was passed, some 6 years after Dr. Krolik graduated from undergraduate pharmacy school. Of course, post-secondary educational institutions, such as 2-year and 4-year colleges as well as graduate or professional schools, were not (and still are not) mandated to provide remedial tutoring or special education services to post-secondary students with disabilities. Furthermore, the NBME appears to presume that college officials or professors should investigate suspected academic disabilities without students requesting such investigations or without college staff having any professional knowledge or competence to do so.

In contrast to implied expectations of Mr. Doane and the NBME, please note that only a minority of clinic-referred adults with ADHD were retained in grade and/or dropped out because of academic frustration. Indeed, the vast majority of clinic-referred adults with ADHD graduated from high school and attended college, obviously exceeding the pessimistic and discriminatory expectations about childhood academic impairments or failure that adults with ADHD are assumed to have had, according to Mr. Doane, NBME staff, and their unnamed ADHD experts. Of course, the scientific and professional irony is that such research data were based on adult subjects' self-reports of academic impairments, not based on objective historical documentation of academic impairments as required by the NBME of medical students.

*Finally, it appears as if Mr. Doane and the NBME appear to be using mental health services records of childhood academic impairments (self-reported or otherwise) that have been observed in only a minority of clinic-referred adults with ADHD as disability and/or diagnostic requirements, which is an NBME-created or invented administrative policy that is not consistent with available scientific evidence, DSM-IV ADHD diagnostic criteria, research and clinical practice standards, or with disability eligibility definitions under disability laws or court rulings.*

**Section 6. Denial of Request for Accommodations Letter from Mr. Doane of the NBME, dated 2-3-03, and Dr. Butterbaugh's Responses**

Please note that each citation of "incomplete" documentation is numbered and corresponds to my subsequent response to each of these citations from Mr. Doane to Dr. Krolik in a letter, dated February 2, 2004, as quoted below:

"Dear Dr. Krolik:

We have carefully reviewed your request for test accommodations for the United States Medical Licensing Examination (USMLE) and accompanying material in accordance with USMLE guidelines for examinees with disabilities and within the framework of the Americans with Disabilities Act. We consulted experts in the disorders of learning and Attention Deficit [sic]/Hyperactivity Disorder (ADHD) to assist in reviewing the documentation.

According to your revised February 2001 Neuropsychological and Educational Evaluation, revised December 2003, your evaluator, Dr. Grant Butterbaugh, assigns you the diagnoses of Attention-Deficit/Hyperactivity Disorder (chronic, probably combined type), Reading Disorder (chronic, with comprehension worse than phonics), and Motor Coordination Disorder (probably mild handwriting and drawing deficits). Dr. Butterbaugh reports "Dr. Krolik has relative neuropsychological weaknesses in reading comprehension, complex verbal/design memory/retrieval, handwriting, and complex design copying, and consistent organizational/attentional control skills." He states in his report, "Given his revised reading scaled scores (based on revised NBME policies about the Nelson-Denny Reading test (sic), we are revising our recommendations that ADHD, but not his Reading Disorder, should be the basis for his substantial limitations in the major life activity of learning" (p. 6). **(see #6i)**

Attention Deficit (sic)/Hyperactivity Disorder is a developmental disability **(see #6iia)** with a childhood onset that typically results in a chronic and pervasive pattern of functional impairment in academic, social, or vocational functioning, and often in daily adaptive functioning. However, the documentation submitted with your request for accommodation does not adequately support an ADHD diagnosis or the existence of a disability. **(see #6iib)** While it is true, as you suggest, that the diagnostic labels of ADHD and Learning Disabilities were not in use in the 1950s, the lives of impulsive or learning impaired children nonetheless showed the impact of their deficits: They failed classes, were retained in grade, required extensive tutoring, received referrals for evaluations by psychiatrists and psychologists, and/or dropped out because of academic frustrations.

The information provided by you does not reflect the manifestations of significant impairment. Your history of academic progress does not indicate that you experienced substantial difficulties in your ability to read and learn. **(see #6iii)** It appears that despite what might have been an active style, you completed elementary school, high school, college, pharmacy school, and medical school without the need for special accommodations. There is no indication that you ever sought evaluation or accommodations prior to taking the USMLE Step 1. **(see #6iv)** Furthermore, no documentation was provided to indicate current functional impairment such as faculty/supervisor comments, job performance

evaluations, or through other sources of information to suggest that you have shown pervasive problems managing the many daily demands for organization and attention that are inherent to [sic] the life of a medical student, resident, or employee. **(see #6v)**

Regulatory decisions and case law have established that the ADA covers individuals who are "substantially limited" in a major life activity as the result of a disability. Determination of whether an individual is substantially limited in functioning as compared to most people is based on assessment of the current impact of the identified impairment. Therefore, a diagnostic label, in and of itself, does not establish coverage under the Americans with Disabilities Act. Overall, the documentation you have provided does not suggest that you are significantly impaired relative to the average person in the general population. Therefore, after a careful review of all your documentation, I must inform you that we are unable to provide you with the requested accommodations. **(see #6vi)**

We will request processing of your exam application without test accommodations. You may inquire at permits@ecfmg.org or call Applicant Information Services at (215) 386-5900 with any questions about your scheduling permit.

Sincerely,
xx
J. Abram Doane, MA, JD
Manager, Disability Services
JAD/c"

My responses follow each point enumerated above in Mr. Doane's letter, dated February 2, 2004:

**NBME citation #6i:** "According to your revised February 2001 Neuropsychological and Educational Evaluation, revised December 2003, your evaluator, Dr. Grant Butterbaugh, assigns you the diagnoses of Attention-Deficit/Hyperactivity Disorder (chronic, probably combined type), Reading Disorder (chronic, with comprehension worse than phonics), and Motor Coordination Disorder (probably mild handwriting and drawing deficits). Dr. Butterbaugh reports "Dr. Krolik has relative neuropsychological weaknesses in reading comprehension, complex verbal/design memory/retrieval, handwriting, and complex design copying, and consistent organizational/attentional control skills." He states in his report, "Given his revised reading scaled scores (based on revised NBME policies about the Nelson-Denny Reading test (sic), we are revising our recommendations that ADHD, but not his Reading Disorder, should be the basis for his substantial limitations in the major life activity of learning" (p. 6)."

**Response**: As previously discussed, this evaluator diagnosed Dr. Krolik with ADHD, based on all evaluation information and also diagnosed Reading Disorder based on official DSM-IV criteria, such as a discrepancy between Dr. Krolik's grade-based standard scores for his reading comprehension as compared to either his measured intelligence and comparable educational peers. This discrepancy-based definition is consistent with the definition of disability used in some court rulings. However, the pooled "grade-based" norm-referenced NDRT standard scores (which were inaccurately called "age-based" standard scores by Mr. Doane) were reported as

requested by Mr. Doane and the NBME staff. Using the latter standard scores, Dr. Krolik's NDRT Reading Comprehension standard scores fell in the average range; thus, he would not be considered substantially limited in reading as compared to the average person in the general population, consistent with some other court rulings. It is important to restate that these latter court rulings were based on disability definitions of substantial limitations that differ from both traditional definitions and official DSM-IV diagnostic criteria for Reading Disorder.

Dr. Krolik was also diagnosed with Motor Coordination Disorder based on his probable graphic motor deficits in comparison to expectations based on his measured intelligence or developmental level. This disorder is consistent with official DSM-IV diagnostic criteria for Motor Coordination Disorder and some court rulings. Dr. Krolik's DSM-IV diagnoses as well as a clinical summary of his psychoeducational and neuropsychological strengths and weaknesses were also provided, as required by the NBME of evaluators.

**NBME citation #6iia:** Attention Deficit (sic)/Hyperactivity Disorder is a developmental disability..."

> **Response:** It is important to note that the NBME appears to concede that ADHD is or is expected to be a disability, not merely a mental disorder. Thus, the NBME appears to concede that individuals diagnosed with ADHD can be expected to be disabled, an opinion with which many qualified professionals can generally agree.

**NBME citation #6iib:** "Attention Deficit (sic)/Hyperactivity Disorder is a developmental disability with a childhood onset that typically results in a chronic and pervasive pattern of functional impairment in academic, social, or vocational functioning, and often in daily adaptive functioning. However, the documentation submitted with your request for accommodation does not adequately support an ADHD diagnosis or the existence of a disability."

> **Response:** Overall, it is my professional opinion of this qualified examiner that Dr. Krolik was one of the most obviously hyperactive and impulsive adult clients, with whom I have ever worked across my 20-year career in mental health.
>
> For example, our Test Observations (p 2 of 8, revised report dated 12-03) described Dr. Krolik as "cooperative and well-motivated during testing, but he showed obvious and consistent high levels of inattention, impulsivity, and overanxiousness. He frequently started tasks before instructions were completed, became distressed and apologized when he made mistakes, and frequently failed to self-monitor and self-correct his performance on his own. His restlessness resembled the disinhibited behavior of a hyperactive school-aged child with obvious impulsive and overactive behavior. He also frequently interrupted the examiners' comments or instructions, not from deliberate discourtesy, but rather from his own impulsiveness." This description indicates current clinically significant ADHD impairments in at least one setting, the functional and relevant area of tests of learning, especially when considered in the context of all other results.
>
> As previously noted by Barkley (1998), patients' self-report about ADHD symptoms may result in clinically significant underreporting of their past and current symptoms and impairments. Third-party reports are neither required nor recommended under

disability laws, but are a clinically necessary diagnostic evaluation strategy that are often used to correct for invalid patient self-report bias. Dr. Krolik certainly underreported his past and current ADHD symptoms, as compared to our own clinical test observations and to his spouse's third-party reports of his current and past ADHD impairments on the widely-used standardized, and norm-referenced Observer Version of the Conners Adult ADHD Rating Scale (CAARS, Conners et al 1999), the standardized Brown Attention-Deficit Disorder Scales (Brown 1996), and the Current ADHD Symptoms Scale—Informant Version (Barkley & Murphy 1998). With the exception of the latter scale, which has been widely used despite its limited norm-referenced data as well as limited evidence of its diagnostic reliability and validity, these ADHD rating scales are standardized and designed for collateral or third-party reports. All third-party reports by his spouse supported the diagnosis of ADHD.

As Dr. Krolik's parents are deceased, objective documentation of "some" childhood ADHD impairments were based on his elementary school teachers' comments on his report cards. Certainly, reasonable persons can disagree about whether Dr. Krolik's teachers' comments represent diagnostic symptoms, given that they had never heard of, nor were they trained to evaluate, treat, and accommodate this then-nonexistent diagnostic disorder. His teachers' comments were consistent across raters as well as with typical ADHD academic or learning impairments. Of course, no ADHD diagnosis, disability laws or accommodations and special education evaluation or remedial tutoring services were available after he graduated from his undergraduate pharmacy school or thereafter.

Third-party interviews about Dr. Krolik's childhood and youth were completed in 2001. His older cousin had some quite vivid memories of Dr. Krolik's frequent childhood overactivity and continuing overtalkativeness as an adult. Mr. Jack Sona, Dr. Krolik's "study partner" in undergraduate pharmacy school, reported that Dr. Krolik "couldn't sit still and concentrate" and "was distracted easily and always on the go." Finally, Mr. Sona perceived that Dr. Krolik "was just as smart as me, but that Ralph made careless mistakes on college course exams."

Of course, the reports of Dr. Krolik's parents would have reflected more ideally knowledgeable third-party raters of his childhood behavior and academic, psychosocial, and developmental history. However, the less-than-ideal, but available third-party reports of his older cousin, college study partner, and spouse exceed or meet typical reasonable clinical and research standards of an ADHD diagnostic evaluation, even without the limited but clinically significant teacher comments about his academic underachievement.

Even if the latter childhood data is not considered, it is professionally indefensible why this clinical patient with "some" severe symptoms and impairments that were clinically observed and well-documented by third-party reports of ADHD impairments by his spouse would be required to meet such unrealistically restrictive diagnostic and disability criteria. It is indefensible, given the historical coincidence of his birth some 24 years before the precursor diagnosis of ADHD and some 29 years before the passage of disability laws that first introduced legal concepts such as disability, substantial limitation, and reasonable accommodation.

Overall, Dr. Krolik provided reasonable documentation of his diagnostic status and disability status and requested common test-taking accommodations consistent with NBME requirements. However, without examining Dr. Krolik and without consideration of differential diagnostic results of widely-used standardized ADHD and other diagnostic rating scales, as well as all other relevant clinical information, Mr. Doane, NBME staff, and unnamed ADHD experts, concluded that Dr. Krolik did not have ADHD, was not disabled, and, therefore, was not eligible for reasonable accommodations.

Finally, the NBME has provided no scientific evidence that providing reasonable test-taking accommodations either "fundamentally" or "substantially alters" the professional use and meaning of the STEP exams Furthermore, the NBME also provided no financial evidence that providing reasonable test-taking accommodations alters their commercial mission or resources. Of course, the more fundamental question related to professional certification evaluations is whether research has produced conclusive scientific evidence that professional certification exam cut-off scores can reliably and validly differentiate competent from incompetent physicians without discriminating against qualified individuals with disabilities (Hafferty & Gibson 2003; Little 2003).

**NBME citation #6iii:** "While it is true, as you suggest, that the diagnostic labels of ADHD and Learning Disabilities were not in use in the 1950s, the lives of impulsive or learning impaired children nonetheless showed the impact of their deficits: They failed classes, were retained in grade, required extensive tutoring, received referrals for evaluations by psychiatrists and psychologists, and/or dropped out because of academic frustrations. ... The information provided by you does not reflect the manifestations of significant impairment. Your history of academic progress does not indicate that you experienced substantial difficulties in your ability to read and learn."

**Response:** Many of these same childhood academic impairments to which Mr. Doane refers appear in a classic text by Dr. Russell Barkley and colleagues (1998) who reviewed research on childhood academic impairments of clinic-referred adults with ADHD. However, Barkley (1998) reported that these associated childhood academic impairments appeared in **only a minority of adults with ADHD**, contradicting the beliefs of Mr. Doane, NBME staff, and unnamed ADHD experts, to wit:

"Adults diagnosed with ADHD seem to share a similar likelihood of problems in academic functioning at some time during their schooling, as was found in children having ADHD followed over development. **Between 16% and 40% of clinic-referred adults have repeated a grade, in keeping with the figures reported for ADHD children discussed earlier in this chapter (Barkley et al., 1996b; Biederman et al., 1993; Murphy & Barkley, 1996b). Up to 43% have also received some of form of extra tutoring services in their academic histories to assist them with their schooling (Biederman et al., 1993). Barkley et al. (1996b) found that 28% of their young adult sample had received special educational services; a figure about that found in hyperactive children followed to young adulthood but still higher than normal.** [emphasis added] Consistent with these studies, Roy-Byrne et al. (1997) also found clinic-referred adults with ADHD to have significantly greater frequency of achievement difficulties in school, grade retentions, and special

educational services. A history of behavioral problems and school suspensions is also significantly more common in clinic-referred adults with ADHD than in clinical control groups (Murphy & Barkley, 1996b). **Yes, young adults with ADHD seen in clinics are far more likely to have graduated high school (92%) and attended college (68%) than are clinic-referred children with ADHD followed to adulthood (Barkley et al., 1993), for whom the high school graduation rate is only about 64% (see earlier). Some studies indicate that clinic-referred adults with ADHD may have less education than non-ADHD adults seen at the same clinic (Roy-Byrne et al., 1997), a finding consistent with adult follow-up of ADHD children (Mannuzza et al., 1993). Others, in contrast, have not found this to be the case (Murphy & Barkley 1996b)."** [emphasis added] (page 214)

It is also important to recall that no mandated remedial tutoring or special education services were available until 1975 when the Education for All Handicapped Children Act was passed, some 6 years after Dr. Krolik graduated from undergraduate pharmacy school. Of course, post-secondary educational institutions, such as 2-year and 4-year colleges as well as graduate or professional schools, were not (and still are not) mandated to provide remedial tutoring or special education services to post-secondary students with disabilities. Thus, no documentation of special educational services or disability-related accommodations would be expected in advance of the historical introduction to professional and the general public.

Also contradicting the pessimistic expectations of Mr. Doane, NBME staff, and the unnamed ADHD experts, please note that researchers observed that only a minority of clinic-referred adults with ADHD were retained in grade and/or dropped out because of academic frustration during childhood. Indeed, the majority of clinician-referred adults with ADHD graduated from high school and attended college. Of course, the scientific and professional irony of these findings is that such research data were based on research subjects' or their family members' self-reports, rather than on objective historical documentation as currently required by the NBME.

*In summary, Mr. Doane and the NBME appear to require a history of severe academic impairments to validate childhood ADHD in spite of the identification of such impairments in only a minority of clinic-referred adults with ADHD, and despite 1) the lack of scientific evidence and consensus about the reliability and validity of such diagnostic criteria and 2) the absence of such requirements in published research studies of ADHD. This NBME-created or invented administrative policy or criterion is not consistent with available scientific evidence, DSM-IV ADHD diagnostic criteria, or the disability eligibility definitions under current disability laws or court rulings.*

**NBME citation #6iv:** "It appears that despite what might have been an active style, you completed elementary school, high school, college, pharmacy school, and medical school without the need for special accommodations. There is no indication that you ever sought evaluation or accommodations prior to taking the USMLE Step 1."

**Response:** It is important to repeat my objections about requiring Dr. Krolik to produce documentation for accommodations when diagnostic, treatment, special

education, tutoring, or accommodations services were unknown and therefore were unavailable during Dr. Krolik's entire childhood and adult undergraduate education.

However, Mr. Doane and the NBME then proceed to ignore such historical facts by requiring documentation from Dr. Krolik of non-existent special educational services or test taking accommodations that could not have been documented until after the passage of either the Rehabilitation Act of 1973 or the Education of All Handicapped Children Act of 1975, some 4 to 6 years after Dr. Krolik graduated from undergraduate pharmacy school.

Of greater importance is the fact that disability under the ADA is defined by whether or not Dr. Krolik has a current disability based on whether he is currently substantially limited in one or more major life activity, such as learning. The historical facts remain that there were no official ADHD diagnosis, no disability laws, and no evaluation, treatment, or special education during Dr. Krolik's childhood. This should suffice as a reasonable explanation of why Dr. Krolik was not previously diagnosed, treated, tutored, or accommodated as a child and young adult.

**NBME citation #6vi:** "Furthermore, no documentation was provided to indicate current functional impairment such as faculty/supervisor comments, job performance evaluations, or through other sources of information to suggest that you have shown pervasive problems managing the many daily demands for organization and attention that are inherent to [sic] the life of a medical student, resident, or employee."

> **Response:** This evaluator discussed such employee evaluations, but decided to not disclose Dr. Krolik's personal health information to his employers as doing so is not required under disability laws, NBME guidelines, or DSM-IV diagnostic criteria.

**NBME citation #6vii:** "Regulatory decisions and case law have established that the ADA covers individuals who are "substantially limited" in a major life activity as the result of a disability. Determination of whether an individual is substantially limited in functioning as compared to most people is based on assessment of the current impact of the identified impairment. Therefore, a diagnostic label, in and of itself, does not establish coverage under the Americans with Disabilities Act. Overall, the documentation you have provided does not suggest that you are significantly impaired relative to the average person in the general population."

> **Response:** As mentioned, several court rulings concerning disability cases have variously defined "substantial limitations" in comparison to:
> - the average peer in the general population
> - the educationally comparable peer, or
> - the discrepancy, for example, between an individual's higher measured intelligence or aptitude as compared to the individual's lower or "substantially limited" functioning in a major life activity, such as learning (or reading).
>
> DSM-IV also uses similar discrepancies between the individual's impaired function in a major life activity and expectations of either comparable peers or an individual's measured intelligence or aptitude. With all due respect, this evaluator would note that court rulings rival in number and controversy professional theories or opinions regarding the "ideal" diagnostic, disability or substantial definitions or criteria regarding learning disorders.

Thus, it is important to emphasize that Dr. Krolik's reading comprehension efficiency or automaticity remains discrepant from his measured verbal IQ test score, if norm-referenced NDRT standard scores are used, as recommended by the NDRT authors. This discrepancy meets DSM-IV criteria for Reading Disabled, consistent with some court rulings. If the inaccurately characterized "age-based standard scores" are used as requested by Mr. Doane and the NBME, then Dr. Krolik's NDRT Reading Comprehension standard score is not discrepant from his measured intelligence, and he does not meet the DSM-IV diagnostic criteria for a Reading Disorder.

As discussed previously, Mr. Doane, NBME staff, and their unnamed ADHD experts repeat often-discussed aspects of the ADA. However, Mr. Doane, NBME staff, and their unnamed ADHD experts inexplicably demand "impossible" objective historical documentation of childhood ADHD impairments, yet then ignore and reject without reason objective documentation of standardized test results that documented Dr. Krolik's current and past chronic substantially limited learning and social major life activities in comparison to the average person in the general population.

For Mr. Doane, NBME staff, and unnamed ADHD experts to deny the clinical relevance of Dr. Krolik's available documentation of childhood and college ADHD limitations in the major life activity of learning and evidence of chronic, persistent, and pervasive impairments is noteworthy for its unexplained disregard of pertinent clinical data that would be not required by most qualified clinicians or researchers. As mentioned, some NBME requirements lack any objective or operational definitions or measurement methods to determine whether diagnostic or disability eligibility criteria have been met or not.

Again, it is interesting to reflect upon the obvious fact that individuals with physical disabilities are not subjected to the extensive intrusions into their private lives personal health, mental health, educational, and family lives, yet they routinely receive reasonable accommodations, such as wheelchair ramps, spacious and adapted restroom facilities. By contrast, individuals with mental disabilities, such as Dr. Krolik, are subjected to routine intrusions into private personal lives, yet are not eligible for common test-taking accommodations. This qualified professional is at a loss to explain such unequal differences in access to reasonable accommodations.

Of course, a more fundamental scientific and legal question related to professional certification examinations such as the STEP is whether the NBME has published conclusive scientific evidence that the STEP exams and their cut-off (passing) scores can reliably and validly differentiate "competent" from "incompetent" physicians (e.g., Hafferty & Gibson 2003), without discriminating against qualified individuals with mental or physical disabilities.

I declare under penalty of perjury that the above statements are true and correct.

Executed on this 8th day of July, 2005, in New Orleans, Louisiana.

GRANT BUTTERBAUGH, Ph.D.

## References

American Psychiatric Association. (1952). *Diagnostic and Statistical Manual of Mental Disorders.* Washington, DC: Author.

American Psychiatric Association. (1968). *Diagnostic and Statistical Manual of Mental Disorders* (2nd ed.). Washington, DC: Author.

American Psychiatric Association. (1980). *Diagnostic and Statistical Manual of Mental Disorders* (3rd ed.). Washington, DC: Author.

American Psychiatric Association. (1987). *Diagnostic and Statistical Manual of Mental Disorders* (3rd ed., rev.). Washington, DC: Author.

American Psychiatric Association. (1994). *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.). Washington, DC: Author.

American Psychiatric Association. (2000). *Diagnostic and Statistical Manual of Mental Disorders* (4th ed., Text Revision). Washington, DC: Author.

Barkley, R.A. (1998). *Attention-Deficit/Hyperactivity Disorder: A Handbook for Diagnosis and treatment* (2nd edition). New York: Guilford Press.

Barkley, R.A., & Biederman, J. (1997). Toward a Broader Definition of the Age-at-Onset Criterion for Attention-Deficit Hyperactivity Disorder. *Journal of the American Academy of Child and Adolescent Psychiatry*, vol. 36, pages 1204-1210.

Biederman, J., Faraone S.V., Spencer T., Wilens, T., Norman D., Lapey, K.A., Mick, E., Lehman, B.K., Doyle, A. (1993). Patterns of Psychiatric Comorbidity, Cognition, and Psychosocial Functioning in Adults with Attention Deficit Hyperactivity Disorder. *American Journal of Psychiatry*, vol. 150, pages 1792-1798.

Brown, J.I., Fishco V.V., Hanna, G. (1993). *Nelson-Denny Reading Test. Directions for Administration Forms G&H.* Itasca, IL: Riverside Publishing Co.

Brown, J.I., Fishco V.V., Hanna, G. (1993). *Nelson-Denny Reading Test. Technical Report Forms G&H.* Itasca, IL: Riverside Publishing Co.

Brown, T.E. (1996). *Brown Attention-Deficit Disorder Scales: Manual.* San Antonio, TX: The Psychological Corporation.

Conners, C.K., Erhardt, D., Sparrow, E. (1999). *Technical Manual. Conners' Adult ADHD Rating Scales (CAARS).* Tonawanda, NY: Multi-Heath Systems Inc.

Dulcan, M., & Work Group on Quality Issues. (1997). Practice Parameters for the Assessment and Treatment of Children, Adolescents, and Adults With Attention-Deficit/Hyperactivity Disorder. *Journal of American Academy of Child and Adolescent Psychiatry,* vol. 36 Suppl., pages 85S-121S.

Goldman, L.S., Genel, M., Bezman, R.J., Slanetz, P.J., & Council on Scientific Affairs, American Medical Association. (1998). Diagnosis and Treatment of Attention-

Deficit/Hyperactivity Disorder in Children and Adolescents. *Journal of the American Medical Association,* vol. 279, pages 1100-1107.

Gordon, M., & Irwin, M. (1997). *The Diagnosis and Treatment of ADD/ADHD: A No-Nonsense Guide for Primary Care Physicians.* DeWitt, NY: GSI Publication, Inc.

Hafferty, F.W., & Gibson, G.G. (2003). Learning Disabilities, Professionalism, and the Practice of Medical Education. *Academic Medicine,* vol. 76, pages 189-201.

March, J.S., Wells, K., & Conners, C. K. (1995). Attention-Deficit/Hyperactivity Disorder: Part I. Assessment and Diagnosis. *Journal of Practical Psychology and Behavioral Health,* vol. 1, pages 219-228.

Murphy, K., & Barkley, R.A. (1996a). Prevalence of DSM-IV Symptoms of ADHD in Adult Licensed Drivers: Implications for Clinical Diagnosis. Journal of Attention Disorders, vol. 1, pages 147-161.

Murphy, K., & Barkley, R.A. (1996b). Attention Deficit Hyperactivity Disorder Adults: Comorbidities and Adaptive Impairments. Comprehensive Psychiatry, vol. 37, pages 393-401.

Murphy, K.A., Barkley, R.A., & Bush, M.A. (2002). Young Adults with Attention-Deficit Hyperactivity Disorder: Subtype Differences in Co-Morbidity, Educational, and Clinical History. *Journal of Nervous and Mental Disease*, vol. 190, pages 147-157.

Murphy, K.R., & LeVert, S. (1995). *Out of the Fog: Treatment Options and Coping Strategies for Adult Attention Deficit Disorder.* New York, NY: Hyperion.

Shaffer D. (1994). Attention Deficit Hyperactivity Disorder in Adults. *American Journal of Psychiatry*, vol. 151, pages 633-638.