# Exhibit 12

1/13/2006 Evidentiary Hearing

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

RALPH E. KROLIK,                    )

                                    )   No.  CV 05-315-PHX-FJM

              Plaintiff,            )

                                    )

        vs.                         )        Phoenix, Arizona

                                    )        January 13, 2006

NATIONAL BOARD OF MEDICAL           )            1:59 p.m.

EXAMINERS, et al.,                  )

                                    )

              Defendants.           )

_____     )

BEFORE:   THE HONORABLE FREDERICK J. MARTONE, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING

Official Court Reporter:

Candy L. Potter, RMR, CRR

Sandra Day O'Connor U.S. Courthouse, Suite 312

401 West Washington Street, Spc 36

Phoenix, Arizona 85003-2151

(602) 322-7246

Proceedings Reported by Stenographic Court Reporter

Transcript Prepared by Computer-Aided Transcription

1    Q.  And would you agree that Dr. Gordon is one of the nation's

2    most highly recognized experts in ADHD as well?

3    A.  Yes.

4    Q.  You would generally respect Dr. Gordon's opinions on

5    matters dealing with ADHD?

6    A.  Yes.

7    Q.  Now, I have here your CV, sir.  Your emphasis -- your

8    academic and practice expertise and emphasis is in epilepsy?

9    A.  Epilepsy and developmental disabilities of all kind.

10   Q.  Autism?

11   A.  Um-hum.

12   Q.  I don't see any publications in any refereed publications

13   on ADHD in your CV.  Am I missing any?

14   A.  No.  In terms of ADHD?

15   Q.  That's right, sir.

16   A.  Yeah, no.  I'm -- I've spent much of my career as a

17   teacher and trainer.

18   Q.  Doctor -- Dr. Butterbaugh, you take the position in your

19   affidavit that Dr. Krolik is substantially limited in the

20   major life activity of learning, do you not?

21   A.  Yes.

22   Q.  You reviewed all his report cards, as you just said?

23   A.  As many as we could find, yes.

24   Q.  And in fact, you just testified that you saw, based on

25   those report cards, that he was basically doing fairly well?

1    Dr. Wurzlow's results and Dr. Hoblit's results.

2    Q.  Well, in fact, Dr. Hoblit found no evidence of AD --

3    ADHD, did she?

4    A.  At the end of the report she states that there is a

5    possibility that he might have ADHD, even though the results

6    were negative, because of his reluctance to admit to

7    shortcomings, either on a conscious or unconscious level.

8         So Dr. Hoblit was seeking to clarify that issue,

9    because there's no definitive acid test for ADHD in terms of

10   being able to determine its presence or absence.

11   Q.  You knew at the time you wrote your report that Dr. Krolik

12   was a registered pharmacist?

13   A.  Yes.

14   Q.  And that he had taken a test in order to achieve that

15   designation?

16   A.  Yes.

17   Q.  You didn't put that in your report, did you?

18   A.  No.

19   Q.  Now, you are no longer saying, are you, that Dr. Krolik

20   suffers from a learning disability that entitles him to an

21   accommodation under the ADA?

22   A.  No, because there's controversy about how it's defined

23   within the court as well as the professional community.

24   Q.  I just wanted to make sure that's no longer on the table

25   before the Court.

1   A.  I do.

2   Q.  What job duties briefly do you have that bear on ADHD?

3   A.  I'm director of an ADHD program that's in its 20th year, I

4   run all the clinical services for child and adolescent

5   psychiatry, including ADHD policy and practice guides.  I

6   conduct a great deal of research in the area of ADHD, both for

7   children and for adults.  And I'm also involved in advocacy

8   organizations to help promote rights and services for

9   individuals of all ages with ADHD.

10   Q.  And you publish quite a bit on ADHD?

11   A.  I have.

12   Q.  You've -- in this particular matter you were retained by

13   the National Board of Medical Examiners to consult upon

14   Dr. Krolik's request for accommodations?

15   A.  That's correct.

16   Q.  And you evaluated that request and supporting

17   documentation?

18   A.  That's correct.

19   Q.  You heard Dr. Butterbaugh say that the NBME, and by

20   influence yourself, applied some standard other than the

21   DSM-IV in evaluating Dr. Krolik's application.  Is that true?

22   A.  No, it's not.

23   Q.  What standards did you apply?

24   A.  The standards I apply are the standards that are derived

25   from the DSM-IV that any of the consultants involved in this

Exhibit 13

Expert Report for

Ralph E. Krolik, M.D., v. National Board of Medical Examiners

Court Case No. CV05-0315 PHX FJM

1.   My name is Michael Gordon, Ph.D. I am a clinical psychologist and Professor of Psychiatry on the faculty of SUNY Upstate Medical University (formerly SUNY Health Science Center at Syracuse). Among my other duties within the Department of Psychiatry, I am director of the ADHD Program. I have attached my Curriculum Vita as Appendix A.

2.   In addition to my faculty responsibilities, I serve as a consultant to the National Board of Medical Examiners, the New York State Board of Law Examiners, the California State Board of Law Examiners, the Missouri Board of Law Examiners, the CFA Institute, and the Law School Admission Council. For each of these organizations, I review documentation submitted by examinees seeking test accommodations based, at least in part, on an ADHD diagnosis. I have also consulted to the Consortium on ADHD Documentation and ACT, Inc. (a test administration organization) about establishing documentation review guidelines.

3.   I have testified three times in federal court regarding ADA matters (*Price v. The National Board of Medical Examiners, Goharderakhshan v. The National Board of Medical Examiners,* and *Rush v. The National Board of Medical Examiners*).  These cases involved students seeking a temporary restraining order against the National Board of Medical Examiners.  My service as an expert witness on behalf of the NBME came about because I was one of the consultants who had reviewed the documentation submitted in support of the requested test accommodations.

4.   I was deposed as an expert witness in *Guckenberger et al. v. Boston University.*

1   My testimony concerned the nature of ADHD and guidelines for

2   documentation review.  I was also deposed in *Rebecca Root v. Georgia State*

3   *Board of Veterinary Medicine* and *Steven B. Pinckney v. Association of*

4   *American Medical Colleges.*

5   5.    From time to time beginning in1999 I have been asked to review

6   documentation submitted by or on behalf of Dr. Krolik in connection with his

7   application for accommodations. I reported my conclusions in letters dated

8   February 7, 1999 (Appendix B), June 4, 1999 (Appendix C), and January 15,

9   2004 (Appendix D).

10   6.    I am compensated for the work I have performed in this case at the rate of $150

11   per hour plus expenses.

12   7.    I reviewed documents listed in Appendix E.

13   8.    At trial, the exhibits on which I may rely include the documents listed in

14   Appendix E, documents produced in this case, and any of the exhibits marked

15   in depositions taken in this matter.

16   9.    My opinion regarding Dr. Krolik's argument that he suffers from Attention

17   Deficit/ Hyperactivity Disorder is as follows:

18   **I. Professional Criteria for ADHD**

19   10.   To evaluate a patient for Attention Deficit/Hyperactivity Disorder (hereafter

20   referred to as "ADHD"), clinicians must use professional guidelines that are

21   widely accepted in the scientific community. These diagnostic guidelines are

22   instantiated in the Diagnostic and Statistical Manual of Mental Disorders,

23   Fourth Edition (DSM-IV).  For adults, the consensus guidelines set forth

24   certain essential features or criteria that must be present to justify a diagnosis

25   of ADHD.

26   11.   *Age of Onset.*  First, and most importantly, evidence must exist that the

2

individual experienced meaningful impairment since early in life. The requirement of a childhood onset flows from ample evidence that ADHD is a developmental disorder that, by definition, must appear during development. The logic underlying this criterion is as follows: Extensive research has shown that the ability to pay attention and exert self control is central to a child's healthy growth and adjustment. In fact, much of what children need to learn, whether at home, in the classroom, or on the playground hinges on the capacity to stop their behavior long enough to allow for a considered response. Without an adequate ability to inhibit behavior, children will inevitably encounter trouble learning rules, getting along with others, controlling emotions, acquiring academic skills, benefiting from past experience, and anticipating future events. The capacity to exert self control and concentrate is so necessary for normal development that any deficits in these areas would necessarily have an early and observable impact on adjustment in the same way that a reading disability would be obvious during the years children typically learn to read.

12. The exact age at which symptoms must be discernable and impairing is somewhat controversial. The official criteria listed in the DSM-IV require impairment before age 7 years. Indeed, most adults who meet criteria for ADHD manifested problems prior to the school years. However, because at least a quarter of well-defined groups of ADHD adults failed to show problems until the end of the elementary school years, some experts recommend an extension of this criterion to the beginning of puberty (around 12-14) *at the latest*. Therefore, while there may be changes in the DSM-IV requirement for age of onset, it is highly unlikely that the upper limit will extend beyond 14 years of age.

13. The early onset of symptoms must be documented through tangible evidence

3

of impairment during childhood.  Such tangible evidence is required because many non-ADHD adults self-report that they experienced the ADHD symptoms of inattentiveness and disorganization as children.  For example, in a published study reporting on the standardization of an ADHD rating scale, 719 normal individuals were asked if they experienced ADHD symptoms during childhood.  On average, 80% of these normal adults reported having experienced at least 6 of the 18 symptoms listed in the DSM-IV criteria at least "sometimes" during childhood.  Twenty-five percent endorsed at least 6 items as having occurred "often."   It is therefore quite normal for people to look back on their childhood and identify themselves as having been ADHD-like.  Because of this tendency to over-report childhood ADHD-like symptoms, concrete evidence of impairment is required.

14.   For individuals who meet criteria for the diagnosis, amassing such evidence is an all-too-easy task.  They can provide clinicians with numerous accounts, across the breadth of their experience, of poor academic performance, impaired social adjustment, and, in many cases, highly impulsive and unruly behavior.  Even for those adults born prior to the advent of special education laws, evidence of maladjustment can be found on old report cards, transcripts that show instances of having failed a grade, significant academic problems, teacher narratives that document frequent disruptive behavior, and accounts by parents, relatives, neighbors, and other adults of serious management problems from early in life.  It should also be noted that these ADHD symptoms emerge *despite* reasonable efforts at compensation on the part of the child, parents, and teachers.

15.   *Consistency and Pervasiveness of Symptoms.* The next two elements of the diagnosis focus on the pervasiveness and chronicity of the impairment.  ADHD

1    symptoms not only appear early in life, but they disrupt someone's adjustment

2    with relative consistency from year to year and from setting to setting (namely

3    home, school, and the community). Therefore, ADHD affects more than just

4    discrete slices of social interaction or job performance. The concept here is that

5    this disorder represents a "hard-wired," enduring set of characteristics that

6    have a broad impact on a person's functioning. Except in unusual

7    circumstances, an individual with ADHD will show those characteristics most

8    of the time and in most situations.

9    16.    Studies that have followed ADHD children through their lives have amply

10    documented the impact of the disorder on adjustment. In almost all areas of

11    functioning, from academics to occupational performance to marital

12    adjustment to vulnerability to substance abuse, ADHD individuals demonstrate

13    widespread maladjustment. As an example, less than 5% of the sample in one

14    scientific study even gained admittance to postsecondary education (as

15    compared to roughly 25% of the normal population). This same group of

16    studies indicates that the effects of chronic and serious impulsive/inattentive

17    behavior are so great that only a fraction of a percent of individuals identified

18    as ADHD are able to pursue graduate studies.

19    17.    *Clinically significant impairment.* The DSM-IV requires that there is evidence

20    of "clinically significant impairment." While specific guidelines have not been

21    established for what constitutes sufficient impairment, the thrust of the criteria

22    is that psychiatric diagnoses should only be assigned to individuals who

23    function abnormally relative to most other people of the same age. Because

24    many psychiatric symptoms tend to represent extremes of universal human

25    traits, it becomes even more important for clinicians to ensure that they

26    identify a disorder only when it causes significant functional impairment. If

5

1    not, definitions of mental disorders can be stretched so thin that they

2    encompass either normal expressions of personality style or expectable

3    reactions to common life events (like failing a class exam or being fired from a

4    job). In essence, that someone manifests symptoms associated with a

5    psychiatric entity does not necessarily mean that he or she is sufficiently

6    impaired to justify a diagnosis. The sine quo non of a disorder is clear evidence

7    of functional impairment or what has been termed "harmful dysfunction." Such

8    impairment emerges as a significantly diminished capacity to meet age-

9    appropriate expectations in major life activities, such as work, school, social

10   relations, and self-care. In clinical parlance, the individual shows significant

11   deficits in adaptive functioning.

12   18.   It is considered inappropriate to assign a psychiatric diagnosis to someone

13   who, while perhaps imperfect, is not significantly impaired. To do so would be

14   like considering an individual to be physically disabled because he could throw

15   much better than he could run, even though his running speed was still

16   average.  For ADHD, impairment is determined by the extent to which the

17   symptoms preclude an individual from managing, as well as most others,

18   routine life tasks across multiple settings (home, school, work, and the social

19   environment). As indicated above, an extensive literature supports the notion

20   that children diagnosed as ADHD during the early years evidence pervasive

21   and chronic maladjustment.

22   19.   *Ruling out other possible explanations for inattention and poor self-control.*

23   Inattention is a highly non-specific symptom that can emerge as a feature in

24   any number of psychiatric, educational, medical, or routine life circumstances,

25   from schizophrenia, depression, and anxiety to migraine headaches, boredom,

26   and unrecognized cognitive limitations. Inattention as a symptom therefore

6

1    resembles fever or chest pains in that its presence alone does little to narrow

2    the field of diagnostic possibilities. It simply means that the individual

3    experiences sufficient distress to affect concentration. Because an individual

4    can be inattentive for so many reasons, the DSM-IV and the consensus of

5    professional opinion require that other disorders be ruled out as explanations

6    for ADHD-type symptoms. ADHD assessments should pursue a differential

7    diagnosis by gathering information from multiple domains and sources to

8    verify that any inattention is not due to some other factor.

9  **II. Dr. Krolik does not meet criteria for ADHD**

10   20.   As indicated above, the diagnosis of ADHD hinges on evidence of clinically

11   significant impairment that has a childhood onset.  It must be documented that

12   such symptoms have consistently and pervasively disrupted the individual's

13   functioning. Without compelling evidence of early-appearing and chronic

14   impairment across settings, the diagnosis is regarded as inappropriate.  Finally,

15   it must also be demonstrated that the symptoms cannot be better explained by

16   other factors.

17   21.   In Dr. Krolik's case, it is evident that none of these criteria were met. As for

18   early impairment, no evidence exists that Dr. Krolik had any significant

19   problems. He moved through his elementary years without any substantial

20   difficulties in that he never failed a grade, required psychiatric or psychological

21   services, or warranted remedial services. To the contrary, he was promoted

22   every year, earned at least average grades, and was characterized by his

23   deportment grades as hard working, courteous, and dependable. The selected

24   teacher comments that Dr. Butterbaugh, one of the evaluators, seized upon to

25   document a childhood history were, in fact, relatively benign and isolated.

26   While some teachers did note that Dr. Krolik could, on occasion, be inattentive

7

1    and careless in his work, most of those comments were of the sort that many

2    students would find on their report cards at various points during their careers.

3    Indeed, the comments about Dr. Krolick were circumscribed and

4    overshadowed by other positive comments and achievements.

5    22.    Dr. Butterbaugh's claim that one cannot identify a history of ADHD symptoms

6    and impairment in someone who was educated prior to introduction of the

7    diagnostic label or special education laws is simply untrue. Maladjustment

8    because of significant inattention and impulsiveness existed prior to the

9    promulgation of this particular psychiatric term. Had Dr. Krolik suffered from

10    ADHD, the significant impact on his adjustment would have been

11    demonstrable, regardless of how this disordered behavior might have been

12    labeled at the time. By way of analogy, some individuals experienced

13    debilitating and identifiable attacks of intense fears long before the DSM

14    committee established the term "Panic Disorders with or without

15    Agoraphobia." Therefore, Dr. Krolik's case fails to meet the criterion for an

16    early onset of symptoms not because he went to elementary school in the

17    1950s (prior to the introduction of the ADHD label), but because his

18    adjustment during the 1950s was normal no matter how childhood behavior

19    disorders were formally categorized.

20    23.    Even if one were to accept that Dr. Krolik had ADHD as a young child, the

21    record makes it clear that his adjustment through high school and beyond was

22    normal and not consistent with an ADHD diagnosis. He graduated from high

23    school on time, without accommodations, and with an academic record

24    sufficient to allow admission to college, from which he graduated without any

25    reported problems. He was also in the military, graduated from pharmacy

26    school and medical school, and was gainfully and successfully employed for

8

many years. To state the obvious, this is not the academic record of an individual who was disabled by significant problems with attention and self control. The documentation is devoid of any information via transcripts, job performance reviews, military records, or faculty/attending comments that he has been maladjusted over his lifetime because of ADHD symptoms. The most that Dr. Butterbaugh could muster to verify ADHD symptomology was a cousin's recollection that Dr. Krolik jumped on the bed a lot as a child; a "study buddy" from pharmacy school also commented that he learned better when he heard information rather than when he read it. Perhaps the clearest indication that Dr. Krolik's life has been relatively normal was that he was never evaluated for ADHD or learning problems until he was 54 years old and had failed the Step 1 exam five times and the Step 2 (CK) exam three times.

24.    It should be pointed out that Dr. Butterbaugh's own words on page 7 of his 2001 report undermine any argument that Dr. Krolik meets impairment criteria for ADHD. He writes: "Dr. Krolik has relative neuropsychological strengths in … reported adaptive living skills." Because the core deficits associated with ADHD more than anything else affect adaptive living skills (that is, the ability to manage home living, social interactions, work life, leisure activities, communication, and self-care), this statement effectively rules out the diagnosis. Claiming that someone with strengths in adaptive living skills has ADHD would be tantamount to asserting that someone who is especially adept at keeping himself happy meets criteria for depression.

25.    After having reviewed this file many times, I have been unable to identify any evidence whatsoever that he was at any point in his life substantially impaired because of ADHD-type problems. If anything, the examinee's life history suggests that he has been a competent and highly accomplished individual who

9

1   has achieved far more than most people in society. According to the

2   Department of Education, only 22% of a regular high school class finishes a

3   four-year degree.  Therefore, Dr. Krolik's academic credentials, by their very

4   nature, place him at a level of academic attainment beyond the reach of many

5   people. That he might have had to work hard to attain those goals is also not

6   evidence of a psychiatric disability.  First, most people who are in competitive

7   academic programs have to work hard to excel. Second, according to research,

8   most students feel that they have to work harder than others in the class. In one

9   study, for example, 44% of normal college students indicated that they have to

10  work harder than other people to get good grades.  Forty one percent said that

11  they did not perform well on timed standardized tests. Fifty-four percent said

12  that they were fidgety or squirmed in their seat.  Finally, 52% said that they

13  were distractible. Again, self-reported claims of having to work hard are not a

14  reasonable basis for identifying a mental disorder.

15  26.  According to all the information I have reviewed, Dr. Krolik's only

16  documented area of frustration has come in passing the Step exams. In all other

17  domains, including those associated with academic examinations, he has

18  functioned normally.  Circumscribed problems passing a highly competitive

19  and challenging post-graduate examination do not represent the level of global

20  impairment that is required by professional criteria for ADHD. By their nature,

21  these tests require mastering a body of knowledge that is far beyond what most

22  individuals in the population could manage, even if they did not suffer from a

23  psychiatric disorder.  Furthermore, otherwise normal and well-functioning

24  individuals can fail these tests for reasons that are unrelated to a disabling

25  mental health condition. Students can fail because of inadequate medical

26  school preparation, test anxiety, or relative weaknesses (but not actual

10

1    abnormalities) in certain cognitive or academic skills. Unfortunately, not

2    everyone who wants to become a licensed physician has the capacity and

3    training to achieve that aim.

### III. Dr. Butterbaugh failed to make a compelling case that Dr. Krolik suffers from ADHD

6    27.    Dr. Butterbaugh provided the most recent assessment of ADHD in this case.

7    He has been advocating for Dr. Krolik to receive accommodations since 2001

8    when he diagnosed Dr. Krolik with ADHD (in addition to Reading, Motor

9    Coordination, and Personality disorders).  It is clear from my review of the

10   various reports and addenda that Dr. Butterbaugh started with the presumption

11   that Dr. Krolik had ADHD and then cast about for any evidence he might

12   marshal, no matter how slim or questionable that evidence might be. For

13   example, he construed some selective comments by teachers and relatives as

14   proof positive of substantial impairment during childhood, even though

15   evidence abounds that he functioned within a normal range. He also made

16   inconsistent assertions about Dr. Krolik's ability to attend and organize. While

17   he acknowledged that Dr. Krolik has "unusual compensatory attention skills

18   for brief periods during which he can attend or concentrate better than is

19   typical for persons with ADHD," he somehow determines that his

20   "compensatory capacity is clearly unreliable." While such statements are

21   couched in terms of neuropsychological findings derived from testing, it seems

22   more likely that they were based on self-report and presumption. It is not at all

23   clear how the clinician substantiates these claims.

24   28.    What is most concerning (and perhaps telling) about Dr. Butterbaugh's

25   evaluation is his near total exclusion of information about substantial and

26   relevant aspects of Dr. Krolik's life history. To be specific, he chose not to

11

1   include detailed information about the examinee's high school record or his

2   performance on entrance examinations for college or medical school. He

3   provided no information about how Dr. Krolik performed in the military, post-

4   secondary education, or on the job during the course of several decades.  Dr.

5   Butterbaugh's decision to bypass information that is so obviously central to the

6   diagnostic process calls into question  the credibility and objectivity of the

7   report.

8   29.    The reports by Dr. Butterbaugh are also curious because they are so internally

9   inconsistent and imprecise. For example, on page 5 of his 2001 report he

10  indicates (and then discounts) Dr. Krolik's self-ratings that apparently placed

11  him in a normal range for both childhood and current symptoms associated

12  with ADHD. However, in his 2003 letter to Mr. Doane he wrote, "Certainly, he

13  fell in the clinically significant range for ADHD (combined type) on current

14  and retrospective self-report scales ..." These statements are incompatible.  Dr.

15  Butterbaugh also makes inconsistent and confusing statements about the extent

16  to which any problems with inattention might be due to anxiety and

17  depression. In 2001 he "suspects" that Dr. Krolik was experiencing "at least

18  mild, though fluctuating, mood disorder." He even described him as

19  "overanxious" during testing and assigned a personality disorder diagnosis.

20  Yet, in his 2003 letter, he argues that "no other psychiatric, psychosocial,

21  motivational or medical disorder ... were identified that could provide

22  plausible alternative explanations for his chronic learning, self-control, and

23  reading comprehension impairments." Again, these positions are contradictory.

24  Furthermore, because anxiety and depression can cause inattention and poor

25  test performance, this is an arena that a clinician would explore exhaustively,

26  not just to the point of being suspicious that a disorder may or may not exist.

1   According to DSM and professional standards, a clinician must systematically
2   rule out non-ADHD explanations, especially in the face of overall normal
3   functioning. Simply dismissing alternate possibilities without careful
4   evaluation is inappropriate.

5   30.   Dr. Butterbaugh engages in some unusual historical revision to marshal
6         arguments for accommodations. After reporting that a prior clinician (a Dr.
7         Hoblet) did *not* assign an ADHD diagnosis, he spins the finding by
8         emphasizing that Dr. Hoblet did not "conclusively rule out ADHD."
9         Remarkably, by the end of the report, Dr. Butterbaugh writes that Dr. Hoblet
10        arrived at a "qualified conclusion that Dr. Krolik could have ADHD." Other
11        inconsistencies mark the reports. For instance, he quotes on page of the 2003
12        letter Mr. Sona (the "study buddy" from pharmacy school) as validating
13        "clinically significant reading and attentional disorders." However, the
14        statement by Mr. Sona makes no mention of problems with reading or
15        attention. It simply indicates that his friend learned more through talking about
16        academic material than reading it.

17  31.   Finally, Dr. Butterbaugh's actual listing of the psychiatric diagnoses he
18        assigned Dr. Krolik reflects a loose and mysterious formulation of the data. He
19        qualifies the ADHD diagnosis as "probably combined type." It is hard to
20        fathom how or why one would equivocate on whether a patient has a history of
21        impulsive/hyperactive behavior. Such a qualification is especially unusual in a
22        clinical document that purports to present a comprehensive and definitive
23        evaluation that included psychological testing and a review of records.

24  **IV. Conclusion**

25  32.   Based on my review of these materials, Dr. Krolik cannot be appropriately
26        diagnosed as having ADHD under generally accepted clinical guidelines.

13

Those criteria require global, consistent, and significant impairment that begins early in life and cannot be accounted for by other psychiatric or non-psychiatric factors. All the information in this case points to a competent individual who, from early on, achieved normally and managed the routine aspects of his life at least as well as others. It remains the case that passing the Step examinations has been the only documented aspect of his life that has been marked by failure. However, difficulties mastering an unusually competitive and challenging test that is administered only to those at the very top of the academic ladder are not, in my opinion, sufficient to identify someone as suffering from a psychiatric disorder.

Michael Gordon, Ph.D.                    8/8/05

                                         Date

14

INDEX OF APPENDICES TO
EXPERT REPORT OF MICHAEL GORDON, PH.D.
IN SUPPORT OF DEFENDANT'S OPPOSITION
TO MOTION FOR PRELIMINARY INJUNCTION

APPENDIX A      Curriculum Vitae of Michael Gordon, Ph.D.

APPENDIX B      Letter of Michael Gordon, Ph.D. dated 2/7/99

APPENDIX C      Letter of Michael Gordon, Ph.D. dated 6/4/99

APPENDIX D      Letter of Michael Gordon, Ph.D. dated 1/15/04

APPENDIX E      Listing of reviewed documents

# APPENDIX A

# *VITA*
## Michael Gordon, Ph.D.

### Personal Information

| | |
|---|---|
| Home Address: | 301 Ambergate Road |
| | DeWitt, New York 13214 |
| | (315) 446-2012 |
| | |
| Work Address: | SUNY Upstate Medical University |
| | Division of Child and Adolescent Psychiatry |
| | 750 East Adams Street |
| | (315) 464-3145 |
| | |
| E-Mail Address: | gordonm@upstate.edu |
| | |
| Born: | May 30, 1952 |
| | |
| Marital Status: | Married, two children |

### Education

Amherst College
Amherst, Massachusetts

1970-74 B.A. magna cum laude
Major: Psychology
Minor: Spanish Literature

The Ohio State University
Major: Clinical Child Psychology

1974-77 Ph.D
Minor: Developmental Psychology

(Doctoral Dissertation:  The Assessment of Impulsivity and Mediating Behaviors in Hyperactive and Nonhyperactive Boys Performing on DRL.)

### Present Position

Professor, Department of Psychiatry, SUNY Upstate Medical University at Syracuse, New York.

Chief Clinical Child Psychologist and Director of Child and Adolescent Psychiatric Services, SUNY Upstate Medical University at Syracuse, New York.

Director, ADHD Program, Department of Psychiatry, SUNY Upstate Medical University at Syracuse, New York.

Lecturer, Program in Medical Humanities

**Editorial Positions and Professional Awards**

Associate Editor, The ADHD Report
Reviewer, Journal of Learning Disabilities
Reviewer, Archives of Clinical Neuropsychology
Reviewer, Perceptual and Motor Skills
Inductee, CHADD Hall of Fame

**Professional Affiliations**

Member, Medical Staff, Crouse Irving Memorial Hospital
Member, American Psychological Association
Member, Central New York Psychological Association
Member, Society for Behavioral Pediatrics
Member, Sigma XI Research Society
Member, Central New York Association for Learning Disabilities
Member, Council for Exceptional Children
Member, International Neuropsychological Society
Member, Society for Research in Child and Adolescent Psychopathology

**Certification**

State of New York, Certification Number 5965
Member, National Register of Health Care Providers in Psychology

**Internship**

Department of Psychiatry, Division of Clinical Psychology
        (Clinical Child specialization), SUNY Upstate Medical Center, Syracuse, New
        York.

**Past Employment**

Staff Psychologist, Psychiatric Services, St. Joseph's Hospital Health Center,
        Syracuse, New York.

**Research Grants**

"The Testing of the Gordon Diagnostic System" funded by Clinical Diagnostics, Inc.,
1983 - 1986.

"The Development of Gordon's Measure of Impulsivity for Clinical, Educational and
Research Applications" funded by the New York State Division of Research Resources,
1980 - 1987.

"The Psychosocial Effects of Short Stature" funded by the New York State Health Research Council (co-investigator with Robert A. Richman, M.D.), 1978 - 1980.

"Study on the long term outcomes of very low birth weight infants at school age" funded by the Robert Wood Johnson Foundation (co-investigator with Steven Gross, M.D.), 1987 - 1988.

"Pediatric survey of relationship disturbance in low birth weight infants" funded by the March of Dimes (co-investigator with Barbara Fiese, Ph.D. and Martin Irwin, M.D.), 1991-1992.

"Advancing ADHD Diagnosis via Standardized Observations" funded by the National Institute of Child Development (co-investigator with Stephanie McConaughy, Ph.D.), 2003-2007.

## Publications

Sorenson, C.A. & Gordon, M. (1975). Effects of 6-hydroxydopamine on shock-elicited aggression, emotionality and maternal behavior in female rats. *Pharmacology, Biochemistry and Behavior*, 3, 331-335.

Gittis, A.G. & Gordon, M. (1979). Developmental analysis of behavioral dysfunction in rats with septal lesions. *Journal of Comparative and Physiological Psychology*, 94-106.

Gordon, M. (1981). The assessment of impulsivity and mediating behaviors in hyperactive and nonhyperactive boys. *Journal of Abnormal Child Psychology*, 7, 317-326.

Gordon, M. & Oshman, H. (1981). Rorschach indices of children classified as hyperactive. *Perceptual and Motor Skills*, 52, 703-707.

Gordon, M., Crouthamel, C., Post, E.M., & Richman, R.A. (1981). Identifying the academic and emotional difficulties associated with short stature. *Pediatric Research*, 15, 411.

Gordon, M. (1982). The egocentric placement of Bender Figure A. *Perceptual and Motor Skills*, 54, 1241-1242.

Gordon, M. & Tegtmeyer, P.F. (1982). The Egocentricity Index and self-esteem in children. *Perceptual and Motor Skills*, 55, 225-227.

Gordon, M. (1983). Responses of internalizing and externalizing children to clinical interview questions. *American Journal of Child Psychiatry*, 22, 444-446.

Gordon, M., Crouthamel, C., Post, E.M., & Richman, R.A. (1982). Psychological aspects of constitutional short stature: social competence, behavior problems, self-esteem and family functioning. *Journal of Pediatrics*, 101, 477-480.

Gordon, M., Post, E.M., Crouthamel, C., & Richman, R.A. (1984). Do children with constitutional growth delay really have more learning problems? *Journal of Learning Disabilities*, 17, 291- 293.

Gordon, M. (1982). Rorschach Scoring Program *(RSCORE)*. Tampa: Psychological Assessment Resources.

Gordon, M., Greenberg, R.P., & Gerton, M. (1983). Wechsler Discrepancies and the Rorschach Experience Balance. *Journal of Clinical Psychology*, 39, 775-779.

Tegtmeyer, P.F. & Gordon, M. (1983). The interpretation of white-space responses in children's Rorschach protocols. *Perceptual and Motor Skills*, 57, 611-616.

Gordon, M. & Tegtmeyer, P.F. (1983). Oral-dependent content in children's Rorschach protocols. *Perceptual and Motor Skills*, 57, 1163-1168.

Greenberg, R.P. & Gordon, M. (1983). Examiner sex and children's Rorschach productivity. *Psychological Reports*, 53, 355-357.

Gordon, M. (1983). *The Gordon Diagnostic System.* DeWitt, NY: Gordon Systems.

Gordon, M., McClure, F.D., & Post, E.M. (1983). *Interpretive guide to the Gordon Diagnostic System.* DeWitt, NY: Gordon Systems, Inc.

Gordon, M., McClure, F.D., & Post, E.M. (1983). *Instruction Manual for the Gordon Diagnostic System.* Denver: Clinical Diagnostics, Inc.

McClure, F.D. & Gordon, M. (1985). Performance of disturbed hyperactive and nonhyperactive children on an objective measure of hyperactivity. *Journal of Abnormal Child Psychology*, 12, 561-572.

Gordon, M. (1986). Microprocessor-based assessment of Attention Deficit Disorders. *Pharmacology Bulletin*, 22, 288-290.

Richman, R.A., Gordon, M., Tegtmeyer, P., Crouthamel, C., & Post, E.M. (1986). Academic and emotional difficulties associated with constitutional short stature. In B. Stabler & L. Underwood (Eds.). *Growing up short: Psychosocial aspects of growth delay.* New York: Lawrence Erlbaum Associates, Inc.

Gordon, M. (1987).  How is a computerized attention test used in the diagnosis of
    Attention Deficit Disorder?  In J. Loney (Ed.).  *The young hyperactive child:*
    *Answers to questions about diagnosis, prognosis, and treatment.*  New York:
    Haworth Press, 53-64.

Gordon, M. (1987).  Errors of omission and commission: a response to Milich and
    colleagues regarding the Gordon Diagnostic System.  *Psychopharmacology Bulletin*,
    23(2), 325-328.

Gordon, M.  & Mettelman, B.B. (1988).  The assessment of  attention: I. Standardization
    and reliability of a behavior-based  measure.  *Journal of Clinical Psychology*, 44,
    682-690.

Gordon, M., DiNiro, D., & Mettelman, B.B.  (1988).  The effect up  on outcome of
    nuances in selection criteria for ADHD/Hyperactivity.  *Psychological Reports*, 62,
    539-544.

Gordon, M. (1989).  Classroom management techniques for ADHD children.  Chadder,
    3(1), 3-4.

Gordon, M., DiNiro, D., Mettelman, B.B., Tallmadge, J. (1989).  Observations of test
    behavior, quantitative scores, and teacher ratings. *Journal of Psychoeducational*
    *Assessment*, 7, 141-147.

Gordon, M., Thomason, D. & Cooper, S. (1990).  To what extent does attention affect
    K-ABC scores?  *Psychology in the Schools*,  27, 144-147.

Bauermeister, J.J., Berrios, V, Jimenez, AI.I., Acevedo, L. &  Gordon, M. (1990).  Some
    issues and instruments for the  assessment of Attention Deficit Hyperactivity Disorder
    in Puerto  Rican children.  *Journal of Clinical Child Psychology*, 19, 9-16.

Post, E.M., Burko, M.S., & Gordon, M.  (1990).  Single-component  microcomputer
    driven-assessment of attention.  *Behavior Research  Methods, Instruments, &*
    *Computers*, 22, 297-301.

Gordon, M., Thomason, D., Cooper, S., & Ivers, C. (1991).  Non-medical treatment of
    ADHD/Hyperactivity: The Attention Training System.  *Journal of School*
    *Psychology*, 29, 151-159.

Gordon, M. (1991).  *ADHD/Hyperactivity: A consumer's guide for parents and teachers*.
    Syracuse: GSI Publications.

Gordon, M. (1991).  *Jumpin' Johnny get back to work!: A child's  guide to*
    *ADHD/Hyperactivity*.  Syracuse: GSI Publications.

Gordon, M. (1992). *My brother's a world-class pain: A sibling's guide to ADHD/Hyperactivity*. Syracuse: GSI Publications.

Gordon, M. (1992). *I would if I could: A teenager's guide to ADHD/Hyperactivity*. Syracuse: GSI Publications.

Gordon, M. (1991). *Jumpin' Johnny get back to work!: A child's guide to ADHD/Hyperactivity* [video]. Syracuse: GSI Publications.

Gordon, M. (1995). *I'd rather be with a real mom who loves me: A story for foster children*. Syracuse: GSI Publications.

Gordon, M. (1995). *How to operate and ADHD clinic or subspecialty practice*. Syracuse: GSI Publications.

Gordon, M. & McClure, F. (1995). *The down and dirty guide to Adult ADD*. Syracuse: GSI Publications.

Irwin, M., Kline, P. & Gordon, M. (1991). Adapting milieu therapy to short-term psychiatric hospitalization of children. *Child Psychiatry and Human Development*, 21, 103-201.

Gordon, M. (1993). ADHD: Assessment techniques and differential diagnosis. In: *Pathways to Progress: Proceedings of the CH.A.D.D. Fourth Annual Conference*. Fairfax, VA: Caset Associates.

Gordon, M. (1993). Do computerized measures of attention have a legitimate role in ADHD evaluations? The ADHD Report, 1(6), 5-6.

Gordon, M., Mettelman, B.B., & Martin, I. (1994). Sustained attention and grade retention. *Perceptual and Motor Skills*, 78, 555-560.

Jerome, L.J., Gordon, M., & Hustler, P. (1994). A comparison of American and Canadian teachers= knowledge and attitudes towards Attention Deficit Hyperactivity Disorder (ADHD). *Canadian Journal of Psychiatry*, 39, 563-567.

Gordon, M. (1995). How to operate an ADHD clinic or subspecialty practice. Syracuse, NY: GSI Publications.

Fischer, M., Newby, R.F., & Gordon. M. (1995). Who are the false negatives on continuous performance tests? *Journal of Clinical Child Psychology*, 24(4), 427-433.

Gordon, M. (1995). ADD: Certainly not a fad, but it can be overdiagnosed. *Attention*, 2(2), 20-22.

Gordon, M. (1996). Must ADHD be an equal opportunity disorder? The ADHD Report, 4 (2), 1-3.

Gordon, M. (1996). *Running an ADHD Clinic or Subspecialty Practice*. The Independent Practitioner, 16(2), 80-83.

Gordon, M. & Irwin, M. (1997). *ADD/ADHD: A no-nonsense guide for the primary care physician*. Syracuse: GSI Publications.

Murphy, K. & Gordon, M. (1997). ADHD as a basis for test accommodations: a primer for clinicians. *The ADHD Report*, 5(1), 10-11.

Aylward, G.P. & Gordon, M. (1997). Relationships between continuous performance task scores and other cognitive measures: Causality or commonality? *Assessment*, 4 (4), 325-336.

Gordon, M., Barkley, R.A., & Murphy, K. R. (1997). ADHD on Trial. *The ADHD Report*, 5(4), 1-4.

Gordon, M. (1997). ADHD in cyberspace. *The ADHD Report*, 5(4), 4-6.

Gordon, M. & Keiser, S., Editors. (1998). *Accommodations in higher education under the Americans with Disabilities Act (ADA): A No-nonsense guide for clinicians, educators, administrators, and lawyers.* NY: Guilford Publications and GSI Publications.

Gordon, M. & Barkley, R.A. (1998). Psychological Testing and Observational Measures. Chapter in: R.A. Barkley (Ed.). *Attention Deficit Hyperactivity Disorders: A handbook for clinicians -- Third Edition.* Guilford Publications.

Murphy, K. R. and Gordon, M. (1998). The assessment of ADHD in adults. A chapter in: R.A. Barkley (Ed) *Attention Deficit Hyperactivity Disorders: A handbook for clinicians -- Third Edition.* Guilford Publications.

Goldstein, S., Barkley, R. A., & Gordon, M. (1998). Clarification on ADHD (Letter to the editor). The APA Monitor, 29 (10), 5.

Gordon, M., Murphy, K., & Keiser, S. (1998). Attention Deficit Hyperactivity Disorder (ADHD) and test accommodations. The Bar Examiner, 67 (4), 26-36.

Gordon, M. (1999). Clinical grand rounds: ASo you=re telling me . . .@ *ADHD Report*, 7(3), 11-13.

Gordon, M., Lewandowski, L., and Keiser, S. (1999). The LD label for relatively well-functioning students: A critical analysis. *Journal of Learning Disabilities, 32(6)*, 485-490.

Gordon, M. (1999). Attention deficit hyperactivity disorder: Diagnosis and management in the USA. *Journal of the Royal Society of Medicine*, 92 (22), 1-3.

Gordon, M. and Barkley, R.A. (1999). Is all inattention ADD/ADHD? *The ADHD Report*, 7(5), 1-8.

Gordon, M. and Barkley, R.A. (1999). A reply to Brown. The ADHD Report, 7(6), 7-8.

Muphy, K., Gordon, M., and Barkley, R. (2000). To what extent are ADHD symptoms common? A re-analysis of standardization data from a DSM-IV checklist. *The ADHD Report*, 8(3), 1-4.

Gordon, M. (2000). College students and the diagnosis of Attention Deficit Hyperactivity Disorder (Letter to the editor). *Journal of American College Health*, 49, 46-47.

Gordon, M. and Murphy, K. (2001). Judging the impact of time limits and distractions on past test performance: A survey of ADHD, clinic-referred, and normal adults. *The ADHD Report*, 9 (3), 1-5.

Lawrence L., Codding, R., Gordon, M.,  Marcoe, M.,  Needham, L.,  and Rentas, J. (2000).  Self-Reported LD and ADHD Symptoms in College Students.  *The ADHD Report*, 8(6), pp. 1-4.

Fiese, B. H., Poehlmann, J., Irwin, M., Gordon, M., Curry-Bleggi, E. (2001). A pediatric screening instrument to detect problematic infant-parent interactions: Initial reliability and validity in a sample of high- and low-risk infants. *Infant Mental Health Journal*, 22(4), 463-478.

Gordon, M., Lewandowksi, L., Murphy, K. & Dempsey, K. (2002). ADA-based accommodations in higher education: A survey of clinicians about documentation requirements and diagnostic standards. *Journal of Learning Disabilities*, 35 (4), 357-363.

Barkley, R. & Gordon, M. (2002). Research on comorbidity, adaptive functioning, and cognitive impairments in Adults with ADHD: Implications for clinical practice. A chapter in: S. Goldstein and A.T.Ellison: Clinician's Guide to Adult ADHD: Assessment and Intervention. London: Academic Press.

Gordon, M., Goldstein, S., Barkley, R., & Murphy, K. (2003). Response to Nadeau on the subject of ADHD in Women [letter to the editor]. Washington, D.D.: Psychology Monitor, 34 (4), p. 10.

Antshel, K. and Gordon, M. (2003). Evaluating and managing ADHD [letter to the editor]. International Journal of Therapy and Rehabilitation, 10, 428.

Kleinmann, A., Lewandowski, L., Sheffield, R. & Gordon, M. (2005). Processing Speed and ADHD. *ADHD Report*s, 13 (1), 6-8.

**Paper Presentations (selected)**

Gordon, M., Greenberg, R.P., & Gerton, M. (1982). *The Rorschach Experience Balance and WAIS Verbal Performance Discrepancies.* Presented at the Meeting of the Society for Personality Assessment, Tampa.

Greenberg, R.P. & Gordon, M. (1982). *Effects of examiner on children's Rorschach productivity.* Paper presented at the Multi-Ethnic Conference on Assessment, Tampa.

Gordon, M. & McClure, F.D. (1983). *The objective assessment of hyperactivity.* Paper presented at the Annual Meeting of the American Psychological Association, Anaheim.

Gordon, M. (1983). *The evaluation of hyperactivity and attentional problems in school-aged children.* Workshop presented at the Annual Meeting of the New York State Association of School Psychologists, Syracuse.

Gordon, M. (1984). *Evaluating Attention Deficit Disorders in clinical populations.* Paper presented at the 35th Annual Meeting of the American Association of Psychiatric Services for Children, Washington.

Gordon, M. & McClure, F.D. (1984). *The relationship between Rorschach Human Movement and an objective measure of impulsivity.* Paper presented at the Annual Meeting of the Society for Personality Assessment, Tampa.

Gordon, M. & McClure, F.D. (1984). *The evaluation of Attention Deficit Disorders by objective techniques.* Paper presented at the National Association of School Psychologists 1984 Convention, Philadelphia.

Gordon, M. & McClure, F.D. (1984). *Cost-effective assessment of Attention Deficit Disorders.* Paper presented at the National Association of Elementary School Principals Annual Convention, New Orleans.

Gordon, M. & Abrams, P. (1984). *The Rorschach protocols of adolescent firesetters.* Paper presented at the International Rorschach Congress, Barcelona.

Gordon, M. & McClure, F.D. (1984). *Assessment of Attention Deficit Disorders using the Gordon Diagnostic System.* Paper presented at the American Psychological Association Annual Convention, Toronto.

Gordon, M. (1985). *The objective assessment of ADD/Hyperactivity: The GDS Pilot Project on Staten Island.* Paper presented at the Second Annual Special Education Institute sponsored by the New York City Board of Education, New York.

Gordon, M. & Meichenbaum, D. (1985). *The objective assessment and effective treatment of ADD/Hyperactivity.* Workshop series presented in Denver, Tampa, Atlanta, and Washington.

Gordon, M. (1985). *Review of current research on the Gordon Diagnostic System.* Paper presented at a symposium on the Gordon Diagnostic System at the American Psychological Association Annual Meeting, Los Angeles.

Gordon, M. (1986). *The assessment of attention: current research.* Symposium presented at the American Psychological Association Annual Meeting, Washington, D.C.

Gordon, M. (1987). *School-based evaluations for attention deficits.* Cumberland County Schools, Cumberland, MD.

Gordon, M. & Mettelman, B. (1987). *Behavior-based assessment of ADD/Hyperactivity: Standardization of the Gordon Diagnostic System.* Presented at the American Psychological Association Annual Meeting, New York, NY.

Gordon, M., Mammen, O., DiNiro, D., & Mettelman, B. (1988). *Source-dependent subtypes of ADHD/Hyperactivity.* Paper presented at the Annual Meeting of the Society for Behav- ioral Pediatrics, Washington, D.C.

Gordon, M., DiNiro, D., Mettelman, B., & Tallmadge, J. (1988). *Quantitative Scores, Observations of Test Behavior, and Behavior Problem Checklists.* Paper presented at the Annual Meeting of the American Psychological Association, Atlanta, GA.

Gordon, M., Mammen, O., DiNiro, D., & Mettelman, B. (1989). *Source-Dependent Subtypes of ADHD: Implications for research criteria and the diagnostic process.* Paper presented at the Society for Research in Child and Adolescent Psychiatry, Miami, FL.

Gordon, M. (1989). *Classroom management of the ADD student.* Invited keynote address presented at the First Annual Conference on Attention Deficit Disorders, Orlando, FL.

Gordon, M., Thomason, D., & Cooper, S. (1989). *To what extent do IQ tests measure attentiveness?* Paper presented at the Annual Meeting of the American Psychological Association, New Orleans, LA.

Gordon, M., Mettelman, B.B., & DiNiro, D.D. (1989). *Are continuous performance tests valid in the diagnosis of ADHD/Hyperactivity?* Paper presented at the Annual Meeting of the American Psychological Association, New Orleans, LA.

Irwin, M., Gordon, M., & Mettelman, B. (1989). *Concurrent validity of the DSM-III-R Criteria for ADHD/Hyperactivity.* Paper presented at the Annual Meeting of the American Psychological Association, New Orleans, LA.

Tallmadge, J.T., Paternite, C.E., & Gordon, M. (1989). *Hyperactivity and aggression in parent-child interactions: Test of a two-factor theory.* Paper presented at the Annual Meeting of the Society for Research in Child Development, Kansas City, MO.

Gordon, M., Mettelman, B., & Irwin, M. (1989). *Cluster analysis of instruments used in the diagnosis of ADHD.* Paper presented at the Annual Meeting of the American Academy of Child and Adolescent Psychiatry, New York, NY.

Gordon, M. & Irwin, M. (1989). *The practicalities of establishing a specialty ADHD clinic.* Workshop presented at the Annual Meeting of the American Academy of Child and Adolescent Psychiatry, New York, NY.

Gordon, M., Thomason, D., & Cooper, S. (1990). *Non-medical treatment of ADHD/Hyperactivity: The Attention Training System.* Paper to be presented at the Annual Meeting of the American Psychological Association, Boston.

Gordon, M., Mettelman, B.B., & Irwin, M. (1990). *The impact of comorbidity on ADHD laboratory measures.* Paper presented at the Annual Meeting of the American Psychological Association, Boston.

Gordon, M. & Irwin, M. (1990). *The practicalities of establishing a specialty ADHD clinic.* Workshop presented at the Annual Meeting of the American Academy of Child and Adolescent Psychiatry, Chicago, IL.

Gordon, M., Mettelman, B.B., & Irwin, M. (1991). *The relationship between paternal psychopathology an behavior ratings of children referred for ADHD.* Paper to be presented at the Annual Meeting of the Society for Research in Child and Adolescent Psychopathology, Amsterdam, 1991.

Irwin, M., Fiese, B.H., Gordon, M., Poehlmann, J., & Levy, S. *Pediatric Infant Parent Exam: Screening Technique to Detect Relationship Disturbances.* Paper presented at the annual meeting of the American Acadmey of Child and Adolescent Psychiatry, San Francisco, 1991.

Gordon, M. & Mettelman, B.B. (1994). *Gender differences in ADHD referrals: IQ, laboratory measures, and behavior ratings.* Paper presented at the annual meeting of the Society for Research in Child and Adolescent Psychopathology, London, June, 1994

Gordon, M. & Mettelman, B.B. (1994). *The impact of parental psychopathology on parent and teacher ratings of child behavior.* Paper presented at the annual meeting of the Society for Research in Child and Adolescent Psychopathology, London, June, 1994]

Aylward, G., Verhulst, S., Bell, S. And Gordon, M. (1995). The relationship between computerized CPT scores and measures of intelligence, achievement, memory, learning, and visual-motor functioning. Paper presented at the Annual Meeting of the Academy of Child and Adolescent Psychiatry, New Orleans.

Gordon, M. Lewandowski, L., Clonan, S., Malone, K. (1996). Standardization of the Auditory Vigilance Task. Paper presented at the Eighth Annual International Conference of CH.A.D.D., Chicago, 1996.

Gordon, M. (1998). ADHD & LD: What are they and how are they diagnosed? Workshop presented at the National Conference of Bar Examiners 1998 Seminar on Bar Admissions, Chicago, IL.

Gordon, M. (1998). Emerging trends in mental disability cases. Paper presented at the National Employment Law Institute=s Americans with Disabilities Act Briefing, Chicago, IL.

Gordon, M. (1998). Neuropsychologists and the ADA. Workshop presented at the National Academy of Neuropsychology. Washington, DC.

Gordon, M. (1998). Should high functioning individuals with LD/ADHD get accommodations? Symposium presented at the annual meeting of the American Academy of Child and Adolescent Psychiatry, Anaheim, CA.

Gordon, M (1999). Diagnosis and management of ADHD in the US. Paper presented at the Royal Society of Medicine joint meeting of the section of paediatrics and the faculty of child psychiatry of the Royal College of Psychiatrists. London, England.

Gordon, M. (2000). *On the assessment of impairment*. University of Massachusetts Memorial Medical Center Grand Rounds, Worcester, MA.

Gordon, M. (2004). ADA Documentation and ADHD. National Conference of Bar Examiners National Meeting, New Orleans, LA.

.

# APPENDIX B



State University of New York

**Upstate Medical University**

Michael Gordon, Ph.D.
Department of Psychiatry
750 East Adams Street
Syracuse, NY 13210
315-464-3145 Voice
315-464-3134 Fax

February 7, 1999

Ms. Mary McAvinue
Educational Commission for
  Foreign Medical Graduates
3624 Market Street
Philadelphia, PA 19104-2685

Examinee: Ralph Krolik
ECFMG ID#: 0-546-768-3
Step II March 1999

Dear Ms. McAvinue:

I am writing because you requested a review of the materials submitted by Mr. Krolik in his effort to gain accommodations on the Step 2 exam. Based upon a diagnosis of ADHD, he is asking for double time and an separate testing room.

The documentation consists of two letters dated 9/11 and 12/16/98 from a psychiatrist, Dr. Gayle Wurzlow. Also included is a handwritten note dated 9/10/98 from the examinee requesting the accommodations, a test exemption, and refunds for previous exams he took not knowing he had
ADHD.

As you know, the diagnosis of ADHD hinges on evidence of clinically significant impairment that has a childhood onset. It must be documented beyond self-report that such symptoms have consistently and pervasively disrupted the individual=s functioning. Without compelling evidence of early-appearing and chronic impairment across settings, the diagnosis is regarded as inappropriate. Finally, it must also be demonstrated that the symptoms cannot be better explained by other factors.

Unfortunately, nothing in these materials documents that Mr. Krolik has suffered impairment because of the purported tendencies toward inattention and impulsiveness. As best one can tell from the record, he moved through his primary and secondary years without substantial difficulties in that there were no prior referrals, grade retentions, or other events that would suggest poor adjustment. If such evidence does exist from teacher comments, report cards,

disciplinary notes, or prior referrals, it should certainly be submitted in any future accommodations request.

As for current impairment, the documentation again offers no convincing evidence that Dr. Krolik=s adjustment has been substantially limited by ADHD-type symptoms. In order to justify a a psychiatric diagnosis, evidence must exist from college transcripts, faculty/supervisory comments, job performance reviews, or other independent sources that the examinee has actually experienced some meaningful impairment because of disabling inattention or impulsiveness. The most one can glean from the current documentation is that Dr. Krolick can be generally impatient but perseverative on examinations. Most significantly, he has never required accommodations in any educational setting.

The documentation offers no psychological testing to rule out cognitive factors that might explain why Dr. Krolick experiences whatever academic problems he may be encountering. In light of comments about his compulsive nature, worrying, and perseveration, it would also be important to rule out other psychiatric issues that may better account for the symptom presentation.

Because this documentation fails to offer any compelling evidence of either early or current impairment, I recommend that the request for accommodations be denied.

Sincerely,

Michael Gordon, Ph.D.
Professor, Department of Psychiatry
Director, ADHD Program

**National Board of Medical Examiners**
**Consultant Review Form**

| | | | |
|---|---|---|---|
| **Consultant:** | Michael Gordon, Ph.D. | **Case Review Hours:** | 2.0 |
| **Due Date:** | February 7, 1999 | **Conference Hours:** | |

Dr. Ralph Krolik
ECFMG ID#: 0-546-768-3
Step II March 1999

9    Diagnosis is supported by documentation.    :    Diagnosis is NOT supported by
                                                       documentation.

9    Accommodation is supported and justified.    :    Accommodation is NOT supported
                                                        and justified.

Comments:

Report Case Review and Conference Hours to the nearest half hour.
Please fax to the NBME Office of Test Accommodations at (215) 590-9777 by the Due
Date show above.  If a conference is necessary, complete the Request for Conference
Call Form and fax to the same number.

# APPENDIX C



**State University of New York**

# Upstate Medical University

Michael Gordon, Ph.D.
Department of Psychiatry
750 East Adams Street
Syracuse, NY 13210
315-464-3145 Voice
315-464-3134 Fax

June 4, 1999

Ms. Shelby Keiser
Test Accommodations Specialist
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

> Re: Ralph Krolick
> ID #:0-546-768-3
> 1999 USMLE Step I (CBT)

Dear Ms. Keiser:

I am writing because you requested that I review the materials Mr. Krolick submitted in appeal of your earlier decision to deny him accommodations. I reviewed all of the materials from the prior application and the following new information: 1) elementary school reports from 1952 to 1960; 2) a letter from Gayle Wurzlow, M.D. that apparently accompanied the report cards; and 3) correspondence between Mr. Krolick and either your office or the ECFMG test accommodations unit.

As you know, the basis for my recommendation that the accommodations be denied initially was threefold: First, no information was provided that documented significant impairment early in his life as a consequence of ADHD-type symptoms. Secondly, it was unclear how these symptoms caused functional impairment for him currently given that there was nothing beyond self-report to document poor functioning. If Dr. Krolick truly suffered from ADHD, you would expect ample evidence via job performance reviews, faculty comments, and independent accounts that would document poor functioning. Even though Dr. Krolick must be in his forties, the documentation is silent on any meaningful difficulties he has encountered over many years of schooling and employment. Finally, I indicated the information provided failed to rule out other psychiatric or cognitive reasons why the examinee might be functioning poorly (if that is indeed his situation).

The grade reports Dr. Wurzlow submitted address only the first of my concerns. They do indeed indicate that Dr. Krolick could, on occasion, be considered by some teachers to be inattentive and careless in his work. However, they also show that he was promoted every year, earned at least average grades, and had problems mainly in language-based areas (which may indicate he was a bit slower to develop such skills). It should also be pointed out that the teachers make

comments inconsistent with an ADHD profile: "Ralph has worked hard this term," "his progress is satisfactory," "Ralph is working very hard and doing his best,""is courteous," and "is dependable" (from the deportment marks).

Even if one accepts at face value that the examinee showed ADHD characteristics in elementary school, the case still must be make that those symptoms persist, are impairing, and cannot be accounted for by other factors. Because those issues have not been addressed. I would again suggest that his request be denied.


Sincerely,

Michael Gordon, Ph.D.
Professor, Department of Psychiatry
Director, ADHD Program

**National Board of Medical Examiners**
**Consultant Review Form**

**Consultant:**   Michael Gordon, Ph.D.          **Case Review Hours:**   2

**Date:** June 4, 1999                            **Conference Hours:**

Ralph Krolick
ID #:0-546-768-3
1999 USMLE Step I (CBT)

☐ Diagnosis is supported by documentation.        ☒ Diagnosis is NOT supported by documentation.

☐ Accommodation is supported and justified.        ☒ Accommodation is NOT supported and justified.

Comments:

Report Case Review and Conference Hours to the nearest half hour.
Please fax to the NBME Office of Test Accommodations at (215) 590-9777 by the Due
Date show above.  If a conference is necessary, complete the Request for Conference
Call Form and fax to the same number.

# APPENDIX D



**State University of New York**

# Upstate Medical University

Michael Gordon, Ph.D.
Department of Psychiatry
750 East Adams Street
Syracuse, NY 13210
315-464-3145 Voice
315-464-3134 Fax
gordonm@upstate.edu

January 15, 2004

J. Abram Doane, Manager
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

FAX: 215-590-9777

Re: Krolik, Ralph Elliott
ID #: 0-546-768-3
USMLE Step 2 CK

Dear Mr. Doane:

I am writing because you requested a review of the materials submitted by Dr. Krolick in his ongoing effort to gain accommodations on the Step exams. I reviewed his original application in 1999 as well as an appeal he filed during that same year.

The current submission contains new information, including a series of reports and letters by Grant Butterbaugh, Ph.D. I also reviewed documents from the earlier applications.

Unfortunately, the documentation still fails to support the argument that Dr. Krolick suffers from ADHD. It remains the case that the only significant and documented problem with academic, social, or vocational functioning I can identify is that he has failed the Step exams. Otherwise, this appears to have been a highly successful and well-adjusted individual whose life history is marked far more by attainment than disability. Therefore, despite what may well have been an active style, he made it through elementary school, high school, college, pharmacy school, and medical school without a hitch or the need for special accommodations. While it is true that formal diagnoses of ADHD and Learning Disabilities did not exist in the 1950s, the lives of impulsive or learning impaired children nonetheless showed the impact of their deficits: They failed classes, were retained in grade, required extensive tutoring, received referrals for evaluations by psychiatrists and psychologists, and/or dropped out because of academic frustrations. Nothing in Dr. Krolick's history reflects what even retrospectively could be considered the manifestations of significant impairment.

Most relevant to the current determination, Dr. Krolick has obviously taken any number of timed, high stakes examinations over the years without requiring accommodations of any kind and with scores sufficient to allow advancement to the heights of the educational system. In the absence of any information to the contrary, I also have to assume that he has performed well in the classroom, on the job, and during the course of managing routine tasks that arise in daily life. It also should be pointed out that he never sought an evaluation for learning problems or ADHD until he was 54 years old and dealing with his lack of success on Step 1. If he truly met criteria for a developmental disorder, significant impairment (well beyond the fact that he was restless when he studied) would have surfaced earlier in his life.

Much of the newer documentation comes from testing completed by Dr. Butterbaugh. (For the record, a Dr. Hoblet apparently conducted a separate evaluation, but it was not included in the documentation I received). As best I can tell, Dr. Krolick's scores all fell within a normal range or better. It is wholly unclear to me which scores indicated "reading comprehension impairments." That statement appears to be based on the fact that his reading comprehension, while average, fell "slightly lower" than some "excellent" scores on other measures. Interpreting minor fluctuations in test scores or actual functioning as somehow representing pathology seems characteristic of Dr. Butterbaugh's arguments.

Because this documentation fails to offer any convincing evidence of either early or current impairment associated with ADHD symptomatology, I still recommend that the request for accommodations based on this disorder be denied.

Sincerely,

Michael Gordon, Ph.D.
Professor, Department of Psychiatry
Director, ADHD Program

**National Board of Medical Examiners**
**Consultant Review Form**

| | | | |
|---|---|---|---|
| **Consultant:** | Michael Gordon, Ph.D. | **Case Review Hours:** | 3.5 |
| **Date:** | 1/15/04 | **Conference Hours:** | |

Krolik, Ralph Elliott
ID #: 0-546-768-3
USMLE Step 2 CK

9   Diagnosis is supported by documentation.　　　　:　Diagnosis is NOT supported
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　 by documentation.

9   Accommodation is supported and justified.　　　 :　Accommodation is NOT
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　 supported and justified.

Comments:

Report Case Review and Conference Hours to the nearest half hour.
Please fax to the NBME Office of Test Accommodations at (215) 590-9777 by the Due
Date show above.  If a conference is necessary, complete the Request for Conference
Call Form and fax to the same number.

# APPENDIX E

# INDEX OF DOCUMENTS REVIEWED

Re:   *Krolik v. National Board of Medical Examiners*

| DATE | DESCRIPTION |
|---|---|
| 9/18/03 | Gayle F. Wurzlow, M.D. letter to Steven Seeling |
| 9/30/03 | Andy Ginn's Memo to Christine Murai regarding ECFMG Examinees for Test Accommodations |
| 12/16/98 | Gayle F. Wurzlow, M.D. letter to Steven Seeling |
| 9/11/98 | Gayle F. Wurzlow, M.D. letter to Mary McAvinue |
| 4/3/01 | Grant Butterbaugh, Ph.D. letter to NMBE Testing Coordinator |
| 2/23/01 | Neuropsychological and Education Evaluation of Ralph Krolik by Grant Butterbaugh, Ph.D. (Revised 4/03) |
| 11/3/03 | US Medical Licensing Examination Questionnaire |
| Undated | Ralph Krolik's personal information letter date stamped received by Disability Services on 11/5/03 |
| 11/6/03 | NBME/J. Abram Doane's Letter to Krolik re USMLE Step 2-2004 |
| 11/10/03 | NBME/J. Abram Doane's Letter to Krolik re USMLE Step 1-2004 |
| 12/11/03 | Krolik handwritten letter re Grant Butterbaugh's representation |
| 12/19/03 | Notes/phone message notes of Joseph A. Doane |
| 12/19/03 | Fax of 16 pages to J.A. Doane from G. Butterbaugh which includes NBME/Doane's 11/10/03 Letter to Krolik; Neuropsychological and Educational Evaluation (rev'd 12-03), and Butterbaugh's 12/19/03 letter to Doane |
| 12/11/03 | Krolik's handwritten letter re Grant Butterbaugh's representation |
| Undated | Letter of Jack Sona Rph. to USMLE Disability Services, date stamped 12/22/03 by Disability Services |
| 12/19/03 | Grant Butterbaugh Ph.D.'s letter to Doane/NBME |
| 2/23/01 | Neuropsychological and Educational Evaluation of Ralph Krolik by Grant Butterbaugh, Ph.D. (Revised 12/03) |
| 01/12/04 (fax date) | NBME Consultant Review Form Consultant:  Joseph E. Bernier, Ph.D. |
| 1/12/04 | Joseph E. Bernier, Ph.D.'s letter to Doane/NBME |
| Undated | NBME Disability Services File Assignment and Action Worksheet |
| Undated | Krolik's letter to Doane/NBME date stamped 1/14/04 by Disability Services |
| 1/15/04 | Michael Gordon, Ph.D.'s letter to Doane/NBME |
| 2/2/04 | Doane/NBME's letter to Krolik re USMLE Step 1 |
| 1/15/04 | NBME Consultant Review Form Consultant:  Michael Gordon, Ph.D. |
| 3/2/04 | Krolik's Letter to Doane re USMLE Exam |
| 3/5/04 | Doane's Letter to Krolik |
| 3/15/04 | Krolik's Letter to Doane |
| 3/19/04 | Amulya Yalamanchili's letter to Dr. Krolik re USMLE Step 1 |
| 10/31/04 (fax date) | Krolik's letter to ECFMG |

| | |
|---|---|
| 11/12/04 | Mary B. McAvinue's letter to Krolik |
| 11/17/04 | Doane/NBME's letter to Krolik re USMLE Step 1 |
| 4/25/01 | Keiser/USMLE's letter to Krolik re USMLE Step 1 – 2001 |
| 4/12/01 | McAvinue's Memo to Keiser/NBME re Receipt of Documentation |
| 4/9/01 | LSU School of Medicine Fax Cover Sheet to McAvinue with Butterbaugh's letter report dated 4/3/01 and Neuropsychological and Educational Evaluation dated 2/23/01 |
| 8/12/98 | Gayle F. Wurzlow, M.D.'s letter to ECFMG |
| 8/13/98 | Krolik's handwritten letter to Mary McAvinue |
| 8/14/98 | Mary McAvinue's letter to Krolik |
| 9/10/98 | Krolik's handwritten letter |
| 9/10/98 | USMLE Questionnaire Step 1 October – Krolik |
| 9/11/98 | Gayle F. Wurzlow, M.D.'s letter to Mary McAvinue |
| 9/23/98 | Handwritten note re voice mail message |
| 9/30/98 | Fax Cover Sheet from Mary McAvinue to Dr. Gayle Wurzlow |
| 1998 | Typed note re documentation to meet threshold for exam |
| 11/4/98 | Krolik's handwritten letter to Steve Seeling |
| 11/16/98 | Stephen Seeling, J.D.'s letter to Dr. Krolik |
| 12/16/98 | Gayle F. Wurzlow, M.D.'s letter to Steven Seeling, J.D. |
| 1/4/99 | Stephen Seeling, J.D.'s Memo to file re Dr. Krolik |
| 1/5/99 (fax date) | Dr. Krolik's letter to McAvinue |
| Undated | Dr. Krolik's letter to McAvinue date stamped 1/13/98 [sic] by ECFMG |
| Undated | Dr. Krolik's letter to Seeling dated stamped 1/13/98 [sic] by ECFMG |
| Undated | Dr. Krolik's letter to Seeling dated stamped 1/13/98 [sic] by ECFMG |
| Undated | Dr. Krolik's letter to Seeling date stamped 1/13/98 [sic] by ECFMG |
| Undated | Dr. Krolik's addendum dated stamped 1/13/98 [sic] by ECFMG |
| 1/13/99 | ECFMG Memo |
| 1/14/99 | Ruth Ann Grush's handwritten memo to ECFMG |
| 1/25/99 | Seeling, J.D.'s letter to Krolik |
| 2/2/99 | Seeling, J.D.'s letter to Krolik |
| Undated | ECFMG Staff Review Sheet with date reviewed by Staff Member as 2/4/99 |
| 2/7/99 | NBME Consultant Review Form |
| 2/7/99 | Michael Gordon, Ph.D.'s letter to McAvinue |
| 2/10/99 | ECFMG/McAvinue's Memo to Martin Bruegel, NBME OTA |
| 2/23/99 | ECFME/McAvinue's Letter to Dr. Krolik |
| 2/24/98 [sic] | Dr. Krolik's handwritten letter to McAvinue (fax date 2/24/00) |
| Stamped 3/1/99 | ECFME Consultant Review Form of Dr. Krolik Consultant: Dr. Kevin Murphy |
| 2/16/99 | Kevin Murphy, Ph.D.'s letter to McAvinue re Krolik's application for exam accommodations |
| 2/24/99 | Handwritten Fax Cover Sheet of Krolik to McAvinue |
| 2/24/99 | McAvinue's email to Stephen Seeling re Dr. Ralph Krolik |
| 3/9/99 | Pete Domenici's letter to McAvinue re Notice of Claim of Dr. Ralph Krolik |

| 3/10/99 | Seeling's letter to Domenici re authorization from Krolik |
|---------|-----------------------------------------------------------|
| 3/24/99 | Malarkey's email to Darcie Davis re Ralph Krolik |
| 3/31/99 | Office of Test Accommodations/Keiser's letter to Krolik |
| 4/7/99 | Copy of telephone message from Krolik to Shelby |
| 4/8/99 | Keiser's Memo to file re telephone conversation with Krolik |
| 4/9/99 | Seeling, J.D.'s cover memo to Keiser (enclosure note) |
| 4/9/99 | Handwritten note from Keiser re conversation with Seeling |
| 4/9/99 | Krolik's handwritten letter to Shelby Keiser |
| 4/13/99 | Keiser's Letter to Krolik |
| 4/14/99 | Malarkey's email to McAvinue re Ralph Krolik |
| 4/28/99 | Bruegel's email to ECFMG-Denial |
| 5/14/99 | Krolik's letter to McAvinue |
| 5/17/99 | Gayle F. Wurzlow, M.D.'s letter to McAvinue re Ralph E. Krolick [sic] |
| 5/18/99 | McAvinue's email to Bruegel re Ralph Krolik |
| 5/19/99 | McAvinue's email to Bruegel date stamped 5/19/99 by Office of Test Accommodations |
| various | Copies of report cards of Dr. Krolik |
| 5/19/99 | Bruegel's email to McAvinue re Krolik |
| 5/21/99 | McAvinue's email to Bruegel re Dr. Ralph Krolik |
| 5/24/99 | Keiser's Letter to Krolik |
| 5/28/99 | McAvinue's email to Bruegel re Dr. Ralph Krolik |
| 5/28/99 | Bruegel's email to McAvinue re Dr. Ralph Krolik |
| 5/28/99 | Krolik's letter to McAvinue and Seeling |
| 6/1/99 | Krolik's letter to Keiser |
| 6/4/99 | NBME Consultant Review Form Consultant: Michael Gordon, Ph.D. |
| 6/4/99 | Michael Gordon, Ph.D.'s Letter to Keiser |
| 6/18/99 | USMLE/Keiser's Letter to Krolik |

3