# Exhibit I

July 8, 2005

Re: Affidavit regarding Krolik v. NBME
U.S. District Court for the District of Arizona
No. CV-05-0315 PHX/FJM

Jeanne Cameron Washburn, Esq.
Domenici Law Firm, P.C.

Ms. Washburn:
     At your request, I have written this affidavit regarding your client, Dr. Ralph Krolik, whose request for reasonable testing taking accommodations was denied despite his "substantial limitations" in learning, as I describe in my reports, in the context of NBME disability evaluation and eligibility guidelines, as well as scientific research and clinical practice standards. The outline of my affidavit is as follows:

## Table of Contents for Dr. Grant Butterbaugh's Affidavit re: Dr. Ralph Krolik v. NBME

I.       Summary of Affidavit (page 2)

II.      Records Reviewed (page 3)

III.     Evaluator Qualifications (page 4)

IV.      Legal, Historical, Scientific, and Clinical Questions about the NBME Evaluation Requirements (page 5)
Section 1. Questions about Disability Laws and DSM-IV Mental Disorders (p 5)
     a.   Disability Laws and Disability Definitions (page 5)
     b.   DSM-IV Diagnostic Concepts, Criteria and Disability Definitions (page 6)
     c.   Comparability Between Disability Laws and the DSM-IV (page 8)
     Table 1. Disability Laws Compared to DSM-IV
Section 2. Questions about Chronology of ADHD Diagnoses, Disability Laws, and Dr. Krolik's Life Events (p 12)
     a.   Chronology of ADHD Diagnosis and Dr. Krolik's Life Events (page 12)
     b.   Chronology of Disability Laws and Dr. Krolik's Life Events (page 12)
     Table 2. Chronology of ADHD as a Diagnosis, Disability Laws, and Dr. Krolik's Life Events (page 13)
     c.   Specific Objections (page 14)
     Table 3. ADHD Diagnostic Criteria (DSM-IV) (page 17)
Section 3. Questions about Scientific Research & Clinical Practice Standards (p 16)
     a.   NBME Disability Evaluation Requirements Exceed Clinical Practice and Research Standards (page 17)
     b.   Current Scientific Evidence and Unresolved Professional Controversies about DSM-IV ADHD Diagnostic Criteria (page 21)
     Table 4. Comparison of Standardized Adult ADHD Rating Scales (page 24)
     Table 5. Chronology of Dr. Krolik's Life Events and Third-Party Reports of "Some" Plausible ADHD Impairments (page 28)
Section 4. Questions about NBME Requirements & Dr. Butterbaugh's Reports (p 34)
     Table 6. NBME Requirements, DSM-IV ADHD Criteria, Research Criteria, and Dr. Butterbaugh's Reports (page 44)
Section 5. Incomplete Documentation Letter from Mr. Doane of the NBME, dated 11-10-03, and Dr. Butterbaugh's Responses (p 48)
Section 6. Denial of Request for Accommodations Letter from Mr. Doane of the NBME, dated 2-3-03, and Dr. Butterbaugh's Responses (p 55)

## I. SUMMARY OF AFFIDAVIT

In the opinion of this evaluator, the National Board of Medical Examiners (NBME) and its employee, Mr. J. Abram Doane, MA, JD, Disability Services Manager, have arbitrarily imposed disability evaluation and test-taking accommodation eligibility requirements that are not operationally or otherwise specifically defined, are not knowable, or therefore, reasonable, and that

1) are neither required by disability laws nor by the official diagnostic and statistical manual of mental disorders (DSM-IV, APA 1994);

2) a. require "objective historical documentation" of childhood ADHD diagnostic symptoms, criteria, and impairments when it is not possible for some qualified individuals with disabilities to provide such documentation, because they were born and educated prior to the official introduction of, and appropriate professional training about, ADHD diagnostic criteria, evaluation methods, and treatment services;

b. require "objective historical documentation" of childhood and young adult diagnostic and disability eligibility as well as receipt of accommodation services when it is not possible for some individuals to provide such documentation, because they were born and educated prior to the passage of disability laws and related legal definitions, such as "disability," "exceptionality," "functional impairments," "substantial limitations," and "reasonable accommodations;"

3) have no scientific basis, given the lack of conclusive scientific evidence and consensus about the reliability and validity of the child-oriented DSM-IV diagnostic criteria in the diagnosis of ADHD in adults regarding diagnostic age-at-onset, symptom, and functional impairment criteria; indeed, the NBME documentation requirements exceed current clinical practice and research standards as evident in empirical studies of adult ADHD published in well-respected, peer-reviewed scientific journals;

4) a) have resulted in a clinically indefensible denial of Dr. Ralph Krolik's diagnosis with adult ADHD, as well as denial of his disabling impairments or limitations in one major life activity of learning; the denial of the ADHD diagnosis and eligible disability; which, therefore, resulted in denial of his request for reasonable test-taking accommodations that are routinely provided to qualified individuals with disabilities during educational and professional certification evaluations;

b) have resulted in a clinically indefensible denial of Dr. Ralph Krolik's request for reasonable test-taking accommodations to access public accommodations; the NBME has not provided conclusive scientific or financial evidence that the NBME suffers "undue hardship" in providing reasonable test-taking accommodations that the NBME publicly implies that are already provided to other qualified individuals with disabilities; finally, the NBME has not provided any conclusive scientific evidence that providing these commonly available test-taking accommodations "substantially or fundamentally alters" the meaning or use of the STEP exams.

## II. RECORDS REVIEWED:

As stated in my original report (dated 2-23-01) and revised evaluation report (dated 12-19-03), I reviewed the following unusually extensive records provided by Dr. Ralph Krolik:

- Drs. Wurzlow and Hoblit's evaluation reports (and Dr. Hoblit's raw test data)

- Dr. Ralph Krolik's elementary school report cards with teacher comments and secondary and post-secondary educational transcripts

- Dr. Ralph Krolik's NBME STEP test score reports

- Dr. Ralph Krolik's letters to and from NBME staff

- Dr. Butterbaugh's contemporaneous phone call notes on 12-09-03 with Mr. Doane of the NBME

III. EVALUATOR QUALIFICATIONS:

To summarize my professional qualifications, as required by the NBME disability evaluation guidelines: I completed coursework with two authorities in clinical neuropsychology: Byron Rourke, Ph.D., an expert in childhood learning disabilities at the University of Windsor, Windsor, Ontario; and Thomas van den Abell, Ph.D., an expert in adult neuropsychology at Western Michigan University, Kalamazoo, MI. I received predoctoral and postdoctoral training in clinical neuropsychology and clinical psychology with Kenneth Adams, Ph.D., and others at Henry Ford Hospital, Detroit, MI, and postdoctoral training in clinical neuropsychology with Stanley Berent, Ph.D., Bruno Giordani, Ph.D., and others at the University of Michigan, Ann Arbor, MI. For nearly 20 years, I have taught, supervised, or consulted with; physicians, medical students, residents, and fellows; psychologists, psychology students, and psychology interns; and educators. My professional teaching and expertise includes various topics about differential diagnosis, developmental consequences, treatment, and neurological bases of genetic, congenital, and acquired neurological or psychiatric disorders, including ADHD and Learning Disorders.

I am a licensed clinical neuropsychologist/psychologist who has routinely evaluated adult medical, dental, nursing, and law students, as well as licensed professionals who had known or suspected disorders of learning. In my clinical experience, these students and professionals may be substantially limited in demonstrating their "true" professional knowledge and skills when faced with lengthy, complex exam questions on classroom or national professional exams, unless they receive extra test-taking time accommodations. Despite their need for exam accommodations, these same students earn comparable faculty evaluations to their peers in practice settings in regard to their professional knowledge and skills.

Currently, I am an Associate Professor of Clinical Psychiatry at Louisiana State University Health Sciences Center, School of Medicine at New Orleans. I teach medical students, residents, fellows, and other health professionals as well as conduct neuropsychological and psychological research, including research in ADHD. I am Director of Neuropsychology for the LSUHSC Epilepsy Center of Excellence. My recent teaching duties have included teaching functional neuroanatomy classes to senior adult psychiatry residents, the neurobiology of ADHD to adult psychiatry residents, and serving as Director of the Pediatric Neuroscience Seminar for child psychiatry fellows at the LSUHSC School of Medicine. I also teach classes on functional neuroanatomy, neurodevelopment, ADHD, learning disorders, language disorders, autistic spectrum disorders, epilepsy, traumatic brain injury, Tourette's Syndrome, obsessive-compulsive disorders, and other disorders. Additionally, I am a faculty member in the Division of Law and Psychiatry, in which I teach adult psychiatry residents.

Previously, I was an Assistant Professor and Director of the Adolescent Trauma Recovery Program at the University of Maryland School of Medicine in Baltimore, MD. I have also served as Neuropsychology and Psychology Coordinator at Children's Hospital in New Orleans. Please see my attached vitae (including my recent testimony in federal cases) or contact me for any further details about my professional qualifications.

## IV. LEGAL, HISTORICAL, SCIENTIFIC, AND CLINICAL QUESTIONS ABOUT THE NBME EVALUATION REQUIREMENTS:

### Section 1. Questions about Disability Laws and DSM-IV Mental Disorders

In this section, disability definitions and concepts are reviewed, as well as DSM-IV Mental Disorders concepts and criteria.

- *Disability Laws and Disability Definitions*

The Rehabilitation Act of 1973 (PL 93-112), as amended in 1978, is believed to be the first civil rights law for the disabled, extending the Civil Rights Act of 1964. The Rehabilitation Act, as initially written, included requirements for reasonable accommodations for physical or mental limitations of disabled persons, including the "appropriate adjustment and modification of examinations." The Americans with Disabilities Act of 1990 (PL 101-336) extended these civil rights protections to the private sector, adopting aspects of prior disability law and its civil rights protections, to cover public accommodations provided by private companies, such as examinations.

As listed in Table 1, these laws define disability as **a physical or mental impairment that substantially limits one or more major life activities**. Disabilities may include persons who have "a record of such impairment, or persons who are "regarded as having such an impairment." A major life activity includes, but is not limited to, caring for one's self, walking, seeing, hearing, speaking, breathing, working, performing manual tasks, and learning.

Under Title I of the ADA, "a qualified individual with a disability is defined as a person who is qualified to perform a job with or without reasonable accommodations." Under Title III of the ADA, "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodations by any person who own leases (or leases to), or operates a place of public accommodation."

"Reasonable accommodations" are required to eliminate discriminatory social or other kinds of barriers for the disabled. "Reasonable" is defined by "undue hardship" and/or "readily available" factors in the context of employment (Title I) and/or public accommodations (Title III). In this context, the NBME, the private company that produces and administers the STEP exams, has apparently conceded that "reasonable test-taking accommodations" (e.g., extra test-taking time or testing in a quiet distraction-free room) are "readily achievable" and can be provided without "undue hardship" for the NBME. Indeed, the NBME has published on its website a series of ever-changing disability evaluation and documentation requirements and instructions about how STEP exam applicants should request test-taking accommodations. However, most NBME requirements lack any objectively or operationally defined criteria meeting either for disability or test-taking accommodations, although the DSM-IV ADHD criteria are frequently referenced.

It is important to state that this evaluator is not aware that the NBME has published any conclusive scientific evidence that providing reasonable accommodations "fundamentally" or "substantially" alters the value or meaning of the STEP exams. If, as can only be assumed, the NBME actually does already provide reasonable test-taking

accommodations to qualified individuals with eligible disabilities, then Dr. Krolik's case may simply question whether or not the NBME's evaluation and test-taking accommodation eligibility requirements are 1) "reasonable," in the context of relevant historical, legal, scientific, and clinical practice standards, and 2) have been adequately met in Dr. Krolik's case.

Of course, the more fundamental scientific and legal question related to professional certification examinations such as the STEP is whether the NBME has published conclusive scientific evidence that the STEP exams and their cut-off (passing) scores can reliably and validly differentiate "competent" from "incompetent" physicians (e.g., Hafferty & Gibson 2003) without discriminating against qualified individuals with disabilities.

- *DSM-IV Diagnostic Concepts, Criteria, and Disability Definitions*

It is essential to have some understanding of the *Diagnostic and Statistical Manual-IV*, (American Psychiatric Association, 1994), to which the NBME frequently refers in their disability evaluation guidelines. The DSM-IV, an official publication of the American Psychiatric Association, represents one of a series of ever-changing manuals of the clinical classification of mental disorders.

1.    Although ADHD and many other mental disorders are believed to represent neurobiological disorders, DSM-IV does not distinguish between mental disorders and general medical conditions or disorders, because:

"It should be recognized that these [mental disorder and general medical condition] are merely terms of convenience and should not be taken to imply that there is any fundamental distinction between mental disorders and general medical conditions, that mental disorders are unrelated to physical or biological factors or processes, or that general medical conditions are unrelated to behavioral or psychosocial factors or processes." (page xxv)

2.    DSM-IV specifically requires the presence of distressing or disabling symptoms and impairments in order to differentiate mental disorders from normal developmental or daily fluctuations in behaviors, emotions, or thinking skills.

"In DSM-IV, **each of the mental disorders is conceptualized as a clinically significant behavioral or psychological syndrome or pattern that occurs in an individual and that is associated with present distress (e.g., a painful symptom) or disability (i.e., impairment in one or more important areas of functioning) or with a significantly increased risk of suffering death, pain, disability, or an important loss of freedom** [emphasis added]. In addition, this syndrome or pattern must not be merely an expectable and culturally sanctioned response to a particular event, for example, the death of a loved one. Whatever its original cause, it must currently be considered a manifestation of a behavioral, psychological, or biological dysfunction in the individual. Neither deviant behavior (e.g., political, religious, or sexual) nor conflicts that are primarily between the individual and society are mental disorders unless the deviance or conflict is a symptom of a dysfunction in the individual, as described above." (pages xxi-xxii)

3.      It is important to emphasize that DSM-IV explicitly states that the symptoms of mental disorders must cause distress or impairment in social, occupational, or other important areas of functioning. Thus,

> "The definition of *mental disorder* [italics in original] in the introduction to DSM-IV requires that there be clinically significant impairment or distress. To highlight the importance of considering this issue, the criteria sets for most disorders include a clinical significance criterion (usually worded "… causes clinically significant distress or impairment in social, occupational, or other important areas of functioning"). **This criterion helps establish the threshold for the diagnosis of a disorder in those situations in which the symptomatic presentation by itself (particularly in its milder forms) in not inherently pathological and may be encountered in individuals for whom a diagnosis of "mental disorder" would be inappropriate** [emphasis added]." (page 7)

4.      DSM-IV does not require or recommend specific tests or methods of measurement, but does explicitly acknowledge the essential role of the clinical judgment of qualified professionals in the diagnosis and evaluation of the severity and impact of symptoms and impairments associated with mental disorders, as discussed in a section entitled **Use of Clinical Judgment:**

> **"DSM-IV is a classification of mental disorders that was developed for use in clinical, educational, and research settings. The diagnostic categories, criteria, and textual descriptions are meant to be employed by individuals with appropriate clinical training and experience in diagnosis. It is important that DSM-IV not be applied mechanically by untrained individuals. The specific diagnostic criteria included in DSM-IV are meant to serve as guidelines to be informed by clinical judgment and are not meant to be used in a cookbook fashion** [emphasis added]." (page xxiii)

5.      DSM-IV provides a complex multi-faceted model of clinical evaluation based on:

> "(a) "multiaxial" assessment system, [which] involves an assessment on several axes, each of which refers to a different domain of information that may help the clinician plan treatment and predict outcome. There are five axes included in the DSM-IV multiaxial classification:

| | |
|---|---|
| Axis I | Clinical Disorders |
| | Other Conditions That May Be a Focus of Clinical Attention |
| Axis II | Personality Disorders |
| | Mental Retardation |
| Axis III | General Medical Conditions |
| Axis IV | Psychosocial and Environmental Problems |
| Axis V | Global Assessment of Functioning |

The use of the multiaxial system facilitates comprehensive and systematic evaluation with attention to the various mental disorders and general medical conditions, psychosocial and environmental problems, and level of functioning that might be overlooked if the focus were on assessing a single presenting problem [emphasis added]. A multiaxial system provides a convenient format for organizing and communicating clinical information, for

capturing the complexity of clinical situations, and for describing the heterogeneity of individuals presenting with the same diagnosis." (page 25)

ADHD and Reading Disorders are included under Axis I in the DSM-IV. Personality Disorders, such as Antisocial Personality Disorder, are included under Axis II. Medical disorders or conditions, such as Traumatic Brain Injury, Spina Bifida, or Leukemia are included under Axis III. Environmental stressors are represented on Axis IV. Axis V, the Global Assessment of Functioning, is discussed directly below.

6.      DSM-IV instructs qualified professionals to use clinical judgment in evaluating each individual's overall functioning across multiple areas of functioning and multiple settings. Thus, DSM-IV states that:

Axis V is for reporting the clinician's judgment of the individual's overall level of functioning. ... The reporting of overall functioning on Axis V is done using the Global Assessment of Functioning (GAF) Scale. ... **The GAF Scale is to be rated with respect only to psychological, social, and occupational functioning. ... The GAF Scale is reported ... [as a] rating from 1 to 100** [emphasis added]." (page 30)*

*Author's Note: On the GAF, 100 represents the highest functional level (i.e., the absence of any functional impairment) and 1 represents the lowest functional level (i.e., the presence of total functional impairment).

Qualified professionals are instructed to rate an individual's overall functioning across multiple settings and different areas and different levels of functioning on Axis V.

- *Comparability between Federal Disability Law and the DSM-IV*

There is some comparability regarding disability concepts as defined in federal disability laws and DSM-IV (APA, 1994), the official classification manual of mental disorders to which the NBME evaluation guidelines so often refers. However, it is very important to note several important distinctions between federal disability laws and DSM-IV, such as:

1.      Disability laws do not provide a list of diagnoses that are eligible disabilities. However, DSM-IV does require that the symptoms of mental disorders cause age-inappropriate disability or distress arising from mental disorders to differentiate symptoms from normal or developmentally expected behaviors, emotions, or cognitive skills.

The clinical relevance of an individual experiencing greater "disability" than self-perceived "distress" is evident in Dr. Krolik's case, as he was not as aware of his own ADHD symptoms as would be expected. Nevertheless, he has been disabled by his clinically significant ADHD impairments, as was clinically observed during his prior psychiatric evaluations and my current evaluation, as well as reported by his spouse of nine years (who at the time of my evaluation was a licensed physician and general psychiatry resident). Indeed, his spouse also provided third-party reports of Dr. Krolik's clinically significant past chronic and current ADHD impairments in social and school settings on widely used standardized adult ADHD diagnostic rating scales (see Table 5 on page 25).

2.      Disability laws require substantial limitations in at least one "major life activity," a term that is not explicitly addressed by the DSM-IV manual, but that appears to be comparable to areas of psychological, social, and occupational (academic) functioning, as assessed using clinical judgment on Axis V and some other standardized measures.

3.      Disability concepts, such as "substantial" or "limitations," have not been explicitly translated into "mild," moderate," or "severe" levels of clinical significance of symptoms or impairments of mental disorders, such as ADHD. However, the diagnosis of mental disorders does require that symptoms and impairments are distressing or disabling in order to differentiate symptoms and impairments of mental disorders from normal fluctuations in behaviors, emotions, or thinking skills, as mentioned.

4.      Disability laws do not explicitly require childhood onset of disability or documentation of childhood onset of disabilities, except when legally relevant, such as in cases of individuals who have records of past impairment, but have no current impairments or disabilities. However, it is well known that ADHD and other learning disorders are often chronic, lifelong mental disorders for many affected individuals that vary in severity according to the nature and complexity of social, learning, and work demands.

5.      Disability laws do not require or recommend specific tests or methods of measurement in the determination of different kinds and severities of substantial limitations of major life activities. Federal court rulings have not been consistent, as "substantial limitations" have been interpreted in very different ways, according to whether an individual is limited in at least one major life activity in comparison to:
- an average person,
- an average "comparable" peer, or
- an individual's other, presumably stronger mental aptitude such as measured intelligence.

Some DSM-IV mental disorders, such as Reading Disorder, require "clinically significant" reading impairment that is discrepant from an individual's estimated general aptitude as represented by comparison to the expectations based on an individual's chronological age, measured intelligence, educational achievement, and/or "developmental level." Clinically significant ADHD diagnostic symptoms or impairments must be discrepant in comparison to expectations based on an individual's "developmental level." This diagnostic criterion exists to avoid over-diagnosing ADHD in children with mental retardation, for example, whose inattentive and overactive behaviors are consistent with expectations based on developmental "age" but not chronological "age."

Thus, disability is typically evaluated with regard to each individual's functional status in comparison to different standards, as variously defined by disability laws, court rulings, and/or official DSM-IV diagnostic criteria.

6.      Disability laws and NBME guidelines do not require specific tests or methods of measurement of various areas of functioning. However, it is important to note that DSM-IV explicitly justifies the use of clinical judgment by qualified professionals in the evaluation of an individual's overall level of psychological, social, or occupational functioning. Note that this is an assessment of an individual's overall level of functioning

across multiple areas of functioning and across multiple settings. Unfortunately, there is no explicit professional consensus about the translation of Global Assessment of Functioning ratings into legal concepts such as "substantial limitations." Nevertheless, the diagnosis of ADHD and other mental disorders using DSM-IV does require that symptoms cause clinically significant **"distress or disability in social, occupational, or other important areas of functioning** [emphasis added]" (page 7; DSM-IV, APA 1994).

Indeed, occupational or academic areas of functioning appear to be generally comparable to the major life activities of work, learning, and communicating (i.e., speaking, listening, reading, writing, etc.), as referenced in disability laws. In DSM-IV, ADHD diagnostic criteria require **"some"** impairment in <u>two or more</u> settings, as well as require clinically significant impairment in social, academic, **or** work functioning [emphasis added]" (page 7).

7.    Disability laws aspire to protect the civil rights of qualified individuals with disabilities by eliminating discriminatory social or other kinds of barriers through reasonable accommodations at work or in public places or services. DSM-IV was not conceived to protect the civil rights of individuals with mental disabilities. Therefore, DSM-IV does not specifically define or discuss many legal concepts or definitions, such as "qualified individuals with disabilities" or "reasonable accommodations."

Regarding Title III, it is interesting to recognize that individuals with physical disabilities are not subjected to the extensive intrusions into their private lives personal health, mental health, educational, and family lives, yet they routinely receive reasonable accommodations, such as wheelchair ramps, spacious and adapted restroom facilities. By contrast, individuals with mental disabilities, such as Dr. Krolik, are subjected to extensive intrusions into their private personal lives, yet are not eligible for common test-taking accommodations. This qualified professional is at a loss to explain such unequal differences in treatment.

The opinion of this evaluator is that Dr. Krolik meets DSM-IV diagnostic criteria for ADHD, meets various definitions of disability, and, therefore, meets eligibility criteria for receiving reasonable test-taking qualifications.

In the following sections, this evaluator will discuss, document, and argue that the NBME disability evaluation and accommodation eligibility requirements are "unreasonable" and are presented as "received scientific fact," without appropriate acknowledgment of the well-known current lack of conclusive scientific evidence and consensus about the reliability and validity of the DSM-IV ADHD diagnostic criteria for the diagnosis and evaluation of ADHD in adults, such as Dr. Krolik.

Table 1. Disability Laws Compared to DSM-IV.

| Federal Disability Laws | DSM-IV (APA 1994) |
|---|---|
| **Disability Definition:** | **Disability Definition:** |
| • a physical or mental impairments that <u>substantially limits one or more of the major life activities</u> | • not specifically defined or cited, but…<br>• Mental Disorder is defined as "a clinically significant behavioral or psychological syndrome or pattern that occurs in an individual and that is associated with present distress (e.g., a painful symptom) or disability (i.e., *impairment in one or more important areas of functioning*) or with a significantly increased risk of suffering death, pain, disability, or an important loss of freedom." (page 7) |
| • a record of such impairment (but not now impaired), or | • not specifically defined or cited |
| • being regarded as having such an impairment (but not impaired) | • not specifically defined or cited |
| **Major Life Activity Definition:** | **Major Life Activity Definition:** |
| defined as including, but not limited to: caring for oneself, walking, seeing, hearing, speaking, learning, breathing, working, and performing manual tasks | • not specifically defined or cited, but …<br>• Axis V is based on by clinician's judgment of the individual's overall level of …psychological, social, and occupational functioning [i.e., excludes physical functioning] (page 30) |
| **"Substantially Limits" Definition:** | **"Substantially Limits" Definition:** |
| • <u>impairment is substantially limiting, based on its effect on that individual's life activities</u> | • not specifically defined or cited, but …<br>• DSM-IV requires "<u>clinically significant distress or impairment in social, occupational, or other important areas of functioning.</u>" (page 7) |
| **Otherwise Qualified Definition:** | **Otherwise Qualified Definition:** |
| • defined in context of employment as a person must be "qualified to perform job with or without reasonable accommodations" | • not specifically defined or cited |
| **Reasonable Accommodations Definition:** | **Reasonable Accommodations Definition:** |
| • defined using "<u>undue hardship</u>" or "<u>readily achievable</u>" standards in context of "employment" or "public accommodations" | • not specifically defined or cited |

Section 2.  Questions about Chronology of ADHD Diagnoses, Disability Laws, and Dr. Krolik's Life Events

*a. Chronology of ADHD Diagnosis and Dr. Krolik's Life Events*

The NBME required Dr. Krolik to provide "objective historical documentation of substantial limitation of learning…" and "…objective records validating your history of impairment." (see Mr. Doane's letter to Dr. Krolik dated 11-10-03 in Section 5).

In my initial and revised evaluation reports and letters to the NBME, I attempted to comply with all published as well as unpublished NBME requirements, as noted in Section 6, starting on page 56. I also clearly expressed my objections to the NBME policy that naively required "adequate documentation" of impairments or limitations symptoms from Dr. Krolik, who was born in 1944 and started first grade in 1950, almost two decades before the American Psychiatric Association first introduced the precursor diagnosis to ADHD (called "Hyperkinetic Reaction of Childhood (or Adolescence)") in DSM-II in 1968. Obviously, as I discuss below, Dr. Krolik was educated before the dissemination of professional and parental knowledge about ADHD and other learning disorders as well as decades before the availability of special educational, psychological, and medical diagnostic and treatment services were available.

As is evident in Table 2 (see next page), the first official manual of mental disorders, DSM-I (APA, 1952), did not include any precursor diagnosis to ADHD. When DSM-I was published, Dr. Krolik was in second grade. The APA officially introduced the first precursor diagnosis to ADHD, "Hyperkinetic Reaction of Childhood (or Adolescence)," in DSM-II (1968). Dr. Krolik was a 25-year-old adult when he graduated from undergraduate pharmacy school, one year after the introduction of this precursor diagnosis to ADHD. Of course, as a 25-year-old adult, Dr. Krolik was already "too old" in 1968 or 1969 to meet criteria for this precursor diagnosis to ADHD.

It is noteworthy that Dr. Krolik graduated from pharmacy school 11 years before the introduction of the official diagnosis of "Attention Deficit Disorder (with or without Hyperactivity)" was published in 1980 (*DSM-III*); 18 years before the introduction of the diagnosis of "Attention-Deficit/Hyperactivity Disorder" published in 1987 (*DSM-III-R*); and 25 years before the introduction of the diagnosis "ADHD" with several subtypes in 1994 (*DSM-IV*); and 31 years before the introduction of the most recent *DSM-IV-Text Revision*, published in 2000.

*b. Chronology of Disability Laws and Dr. Krolik's Life Events*

As is also evident in Table 2, Dr. Krolik completed his elementary and secondary education in Winnipeg, Manitoba (Canada). He subsequently moved to the United States, served in the US military, earning a Purple Heart, and then graduated from undergraduate pharmacy school at the University of New Mexico in 1969, 4 years before the passage of Section 504 of the Rehabilitation Act of 1973; 6 years before passage of the Education of All Handicapped Children in 1975 (PL 94-142), which did not include ADHD as a covered exceptionality; 21 years before the passage of the Americans with Disabilities Act and the Individuals with Disabilities Education Act (IDEA) in 1990; and 22 years before the Secretary of the US Department of Education stated in 1991 that ADHD should be considered as an exceptionality under Other Health Impaired in IDEA.

Table 2. Chronology of ADHD Diagnoses, Disability Laws, and Dr. Krolik's Life Events

| Year | Chronology of ADHD as Diagnosis and of Disability Laws | Dr. Krolik's Life Events |
|------|--------------------------------------------------------|--------------------------|
| 1944 | | Year of birth in Winnipeg, Manitoba |
| 1950 | | Year started first grade at the age of 6 |
| 1952 | DSM-I published; no precursor diagnosis to ADHD included | |
| 1962-1964 | | U.S. military service |
| 1965-1969 | | Attended undergraduate pharmacy school |
| 1968 | DSM-II published, introduction of precursor diagnosis to ADHD diagnosis, "Hyperkinetic Reaction of Childhood (or Adolescence)" | |
| 1969 | | Year graduated from undergraduate pharmacy school as a 25-year-old adult, who was ineligible to be diagnosed with a childhood or adolescent mental disorder |
| 1973 | Rehabilitation Act of 1973, Section 504 (PL 93-112)—Defined "disability" and mandated reasonable accommodations for qualified persons with eligible disabilities | |
| 1975 | Education of All Handicapped Children Act of 1975 (PL 94-172)—mandated special education for children with eligible disabilities | |
| 1980 | DSM-III published, includes ADD subtypes either with or without hyperactivity | |
| 1987 | DSM-III-R published, includes ADHD (inattentive subtype eliminated) | |
| 1990/1997 | Individuals with Disabilities Education Act (PL101-476--reauthorization of the 1975 special education law, as amended by PL105-17), IDEA Improvement Act (PL108-446) passed in 2004; no regulations published yet); ADHD is not mentioned as a covered exceptionality | |
| 1990 | Americans with Disabilities Act of 1990 (PL 101-336)—provided legal protection to qualified persons with eligible disabilities | |
| 1991 | US Department of Education (Office of Special Education) rules that ADHD should be covered under IDEA as part of the "Other Health Impaired" exceptionality | |
| 1994 | DSM-IV published, includes ADHD, with several subtypes | |
| 1996 | | Year graduated from medical school, after successfully completing all requirements |

*c. Specific Objections*

My specific objections are as follows:

1.      The NBME documentation requirements presume that mental health, medical, and educational professionals in the 1950's would have been able to reliably and validly observe, diagnose, and treat, as well as document the onset and course of childhood ADHD symptoms and functional impairments, prior to the introduction in 1968 of the first official precursor diagnosis to ADHD. Of course, there were no reliable and valid tests or methods of measurement of either the nonexistent precursor diagnosis to ADHD or the nonexistent diagnosis of ADHD at that time.

        Since Dr. Krolik's parents are deceased and thus could not complete standardized retrospective rating scales of Dr. Krolik's childhood behavior and learning, Dr. Krolik provided the only available objective documentation about his childhood behavior and academic performance: namely, his teachers' comments on his elementary and secondary school report cards, as will be discussed later. Ideally, his parents' reports would have been better measures of his childhood ADHD symptoms and impairments than his report cards. However, as will be evident in Table 6 in Section 4, Dr. Krolik's elementary school teachers' comments referred to his inconsistent academic functioning consistent with "some" typical and plausible childhood ADHD classroom learning impairments at school.

2.      The NBME requires that Dr. Krolik provide objective documentation about his adult ADHD symptoms and functional impairments from his undergraduate college and pharmacy school professors. His professors, however, would not and could not have documented Dr. Krolik's status, as they: 1) do not routinely evaluate student classroom behavior and learning abilities when grading students (unlike elementary school), and 2) are not qualified mental health or educational professionals specifically trained to reliably and validly observe, identify, diagnose, and document diagnostic symptoms and functional impairments related to the childhood precursor diagnosis to ADHD. Of course, this latter diagnosis was not applicable to adults when it was introduced, based on scientific understanding at that time. Of course, there were also no reliable and valid tests or methods of measurement of the precursor diagnosis to ADHD nor the current diagnosis of ADHD during the Dr. Krolik's childhood. As will be evident in Table 6 in Section 4 (page 36), the third party reports of Dr. Krolik's college study partner, Mr. Jack Sona, are consistent with "some" typical and plausible adult ADHD learning impairments at college.

3.      The terms "impairment" and "substantial limitation" as used by the NBME are recent technical legal concepts defined in recent federal disability rights laws and court rulings, and did not have meaning beyond standard dictionary definitions prior to passage of these laws. The NBME presumes that mental health, medical, and educational professionals in the 1950s could have known about and documented legal distinctions that did not even exist until the passage of federal disability rights laws in the 1970s and 1990s.

4.      It is heartening that Mr. Doane and the NBME conceded in the letter to Dr. Krolik, dated November 10, 2003, that the requested "objective and historical documentation" of his "childhood development" may be "impossible" to obtain (See Mr. Doane's letter dated November 10, 2003 in Section 5, starting on page 48).

However, this evaluator would ask Mr. Doane, NBME staff, and unnamed ADHD experts (to whom Mr. Doane refers in his letter dated 2-3-03, shown in Section 6, page 55) to please describe or explain the "possible" evidence-based mechanism by which mental health, medical, and educational professionals or parents in the 1950s and 1960s could have validly identified, diagnosed, treated, accommodated, as well as appropriately documented mental health evaluations, educational diagnostic evaluations, and instructional accommodations or services that did not exist throughout Dr. Krolik's childhood and early adult education.

It is important to remind readers that even Dr. Krolik's undergraduate pharmacy school professors in the 1960s could not have been any more knowledgeable than were Dr. Krolik's elementary and secondary school teachers to reliably and validly observe ADHD diagnostic criteria, or to diagnose or accommodate ADHD impairments at that time. Indeed, most college professors in 2005 are not any more knowledgeable or qualified to reliably and validly identify or diagnose ADHD or other learning disabilities. These functions continue to be performed by qualified professionals.

Finally, the scientific reliability and validity of evaluating any individual's medical, mental health, and educational history based on available medical, mental health, and educational records is not known. Given the profound advances in disability laws, special education, and mental health during Dr. Krolik's life, there is even less known, if that is possible,  about the reliability and validity of using whatever medical, mental health, and educational records of any specific individual adult to determine his or her childhood medical, mental health, and educational conditions or disorders.

Nevertheless, this evaluator reviewed Dr. Krolik's available, third-party documentation and found "some" plausible clinical indicators of ADHD learning impairments in elementary school and college. As will be discussed, this evaluator obtained third-party reports from his spouse of significant ADHD impairments as well.

This evaluator explicitly acknowledges the well-known and inevitable limitations of current scientific knowledge and the lack of professional consensus about the best measurement methods or specific tests in the diagnosis of adult ADHD. And, as will be also discussed, the NBME evaluation requirements exceed scientific research and clinical practice standards.

Section 3. Questions about Scientific Research and Clinical Practice Standards

The NBME disability evaluation guidelines include diagnostic evaluation and documentation requirements that are not specifically required for diagnosis of ADHD by qualified professionals, according to *DSM-IV* (1994), the official diagnostic manual of mental disorders to which the NBME so frequently refers. To understand whether the NBME evaluation requirements are reasonable, it is critical to understand some of the current limits of scientific knowledge and lack of conclusive professional consensus about the reliability and validity of DSM-IV ADHD criteria in the diagnosis of ADHD in adults.

All qualified professionals, including well-recognized ADHD experts, are familiar with the current limits of scientific evidence and current lack of any conclusive professional consensus about the reliability and validity of the child-oriented ADHD diagnostic symptoms and criteria in the diagnosis and evaluation of adults. The NBME has not acknowledged these well-known and unresolved controversies, but, nevertheless, the NBME has imposed these unreasonable diagnostic disability and test-taking accommodations requirements that create potential serious consequences for individuals with disabilities seeking reasonable test-taking accommodations.

As seen below, Table 3 lists the official ADHD diagnostic criteria in *DSM-IV* (APA 1994). Note these diagnostic criteria do not include any requirement that professionals obtain standardized, retrospective parental ratings or objective documentation (i.e., elementary, secondary, or post-secondary educational records) of childhood ADHD symptoms and functional impairments in order to diagnose ADHD in adult patients. Indeed, DSM-IV does not require or recommend any specific tests and measurement methods for mental disorders, but rather instructs qualified professionals to use their clinical judgment to diagnose mental disorders, as previously stated.

As also will be discussed, Table 4 compares what are arguably the most widely-used current adult ADHD diagnostic rating scales, with associated norm-referenced samples, authors, test descriptions, and evidence supporting test validity. Although these tests are not required by disability laws, DSM-IV, or the NBME, this evaluator used the results of Dr. Krolik's self-report and his wife's third-party report on these adult ADHD rating scale results as well as all other clinical information as part of differential diagnostic consideration and conclusions as will be discussed below.

Even rigorous empirical studies of adults with ADHD, published in peer-reviewed scientific journals, do not demand adult ADHD research subjects to provide "objective historical documentation" of the childhood onset of ADHD diagnostic symptoms, criteria, and impairments in order to be included in empirical studies (e.g., see studies Biederman et al 1993; Murphy et al 2002 cited below).

**Table 3. Attention-Deficit/Hyperactivity Disorder Diagnostic Criteria (DSM-IV)\***

A. Either (1) or (2):

(1) six or more of the following symptoms of **inattention** *have persisted for at least six months to a degree that is maladaptive and inconsistent with developmental level:* (italics added)

*Inattention*
- (a) often fails to give close attention to details or makes careless mistakes in schoolwork, work, or other activities
- (b) often has difficulty sustaining attention in tasks or play activities
- (c) often does not seem to listen when spoken to directly
- (d) often does not follow through on instructions and fails to finish schoolwork, chores, duties in workplace (not due to oppositional behavior or failure to understand instructions)
- (e) often has difficulties organizing tasks and activities
- (f) often avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort (such as schoolwork or homework)
- (g) often loses things necessary for tasks or activities (e.g., toys, school assignments, pencils, books, or tools)
- (h) is easily distracted by extraneous stimuli
- (i) is often forgetful in daily activities

(2) six (or more) of the following symptoms of **hyperactivity-*impulsivity*** *have persisted for at least 6 months to a degree that is maladaptive and inconsistent with developmental level:* (italics added)

*Hyperactivity*
- (a) often fidgets with hands or feet or squirms in seat
- (b) often leaves seat in classroom or in other situations in which remaining seated is expected
- (c) often runs about or climbs excessively in situations in which it is inappropriate (in adolescents or adults, may be limited to subjective feelings of restlessness)
- (d) often has difficulty playing or engaging in leisure activities quietly
- (e) is often "on the go" or often acts as if "driven by a motor"
- (f) often talks excessively

*Impulsivity*
- (g) often blurts out answers to questions before the questions have been completed
- (h) often has difficulty awaiting turn
- (i) often interrupts or intrudes on others (e.g., butts into conversations or games)

B. **Some** hyperactive-impulsive or inattentive symptoms that caused impairment were present before age 7 years. [emphasis added]

C. **Some** impairment from the symptoms is present in two or more settings (e.g., at school [or work] and at home). [emphasis added]

D. There must be **clear evidence of clinically significant impairment in social, academic, or occupational functioning.** [emphasis added]

E. The symptoms do not occur exclusively during the course of a Pervasive Developmental Disorder, Schizophrenia, or other Psychotic Disorder, and are not better accounted for by another mental disorder (e.g., Mood Disorder, Anxiety Disorder, Dissociative Disorder, or a Personality Disorder).

\*   emphasis   added   to   highlight   important   elements   of   official   diagnostic   criteria

Biederman and colleagues (1993), for example, <u>did not</u> require research subject inclusion criteria based on 1) objective documentation of childhood educational, medical, and mental health histories or 2) third-party parent or teacher reports on standardized childhood ADHD rating scale from research subjects with adult ADHD. They stated:

"(w)e studied 84 adults of both sexes who had been referred to the Psychopharmacology Unit at Massachusetts General Hospital for the treatment of attention deficit hyperactivity disorder. Each had a clinical diagnosis of childhood-onset hyperactivity disorder confirmed by <u>structured interview</u>." (emphasis added, page 1793)

Further, Biederman and colleagues (1993) state:

"(t)o be given a diagnosis of adult attention deficit hyperactivity disorder, the subject had to 1) have met the DSM-III-R criteria for the diagnosis by the age of 7, 2) have at least five DSM-III-R symptoms of this disorder at the time of the assessment, and 3) describe a chronic course of symptoms of the disorder from childhood to adulthood. To elicit these symptoms we used the attention deficit hyperactivity disorder module from the KIDDIE-SADS-E, wording questions in the past tense. If the subject endorsed a symptom to a clinically meaningful degree, we asked whether similar problems were currently present. By using this method we could ensure that the syndrome observed in adulthood had some continuity with the syndrome reported in childhood." (page 1793)

In another example, Murphy, Barkley, and Bush (2002) did not require research subject inclusion criteria based on "1) have met the DSM-III-R criteria for the diagnosis by the age of 7, 2) have at least five DSM-III-R symptoms of this disorder at the time of the assessment, and 3) describe a chronic course of symptoms of the disorder from childhood to adulthood." They used expert clinical judgment to diagnose adult ADHD and stated:

"Participants in the ADHD group … had to receive an expert clinical diagnosis of ADHD established **not only by meeting the DSM-IV diagnostic criteria, but also by the judgment of an expert clinician.** The DSM criterion for onset of symptoms was amended to age 12 or earlier rather than the threshold of 7 years of age. This adjustment was based on the consideration that no empirical, historical or pragmatic evidence exists to show that criterion of onset by age 7 distinguishes valid from invalid cases (Barkley and Biederman, 1997). Moreover, the DSM-IV field trial (using only children) also found that use of this criterion significantly diminished the reliability of the diagnosis (Applegate et al., 1997). Imposition of such an unjustifiable threshold would create even further difficulties for the reliability of diagnosis in adults given the greater span of time involved in their own retrospective reports of their childhood behavior. **Consequently, participants were asked to consider their childhood behavior between the ages of 5 and 12 years of age (elementary school years) in answering questions about the onset of their symptoms,** *as recommended by Barkley and Biederman (1997)* [emphasis added]." (page 149)

However, Barkley and Biederman (1997) did not actually make this specific recommendation as stated by Murphy and colleagues (2002). As will be discussed below under Criterion B, Biederman and Barkley (1997) concluded that there was no

conclusive empirical support for any age-of-onset criterion for either ADHD symptoms or impairments.

"The diagnosis of ADHD was determined through a multistep process. **First, all potentially eligible study subjects completed the Adult ADHD Rating Scale …for their current functioning and for recall of childhood, ages 5 to 12 years, as an initial screen for probable ADHD. Whenever possible, these same two rating scales were completed by the participants' parents. Parent information was available for 80 of 105 ADHD participants (76%)** [emphasis added]. Some local norms (*i.e.*, those currently followed in central Massachusetts) were available on this rating scale for both the self-report forms (Murphy and Barkley, 1996b). These norms were used to determine that the participants displayed clinically deviant levels of ADHD symptoms (at least +1.5 SD [standard deviations] more than the normal mean). Second, study subjects passing this screen received a structured clinical diagnostic interview. Whenever possible, this interview included at least one of the participant's parents. This interview was conducted by a licensed clinical psychologist with 9 years of clinical experience evaluating teens and adults with ADHD (K.R.M.). **Given that no DSM-IV-based structured interview exists for the determination of ADHD in adults, the investigators created one for this project that explicitly set forth all symptoms and other diagnostic criteria for ADHD (with age of onset criterion modified as already specified)** [emphasis added]. … To be eligible at this stage, study subjects had to meet DSM-IV criteria for ADHD with onset of symptoms producing impairment before age 12 years." (page 149)

**In the last stage, the expert clinician then based his final judgment of the diagnosis not only on the reports of participants to these explicit DSM criteria but, when available, on those of their parents as well. Furthermore, the expert's final decision also included a review of past school records, where available, and any other sources of information the study subject brought to the evaluation (previous professional reports). It also involved ruling out other more parsimonious explanations for the subject's symptoms in keeping with DSM-IV recommendations to this effect** [emphasis added]." (page 150)

Overall, these published empirical studies of adult ADHD used scientific research standards that are less rigorous than the NBME evaluation requirements. The NBME requires objective documentation of childhood educational, medical, and mental health histories, as well as third-party parent and teacher reports.

I will now review current unresolved professional controversies about each of the five DSM-IV ADHD diagnostic criteria.

- *Criterion A from the ADHD Diagnostic Criteria (DSM-IV) (see Table 3)*

A. Either (1) or (2):
(1) six or more of the following symptoms of **inattention** have persisted for at least six months to a degree that is maladaptive and inconsistent with developmental level:
 *Inattention*
(2) six (or more) of the following symptoms of **hyperactivity-impulsivity** have persisted for at least 6 months to a degree that is maladaptive and inconsistent with developmental level:
 *Hyperactivity*

First, qualified professionals who are knowledgeable about childhood ADHD understand that these symptoms and impairments are not consistently exhibited across multiple ratings, settings, or areas of functioning. Furthermore, children with ADHD do not exhibit consistently severe, pervasive symptoms, as noted by Barkley (1998), who states:

"all the primary symptoms of ADHD show significant fluctuations across various settings and caregivers." (page 73)

Further, "(s)ome of the factors determining this variation have been delineated. One of these, the extent to which caregivers make demands on ADHD children to restrict behavior, appears to affect the degree of deviance of the child's behavior from normal children. In free-play or low-demand settings, ADHD children are less distinguishable from normal children than in highly restrictive ones (Barkley 1985; Jacob et al., 1978; Luk, 1985; Routh & Schroeder, 1976). **Related to this issue of setting demands is the effect of task complexity on ADHD children. The more complicated the task and hence its greater demand for planning, organization, and executive regulation of behavior, the greater the likelihood that ADHD children will perform more poorly on the task than normal children (Douglas, 1983; Luk, 1985). Clearly, the symptoms of ADHD are only handicapping when the demands of the environment or task exceed the child's capacity to sustain attention, regulate activity, and restrain impulses. In environments that place little or no demands on these behavioral faculties, ADHD children will appear less deviant and certainly be viewed by others as less troublesome than in settings or tasks that place high demands on these abilities** [emphasis added]. As Zentall (1985) rightly noted in her comprehensive review of setting factors in the expression of ADHD symptoms, we must look closely at the nature of the stimuli in the task and setting to which the child is being required to respond to gain a better understanding of why these children have so much trouble in some settings and with some tasks than others." (page 74)

Barkley (1998) further notes:

**"(t)hese situational fluctuations in symptom levels have significant implications for clinical diagnosis of ADHD. It is clear that the disorder is not completely pervasive across all settings. As a result, the previous and common clinical practice of establishing places where the ADHD child**

could behave normally and then ruling out the diagnosis is no longer tenable. ... It is now quite clear that ADHD children show a tremendous variation in their symptom severity across settings, tasks, and time. And although they are typically more deviant than normal children in their levels of activity and inattention in most settings, the factors within the setting and especially in the demands of the task are highly related to the level of deviance noted (Zentall, 1985) [emphasis added]." (page 78)

Furthermore, Barkley (1998) notes that daily fluctuations in academic functioning are common in children affected by ADHD:

"Even for those without comorbid learning disabilities, almost all ADHD children are haunted by their highly erratic educational performance over time, some days performing at or near normal levels of ability and accomplishing all assignments, other days failing quizzes and tests and not completing assigned work [emphasis added]." (page 191)

Barkley (1998) also summarized associated childhood academic impairments in a minority of adults with ADHD:

"Adults diagnosed with ADHD seem to share a similar likelihood of problems in academic functioning at some time during their schooling, as was found in children having ADHD followed over development. Between 16% and 40% of clinic-referred adults have repeated a grade, in keeping with the figures reported for ADHD children discussed earlier in this chapter (Barkley et al., 1996b; Biederman et al., 1993; Murphy & Barkley, 1996b). Up to 43% have also received some of form of extra tutoring services in their academic histories to assist them with their schooling (Biederman et al., 1993). Barkley et al. (1996b) found that 28% of their young adult sample had received special educational services; a figure about that found in hyperactive children followed to young adulthood but still higher than normal [emphasis added]. Consistent with these studies, Roy-Byrne et al. (1997) also found clinic-referred adults with ADHD to have significantly greater frequency of achievement difficulties in school, grade retentions, and special educational services. A history of behavioral problems and school suspensions is also significantly more common in clinic-referred adults with ADHD than in clinical control groups (Murphy & Barkley, 1996b). Yes, young adults with ADHD seen in clinics are far more likely to have graduated high school (92%) and attended college (68%) than are clinic-referred children with ADHD followed to adulthood (Barkley et al., 1993), for whom the high school graduation rate is only about 64% (see earlier). Some studies indicate that clinic-referred adults with ADHD may have less education than non-ADHD adults seen at the same clinic (Roy-Byrne et al., 1997), a finding consistent with adult follow-up of ADHD children (Mannuzza et al., 1993). Others, in contrast, have not found this to be the case (Murphy & Barkley 1996b) [emphasis added]." (page 214)

Please recall that these academic impairments are not specifically required by DSM-IV, are not exhibited by most clinic-referred adults who are diagnosed with adult ADHD, and are associated with other childhood mental disorders and developmental disabilities.

Other experts in ADHD, such as Keith Conners, Ph.D., and colleagues (1999), have expressed serious unresolved professional controversies about the reliability and validity of the DSM-IV ADHD diagnostic criteria, symptoms, and functional impairments in regard to adult ADHD. Conners and colleagues (1999) state that:

"... (I)nterest in the phenomenology, assessment, diagnosis, and treatment of adult attention-deficit/hyperactivity disorder has risen dramatically in recent years. It is important to emphasize, however, that the pace of clinical activity involving ADHD in adults has outstripped the development of empirically validated methods of assessment, diagnosis, and treatment. [emphasis added] Understanding of the phenomenology of ADHD in adulthood is still in a very primitive state. Clinical impressions and anecdotal reports from accumulated cases have formed much of what is known about the nature of ADHD in adults (Hallowell & Ratey, 1994). The area lacks empirically based measures of known reliability and validity (e.g., structured interviews, standardized rating scales).

One important factor limiting the advancement of research is that consensus has not yet emerged on the appropriate diagnostic criteria for ADHD in adults. [emphasis added] The set of criteria offered for ADHD in the DSM-IV (APA, 1994), despite being commonly employed by practitioners and researchers, suffers from a number of important limitations. These criteria were developed on the basis of field tests with children and adolescents ranging from 4-16 years of age (see Applegate, [sic] et al., 1995). Thus, the applicability of the DSM-IV criteria for adults with ADHD may be questioned on a number of grounds:

- There are age-related changes in the phenomenology and functional impact of ADHD symptoms (see March, Wells, & Conners, 1995; Weiss & Hechtman, 1993). The DSM-IV items may lack content validity by not adequately sampling core symptoms in adults (e.g., self-organization, planning, or time management).
- DSM-IV item-wording may be inappropriate for adult samples." (page 49).

In his classic text on ADHD, Barkley (1998) also cautions about the appropriateness of official ADHD criteria as applied to adults

"*The developmental appropriateness of DSM criteria for adults.* (italics in the original) This issue was debated in the committee meetings associated with the creation of the DSM-IV criteria but was not fully resolved. ... Most DSM items are still far more pertinent to childhood than to adult contexts. This fact poses a problem for the study of persistence of ADHD over the lifespan. ... Use of the DSM criteria across the life span would make it appear as if individuals with ADHD were outgrowing their disorder when in reality they were simply outgrowing the DSM item set." (emphasis added; Barkley 1998; page 205).

Barkley (1998) also has documented the serious limitations of retrospective self-reported, as compared to parent-reported, childhood ADHD symptoms and impairments in a follow-up study of research subjects who were diagnosed with ADHD as children:

"Thus, the persistence of ADHD into adulthood is very much a matter of the source of information and the diagnostic criteria being employed (Fischer, 1997). If DSM criteria are applied to the subject's own self-reports, low rates of persistence of ADHD are found in this study. But if parent reports of the subjects continue to be used, as they were in the prior follow-up assessments (and in other studies of ADHD into adolescence), persistence of disorder is 14 times greater. And if an empirical criterion is established for disorder, rates are nearly 23 times greater. **This and other information** (see Chapter 1, this volume) **suggests that the DSM criteria become increasingly less sensitive to the disorder with age. This information also implies that subjects with ADHD may be prone to seriously underreporting their symptoms of the disorder relative to what others may say about them...** [emphasis added]" (page 202)

Relevance of Criterion A to Dr. Krolik's Case

These citations document the complexity of the ADHD diagnostic evaluation task in children. This task is arguably more complex with adults because:

1. limited scientific evidence and lack of professional consensus exists regarding the reliability and validity of the use of the child-oriented DSM-IV ADHD diagnostic criteria in the evaluation of adults;
2. affected adults with ADHD may not be reliable or valid reporters given that they may under-report their childhood ADHD symptoms and impairments, as compared to third-party reporters;
3. as Gordon and Irwin (1997) note about evaluating adults with ADHD: "There are fewer standardized settings in which to judge performance. All children study in classrooms, but adult jobs vary in demands for attention and planning." (page 3-37)
4. and, in Dr. Krolik's case, ADHD (or its precursor diagnosis) was unknown to educational, medical, and mental health professionals during the 1950s and early 1960s and, as a result, they would have lacked the knowledge to reliably and validly observe, and diagnose ADHD during childhood.

As is evident in Table 4 on the next page, the current widely-used standardized ADHD rating scales have limitations in the representativeness of their norm-referenced samples and evidence-based support for test validity with the exception of the Conners scale. Fortunately, third-party reports about Dr. Krolik's ADHD symptoms and impairments were available from his spouse of 9 years, a licensed physician and adult psychiatry resident, who completed standardized adult ADHD rating scales as part of my evaluation as well as prior mental health evaluations from 1998. Nevertheless, this evaluator used Dr. Krolik's self-reported and his wife's third-party reported results on all of these adult ADHD scales.

Dr. Krolik underestimated his own current ADHD impairments, but his wife of 9 years reported severe, chronic impairments that exceeded those of 90-95% of individuals in the general population. Indeed, this evaluator would have been concerned about the validity of her

Table 4. Comparison of Standardized Adult ADHD Rating Scales   (NR = Not Reported)

| | Current Symptom Scales | | Childhood Symptom Scales | | Brown ADD Scales | | Conners Adult ADHD Scales | |
|---|---|---|---|---|---|---|---|---|
| | Self-Report | Other-Report | Self-Report | Other-Report | Self-Report | Collateral-Report | Self-Report | Observer-Report |
| Authors | Barkley & Murphy, 1998 | | Barkley & Murphy, 1998 | | Brown, 1996 | | Conners et al 1999 | |
| Manual: Norms, Validity & Test Description? | ADHD: symptom/impairment rating scales | | ADHD: symptom/impairment rating scales | | ADHD: symptom/impairment rating scales | | ADHD symptom/impairment rating scales | |
| Norm-Referenced Sample? | No? local sample n = 719 | No | No? local sample n = 719 | No | No? local sample n = 143 | No | Yes, national samples n = 1,026 | Yes, national samples n = 943 |
| Ages | 17-84 yo | NR | 17-84 yo | NR | 18-64 yo | NR | 18-80 yo | 18-72 yo |
| Sample | Recruited from 2 DMV offices in Worcester, MA | NR | recruited from 2 DMV offices in Worcester, MA | NR | recruited from work setting or civic association | NR | recruited from US and Canadian locations | recruited from US and Canadian locations |
| **Validity?** | | | | | | | | |
| Factor Analysis? | No | No | No | No | No | No | Yes | Yes |
| Group n's | NR | NR | NR | NR | NR | NR | n = 1,026 | n = 943 |
| Discriminative? | No | No | No | No | Yes | No | Yes | No |
| Group n's | | | | | n = 143 ADHD n = 142 no ADHD | NR NR | n = 96 ADHD n = 96 no ADHD | NR NR |
| Construct? | No | No | No | No | Yes, correlated for teens | Yes, correlated for teens | Yes, correlated | Yes, correlated |
| Self- & Other-Reports | NR | NR | NR | NR | | | | |
| Diagnostic Accuracy? | No | No | No | No | Yes | No | Yes | No |
| Group n's | NR | NR | NR | NR | n = 285 | NR | n = 192 | NR |
| Correct/Incorrect Rates | NR | NR | NR | NR | 4% false positive; 6% false negative; NR % correct classification | NR | 29% false negative; 25% false positive; 73% correct classification | NR |

third-party results, except for the fact that Dr. Krolik presented as one of the most hyperactive adults with whom I have worked. Ironically, he did not report clinically significant symptoms of adult ADHD, but his wife did, a pattern that is obviously consistent with empirical results reported in the scientific literature.

Unfortunately, the NBME did not acknowledge this third-party evidence, which was apparently dismissed by the NBME without explanation. Despite the obvious evaluation challenges due to 1) the deaths of his parents and the consequent absence of their retrospective reports, 2) the historical absence of professional knowledge of both ADHD as a diagnosis, and 3) the historical absence of disability laws during Dr. Krolik's childhood, the NBME disregarded the conclusions and clinical judgment of two qualified professionals about his past and current diagnostic- and disability-related status.

- *Criterion B from the ADHD Diagnostic Criteria (DSM-IV)*

> **Some** hyperactive-impulsive or inattentive symptoms that caused impairment were present before age 7 years.

The NBME required Dr. Ralph Krolik (and no doubt other applicants with potentially eligible disabilities) to provide "objective documentation" of the childhood onset of ADHD symptoms and impairments.

The NBME requirement does not reflect the unambiguous rebuke of two undisputed experts in ADHD research, Russell A. Barkley, Ph.D., and Joseph Biederman, MD. These experts concluded in their widely cited review of the ADHD scientific literature that there was no conclusive scientific evidence for, or professional consensus about, the validity of a diagnostic age-at-onset criterion (AOC) for either childhood ADHD symptoms or related functional impairments, despite the inclusion of the AOC as a diagnostic criterion in *DSM-IV*. Barkley and Biederman (1997) state:

"ADHD also has been granted the status of a disability under various forms of legislation and regulation, such as eligibility for special educational services, Social Security Disability benefits, and insurance and employment protections provided under the Americans With [sic] Disabilities Act (Latham and Latham, 1992). **Failing to grant the diagnosis of ADHD when, with the exception of meeting the AOC, it would be correct to do so can serve to disenfranchise these individuals from important services, treatments, and legal protections.** [emphasis added] While Shaffer (1994) may have been prudent to caution clinicians about being too liberal in granting a diagnosis of ADHD to adults or being too quick to prescribe medications for treatment in such cases, the consequences of not diagnosing or treating when a valid disorder exists are as much or more egregious." (page 1209)

"The present discussion demonstrates, however, that at least one of the criteria required for ADHD did not have its conceptual feet held to the empirical fire when the *DSM-IV* and *ICD-10* criteria were drafted—that criterion is the precise AOC of 7 years for impairing symptoms. Both this age of onset of symptoms and the further stipulation that those symptoms be impairing by that age are without merit. While clearly a useful criterion for research purposes, the AOC of age 7 years has come to be enshrined in

clinical diagnostic criteria and now serves to constrain the very research it was initially intended to benefit. Prudence, therefore, dictates that a precise AOC not be required for the clinical or research diagnosis of ADHD until such time as there is reasonable empirical support to introduce one into a diagnostic taxonomy. Moreover, the onset of impairment needs to be studied as a separate issue from that of onset of symptoms so as to give both careful study. There is no harm, and probably there is some conceptual value, in continuing to view ADHD as a developmental disorder whose typical symptoms arise in childhood. Nor is there harm, and indeed there is some good, in researchers specifying an early onset for symptoms so as to ensure a relatively homogenous sample, reliability of selection criteria across studies, and a high probability of subjects of having a valid disorder. But until such time as a justification can be marshaled for a precise AOC for either symptom onset or impairment, the AOC deserves to be either abandoned or very generously interpreted as occurring sometime in childhood, broadly construed. To do otherwise would be simply arbitrary, surely discriminatory, and empirically indefensible. [emphasis added]" (Barkley & Biederman 1997, page 1209).

Regarding the age of onset criterion (AOC) for ADHD, Barkley and Biederman (1997) concluded:

"But it is one thing to conceptualize ADHD as having an onset in childhood and quite another to stipulate that a precise (and relatively early) AOC [age-at-onset criterion] must be met in order for the diagnosis to be valid, either clinically or for research purposes. And it is an even greater leap of faith to extend this AOC to that of symptoms producing impairment, for which no prior supportive evidence exists. Few other childhood and no adult disorders require so precise an AOC even though many are as "developmental" as ADHD, often having their onset in childhood or adolescence. For many of the childhood disorders, an onset of symptoms before 18 years of age appears to be sufficient if any AOC is required at all. None require an onset of impairment by so young an age [emphasis added]. And so there exists ample precedent for continuing to consider a disorder as typically having a childhood onset without demanding that it do so to be valid or that impairment be associated with that onset. Nor would conceptualizing ADHD as a childhood-onset disorder necessarily invalidate the disorder as an adult diagnosis just because a specific AOC cannot be reliably recalled by adults with any precision. Many of the mood and anxiety disorders of adulthood often have their onset in childhood (Newman et al., 1996), but no childhood AOC is required for their diagnosis nor must their recall of such onset be reliable to render them valid. The issue, then, is not whether ADHD should be viewed as a childhood-onset disorder, but whether so precise an AOC should be used to establish validity of disorder and whether onset of impairment should be folded in with it. The evidence suggests not" (emphasis added, page 1208).

<u>Relevance of Criterion B to Dr. Krolik's Case</u>

These references highlight the current limits of scientific evidence and lack of conclusive professional consensus about: 1) whether to require an age-of-onset diagnostic criterion for either ADHD symptoms or functional impairments and 2) how to