evaluations, or through other sources of information to suggest that you have shown pervasive problems managing the many daily demands for organization and attention that are inherent to [sic] the life of a medical student, resident, or employee. **(see #6v)**

Regulatory decisions and case law have established that the ADA covers individuals who are "substantially limited" in a major life activity as the result of a disability. Determination of whether an individual is substantially limited in functioning as compared to most people is based on assessment of the current impact of the identified impairment. Therefore, a diagnostic label, in and of itself, does not establish coverage under the Americans with Disabilities Act. Overall, the documentation you have provided does not suggest that you are significantly impaired relative to the average person in the general population. Therefore, after a careful review of all your documentation, I must inform you that we are unable to provide you with the requested accommodations. **(see #6vi)**

We will request processing of your exam application without test accommodations. You may inquire at permits@ecfmg.org or call Applicant Information Services at (215) 386-5900 with any questions about your scheduling permit.

Sincerely,
xx
J. Abram Doane, MA, JD
Manager, Disability Services
JAD/c"

My responses follow each point enumerated above in Mr. Doane's letter, dated February 2, 2004:

**NBME citation #6i:** "According to your revised February 2001 Neuropsychological and Educational Evaluation, revised December 2003, your evaluator, Dr, Grant Butterbaugh, assigns you the diagnoses of Attention-Deficit/Hyperactivity Disorder (chronic, probably combined type), Reading Disorder (chronic, with comprehension worse than phonics), and Motor Coordination Disorder (probably mild handwriting and drawing deficits). Dr. Butterbaugh reports "Dr. Krolik has relative neuropsychological weaknesses in reading comprehension, complex verbal/design memory/retrieval, handwriting, and complex design copying, and consistent organizational/attentional control skills." He states in his report, "Given his revised reading scaled scores (based on revised NBME policies about the Nelson-Denny Reading test (sic), we are revising our recommendations that ADHD, but not his Reading Disorder, should be the basis for his substantial limitations in the major life activity of learning" (p. 6)."

**Response:** As previously discussed, this evaluator diagnosed Dr. Krolik with ADHD, based on all evaluation information and also diagnosed Reading Disorder based on official DSM-IV criteria, such as a discrepancy between Dr. Krolik's grade-based standard scores for his reading comprehension as compared to either his measured intelligence and comparable educational peers. This discrepancy-based definition is consistent with the definition of disability used in some court rulings. However, the pooled "grade-based" norm-referenced NDRT standard scores (which were inaccurately called "age-based" standard scores by Mr. Doane) were reported as

requested by Mr. Doane and the NBME staff. Using the latter standard scores, Dr. Krolik's NDRT Reading Comprehension standard scores fell in the average range; thus, he would not be considered substantially limited in reading as compared to the average person in the general population, consistent with some other court rulings. It is important to restate that these latter court rulings were based on disability definitions of substantial limitations that differ from both traditional definitions and official DSM-IV diagnostic criteria for Reading Disorder.

Dr. Krolik was also diagnosed with Motor Coordination Disorder based on his probable graphic motor deficits in comparison to expectations based on his measured intelligence or developmental level. This disorder is consistent with official DSM-IV diagnostic criteria for Motor Coordination Disorder and some court rulings. Dr. Krolik's DSM-IV diagnoses as well as a clinical summary of his psychoeducational and neuropsychological strengths and weaknesses were also provided, as required by the NBME of evaluators.

**NBME citation #6iia:** Attention Deficit (sic)/Hyperactivity Disorder is a developmental disability…"

> **Response:** It is important to note that the NBME appears to concede that ADHD is or is expected to be a disability, not merely a mental disorder. Thus, the NBME appears to concede that individuals diagnosed with ADHD can be expected to be disabled, an opinion with which many qualified professionals can generally agree.

**NBME citation #6iib:** "Attention Deficit (sic)/Hyperactivity Disorder is a developmental disability with a childhood onset that typically results in a chronic and pervasive pattern of functional impairment in academic, social, or vocational functioning, and often in daily adaptive functioning. However, the documentation submitted with your request for accommodation does not adequately support an ADHD diagnosis or the existence of a disability."

> **Response:** Overall, it is my professional opinion of this qualified examiner that Dr. Krolik was one of the most obviously hyperactive and impulsive adult clients, with whom I have ever worked across my 20-year career in mental health.
>
> For example, our Test Observations (p 2 of 8, revised report dated 12-03) described Dr. Krolik as "cooperative and well-motivated during testing, but he showed obvious and consistent high levels of inattention, impulsivity, and overanxiousness. He frequently started tasks before instructions were completed, became distressed and apologized when he made mistakes, and frequently failed to self-monitor and self-correct his performance on his own. His restlessness resembled the disinhibited behavior of a hyperactive school-aged child with obvious impulsive and overactive behavior. He also frequently interrupted the examiners' comments or instructions, not from deliberate discourtesy, but rather from his own impulsiveness." This description indicates current clinically significant ADHD impairments in at least one setting, the functional and relevant area of tests of learning, especially when considered in the context of all other results.
>
> As previously noted by Barkley (1998), patients' self-report about ADHD symptoms may result in clinically significant underreporting of their past and current symptoms and impairments. Third-party reports are neither required nor recommended under

disability laws, but are a clinically necessary diagnostic evaluation strategy that are often used to correct for invalid patient self-report bias. Dr. Krolik certainly underreported his past and current ADHD symptoms, as compared to our own clinical test observations and to his spouse's third-party reports of his current and past ADHD impairments on the widely-used standardized, and norm-referenced Observer Version of the Conners Adult ADHD Rating Scale (CAARS, Conners et al 1999), the standardized Brown Attention-Deficit Disorder Scales (Brown 1996), and the Current ADHD Symptoms Scale—Informant Version (Barkley & Murphy 1998). With the exception of the latter scale, which has been widely used despite its limited norm-referenced data as well as limited evidence of its diagnostic reliability and validity, these ADHD rating scales are standardized and designed for collateral or third-party reports. All third-party reports by his spouse supported the diagnosis of ADHD.

As Dr. Krolik's parents are deceased, objective documentation of "some" childhood ADHD impairments were based on his elementary school teachers' comments on his report cards. Certainly, reasonable persons can disagree about whether Dr. Krolik's teachers' comments represent diagnostic symptoms, given that they had never heard of, nor were they trained to evaluate, treat, and accommodate this then-nonexistent diagnostic disorder. His teachers' comments were consistent across raters as well as with typical ADHD academic or learning impairments. Of course, no ADHD diagnosis, disability laws or accommodations and special education evaluation or remedial tutoring services were available after he graduated from his undergraduate pharmacy school or thereafter.

Third-party interviews about Dr. Krolik's childhood and youth were completed in 2001. His older cousin had some quite vivid memories of Dr. Krolik's frequent childhood overactivity and continuing overtalkativeness as an adult. Mr. Jack Sona, Dr. Krolik's "study partner" in undergraduate pharmacy school, reported that Dr. Krolik "couldn't sit still and concentrate" and "was distracted easily and always on the go." Finally, Mr. Sona perceived that Dr. Krolik "was just as smart as me, but that Ralph made careless mistakes on college course exams."

Of course, the reports of Dr. Krolik's parents would have reflected more ideally knowledgeable third-party raters of his childhood behavior and academic, psychosocial, and developmental history. However, the less-than-ideal, but available third-party reports of his older cousin, college study partner, and spouse exceed or meet typical reasonable clinical and research standards of an ADHD diagnostic evaluation, even without the limited but clinically significant teacher comments about his academic underachievement.

Even if the latter childhood data is not considered, it is professionally indefensible why this clinical patient with "some" severe symptoms and impairments that were clinically observed and well-documented by third-party reports of ADHD impairments by his spouse would be required to meet such unrealistically restrictive diagnostic and disability criteria. It is indefensible, given the historical coincidence of his birth some 24 years before the precursor diagnosis of ADHD and some 29 years before the passage of disability laws that first introduced legal concepts such as disability, substantial limitation, and reasonable accommodation.

Overall, Dr. Krolik provided reasonable documentation of his diagnostic status and disability status and requested common test-taking accommodations consistent with NBME requirements. However, without examining Dr. Krolik and without consideration of differential diagnostic results of widely-used standardized ADHD and other diagnostic rating scales, as well as all other relevant clinical information, Mr. Doane, NBME staff, and unnamed ADHD experts, concluded that Dr. Krolik did not have ADHD, was not disabled, and, therefore, was not eligible for reasonable accommodations.

Finally, the NBME has provided no scientific evidence that providing reasonable test-taking accommodations either "fundamentally" or "substantially alters" the professional use and meaning of the STEP exams Furthermore, the NBME also provided no financial evidence that providing reasonable test-taking accommodations alters their commercial mission or resources. Of course, the more fundamental question related to professional certification evaluations is whether research has produced conclusive scientific evidence that professional certification exam cut-off scores can reliably and validly differentiate competent from incompetent physicians without discriminating against qualified individuals with disabilities (Hafferty & Gibson 2003; Little 2003).

**NBME citation #6iii:** "While it is true, as you suggest, that the diagnostic labels of ADHD and Learning Disabilities were not in use in the 1950s, the lives of impulsive or learning impaired children nonetheless showed the impact of their deficits: They failed classes, were retained in grade, required extensive tutoring, received referrals for evaluations by psychiatrists and psychologists, and/or dropped out because of academic frustrations. … The information provided by you does not reflect the manifestations of significant impairment. Your history of academic progress does not indicate that you experienced substantial difficulties in your ability to read and learn."

**Response:** Many of these same childhood academic impairments to which Mr. Doane refers appear in a classic text by Dr. Russell Barkley and colleagues (1998) who reviewed research on childhood academic impairments of clinic-referred adults with ADHD. However, Barkley (1998) reported that these associated childhood academic impairments appeared in **only a minority of adults with ADHD**, contradicting the beliefs of Mr. Doane, NBME staff, and unnamed ADHD experts, to wit:

"Adults diagnosed with ADHD seem to share a similar likelihood of problems in academic functioning at some time during their schooling, as was found in children having ADHD followed over development. **Between 16% and 40% of clinic-referred adults have repeated a grade, in keeping with the figures reported for ADHD children discussed earlier in this chapter (Barkley et al., 1996b; Biederman et al., 1993; Murphy & Barkley, 1996b). Up to 43% have also received some of form of extra tutoring services in their academic histories to assist them with their schooling (Biederman et al., 1993). Barkley et al. (1996b) found that 28% of their young adult sample had received special educational services; a figure about that found in hyperactive children followed to young adulthood but still higher than normal.** [emphasis added] Consistent with these studies, Roy-Byrne et al. (1997) also found clinic-referred adults with ADHD to have significantly greater frequency of achievement difficulties in school, grade retentions, and special

educational services. A history of behavioral problems and school suspensions is also significantly more common in clinic-referred adults with ADHD than in clinical control groups (Murphy & Barkley, 1996b). Yes, young adults with **ADHD seen in clinics are far more likely to have graduated high school (92%) and attended college (68%) than are clinic-referred children with ADHD followed to adulthood (Barkley et al., 1993), for whom the high school graduation rate is only about 64% (see earlier). Some studies indicate that clinic-referred adults with ADHD may have less education than non-ADHD adults seen at the same clinic (Roy-Byrne et al., 1997), a finding consistent with adult follow-up of ADHD children (Mannuzza et al., 1993). Others, in contrast, have not found this to be the case (Murphy & Barkley 1996b).**" [emphasis added] (page 214)

It is also important to recall that no mandated remedial tutoring or special education services were available until 1975 when the Education for All Handicapped Children Act was passed, some 6 years after Dr. Krolik graduated from undergraduate pharmacy school. Of course, post-secondary educational institutions, such as 2-year and 4-year colleges as well as graduate or professional schools, were not (and still are not) mandated to provide remedial tutoring or special education services to post-secondary students with disabilities. Thus, no documentation of special educational services or disability-related accommodations would be expected in advance of the historical introduction to professional and the general public.

Also contradicting the pessimistic expectations of Mr. Doane, NBME staff, and the unnamed ADHD experts, please note that researchers observed that only a minority of clinic-referred adults with ADHD were retained in grade and/or dropped out because of academic frustration during childhood. Indeed, the majority of clinician-referred adults with ADHD graduated from high school and attended college. Of course, the scientific and professional irony of these findings is that such research data were based on research subjects' or their family members' self-reports, rather than on objective historical documentation as currently required by the NBME.

*In summary, Mr. Doane and the NBME appear to require a history of severe academic impairments to validate childhood ADHD in spite of the identification of such impairments in only a minority of clinic-referred adults with ADHD, and despite 1) the lack of scientific evidence and consensus about the reliability and validity of such diagnostic criteria and 2) the absence of such requirements in published research studies of ADHD. This NBME-created or invented administrative policy or criterion is not consistent with available scientific evidence, DSM-IV ADHD diagnostic criteria, or the disability eligibility definitions under current disability laws or court rulings.*

NBME citation #6iv: "It appears that despite what might have been an active style, you completed elementary school, high school, college, pharmacy school, and medical school without the need for special accommodations. There is no indication that you ever sought evaluation or accommodations prior to taking the USMLE Step 1."

Response: It is important to repeat my objections about requiring Dr. Krolik to produce documentation for accommodations when diagnostic, treatment, special

education, tutoring, or accommodations services were unknown and therefore were unavailable during Dr. Krolik's entire childhood and adult undergraduate education.

However, Mr. Doane and the NBME then proceed to ignore such historical facts by requiring documentation from Dr. Krolik of non-existent special educational services or test taking accommodations that could not have been documented until after the passage of either the Rehabilitation Act of 1973 or the Education of All Handicapped Children Act of 1975, some 4 to 6 years after Dr. Krolik graduated from undergraduate pharmacy school.

Of greater importance is the fact that disability under the ADA is defined by whether or not Dr. Krolik has a current disability based on whether he is currently substantially limited in one or more major life activity, such as learning. The historical facts remain that there were no official ADHD diagnosis, no disability laws, and no evaluation, treatment, or special education during Dr. Krolik's childhood. This should suffice as a reasonable explanation of why Dr. Krolik was not previously diagnosed, treated, tutored, or accommodated as a child and young adult.

**NBME citation #6vi:** "Furthermore, no documentation was provided to indicate current functional impairment such as faculty/supervisor comments, job performance evaluations, or through other sources of information to suggest that you have shown pervasive problems managing the many daily demands for organization and attention that are inherent to [sic] the life of a medical student, resident, or employee."

**Response:** This evaluator discussed such employee evaluations, but decided to not disclose Dr. Krolik's personal health information to his employers as doing so is not required under disability laws, NBME guidelines, or DSM-IV diagnostic criteria.

**NBME citation #6vii:** "Regulatory decisions and case law have established that the ADA covers individuals who are "substantially limited" in a major life activity as the result of a disability. Determination of whether an individual is substantially limited in functioning as compared to most people is based on assessment of the current impact of the identified impairment. Therefore, a diagnostic label, in and of itself, does not establish coverage under the Americans with Disabilities Act. Overall, the documentation you have provided does not suggest that you are significantly impaired relative to the average person in the general population."

**Response:** As mentioned, several court rulings concerning disability cases have variously defined "substantial limitations" in comparison to:
- the average peer in the general population
- the educationally comparable peer, or
- the discrepancy, for example, between an individual's higher measured intelligence or aptitude as compared to the individual's lower or "substantially limited" functioning in a major life activity, such as learning (or reading).

DSM-IV also uses similar discrepancies between the individual's impaired function in a major life activity and expectations of either comparable peers or an individual's measured intelligence or aptitude. With all due respect, this evaluator would note that court rulings rival in number and controversy professional theories or opinions regarding the "ideal" diagnostic, disability or substantial definitions or criteria regarding learning disorders.

Thus, it is important to emphasize that Dr. Krolik's reading comprehension efficiency or automaticity remains discrepant from his measured verbal IQ test score, if norm-referenced NDRT standard scores are used, as recommended by the NDRT authors. This discrepancy meets DSM-IV criteria for Reading Disabled, consistent with some court rulings. If the inaccurately characterized "age-based standard scores" are used as requested by Mr. Doane and the NBME, then Dr. Krolik's NDRT Reading Comprehension standard score is not discrepant from his measured intelligence, and he does not meet the DSM-IV diagnostic criteria for a Reading Disorder.

As discussed previously, Mr. Doane, NBME staff, and their unnamed ADHD experts repeat often-discussed aspects of the ADA. However, Mr. Doane, NBME staff, and their unnamed ADHD experts inexplicably demand "impossible" objective historical documentation of childhood ADHD impairments, yet then ignore and reject without reason objective documentation of standardized test results that documented Dr. Krolik's current and past chronic substantially limited learning and social major life activities in comparison to the average person in the general population.

For Mr. Doane, NBME staff, and unnamed ADHD experts to deny the clinical relevance of Dr. Krolik's available documentation of childhood and college ADHD limitations in the major life activity of learning and evidence of chronic, persistent, and pervasive impairments is noteworthy for its unexplained disregard of pertinent clinical data that would be not required by most qualified clinicians or researchers. As mentioned, some NBME requirements lack any objective or operational definitions or measurement methods to determine whether diagnostic or disability eligibility criteria have been met or not.

Again, it is interesting to reflect upon the obvious fact that individuals with physical disabilities are not subjected to the extensive intrusions into their private lives personal health, mental health, educational, and family lives, yet they routinely receive reasonable accommodations, such as wheelchair ramps, spacious and adapted restroom facilities. By contrast, individuals with mental disabilities, such as Dr. Krolik, are subjected to routine intrusions into private personal lives, yet are not eligible for common test-taking accommodations. This qualified professional is at a loss to explain such unequal differences in access to reasonable accommodations.

Of course, a more fundamental scientific and legal question related to professional certification examinations such as the STEP is whether the NBME has published conclusive scientific evidence that the STEP exams and their cut-off (passing) scores can reliably and validly differentiate "competent" from "incompetent" physicians (e.g., Hafferty & Gibson 2003), without discriminating against qualified individuals with mental or physical disabilities.

I declare under penalty of perjury that the above statements are true and correct.

Executed on this 8th day of July, 2005, in New Orleans, Louisiana.

GRANT BUTTERBAUGH, Ph.D.

# References

American Psychiatric Association. (1952). *Diagnostic and Statistical Manual of Mental Disorders*. Washington, DC: Author.

American Psychiatric Association. (1968). *Diagnostic and Statistical Manual of Mental Disorders* (2nd ed.). Washington, DC: Author.

American Psychiatric Association. (1980). *Diagnostic and Statistical Manual of Mental Disorders* (3rd ed.). Washington, DC: Author.

American Psychiatric Association. (1987). *Diagnostic and Statistical Manual of Mental Disorders* (3rd ed., rev.). Washington, DC: Author.

American Psychiatric Association. (1994). *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.). Washington, DC: Author.

American Psychiatric Association. (2000). *Diagnostic and Statistical Manual of Mental Disorders* (4th ed., Text Revision). Washington, DC: Author.

Barkley, R.A. (1998). *Attention-Deficit/Hyperactivity Disorder: A Handbook for Diagnosis and treatment* (2nd edition). New York: Guilford Press.

Barkley, R.A., & Biederman, J. (1997). Toward a Broader Definition of the Age-at-Onset Criterion for Attention-Deficit Hyperactivity Disorder. *Journal of the American Academy of Child and Adolescent Psychiatry*, vol. 36, pages 1204-1210.

Biederman, J., Faraone S.V., Spencer T., Wilens, T., Norman D., Lapey, K.A., Mick, E., Lehman, B.K., Doyle, A. (1993). Patterns of Psychiatric Comorbidity, Cognition, and Psychosocial Functioning in Adults with Attention Deficit Hyperactivity Disorder. *American Journal of Psychiatry*, vol. 150, pages 1792-1798.

Brown, J.I., Fishco V.V., Hanna, G. (1993). *Nelson-Denny Reading Test. Directions for Administration Forms G&H*. Itasca, IL: Riverside Publishing Co.

Brown, J.I., Fishco V.V., Hanna, G. (1993). *Nelson-Denny Reading Test. Technical Report Forms G&H*. Itasca, IL: Riverside Publishing Co.

Brown, T.E. (1996). *Brown Attention-Deficit Disorder Scales: Manual*. San Antonio, TX: The Psychological Corporation.

Conners, C.K., Erhardt, D., Sparrow, E. (1999). *Technical Manual. Conners' Adult ADHD Rating Scales (CAARS)*. Tonawanda, NY: Multi-Heath Systems Inc.

Dulcan, M., & Work Group on Quality Issues. (1997). Practice Parameters for the Assessment and Treatment of Children, Adolescents, and Adults With Attention-Deficit/Hyperactivity Disorder. *Journal of American Academy of Child and Adolescent Psychiatry*, vol. 36 Suppl., pages 85S-121S.

Goldman, L.S., Genel, M., Bezman, R.J., Slanetz, P.J., & Council on Scientific Affairs, American Medical Association. (1998). Diagnosis and Treatment of Attention-

Deficit/Hyperactivity Disorder in Children and Adolescents. *Journal of the American Medical Association,* vol. 279, pages 1100-1107.

Gordon, M., & Irwin, M. (1997). *The Diagnosis and Treatment of ADD/ADHD: A No-Nonsense Guide for Primary Care Physicians.* DeWitt, NY: GSI Publication, Inc.

Hafferty, F.W., & Gibson, G.G. (2003). Learning Disabilities, Professionalism, and the Practice of Medical Education. *Academic Medicine*, vol. 76, pages 189-201.

March, J.S., Wells, K., & Conners, C. K. (1995). Attention-Deficit/Hyperactivity Disorder: Part I. Assessment and Diagnosis. *Journal of Practical Psychology and Behavioral Health,* vol. 1, pages 219-228.

Murphy, K., & Barkley, R.A. (1996a). Prevalence of DSM-IV Symptoms of ADHD in Adult Licensed Drivers: Implications for Clinical Diagnosis. Journal of Attention Disorders, vol. 1, pages 147-161.

Murphy, K., & Barkley, R.A. (1996b). Attention Deficit Hyperactivity Disorder Adults: Comorbidities and Adaptive Impairments. Comprehensive Psychiatry, vol. 37, pages 393-401.

Murphy, K.A., Barkley, R.A., & Bush, M.A. (2002). Young Adults with Attention-Deficit Hyperactivity Disorder: Subtype Differences in Co-Morbidity, Educational, and Clinical History. *Journal of Nervous and Mental Disease*, vol. 190, pages 147-157.

Murphy, K.R., & LeVert, S. (1995). *Out of the Fog: Treatment Options and Coping Strategies for Adult Attention Deficit Disorder.* New York, NY: Hyperion.

Shaffer D. (1994). Attention Deficit Hyperactivity Disorder in Adults. *American Journal of Psychiatry*, vol. 151, pages 633-638.



School of Medicine in New Orleans
School of Medicine in Shreveport
School of Dentistry
School of Nursing
School of Allied Health Professions
School of Graduate Studies
Health Care Services Division

## NEUROPSYCHOLOGICAL AND EDUCATIONAL EVALUATION

Name: **Dr. Ralph Krolik**        Gender:        Male
Age:    56 years old              DOB:           11-22-44
DOT:    2-23-01                   Education:     Medical school graduate
**ECFMG# 0-546-768-3**

Dr. Krolik is a 56-year-old male who was referred for neuropsychological assessment of his diagnostic and treatment needs, related to whether or not he has lifelong learning difficulties and related to the exact nature of his disabilities, if any exist. Previous psychiatric evaluation by Dr. G. Wurzlow at Ochsner Foundation Hospital provided both diagnosis of, and medication treatment for, ADHD. However, a subsequent psychological evaluation by Dr. P. Hoblet did not indicate a "high probability" of ADHD from Dr. Krolik's self-reported symptoms (despite a clinically significant collateral report of ADHD symptoms from his spouse), though ADHD was not conclusively ruled out. Further, Dr. Hoblet did not administer a reading comprehension test despite Dr. Krolik's presenting problem of slow and inaccurate reading problems. The ECFMG has denied his past request for previous test accommodations, in spite of Dr. Wurzlow's diagnosis of ADHD and recommendation for testing accommodations.

Dr. Krolik's childhood report cards, letters to/from ECFMG, Dr. Wurzlow's letter to ECFMG, Dr. Hoblet's report and raw data were reviewed and included with this report. Further, a cousin (Gerald Krolik) who knew his behavior as a child and a college peer (Jack Sona) who knew Dr. Krolik's behavior as an adult were interviewed about their recollections of his behavioral characteristics. As Dr. Krolik's parents are no longer living, their retrospective behavioral ratings of his childhood behavior cannot be obtained to determine his early childhood behavioral characteristics at home.

## Developmental and Medical History:
Dr. Krolik has a reported history of spina bifida occulta (without known neurological impairments), two previous knee surgeries from sports injuries, and successful treatment for leukemia that is currently in remission. He has a history of possible mild concussive injury without clear neurological consequences (e.g., loss of consciousness) from a grenade explosion while in military service.

## Family and Social History:
Dr. Krolik lives with his spouse. He has been previously married and has two adult children. He works as a pharmacist and his spouse is a psychiatric resident. He is experiencing emotional distress related to his frustration from not passing his medical school board exams. Additional family information is on file for clinical purposes.

**Educational History:**

Dr. Krolik graduated in 1996 from the School of Medicine at the American University of the Caribbean in Plymouth, Monserrat, B.W.I., and from the University of New Mexico in Pharmacy in 1969 (the latter with a 2.34 GPA). He has taken the USMLE 5 or 6 times without ever completing the test, and failed to pass on each occasion.

Review of his available grade and high school report cards revealed a history consistent with expected childhood underachievement associated with intermittent teacher-reported attention, reading, handwriting, and study skills problems. For instance, teacher comments from the 1st through 6th grades (1950-1956) complained of unsatisfactory reading, concentration, attention or both reading and attention/concentration problems, which were all the more notable because of teachers' comments about his unrealized potential. His teachers also mentioned his concurrent courteousness and earnest effort during this same period, which minimizes the likelihood of an alternative explanation for his attention/concentration and reading problems: namely, severe conduct and emotional problems.

During the 1950's, educators' knowledge of evaluation and treatment of ADHD and reading disorders was virtually nonexistent. Given the well known lack of professional and parental knowledge at that time, it would be surprising if there was any specific individualized appraisal or diagnostic data concerning whether or not Dr. Krolik had ADHD or Reading Disorders.

**Test Observations:**

During the assessment, Dr. Krolik was casually dressed and did not have any obvious atypical physical characteristics. He was cooperative and well motivated during testing, but he showed obvious and consistent high levels of inattention, impulsivity, and overanxiousness. He frequently started tasks before instructions were completed, became distressed and apologized when he made mistakes, and frequently failed to self-monitor and self-correct his performance on his own. His restlessness was frequently like that of a school-aged child, with obvious impulsive and overactive behavior. He also frequently interrupted the examiners' comments or instructions, which did not appear to be deliberate discourtesy on his part, but rather to be related to his own impulsiveness. Given his cooperation, these results validly represent his current neuropsychological status; indeed, these results may overestimate his ability to use his skills in settings in which he does not receive consistent one-on-one instructions, encouragement, and redirection from others. As Dr. Krolik was evaluated recently (11-12-98) and he has had no subsequent medical or psychiatric disorders prior to this current evaluation, his 1998 evaluation results from WAIS-III IQ and MMPI-II personality testing, as well as from self- and spouse-reported ADHD rating scales will be considered, in addition to these current test results.

**Test Results:**

| Note: | | |
|---|---|---|
| | Average: | within $\pm$ 1 standard deviation |
| | Above Average: | $\geq$ 1 standard deviation above average |
| | Well Above Average: | $\geq$ 2 standard deviations above average |
| | Superior: | $\geq$ 3 standard deviations above average |
| | Below Average: | $\geq$ 1 standard deviation below average |
| | Moderate Deficit: | $\geq$ 2 standard deviations below average |
| | Severe Deficit: | $\geq$ 3 standard deviations below average |

As previously reported by Dr. Hoblet in November 1998, Dr. Krolik's WAIS-III results revealed obtained above average to average standard scores (within a 95% confidence interval) for Verbal (111-120), Performance (102-115), and Full Scale (109-117), with some interskill scatter.  His working memory abilities appeared to be better developed than were his general verbal and perceptual-motor-related thinking abilities and knowledge. While inconsistent with the typical "group" ADHD profile reported for the WAIS-III, the typical WAIS-III profile is not required as the basis for meeting the official diagnostic criteria for ADHD in DSM-IV. Furthermore, lower verbal and perceptual-motor skills than working memory skills may reflect co-morbid motor coordination and subtle learning/language impairments that frequently accompany ADHD (as are noted below in Dr. Krolik's own current test performances).

Dr. Krolik's language-related abilities in his receptive auditory verbal skills in comprehension of verbal passages were above average on the Revised-Woodcock-Johnson Listening Comprehension subtest. His expressive verbal abilities in picture naming and controlled verbal fluency were average to nearly above average, respectively.  His verbal performances were remarkable because of the absence of obvious word finding/recall deficits, even though he has relatively higher intellectual and listening than reading comprehension skills. The latter impairment is discussed below.  His above average listening comprehension is noteworthy in contrast to his below average reading comprehension skills as mentioned below.

Dr. Krolik's reading stanine (stanine mean = 5; sd = 2) and percentile scores, as determined on the Nelson-Denny Reading Test, Form G, were below average to above average on the Vocabulary (7; 87%), Comprehension (3; 20%), and Reading Rate (6; 67%) subtests.  His other academic skills, as reflected by standard (mean = 100, sd = 15) and percentile scores on an abbreviated Revised-Woodcock-Johnson Tests of Achievement, were well above average to average on the Word Attack (124; 95%), Dictation (105; 62%), Writing Samples (111; 78%), Calculation (132; 98%), and Applied Problems (121; 92%) subtests.   Recall that his past psychological evaluation did not assess reading comprehension as only the WRAT-III was used to assess academic skills.

His reading comprehension and handwriting fell significantly below his oral phonics, expressive writing, and math skills. Qualitative evidence was noted of excellent phonics knowledge, which is necessary in reading "phonetically regular" words, in spite of his below average reading comprehension skills, as noted above. Dr. Krolik's handwriting was not consistently legible, consistent with his self-reported history of intermittent graphic-motor difficulties. However, no calculation disability was noted. Thus, graphic-motor and reading comprehension disorders were noted, consistent with his self-reported or documented childhood and current educational history of limitations in the major life area of learning. Such reading comprehension impairments often result in affected persons learning more easily by listening rather than by reading in school, on the job, or at home. Initial and continuing professional testing requirements also require reading that can result in unfair measurement of affected persons' true professional knowledge as well unless test taking accommodations are granted. Thus, both his past and future learning via continuing professional training as well as on-the-job literacy requirements could be affected to some degree via reading (as well as attention as will be reported on below).

Dr. Krolik's visual-perceptual-related abilities appeared to be nearly above average on a motor-free spatial perception test. His ability to rapidly generate or create novel designs was above

average, though he repeatedly redrew many previously created designs (thus revealing perseverative tendencies). His graphic drawing ability was severely impaired, with indications that he used both part- and global-oriented organizational strategies in perceiving and or copying a complex geometric design. Thus, obvious graphic-motor impairments were noted on both handwriting and complex design copying tasks, despite nearly above average motor-free spatial-perceptual skills, consistent with his having a Motor Coordination Disorder. His handwriting is probably adequate compared to many other people because inconsistent or impaired graphic-motor impairments are not uncommon, especially amongst professionals.

Dr. Krolik's performances on learning and memory tests were above average to below average on auditory-verbal story and word list memory tests. However, greater retrieval deficits were noted on the word list learning and memory task. His performances were above average to moderately impaired on visual-nonverbal spatial location, design, and picture memory tests. The pattern of performances suggests that he has better simple auditory-verbal (story) and nonverbal (organized pictorial) learning and memory abilities than he has complex verbal retrieval and visual-nonverbal learning and memory abilities for complex designs. These results are associated with greater difficulties in his acquiring and/or retrieving new complex verbal and nonverbal information than in his acquiring and/or retrieving new verbal and nonverbal information that is already organized for him.

Executive-related exams revealed that Dr. Krolik had below average rapid mental flexibility, despite receiving continuous corrective and encouraging feedback on the accuracy of his visual search and shifting performances. In contrast, his simple rapid visual search for serial numbers on a related, but less demanding task was average. No evidence of visual-spatial neglect or inattention was observed on either of these psychomotor shifting or on other perceptual-related tasks.

Manual motor and simple sensory-perceptual exams revealed that Dr. Krolik made no right- or left-sided auditory, visual, or tactile extinction errors. He had average right- and left-sided eye-hand coordination speed on separate manual pegboard tasks. No atypical or lateralized simple sensory or manual motor difficulties would be indicated based on these results.

Socioemotional assessment utilized clinical observations and interviews, as well as self-administered rating scales and personality inventories, from both Dr. Hoblet's 1998 evaluation and this current evaluation. Dr. Hoblet's evaluation did not identify the presence of any mood or anxiety disorders, though Dr. Krolik was reported to have shown possible conscious or unconscious reluctance in his willingness or ability to admit having problems, which may be associated with his high degree of self-confidence. Some mild socially reclusive and distrustful tendencies, as well as compulsive and independent-minded personality tendencies were noted as well on the MMPI-II and MCMI-II personality tests, consistent with some non-specific Personality Disorder (which cannot account for his other reading, motor coordination or attentional disorders).

Ratings from Dr. Krolik and his spouse were obtained on current symptom rating scales of ADHD and associated symptoms or disorders (CAARS Self-Report and Observer versions (Connors et al., 1998) and Current Symptoms Scales—Self-Report and Other-Report Forms (Barkley & Murphy, 1998). Dr. Krolik also completed the Childhood Symptoms Scales—Self-Report Form (Barkley & Murphy, 1998). As was evident in Dr. Hoblet's 1998 results and report, Dr. Krolik's

spouse reported currently significant symptoms of ADHD (combined type), while Dr. Krolik appeared to minimize the severity and presence of these same symptoms, both in his retrospective childhood and current self-reports. His self-ratings are discrepant from his behavior as commented on by his teachers (inferred from their comments in records), spouse, and our own observations of his consistently impulsive and overactive behaviors during this evaluation, regardless.

His cousin, Gerald Krolik (who is older than Dr. Krolik), rarely visited with Dr. Krolik when they were school-aged children. As Dr. Krolik's parents are both dead, Gerald Krolik (who is now seriously ill) was interviewed by phone by this examiner to obtain the only possible recollections of Dr. Krolik's behavior as a child. Gerald Krolik reported that Dr. Krolik was physically "wild...as I remember Ralph jumping up and down on the couch." Apparently, Mr. and Dr. Krolik's visits during their childhood were infrequent.

Mr. Jack Sona, a University of New Mexico "study buddy" and friend, was interviewed by this examiner and reported that Dr. Krolik "couldn't sit still and concentrate"...[and] "couldn't sit and do homework without learning by talking in a conversation." Further he said: "he was always on the go, restless, up and down...making careless mistakes on tests."

Based on our current clinical interview and recent history, we suspect that Dr. Krolik is also experiencing at least mild, though less clearly documented, mood disorder. As may be characteristic, Dr. Krolik was reluctant to discuss these kinds of symptoms as well.

## Summary and Recommendations:

This cooperative gentleman exhibited several neuropsychological and socioemotional strengths and weaknesses. Such results are consistent with childhood and adult symptoms of Attention-deficit/Hyperactivity and Reading Disorders as well as with probable chronic Motor Coordination as well as non-specific Mood and Personality Disorders. Given the level of professional knowledge about hyperactivity and reading disorders in the 1950s when Dr. Krolik went to elementary and high school, it would be unexpected if he did have adequate documentation of ADHD and Reading Disorders and/or of their past disability-related accommodations. Indeed, these disorders were little known by professionals and parents. The Rehabilitation Act of 1973, Special Education Act of 1975, and the ADA of 1990, did not even exist when Dr. Krolik graduated from college.

This report is consistent with Dr. Wurzlow's previous diagnosis of ADHD and Dr. Hoblet's qualified conclusion that Dr. Krolik could have ADHD, as well as, more importantly, Dr. Krolik's chronic complaints of reading comprehension and learning problems. No credible alternative motivational, cultural, ESL, instructional, sensory, psychiatric, personality, or acute medical explanations for Dr. Krolik's symptoms could be identified. The pattern of his functional strengths and weaknesses as well as some recommendations will be discussed below.

Dr. Krolik has relative neuropsychological strengths in his expressive/receptive oral language, oral phonics, single word reading, expressive written language, math, simple verbal/nonverbal memory, motor-free spatial-perceptual, simple sensory-motor, and reported adaptive living skills. He has unusual compensatory attention skills for brief periods during which he can attend or concentrate better than is typical for persons with ADHD. However, this compensatory capacity

does not eliminate his reading comprehension or daily organizational and learning efficiency deficits.

Dr. Krolik has relative neuropsychological weaknesses in his reading comprehension, complex verbal/design memory/retrieval, handwriting, complex design copying, and consistent organizational/attentional control skills. Dr. Krolik's personal frustration reflects distress from his likely anger/embarrassment from not overcoming his disabilities through hard work, which had previously worked well for him. Thus, the acquisition of professional information via reading will continue to be impractical or unlikely, especially for lengthy periods or tasks. Likewise, day-to-day organizational and efficient completion of professional demands will continue to be difficult for him because of his poor self-control, especially in settings with rapidly changing or demanding reading comprehension and task organizational demands. In this context, professional exams are but one instance for which reasonable accommodations are typically provided to students or employees. He would benefit from the availability of "quiet, distraction-free" test or reading rooms and extra test-taking time (2 times the usual time), which would be helpful in both current and lifelong professional training and in professional work settings. Such reasonable accommodations for reading activities would address his inefficient and/or inaccurate reading and work habits, regardless of whether or not medication could improve his attention to work or training tasks. Given his below average reading comprehension, orally reading test questions and providing printed test questions (to help him fill in attentional lapses) by re-reading or reading test questions may be a fair accommodation as well. Certainly, his true professional potential and knowledge cannot be realized without test taking accommodations given his lifelong learning or in-service challenges related to ADHD and Reading Disorders.

Thank you for referring this interesting gentleman. If I can be of assistance, please contact me.

## Diagnoses:

Axis I  Attention-deficit Hyperactivity Disorder (chronic, with probably combined type, but compensation better for attention than for impulsivity/hyperactivity)
Reading Disorder (chronic, with comprehension worse than phonics)
Motor Coordination Disorder (handwriting and drawing deficits)
Axis II  Personality Disorder, Not Otherwise Specified (distrustful, compulsive features)
Axis III  Spina bifida, leukemia, (in remission), knee surgeries, possible concussive injury
Axis IV  Educational problems
Axis V  GAF = 70 (current)

## Relative Strengths:

Working memory greater than verbal/perceptual motor intellectual skills
Expressive and receptive language skills
Motor-free perceptual skills
Simple auditory-verbal (story) and visual-nonverbal (social-pictorial) memory/recall skills
Oral reading, writing, calculation, and applied math skills
Simple sensory-perceptual and manual motor skills
Adaptive communication, self-care, and socialization skills (by history)

**Relative Weaknesses:**

Verbal and perceptual-motor intelligences (related to visual-motor & learning deficits)
Perceptual-motor (design copying and handwriting) skills
Complex auditory-verbal and visual-nonverbal design memory/recall skills
Reading comprehension skills
Self-control of daily organizational, impulse control, activity level, and learning skills

**Recommendations:**

Classification as Worker/Student with ADHD & Reading (Comprehension) Disorders
Appropriate educational and work accommodations (extra pre- and post-license test/reading completion time in quiet room with *printed and orally presented* test questions/multiple choice format)
Consideration of medication treatment of ADHD and emotional distress (which, even if effective, will not resolve reading deficits)
Consideration of remedial reading and professional content review instructional programs
Re-evaluation, if medically or professionally necessary

Grant Butterbaugh, Ph.D.
Associate Clinical Professor of Psychiatry
La. Licensed Psychologist/Neuropsychologist  #681
504-568-3068

 **Health Sciences Center**

SCHOOL OF MEDICINE IN NEW ORLEANS

Department of Psychiatry

School of Medicine in New Orleans
School of Medicine in Shreveport
School of Dentistry
School of Nursing
School of Allied Health Professions
School of Graduate Studies
Health Care Services Division

Testing Coordinator                                          4-3-01
Office of Test Accommodations
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3190

To whom it may concern:

I am pleased to respond in writing to validate Dr. Ralph Krolik's eligibility for having current and chronic, past "substantial limitations in a major life activity such as learning" under the Americans with Disabilities Act of 1990 (ADA). Thus, I believe that he is qualified to receive testing accommodations for the USMLE Step exams. I have attached my current educational and neuropsychological evaluation report that integrates conclusions from his past medical and educational records.

To fulfill requirements, NBME guidelines appear to require documentation of my qualifications to diagnose Dr. Krolik's as having a previously undiagnosed (but clinically and educationally significant) ADHD. I was fortunate to train with one of the pioneers in neuropsychological research on childhood learning disorders, Dr. Byron Rourke, and his colleagues at the University of Windsor, Henry Ford Hospital (Detroit), and the University of Michigan (Ann Arbor). For over 15 years, I have taught physicians, psychologists, and educators about differential diagnosis, assessment, treatment, and neurological bases of ADHD and LD, as well as traumatic brain injury and psychiatric disorders in adults and children. Please contact me if you require further information about my qualifications.

We utilized current, or recent pre-existing, test results from standardized, appropriately norm-referenced neuropsychological and educational tests, including the WAIS-III, Nelson-Denny Reading Test 3-E, as well as abbreviated Revised-Woodcock-Johnson Tests of Achievement (i.e., without Passage Comprehension and Word Identification subtests) and R-WJ Tests of Cognition (Spatial Relations and Listening Comprehension subtests). Naming and word fluency as well as design copying and design fluency test results were considered to clarify hemispheric motor-dependent processing skills upon which verbal and nonverbal recall/memory skills are obviously based. Nonverbal (WAIS-III Matrix Reasoning) and verbal (WAIS-III Similarities and Comprehension) conceptual reasoning and rapid mental search/shifting or inhibition (Trail Making A & B, as well as Stroop Tests) were assessed within the context of other more fundamental skills. Given this person's history of possible traumatic brain injury, standard sensory-perceptual (unilateral followed by bilateral simultaneous tactile, auditory, and visual stimulation) and fine motor (rapid unilateral manual pegboard placement) exams were utilized as well. Please contact me if your require further information about these and other related standard tests that I utilized.

As for considering prior history and differential psychiatric or developmental disorders, an extended interview was completed regarding his educational, psychosocial, work, medical, and mental status. In addition, patient-completed rating scales were used to evaluate the presence of any personality, mood, anxiety, thought/perceptual (e.g., mental status interview, Social Phobia & Anxiety Inventory, and MMPI-II tests) and attention deficit (e.g., Barkley & Murphy's Childhood and Current Symptoms Scales, as well as Brown's ADD Scale-Adult self-report version) disorders. Collateral rating scales (e.g., Barkley & Murphy's Current Symptoms Scale-Other Report Form, as well as Brown's ADD Scale-Collateral-report version) was administered to his spouse as an additional validity check of his current self-ratings. Thus, verification was sought of any of his possible limitations in major life activities due to any possible current impulse control, motor restlessness, and social conduct impairments.

In regard to his academic or literacy skills, Dr. Krolik obtained below average reading comprehension score on the Nelson-Denny Reading Test, when compared to others in the population to which he was compared. This is somewhat validated by his frequent college "study buddy," Mr. Sona who reported that Dr. Krolik could only learn via conversational studying rather than from reading text books. Early childhood comments by his teachers indicate inattention, concentration or effort (but no conduct problems) problems that could have contributed to his reading comprehension impairments as well, although no clear individualized testing results from early grade school are evident (or could be expected, given the current knowledge of reading and hyperactivity disorders in the 1950s).

The results from this evaluation attempted from available records and clinical measures to determine whether or not Dr. Krolik exhibits educationally and vocationally significant impairments in these major life activities via clinical history, test results and decision making. Certainly, there is no professional consensus or "gold standard" that exists about what constitutes a "reasonable" evaluation or review of available records, though several "idealized" guidelines have been reported in the professional literature as selectively reflected in current NBME recommendations concerning disability-related evaluation test elements. In Dr. Krolik's case, should the absence of professional educators' knowledge of reading and hyperactivity disorders at the time of his education in the early 1950s & 1960sbe used against him because of the absence of adequate documentation of learning disabilities in his available school record?

As stated in my report, Dr. Krolik reported, and my own collateral interviews or record review revealed, reading/listening comprehension (e.g., chronic need to reread to comprehend text) as well as highly probable inattention and inefficient learning impairments across his grade school, middle/high school, and college years. His difficulties were apparent across course grades or standardized college, graduate, or medical school entry exam scores. While content difficulties would be difficult for many people enrolled in higher education programs, Dr. Krolik experienced difficulties in sustaining simple attention, impulse control, learning, and work efforts while learning at school or on the job. Certainly, he fell in the clinical range for ADHD (combined type) on current and retrospective self-report scales, with some confirmatory collateral reports or documentation by others (i.e., his spouse and "college study buddy" or in his childhood school records).

There is little doubt about the functional significance of his consistently inconsistent learning impairments in reading/listening comprehension, attention, and impulse control skills, despite his many compensatory attempts to overcome these impairments that have substantially limited his learning as a major life activity.

No other relevant psychiatric, psychosocial, motivational, or medical disorders (including traumatic brain injury or other medical and psychiatric disorders) were

identified that can provide plausible, alternative explanations for his selective, though chronic learning, self-control, and reading impairments.

Dr. Krolik has excellent motivation with which to succeed if he is permitted modest test taking strategies such as extended test taking time (e.g., 1.5 times the usual period per subtest) and testing in a quiet room. Given his history and currently documented lower reading than listening comprehension skills, Dr. Krolik may even benefit from oral (and concurrent printed "hard copy" rather than computer presented copy) administration of the Step exams (i.e., his reading comprehension is below average compared to the normative population of the Nelson-Denny Reading Test and compared to average people who do not require conversational means in order to learn).

Please contact me if you have any concerns or questions about this motivated student. Certainly, I believe that is more likely legally unfair than legally fair to require a student raised in the 1950s to produce what is now considered to be adequate documentation of past and current learning or hyperactivity impairments for diagnoses that were not even likely to be known to the majority of physicians, educators or parents at the time. Although this gentleman is not fully aware of his ADHD or reading symptoms and limitations in learning, no other plausible alternative explanations can be found for others' (and our own) observations and conclusions that he has reading comprehension and ADHD disabilities substantially limiting his learning.

Sincerely yours,

Grant Butterbaugh, Ph.D.
Associate Clinical Professor
LSUHSC-Psychiatry, Room 235F
1542 Tulane Ave.
New Orleans, LA 70112-2822
504-568-3068 (o)
gbutte@lsuhsc.edu

**Recommendations:**

Classification as Worker/Student with ADHD & Reading (Comprehension) Disorders

Appropriate educational and work accommodations (extra pre- and post-license test/reading completion time in quiet room with printed and orally presented test questions)

Consideration of medication treatment of ADHD and emotional distress (which, even if effective, will not resolve reading deficits)

Consideration of remedial reading and professional content review instructional programs

Re-evaluation, if medically or professionally necessary

Grant Butterbaugh, Ph.D.
Associate Clinical Professor of Psychiatry
La. Licensed Psychologist/Neuropsychologist  #681
504-568-3068



### LSU SCHOOL OF MEDICINE
### DEPARTMENT OF PSYCHIATRY
### SECTION OF PSYCHOLOGY
(504) 568-3068
FAX   (504) 599-0201

RECEIVED

APR 9 — 2001

ECFMG
RS

DATE: ___4/9/01_____

TO: ___Ms. Mary  McAvinne, Mgr. Test Ctr. Prog.___
_____Philadelphia, PA___

FAX #: ___215·386·6327_____

FROM: ___Sally / Dr. Butterbaugh - Ph.D_____

REMARKS: _____

_____

_____

_____

_____

Number of Pages (including cover): ___11_____

If any problems are encountered with this transmission, please call (504) 568-3068.

RECEIVED

APR 1 3 2001

OFFICE OF
TEST ACCOMMODATIONS

(36)

NBME00087

APR-09-2001  09:47        LSUMC PSYCHOLOGY                    5045990201   P.02/11

RECEIVED

APR 9 = 2001

E C F M G
R S



LSU Health Sciences Center

SCHOOL OF MEDICINE IN NEW ORLEANS

Department of Psychiatry

School of Medicine in New Orleans
School of Medicine in Shreveport
School of Dentistry
School of Nursing
School of Allied Health Professions
School of Graduate Studies
Health Care Services Division

RECEIVED

APR 1 3 2001

OFFICE OF
TEST ACCOMMODATIONS

4-3-01

Testing Coordinator
Office of Test Accommodations
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3190

To whom it may concern:

I am pleased to respond in writing to argue for **Dr. Ralph Krolik's (ECFMG# 0-546-768-3)** eligibility for having current and chronic, past "substantial limitations in a major life activity such as learning" under the Americans with Disabilities Act of 1990 (ADA). Thus, I believe that he is qualified to receive testing accommodations for the USMLE Step exams or any other professional exams that purport to measure his professional learning. I have attached my current educational and neuropsychological evaluation report that integrates conclusions from his medical and educational records.

To fulfill requirements, NBME guidelines appear to require documentation of my qualifications to diagnose Dr. Krolik's as having a previously undiagnosed (but clinically and educationally significant) ADHD. I was fortunate to train with one of the pioneers in neuropsychological research on childhood learning disorders, Dr. Byron Rourke, at the University of Windsor and, subsequently, with his colleagues in the Division of Neuropsychology at Henry Ford Hospital (Detroit), and in the Division of Neuropsychology at the University of Michigan (Ann Arbor). For over 15 years, I have taught physicians, psychologists, and educators about differential diagnosis, assessment, treatment, and neurological bases of ADHD and LD, as well as traumatic brain injury and psychiatric disorders in adults and children. Please contact me if you require further information about my qualifications.

We utilized current, or recent pre-existing, test results from standardized, appropriately norm-referenced neuropsychological and educational tests, including the WAIS-III, Nelson-Denny Reading Test 3-E, as well as abbreviated Revised-Woodcock-Johnson Tests of Achievement (i.e., without Passage Comprehension and Word Identification subtests) and R-WJ Tests of Cognition (Spatial Relations and Listening Comprehension subtests). Naming and word fluency as well as design copying and design fluency test results were considered to clarify hemispheric motor-dependent processing skills upon which verbal and nonverbal recall/memory skills are obviously based. Nonverbal (WAIS-III Matrix Reasoning) and verbal (WAIS-III Similarities and Comprehension) conceptual reasoning and rapid mental search/shifting or inhibition (Trail Making A & B, as well as Stroop Tests) were assessed within the context of other more fundamental skills. Given this person's history of possible traumatic brain injury, standard sensory-perceptual (unilateral followed by bilateral simultaneous tactile, auditory, and visual stimulation) and fine motor (rapid unilateral manual pegboard

Louisiana State University Health Sciences Center • 1542 Tulane Avenue • New Orleans, Louisiana 70112-2822
phone (504) 568-6001   fax (504) 568-8647   www.lsuhsc.edu                        NBME00088

APR-09-2001  09:47       LSUMC PSYCHOLOGY                    5045990201     P.03/11



placement) exams were utilized as well. Please contact me if your require further information about these and other related standard tests that I utilized.

As for considering prior history and differential psychiatric or developmental disorders, an extended interview was completed regarding his educational, psychosocial, work, medical, and mental status. In addition, patient-completed rating scales were used to evaluate the presence of any personality, mood, anxiety, thought/perceptual (e.g., mental status interview, Social Phobia & Anxiety Inventory, and MMPI-II tests) and attention deficit (e.g., Barkley & Murphy's Childhood and Current Symptoms Scales, as well as Brown's ADD Scale-Adult self-report version) disorders. Collateral rating scales (e.g., Barkley & Murphy's Current Symptoms Scale-Other Report Form, as well as Brown's ADD Scale-Collateral-report version) was administered to his spouse as an additional validity check of his current self-ratings. Thus, verification was sought of any of his possible limitations in major life activities due to any possible current impulse control, motor restlessness, and social conduct impairments.

In regard to his academic or literacy skills, Dr. Krolik obtained below average reading comprehension score on the Nelson-Denny Reading Test, when compared to others in the population to which he was compared. This is somewhat validated by his frequent college "study buddy," Mr. Sona who reported that Dr. Krolik could only learn via conversational studying rather than from reading text books. Early childhood comments by his teachers indicate inattention, concentration or effort (but no conduct problems) problems that could have contributed to his reading comprehension impairments as well, although no clear individualized testing results from early grade school are evident (or could be expected, given the current knowledge of reading and hyperactivity disorders in the 1950s).

The results from this evaluation attempted from available records and clinical measures to determine whether or not Dr. Krolik exhibits educationally and vocationally significant impairments in these major life activities via clinical history, test results and decision making. Certainly, there is no professional consensus or "gold standard" that exists about what constitutes a "reasonable" evaluation or review of available records, though several "idealized" guidelines have been reported in the professional literature as selectively reflected in current NBME recommendations concerning disability-related evaluation test elements. In Dr. Krolik's case, there was a well-known absence of professional educators' knowledge of reading and hyperactivity disorders at the time of his education in the early 1950s & 1960s. Further, federal law concerning learning and behavioral disabilities wasn't even enacted until 1975, at least a decade after he was in college. Given the deficient professional and lay knowledge during his childhood and young adult years, should you or can you credibly use the absence of adequate documentation in his available past school and medical record against his claimed current disability?

As stated in my report, Dr. Krolik reported, and my own collateral interviews or record review revealed, substantial limitations in reading/listening comprehension (e.g., chronic need to reread to comprehend text) as well as in attentional and efficient learning across his grade school, middle/high school, and college years. His difficulties were apparent across course grades or standardized college, graduate, or medical school entry exam scores. While content difficulties would be difficult for many people enrolled in higher education programs, Dr. Krolik experienced difficulties in sustaining simple attention, impulse control, learning, and work efforts while learning in grade school as well as subsequently in higher education. Certainly, he fell in the clinical range for ADHD (combined type) on current and retrospective self-report scales, with some confirmatory collateral reports or documentation by others (i.e., his spouse, "college study buddy," cousin, and in his childhood school records).



RECEIVED

APR 1 3 2001

OFFICE OF
TEST ACCOMMODATIONS

NBME00089



There is little doubt about the functional significance of his consistently inconsistent learning impairments in reading/listening comprehension, attention, and impulse control skills, despite his many compensatory attempts to overcome these impairments that have substantially limited his learning as a major life activity.

No other relevant psychiatric, psychosocial, motivational, or medical disorders (including traumatic brain injury or other medical and psychiatric disorders) were identified that provide plausible, alternative explanations for his selective, though chronic learning, self-control, and reading impairments.

Dr. Krolik has excellent motivation with which to succeed if he is permitted modest test taking strategies such as extended test taking time (e.g., 2 times the usual period per subtest) and testing in a quiet room.  Given his history and currently documented lower reading than listening comprehension skills, Dr. Krolik could benefit from oral and concurrent printed administration (rather than the usual computer administration) of the Step exams.  For instance, his reading comprehension is below average compared to the normative population of the Nelson-Denny Reading Test and compared to average people who would not have needed to learn via conversational means, as did Dr. Krolik, in order to learn new information.

Please contact me if you have any concerns or questions about this motivated student.  Certainly, I believe that is more likely legally unfair than legally fair to require a student raised in the 1950s and 1960s to produce what is now considered to be adequate documentation of past and current learning or hyperactivity impairments for diagnoses that were not even known to the majority of physicians, educators or parents at the time.  Although this gentleman is not fully aware of his ADHD or reading impairments, no other plausible alternative explanations can be found for others' (and our own) conclusions that he has disabilities that substantially limit his learning.  As his current impairments are not contested, we hope that this letter and related report will provide support for Dr. Krolik's reasonable request for what can only be described as minor test taking accommodations.

Sincerely yours,

Grant Butterbaugh, Ph.D.
Associate Clinical Professor
LSUHSC-Psychiatry, Room 235F
1542 Tulane Ave.
New Orleans, LA 70112-2822
504-568-3068 (o)
gbutte@lsuhsc.edu

**RECEIVED**

APR 1 3 2001

OFFICE OF
TEST ACCOMMODATIONS

NBME00090