Exhibit J

**Page 1**

```
 1         UNITED STATES DISTRICT COURT
 2          IN THE DISTRICT OF ARIZONA
 3
   RALPH E. KROLIK, M.D.,
 4
            Plaintiff,
 5
   VERSUS            CIVIL ACTION NO.
 6                   CV05-0315 PHX FJM
   NATIONAL BOARD OF MEDICAL
 7  EXAMINERS,
 8          Defendant
 9  * * * * * * * * * * * * * * * *
10
11     Deposition of DR. GRANT J. BUTTERBAUGH,
   942 Jefferson Avenue, New Orleans, Louisiana,
12  70115, taken at the Astor Crowne Plaza, 739
   Canal Street Royal Room, M2, New Orleans,
13  Louisiana, on April 26th, 2006, at or about
   1:00 p.m.
14
15
   APPEARANCES:
16
      (Via Conference Telephone)
17  DOMINICI LAW FIRM
   By: Jeanne Washburn, Esquire
18  320 Gold Avenue SW, Suite 1000
   Albuquerque, NM 87102
19  (Counsel for Plaintiff)
20  OSBORN MALEDON
   By: Diane M. Johnsen, Esquire
21  2929 North Central, Suite 2100
   Phoenix, Arizona 85012-2794
22  (Counsel for Defendant)
23  REPORTED BY:
24  Gail F. Mason, RPR
   Certified Court Reporter
25  Certificate No. 96004
```

**Page 2**

```
 1            I N D E X
 2
 3  Title Page  . . . . . . . . . . . . .   1
 4  Appearances . . . . . . . . . . . . .   1
 5  Index  . . . . . . . . . . . . . .    2
 6  Stipulations of Counsel . . . . . . .   3
 7  EXAMINATION:
 8    By Ms. Johnsen . . . . . . . . .    3
 9  EXHIBITS:
10    Exhibit No. 1 (Notice of Depo) . .   3
11    Exhibit No. 2 (CV) . . . . . . .    4
12    Exhibit No. 3 (records produced) .   6
13  Witness' Certificate . . . . . . . .  196
14  Reporter's Certificate. . . . . . . .  197
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1         S T I P U L A T I O N
 2
 3      It is stipulated and agreed by and between
 4  counsel for the parties hereto that the
 5  deposition of the aforementioned witness is
 6  hereby being taken pursuant to the Federal
 7  Rules of Civil Procedure 26 and 30, for all
 8  purposes;
 9      That the formalities of sealing,
10  certification, and filing are specifically
11  waived;
12      That the formalities of signing are
13  specifically not waived;
14      That all objections are to be considered
15  under the Federal Rules of Civil Procedure.
16              * * * * * *
17      (DR. GRANT J. BUTTERBAUGH, AFTER HAVING
18  BEEN FIRST DULY SWORN BY THE ABOVE-NAMED
19  CERTIFIED COURT REPORTER, WAS EXAMINED AND
20  TESTIFIED AS FOLLOWS:)
21  EXAMINATION BY MS. JOHNSEN:
22      Q.  Dr. Butterbaugh, I'm going to put
23  before you what the court reporter has marked
24  as Exhibit No. 1 to your deposition and ask you
25  whether that's a copy of the Notice of
```

**Page 4**

```
 1  Deposition by which you are appearing here
 2  today?
 3      A.  Yes.
 4      Q.  All right.  Exhibit No. 2 which I've
 5  marked is a copy of your CV; is it not?
 6      A.  Yes.
 7      Q.  From looking at it, sir, can you tell
 8  how current that CV is?
 9      A.  It's probably about a year-plus old.
10      Q.  Okay.  A year -- probably less than
11  two years old?
12      A.  Somewhere in 2004 or '05.
13      Q.  All right.
14      A.  Yes.  I can provide an updated vitae
15  if that would be helpful.
16      Q.  That would be helpful, and I'll get it
17  through Jeanne.  What would be the significant
18  additions that we would see in your current
19  vitae that we do not see in Exhibit No. 2?
20      A.  I think two articles have been
21  published since that was generated, that vitae
22  was generated.
23      Q.  And what are the subject matters of
24  those articles?
25      A.  Related to epilepsy.
```

Page 5

1       Q.  Both of them are?
2       A.  Yes.
3       Q.  By what entity, Doctor, are you
4  currently employed?
5       A.  LSU School of Medicine.
6       Q.  And do you -- you were telling me
7  before, and I actually heard it from Pete or
8  Jeanne, that you intend to take a new position
9  before too long?
10      A.  Yes.
11      Q.  What is that position that you intend
12  to take?
13      A.  Director of Neuropsychology at Maine
14  Medical Center.
15      Q.  All right.  And that's in the state of
16  Maine?
17      A.  Yes, it is.  Portland, Maine.
18      Q.  Is there another position that you
19  also intend to take shortly?
20      A.  No.  I think that's associated with
21  like a clinical appointment at the University
22  of Vermont, School of Medicine.  But, no,
23  that's the position I'll be taking.
24      Q.  All right.  And when do you intend to
25  take that position, sir?

Page 6

1       A.  After my home is finished being
2  renovated and we sell it and move, my wife
3  and I.
4       Q.  Within calendar year '06?
5       A.  Yes, yes.  Probably around July.
6       Q.  Okay.  Now, the court reporter has
7  marked as Exhibit No. 3 to your deposition --
8       A.  Right.
9       Q.  -- a set of documents that I
10  understand are the documents that you produced,
11  Dr. Butterbaugh, pursuant to a subpoena deuces
12  tecum --
13      A.  Yes, ma'am.
14      Q.  -- that was served on you a few weeks
15  ago?
16      A.  Yes.
17      Q.  The set of documents that has been
18  marked as an exhibit to this deposition has
19  been labeled with Bates numbers.  And the
20  range, for the record, of those Bates numbers
21  are DRGB00001 through 405; is that correct,
22  sir?
23      A.  Yes.
24      Q.  Okay.
25          BY MS. JOHNSEN:

Page 7

1           Jeanne, as we go, we'll be
2  referring -- for the record here, we'll be
3  referring to these pages by those Bates
4  numbers.  But I'll try to describe to you where
5  in the stack they are so that you can follow
6  along.
7           BY MS. WASHBURN:
8               Okay.  Thank you.
9  EXAMINATION BY MS. JOHNSEN:
10      Q.  I'm going to ask you, Dr. Butterbaugh,
11  to turn to Bates 193 within Exhibit No. 3.
12      A.  Okay.  Yes.
13      Q.  Now, this is the first page, is it
14  not, of your affidavit dated July 8, 2005 that
15  you did in connection with this litigation?
16      A.  Yes, I believe so.
17      Q.  And your affidavit, it runs through
18  page 256 within Exhibit 3, correct?
19      A.  Yes.
20      Q.  Okay.  So is it correct, sir, that
21  Bates numbers 193 through 256 comprise the
22  report that you did as a consultant retained by
23  the plaintiff in this litigation?
24      A.  To the best of my knowledge, assuming
25  all pages are there and they haven't been

Page 8

1  altered, yes.
2       Q.  Now, sir, is this the only report that
3  you have done in connection with this
4  litigation?
5       A.  No, I've done clinical reports as
6  well.  Those were included.
7       Q.  Were those clinical reports done
8  before the litigation was filed?
9       A.  Yes.
10      Q.  Okay.  So since the litigation has
11  been filed, Bates 193 through 256 comprise the
12  only report that you've -- that you prepared?
13      A.  Yes.
14      Q.  Now, are all the opinions that you
15  intend to offer in this litigation contained in
16  this July 8, 2005 report?
17      A.  That would depend on the questions
18  that I'm asked.  But I tried to address the
19  topic comprehensively, but I can't anticipate
20  whether I'd be asked a question that would
21  result in me expressing a new opinion about
22  something.
23      Q.  Well, have you been asked to perform
24  any analysis since July 8, 2005 in connection
25  with this litigation?

ASSOCIATED REPORTERS, INC.
504-529-3355

35c2eb28-53f8-4191-a040-4b328f127833

Page 9

1    A. I have reviewed the -- some tests
2 accommodation consultant reports related to, I
3 think, Dr. Gordon and maybe others' review of
4 other applicants for test-taking
5 accommodations.
6    Q. Were these the 40 pages of rationales?
7    A. Yes.
8    Q. Okay. So you reviewed those 40 file
9 rationales?
10    A. Yes.
11    Q. Have you been asked by counsel for
12 Dr. Krolik to form any other analysis in
13 connection with this litigation since July 8,
14 2005 other than to review those 40 file
15 rationales?
16    A. No, not to the best of my knowledge.
17    Q. Have you -- when did you perform your
18 analysis of the 40 file rationales?
19    A. It would have been between the time we
20 had the injunction hearing in Phoenix and now.
21 I can't recollect the exact date or dates that
22 I reviewed it, but sometime within the last
23 several -- the last few months since I received
24 it.
25    Q. Okay. Did you form any conclusions as

Page 10

1 a result of your analysis of the 40 file
2 rationales?
3    A. Yes. I -- I did not find any explicit
4 criteria by which the independent document
5 describing the criteria by which documentation
6 was acceptable or not or the methods by which
7 the reports were evaluated -- the cases were
8 evaluated on a case-by-case basis.
9    Q. You concluded that -- from your review
10 that the files -- the material within each of
11 the files was evaluated on a case-by-case
12 basis?
13    A. No. I didn't find any documents,
14 official documents or institutional documents,
15 that listed the guidelines -- the explicit
16 guidelines by which the cases were evaluated
17 individually. So this would be -- sometimes we
18 use checklists or other devices like that to --
19 with language describing what the criteria are
20 by which we evaluate criteria such as in DSM.
21 There are explicit descriptive criteria for
22 what's required to meet a diagnostic criteria,
23 you know, meet the diagnostic criteria for a
24 DSM disorder such as ADHD, for instance.
25    And so I didn't find anything

Page 11

1 that was National Board of Medical Examiners
2 type checklists by which those cases were
3 evaluated.
4    Q. Did you expect to find those
5 checklists in the 40 file rationales?
6    A. I did, actually, because one would
7 think that since DSM criteria might be used or
8 some other criteria within the institution by
9 which those cases would have been judged on a
10 case-by-case basis, so that it was transparent,
11 so it was apparent what the criteria are and
12 what are the standards for meeting or not
13 meeting the criteria.
14    Q. Did you expect to see something on the
15 order of a checklist in these 40 rationales?
16    A. Something. Something, yeah.
17    Q. Did you compare the language in the 40
18 file rationales to the text of the NBME
19 website?
20    A. No. Again, I wasn't sure what was
21 used for the basis for arriving at conclusions
22 and judgments on the cases. So I considered
23 those, you know, guidelines, but I wasn't sure
24 what the explicit criteria were. And, of
25 course, I don't know what the case material

Page 12

1 was, you know. That would be private
2 information that would have been submitted as
3 part of the individual files. And so I can't,
4 you know, know what was not before me in terms
5 of judging how the description of each case,
6 the conclusions of each case, how that was
7 arrived at in regard to individual cases.
8    Q. Did you form an opinion of any sort
9 upon your review of the 40 file rationales?
10    A. I just -- I'm used to operational
11 definitions as in DSM by which diagnostic
12 criteria are publicly available and clearly
13 expressed. And so I wasn't -- I walked away
14 with uncertainty about how the conclusions were
15 reached, what was the standard of evidence that
16 was applied on a case-by-case basis for
17 determining whether or not somebody was
18 eligible or not.
19    Q. So one opinion that you reached was
20 that you couldn't tell what objective standards
21 had been applied in the case of the 40 files?
22    A. Whether it was DSM or something else.
23    Q. All right. Did you form any other
24 opinion as a result of your review of the 40
25 file rationales?

3 (Pages 9 to 12)

35c2eb28-53f8-4191-a040-4b328f127833

Page 13

1  A. Yes. It was quite clear that that was
2  a very different evaluation then would be done
3  under DSM criteria in a clinical setting. In
4  other words, there would be a clinical
5  evaluation of a patient. It's called a
6  diagnostic intake or interview. There might be
7  follow-up sessions or evaluations depending on
8  the professional involved, you know, the
9  qualified certified professional involved,
10  whether it was a psychologist, psychiatrist,
11  neuropsychologist or whatever.
12  You know, that generates in a
13  sense that we know we're using the same
14  standard, the DSM. And so those criteria are
15  available, publicly available. We're trained
16  to interpret people's presentation according to
17  the diagnostic guidelines. And so that process
18  of evaluating them for disability eligibility
19  is still unclear to me after reviewing those
20  cases.
21  Q. Did you form any other conclusions or
22  opinions as a result of your review of those 40
23  file rationales?
24  A. I was concerned that others may not
25  have understood the importance of obtaining

Page 14

1  objective historical documentation in order to
2  justify their request for test-taking
3  accommodations. Problems such as were the
4  records available, did anybody in the school
5  system where individuals might have gone know
6  where such records were kept, what specifically
7  was being looked for.
8  Sometimes adults grow up and
9  their pediatrician that cared for them during
10  childhood or their teachers just haven't left
11  much of a paper trail behind. And so that can
12  lead to inconsistency in judging individual
13  cases when the same evidence is not available
14  for each of those cases.
15  Q. Did you form any other opinions or
16  conclusions as a result of your review of the
17  40 file rationales?
18  A. I worried that it was not essentially
19  a scientifically empirically supported
20  evaluation process, that -- in other words, one
21  could arrive at idiosyncratic judgments,
22  someone reviewing eligibility, because of the
23  lack of explicit criteria. Because it didn't
24  appear to be DSM criteria that were being used,
25  because of the vulnerability of documentation

Page 15

1  problems, you know, not being able to retrieve
2  all documents relevant to an individual case, I
3  was concerned that that was an unreliable and
4  invalid process.
5  Q. Did you form any other conclusions as
6  a result of that review?
7  A. No. I think that kind of summarizes
8  it. There might have been some nuance or
9  something, but I think that summarizes it.
10  Q. Based on your conversations with
11  counsel for Dr. Krolik, do you expect that
12  you'll be asked to testify to the conclusions
13  you've drawn as a result of your analysis of
14  the other 40 file reviews?
15  A. Perhaps, yes.
16  Q. Have you been -- have you talked about
17  that with counsel for Dr. Krolik?
18  A. No. I just expressed my opinion as I
19  did here today.
20  Q. All right. So they haven't told you
21  one way or the other whether they're going to
22  ask you to testify to that?
23  A. No.
24  Q. All right. Let's go back to the
25  subpoena deuces tecum that was served on you.

Page 16

1  A. Yes.
2  Q. Do we have before us -- well, I will
3  tell you that Exhibit No. 3 is a photocopy of
4  the documents I've been provided --
5  A. Yes.
6  Q. -- by Ms. Washburn as responsive to
7  the subpoena that we served on you. Were there
8  any documents, sir, in your files that
9  pertained to Dr. Krolik in any way that you
10  didn't make available pursuant to this
11  production?
12  A. No, I don't believe so.
13  Q. What did you do in response to the
14  subpoena deuces tecum?
15  A. Unfortunately, because of the
16  distruction of my offices at the medical
17  school, despite the best efforts of
18  Mr. Domenici and Ms. Washburn, I believe there
19  might have been -- when I was getting things
20  ready for copying, I came across a letter that
21  was -- a subpoena of records that was sent
22  sometime maybe in March or something?
23  Q. That's the one I'm speaking of.
24  A. Yes. So I didn't see that. I saw the
25  one in April. And that's because my records

4 (Pages 13 to 16)

35c2eb28-53f8-4191-a040-4b328f127833

Page 17

1 were at the office. No mail is being delivered
2 there. And so I asked Mr. Domenici and
3 Ms. Washburn to send any legal documents to my
4 home.
5     That March subpoena got misplaced
6 in my home because we're doing renovation in
7 the home. We do not -- I don't have an
8 official office at LSU. And so I didn't know I
9 was served until April, the first week of April
10 let's say. And so I apologize, and I want to
11 put that on the record that any delay was my
12 fault, that the original subpoena in March was
13 misplaced. I didn't know it had arrived.
14     And so when I was contacted by
15 Ms. Washburn to get these documents out, it was
16 getting them together and copying them when I
17 came across the original subpoena, which I
18 think was the first one. So I apologize for
19 any delay because it would have been helpful to
20 other witnesses in this case, you know, that
21 they would have received the documents a little
22 bit earlier and perhaps to counsel as well.
23     So in any event, in the first
24 week of April then, I had to get into the
25 school which was under armed guard and get the

Page 18

1 medical records out and take them and
2 personally copy the records to make sure they
3 were true and accurate, you know, records to
4 the best of my knowledge and get those out to
5 Ms. Washburn to distribute to counsel or
6 counsel involved.
7     So I hope that answers that issue
8 because I did receive a few e-mails in which,
9 appropriately so, people were frustrated with
10 the delay in receiving the documents related to
11 depositions were being held. I just want to
12 put on the record my personal and professional
13 apology for that --
14     Q. Certainly.
15     A. -- omission on my part.
16     Q. Now, I don't see any copies of e-mails
17 between you and counsel for Dr. Krolik in this
18 production.
19     A. When I get an e-mail, I just delete it
20 after I read it.
21     Q. So you don't --
22     A. I don't have any e-mails.
23     Q. So you don't save e-mails?
24     A. No.
25     Q. I don't see a retainer letter between

Page 19

1 yourself and Dr. Krolik or his counsel?
2     A. I think that was done verbally over
3 the phone or something.
4     Q. You don't have a retainer letter?
5     A. No, no, no.
6     Q. What's the hourly right that you're
7 charging Dr. Krolik or his counsel?
8     A. It's roughly $250 an hour. And then I
9 normally charge higher than that, but it's $250
10 an hour.
11     Q. You said roughly. Is it $250 or is it
12 something other than $250?
13     A. I didn't want to charge either counsel
14 with excessive copying charges. We have state
15 laws in Louisiana --
16     Q. Excuse me. What I'm talking about is
17 your retainer agreement with Dr. Krolik. I'm
18 not speaking for this afternoon time. I'm just
19 speaking what are you charging him per hour for
20 the work you do for him on this case.
21     A. Right. I'm charging below my normal
22 rates because of hardship on his part. And so
23 generally it's been $250 an hour and that kind
24 of thing to be able to carry this out, which is
25 below my usual rate.

Page 20

1     Q. You say generally $250 an hour --
2     A. Roughly. I'm not --
3     Q. Well, how much --
4     A. I'm not counting the minutes. No, I
5 mean, it's roughly $250 an hour. So I'm not
6 counting minutes on that and that kind of
7 thing.
8     Q. But you do charge him $250 an hour?
9     A. Yes.
10     Q. And how much has he paid you to date?
11     A. I believe. Let's see. I'm not sure.
12 I think it's been $2,000, and there's an
13 outstanding bill for about a thousand. And
14 then today's services, I send an e-mail to both
15 opposing counsel --
16     Q. I saw that.
17     A. Yeah. Okay.
18     Q. But didn't you say during the trial in
19 January that you've spent about more than 100
20 hours on this matter?
21     A. Yes. Yeah.
22     Q. So did you bill Dr. Krolik for all
23 that time?
24     A. No. I've done that before on another
25 trial that I worked with the advocacy center

Page 21

1  for the elderly and disabled here in Louisiana.
2      Q.  Sir, we've only got a limited number
3  of hours.
4      A.  I know.
5      Q.  Let's talk about this case, not
6  something else.  You testified at trial that
7  you have -- you spent, I believe, 120 hours or
8  more --
9      A.  Uh-huh (affirmative response.)
10     Q.  -- on this matter, correct?
11     A.  Uh-huh (affirmative response.)
12     Q.  Is that correct?
13     A.  Yes.
14     Q.  So at $250 an hour, that would be by
15  my count --
16     A.  A lot of money.
17     Q.  $25,000 or $30,000?
18     A.  Right.  And that's not -- the reason I
19  didn't want to charge by that hourly rate was
20  that I had a professional reason why I was
21  doing research.  I plan to publish my review of
22  this kind of matter in a peer review journal.
23  And I didn't think it was professionally
24  appropriate to charge a client in an individual
25  case for research that I was doing on behalf of

Page 22

1  my own personal professional reasons for
2  reviewing the literature on disability
3  accommodations and testing.
4      Q.  Have you submitted that article for
5  publication anywhere?
6      A.  No.  I'm getting ready to get that all
7  together, including a publication of cases of
8  medical students and residents who I've
9  evaluated personally for learning disability or
10  ADHD related disorders over the years.
11     Q.  Do you intend to bill Dr. Krolik for
12  any part of that 120 hours other than what
13  you've already billed?
14     A.  I already did, yeah.  There's no other
15  outstanding -- besides the thousand for my fees
16  and the injunction hearing that we held in
17  Phoenix and the money from today's deposition
18  preparation.
19     Q.  So setting aside this afternoon's
20  deposition, do I understand correctly that
21  Dr. Krolik has paid you about $2,000 to date --
22     A.  Yes.
23     Q.  -- and that you have billed him for
24  another $1,000 --
25     A.  Right.

Page 23

1      Q.  -- and as far as you are concerned,
2  setting aside today's deposition, that's all
3  that he owes you for work that you've incurred
4  to date?
5      A.  That's correct.
6      Q.  Now, I don't see any handwritten notes
7  from yourself in this document production.
8      A.  Right.
9      Q.  Do you, sir, take handwritten notes
10  when you interview a patient or a client?
11     A.  No.  What I do is I get the interview
12  into a report as quickly as I can for memory
13  purposes and, you know, do it that way.  So
14  that's how I typically do interviewing and that
15  kind of thing.
16     Q.  Well, do you take handwritten notes
17  when you interview a client?
18     A.  No, not usually.
19     Q.  You don't take any notes at all?
20     A.  No, no.
21     Q.  I didn't see a diagnostic intake form
22  of any sort.
23     A.  No.
24     Q.  You don't --
25     A.  I don't use that.

Page 24

1      Q.  You don't customarily use those?
2      A.  No.
3      Q.  All right.  Now, we've talked about
4  your series of opinions that you have formed as
5  a result of your analysis of the 40 file
6  reviews that were produced by the NBME in this
7  litigation.
8      A.  Yes.
9      Q.  Setting that aside, does your July
10  8th, 2005 report contain all of the substantive
11  opinions that you intend to offer at trial?
12     A.  Again, I tried to be comprehensive,
13  but I can't anticipate if I've put all my
14  opinions from, you know, any possible question
15  into the one document.  I've tried to be as
16  comprehensive as I can.
17     Q.  Are you now aware of any
18  substantive opinion that you intend to offer at
19  trial that's not contained in the July 8, 2005
20  report other than your review of the 40 files?
21     A.  No.  The only concern I would have is
22  that I'm a voracious reader.  I teach for a
23  living, and so I'm constantly reading, you
24  know, professional journals and that kind of
25  thing, teaching, et cetera.  And so I'd just be

6 (Pages 21 to 24)

35c2eb28-53f8-4191-a040-4b328f127833



Page 25

1  concerned that I can't separate what, you know,
2  essentially has come after that date and now,
3  you know, or any time in the future. I'm just
4  offering a caution.
5     Q. I saw somewhere that you had written
6  that you had taught about ADHD.
7     A. Yes.
8     Q. Have you ever taught a course, an ADHD
9  course, sir?
10    A. Yes.
11    Q. Where and when did you teach that
12 course?
13    A. I think it's in my curriculum vitae if
14 you'd like me to review that.
15    Q. Yes, please do. Actually, if you can
16 find it in the exhibit.
17    A. Oh, sure. Thank you. In some of the
18 -- on the front page, professional positions,
19 Associate Clinical Professor, Department of
20 Psychiatry, some of these courses that I
21 routinely teach and have taught over the years
22 have included ADHD and learning disability --
23    Q. Well --
24    A. -- type teaching.
25    Q. -- that wasn't my question. I wasn't

Page 26

1  asking whether you've ever taught a course that
2  touched on ADHD. I'm asking whether you've
3  ever taught a course that was centered on ADHD.
4     A. Again, in a medical school
5  environment, the lectures are the courses. So
6  that, in other words, topics on a particular
7  disorder, a particular type of methodology for
8  assessment or treatment is offered as a lecture
9  as -- and that kind of thing. So I'm trying to
10 answer to the best of my ability within the
11 constraints of what medical stool teaching is
12 about. And typically that occurs in terms of
13 seminars, teaching. And so I've taught
14 courses, in other words, hours, you know, in a
15 medical curriculum for residents, medical
16 students, fellows, interns --
17    Q. What I'm asking you, sir, is whether
18 you've taught a semester-long class that
19 centered an ADHD.
20    A. No. And I've never taken one either
21 on that.
22    Q. Okay. Why don't you turn to Exhibit
23 No. 3.
24    A. Yes.
25    BY MS. JOHNSEN:

Page 27

1     Boy, that noise is loud.
2  BY THE WITNESS:
3     Can you hear, Jeanne?
4  BY MS. WASHBURN:
5     Sure. There's a loud noise.
6  Yes, I can hear.
7  BY THE WITNESS:
8     There's drilling going on.
9  BY MS. WASHBURN:
10    Of course. But I can hear, yeah.
11 BY MS. JOHNSEN:
12    Hopefully it won't go on too much
13 longer here.
14 BY MS. WASHBURN:
15    Are they in the building
16 drilling?
17 BY THE WITNESS:
18    Yes.
19 EXAMINATION BY MS. JOHNSEN:
20    Q. Did you review your document
21 production as you were copying it or before you
22 photocopied it, sir?
23    A. Yes, I tried to.
24    Q. Okay. Look, if you will -- I'm going
25 to ask you to look at Bates No. 6 which is way

Page 28

1  early on in Exhibit No. 3. Is your --
2     A. Yes.
3     Q. This is your neuropsychological and
4  educational evaluation report performed with
5  respect to Dr. Krolik dated -- date of
6  treatment February 23rd, 2001, correct?
7     A. Uh-huh (affirmative response.)
8     Q. And this report extends from Bates No.
9  6 through Bates No. 12, correct?
10    A. This looks like the first report; is
11 that right?
12    Q. Well, that's what I'm going to ask
13 you --
14    A. Right.
15    Q. -- but first I want to establish where
16 the report -- or what -- the pages that
17 comprise the report is 6 through 12?
18    A. Sure, uh-huh (affirmative response.)
19    Q. Now --
20 BY MS. WASHBURN:
21    I'm sorry, Diane. What was the
22 Bates numbers you have?
23 BY MS. JOHNSEN:
24    Six through 12.
25 BY MS. WASHBURN:

35c2eb28-53f8-4191-a040-4b328f127833

Page 29

1    And the date of treatment is
2  2/23/01?
3        BY MS. JOHNSEN.
4        Yes.
5        BY MS. WASHBURN:
6        Okay. I have it.
7  EXAMINATION BY MS. JOHNSEN:
8        Q. So, sir, is it correct that this is
9  the initial evaluation report that you prepared
10 with respect to Dr. Krolik?
11       A. Yes, uh-huh (affirmative response.)
12       Q. Okay.
13       A. I believe so.
14       Q. Now, was this the -- was this the
15 first report that you submitted on behalf of
16 Dr. Krolik in support of his request for
17 examination accommodations?
18       A. Yes. And I believe when it was sent
19 in, it was sent in with the document on Bates 3
20 through 5, which was the letter addressed to I
21 believe -- I don't know whether Mr. Doane was
22 there or not, but whoever was the testing
23 coordinator at the National Board of Medical
24 Examiners.
25       Q. Okay. Bates No. 3 through 5 is your

Page 30

1  letter dated April 3rd, 2001 addressed to the
2  testing coordinator, Office of Test
3  Accommodations at the NBME, right?
4        A. Right. And I believe they went in the
5  same time, but I'm not sure.
6        Q. Look at Bates 6, which is the first
7  page of your Neuropsychological and Educational
8  Evaluation Report.
9        A. Right.
10       Q. And I would direct your attention to
11 the first sentence of the second paragraph on
12 page 5, which I will read to you. And that
13 sentence says: Dr. Krolik's childhood report
14 cards, letters to, slash, from ECFMG,
15 Dr. Wurzlow's letter to ECFMG, Dr. Hoblet's
16 report and raw data were reviewed and included
17 with this report.
18       A. Right.
19       Q. Now, at the time that you submitted
20 this, did you -- did you, in fact, submit to
21 the NBME copies of Dr. Krolik's childhood
22 report cards?
23       A. No. He said that he had done that.
24       Q. Okay. So those weren't included with
25 this report, right?

Page 31

1        A. I didn't include it. I don't know
2  when he sent his material on.
3        Q. Now, neither did you send on to the
4  NBME a copy of Dr. Hoblet's report at this
5  time, did you?
6        A. No.
7        Q. Nor did you send raw data at this
8  time? And I'm speaking of February 23rd, '01.
9        A. Right. It's not been requested in my
10 experience in dealing with the National Board
11 of Medical Examiners.
12       Q. My only question was whether it was --
13       A. No.
14       Q. Here your letter says: Raw date was
15 included with this report. And I just want to
16 confirm that raw data were not included with
17 this report.
18       A. Included in the sense in the writing
19 of the report, in the content of the report,
20 not in the submission of the report.
21       Q. Not included with the report?
22       A. That's correct. It's not been
23 requested. It's not in the --
24       Q. Sir, that's not my question. When
25 your lawyer examines you at length, you'll have

Page 32

1  a chance --
2        A. Just letting you know.
3        Q. -- to talk on. Now, turn to Bates No.
4  13 within this stack, which is a letter
5  addressed to the testing coordinator office of
6  test accommodations dated July 9th, '03. And
7  this letter that I'm referring to now extends
8  from Bates 13 through 16. And I'd ask you to
9  compare that to another letter found within
10 Exhibit 3 at Bates 292.
11       And my question ultimately to you
12 is going to be whether both of these letters
13 were sent or only one was sent. For the
14 record, Bates -- the letter that you begin Bates
15 292 is dated July -- I'm sorry -- December
16 19th, 2003, and it encompasses Bates 292
17 through 295 -- I'm sorry -- 292 through 297.
18       You can see, Dr. Butterbaugh,
19 that these two letters, the one beginning at
20 Bates 13 and the one beginning at Bates 292 are
21 substantially similar. Both are signed. My
22 question to you is whether both were sent or
23 whether just the latter was sent?
24       A. Let me check this. I believe that
25 just the latter was sent, that is, the letter

8 (Pages 29 to 32)

Page 33

1   that is dated 12/19/03. And I believe that was
2   the letter that was sent. I believe that the
3   12/9/03 is a draft that I had developed to
4   respond to the National Board of Medical
5   Examiners in re-submitting materials to them.
6   And if I could elaborate just briefly.
7       Q. Sure.
8       A. I was in phone contact with the
9   National Board of Medical Examiners on what
10  materials they specifically needed, whether
11  there were deficiencies in the report that I
12  needed to correct, and what the nature of those
13  deficiencies were.
14          So I believe that I heard that he
15  was rejected on the first application or that
16  there was some problem. I started to draft
17  something on 12/09/03. I may have submitted it
18  to the National Board of Medical Examiners. I
19  don't believe I did. But I did call. And then
20  this letter 12/19 or whatever it is the
21  letter that went in with the revised report.
22      Q. All right.
23      A. And so this is to the best of my
24  knowledge and memory.
25      Q. Okay.

Page 34

1       A. And I included it in the copying just
2   because it's a subpoena to produce the chart.
3       Q. Certainly. So what I understand you
4   to say is you do not believe that you sent in
5   to the NBME the letter that's Bates number 13
6   through 16 --
7       A. But I might have, and that still might
8   have been deficient. I was on the phone after
9   I sent this letter to correct the deficiencies
10  that were then noted in the 12/19 letter and
11  report that accompanied that.
12      Q. And -- yes. All right.
13      A. I hope that answers the question.
14      Q. I think so. Now, turn back to --
15      A. Okay.
16      Q. -- the beginning of your file. I want
17  to refer you to Bates No. 17.
18      A. 17. Okay.
19      Q. Now, Bates No. 17 through 24 --
20      A. Okay.
21      Q. -- is a revised version of your
22  February 23rd, '01 neuropsychological and
23  educational evaluation.
24      A. Yes.
25      Q. As we've just looked at a pair of

Page 35

1   letters from yourself to the NBME --
2       A. Right.
3       Q. -- I would direct your attention to
4   another version of this revised
5   neuropsychological and educational evaluation
6   which begins on Bates No. 25.
7       A. That's correct.
8       Q. Is it correct that the
9   neuropsychological and educational evaluation
10  that begins on Bates 25 and runs through Bates
11  32 is the version that you sent to the NBME
12  with your letter dated December 19, 2003 which
13  begins on Bates No. 292?
14      A. Yes.
15      Q. So --
16      A. Same rationale.
17      Q. That's what I figured from looking --
18  from comparing them?
19      A. Right.
20      Q. So you believe that the version of
21  your evaluation report that bears Bates 17
22  through --
23      A. 24.
24      Q. -- 24 was prepared by yourself but not
25  sent out?

Page 36

1       A. Correct. Because I wanted to cover my
2   tracks. And one of the differences, for
3   instance, this is after conversing with
4   Mr. Doane, or whoever it was that I was talking
5   to at the National Board of Medical Examiners.
6   They had requested standard scores for the
7   behavioral rating scales. And so the Bates 17
8   through 24 in the section on page 21, I
9   believe, Bates 021, does not have the standard
10  scores for the behaviorial rating scale.
11          So before sending them something
12  that I knew was not going to be compliant, I
13  generated another report and included the
14  standard scores that are present in Bates 29 in
15  the report that went to the National Board of
16  Medical Examiners on 12/19/03.
17      Q. All right. Let's look at your revised
18  report.
19      A. Right.
20      Q. The one that begins on Bates No. 25 --
21      A. Yes.
22      Q. -- and runs through Bates 32.
23      A. Right.
24      Q. You note near the end of the first
25  full paragraph on Bates No. 25 --

9 (Pages 33 to 36)

Page 37

1    A. Yes.
2    Q. -- the first page of your report, your
3 disagreement with the -- or your objection to
4 the relevance of WAIS -- and that's W-A-I-S.
5    A. Yes.
6    Q. -- dash Roman III, WAIS III subtest
7 scores --
8    A. Right.
9    Q. -- in connection with the diagnosis of
10 any learning disability, correct?
11    A. Yes.
12    Q. And then you also -- do you object --
13 would it be correct to read your report as also
14 objecting to the application of age normed
15 Nelson-Denny reading test results?
16    A. Yes.
17    Q. What's the basis for your objecting to
18 use of age normed -- and maybe I'm not using
19 the right terminology -- age normed
20 Nelson-Denny reading test results?
21    A. Because the National Board of Medical
22 Examiners called them age normed, and they
23 aren't age norms. They're pooled results
24 across people of different ages. And so the
25 norms that are used in the manual typically are

Page 38

1 based on grade-based norms, that is, it
2 compares a group of individuals who are in the
3 same educational grade.
4    Q. So when you first did your evaluation
5 of Dr. Krolik, you compared his Nelson-Denny
6 reading test results with those who had
7 finished a post graduate education?
8    A. The norms are deficient in that sense.
9 They only go up to graduation from college.
10    Q. So you compared them with those who
11 had completed a four-year college program?
12    A. Originally I -- yeah, it would be
13 like, you know, the last year of undergraduates
14 or something.
15    Q. So effectively grade 16?
16    A. That's right. And the norms start at
17 9th grade approximately. So that essentially
18 then you can look at an individual, compare 9th
19 graders with other 9th graders and seniors in
20 college to other seniors in college.
21    Q. And you had compared Dr. Krolik to
22 those who had completed college?
23    A. Or were in the final year, their
24 senior year of college.
25    Q. So what you understood the NBME to be

Page 39

1 asking for was a comparison of Dr. Krolik's
2 Nelson-Denny's reading test results with the
3 general population?
4    A. They called it the general population,
5 but the norms of the Nelson-Denny only go from
6 those who have completed 9th grade to those
7 that have completed -- you know, or were in the
8 final year of undergraduates. So it's not the
9 general population.
10    Q. It's a subset of the general
11 population?
12    A. Correct. And so --
13    Q. It would be the subset of individuals
14 that completed 9th grade or any other higher
15 grade level?
16    A. 9th grade or higher.
17    Q. So it would have eliminated 8th
18 graders?
19    A. And adults who didn't go -- right, any
20 adult that didn't go as far as the 9th grade or
21 higher. And it's -- the norms are a little bit
22 shaky. And Mr. Doane had said that we use
23 age-based norms, and there are no such things.
24 So in my comments I'm pointing out, you're
25 asking me to use which table, because it wasn't

Page 40

1 in the instructions on the National Board of
2 Medical Examiners evaluation guidelines for
3 evaluators. I had to dig it out of Mr. Doane
4 after repeated phone calls on what's wrong with
5 the reporting of these test data.
6    Q. How many phone calls did you have with
7 Mr. Doane?
8    A. At least six.
9    Q. You spoke to him on six separate
10 occasions?
11    A. Yes.
12    Q. All of them in December of '03?
13    A. It has been a struggle --
14    Q. No, I -- just answer my question.
15    A. All right.
16    Q. All of those six conversations in
17 December of '03?
18    A. I don't know when they all occurred.
19 They occurred from the first -- they occurred
20 with somebody at the National Board of Medical
21 Examiners starting at the time that I completed
22 my first report or possibly before I completed
23 my report until the time of December of 19th,
24 '03. And they would have occurred
25 intermittently, but generally clustered around

10 (Pages 37 to 40)

35c2eb28-53f8-4191-a040-4b328f127833

Page 41

1 the time that I was submitting a report because
2 I had been evaluating numerous kinds of
3 residents, fellows who were seeking evaluation
4 for disability purposes or diagnostic purposes
5 as well clinically.
6      The dean at my medical school,
7 the dean's office of student services, would
8 refer those people. And they were routinely
9 being rejected by the National Board of Medical
10 Examiners. So I was putting in calls to figure
11 out what are the criteria that they're using,
12 because I was doing the best I could to adhere
13 to those and my students were not receiving
14 accommodation as requested after I attempted to
15 follow the guidelines of the National Board of
16 Medical Examiners available on the internet.
17     Q. Okay. Getting back to use of the
18 Nelson-Denny reading test with respect to
19 Dr. Krolik --
20     A. Yes.
21     Q. -- what you ended up doing was finding
22 in the text manual, right?
23     A. Right.
24     Q. -- finding it in the Nelson-Denny test
25 manual the reported scores for 9th graders and

Page 42

1 anyone who had completed any grade above 9th
2 grade?
3     A. I believe it was for everyone, that's
4 right. There are two different versions.
5 There's, you know, two different forms. And so
6 there are different tables depending on which
7 form you use.
8     Q. So what you ended up doing then was
9 comparing Dr. Krolik's reading scores with 9th
10 graders and above?
11     A. Correct. And I was directed to the
12 specific table --
13     Q. You know, I'm not asking you that
14 question.
15     A. No, I know, but I'm --
16     Q. And I heard --
17     A. -- this is a level of the conversation
18 with Mr. Doane. He actually directed me to
19 what he said was the age-based norm table in
20 the manual, and there was no such age-based.
21     Q. But you found what you needed to in
22 the test manual, correct?
23     A. That he had directed me to
24 inaccurately.
25     Q. All right. But you did find what you

Page 43

1 needed to find in the Nelson-Denny test manual,
2 right?
3     A. What he -- yes. And that was so that
4 I could be compliant in reporting the standard
5 scores based on the norms that were requested.
6     Q. All right. Your December 19th report,
7 and I'll call it that. It's the report that
8 begins on Bates 25 --
9     A. Yes.
10     Q. -- refers to a cousin of Dr. Krolik by
11 the name of Gerald Krolik?
12     A. Yes.
13     Q. Did you speak to Gerald Krolik?
14     A. Yes, I did.
15     Q. On how many occasions?
16     A. One occasion.
17     Q. And how long was your call with him?
18     A. It was brief because I was told he was
19 very very ill.
20     Q. Was it a phone call?
21     A. Yes, it was.
22     Q. How long a phone call was it?
23     A. Maybe five minutes.
24     Q. Did you take any notes?
25     A. No. I was calling for a specific

Page 44

1 verification of how he appeared, this
2 individual appeared, Dr. Krolik, appeared as a
3 child as recollected by one of the few
4 surviving relatives that were alive.
5     Q. So did you recount in your December
6 19th, 2003 report all that Gerald Krolik told
7 you that you believed was relevant to the
8 issue?
9     A. Let me look. I don't believe I did.
10 I included what I thought was pertinent at the
11 time.
12     Q. Well, I guess that's my question. Did
13 you include in your report all that you
14 believed was relevant that Gerald told you?
15     A. Yes, I believe so.
16     Q. All right.
17     A. Related to the specific issue of
18 whether or not he had symptoms or impairments.
19     Q. Can you remember anything else that
20 Gerald told you?
21     A. He didn't want to get involved, you
22 know, in the case. And I thanked him for his
23 participation. And I was told by Mr. Krolik
24 that he was very ill, that the relations, you
25 know, he hoped would be better, you know, than

11 (Pages 41 to 44)

Page 45

1 they had been over the years at time, but that
2 please not to be a burden with his relative who
3 was, as Dr. Krolik understood, very ill and
4 probably not in a state of mind to be disturbed
5 very much.
6    Q. Did you also speak to a fellow by the
7 name of Jack Sona?
8    A. Yes, I did.
9    Q. Did you speak to him by phone?
10    A. Yes.
11    Q. On how many occasions?
12    A. One, I believe.
13    Q. And how long was that phone call?
14    A. That was a little bit longer, about
15 five or ten minutes, something like that.
16    Q. Did you take any notes on that call?
17    A. No. I had a specific purpose that I
18 was calling for.
19    Q. Did you include in your December 19th,
20 2003 report all that Mr. Sona told you that he
21 believed was relevant to Dr. Krolik's issue?
22    A. I don't -- let me find out what he
23 said. More or less but not -- in neither case
24 were they total. I was -- my purpose in doing
25 so was that I clarified with the National Board

Page 46

1 of Medical Examiners --
2    Q. Sir, I'm just asking whether you
3 recounted in the report everything that
4 Mr. Sona told you that you believe was
5 relevant.
6    A. Well, no, probably not.
7    Q. Okay. What else did Mr. Sona tell you
8 that you believe was relevant to this issue?
9    A. Relevant in the sense that it wasn't
10 exactly on point. My purpose was to see
11 whether he appeared to have symptoms or
12 impairment. In an open-ended question that I
13 asked both of these parties, whether they would
14 spontaneously report any difficulties that
15 Dr. Krolik had had or --
16    Q. And what did Mr. Sona report to you?
17    A. Apart from what is listed here, you
18 know -- let me see -- that he was a very active
19 person, that he simply could not sit down, that
20 it was very difficult for him. He, you know,
21 wanted to study by talking all the time rather
22 than reading and that kind of thing, that he
23 really had a hard time sitting down and
24 reading. And I just summarized that he was
25 restless, up and down. That was the comment

Page 47

1 that was most pertinent to my diagnostic and
2 disability type evaluation.
3    So rather than elaborate with
4 every fine detail, I just included what I
5 thought was most pertinent.
6    Q. Okay. Turn to the next page, Bates
7 No. 26.
8    A. Okay.
9    Q. I'd direct your attention to the
10 paragraph that is labeled Family and Social
11 History. The last sentence in that paragraph
12 says: Additional family information is on file
13 for clinical purposes. What file were you
14 referring to?
15    A. The file test results, you know, and
16 that kind of thing that I copied. So it's a
17 standard -- this is a standard thing I have in
18 all my reports.
19    Q. Additional family information is on
20 file?
21    A. Yeah. And that would include, you
22 know, sensitive information not pertinent to a
23 disability evaluation that might be of a
24 therapeutic nature, a very private matter.
25    Q. Have you produced all the file -- have

Page 48

1 you produced the file that's referenced here --
2    A. Yes.
3    Q. -- in this litigation?
4    A. Yes, I have. Yes.
5    Q. All right. Moving on down the page in
6 Bates No. 26 under Educational History --
7    A. Yes.
8    Q. -- the first sentence of the second
9 paragraph there you say: Review of his
10 available grade and high school report cards
11 reveal a history consistent with expected
12 childhood underachievement --
13    A. Yes.
14    Q. -- associated with intermittent
15 teacher-reporter attention reading, handwriting
16 and study skills problems.
17    A. Yes.
18    Q. What did you see in Dr. Krolik's high
19 school report cards, sir, that revealed a
20 history consistent with expected childhood
21 underachievement associated with intermittent
22 teacher-reported attention?
23    A. It -- just to correct you, it says
24 available grade and high school report cards
25 rather than just high school. So that I'm

12 (Pages 45 to 48)

Page 49

1 summarizing --
2     Q. I think I read that. But my question
3 right now to you, sir --
4     A. Right. I'm summarizing --
5     Q. -- what did you see in the high school
6 report cards that reveals a history consistent
7 with what you report here?
8     A. He didn't do well in his grades as I
9 would expect him to do as an above-average --
10 above-average intelligence, and he didn't do as
11 well in all the courses as I would have
12 expected given that he was a fairly motivated
13 person. And so there were inconsistencies in
14 some of his academic performances.
15     Q. What makes you think he should have
16 done better than he did in high school?
17     A. A teacher mentioned that -- you know,
18 that he had more potential than he was
19 realizing, one of the grade school teachers --
20     Q. What about in high school though?
21     A. -- there was an understudy,
22 inconsistent performance that I was commenting
23 on across -- in a developmental course across
24 many grades.
25     Q. All right. But I'm focusing on high

Page 50

1 school.
2     A. Right.
3     Q. Do I understand correctly that you're
4 saying that he did not do as well in high
5 school as you would have expected him to do?
6     A. That there was inconsistencies, you
7 know, in his performances as evident in his
8 high school records that I had available to me.
9     Q. Look at page 336.
10     A. Okay.
11     Q. Now, is that the high school report
12 card that you referred to in your December
13 19th, 2003 report?
14     A. I have -- I have to stop and examine
15 all these. I'm sorry.
16     BY MS. WASHBURN:
17         Excuse me, Diane. What document
18 are you referring to now?
19     BY MS. JOHNSEN:
20         I'm referring to the -- what's
21 dated January 5th, 1965. It appears the
22 Department of Education, Province of Manitoba.
23     BY MS. WASHBURN:
24         That one sheet?
25     BY MS. JOHNSEN:

Page 51

1         That's right.
2     BY MS. WASHBURN:
3         And what number?
4     BY MS. JOHNSEN:
5         It's Bates No. 336.
6     BY MS. WASHBURN:
7         Okay. Thank you.
8     BY THE WITNESS:
9         I'll check -- what I'm trying to
10 do is look and make sure I'm commenting on all
11 pages that I commented on. This is --
12     EXAMINATION BY MS. JOHNSEN:
13     Q. But my question is asking you to focus
14 on high school report cards.
15     A. Right. You know, I don't have a
16 perfect recollection of everything I saw at the
17 time. But the problem is the document that you
18 referred to as an examination listed
19 examinations that are taken rather than school
20 grades. And so this -- I can't remember this
21 specifically, but it appears to be something
22 that I looked at. I don't know that this is
23 the only thing I looked at. I'm trying to --
24     Q. Well, all I have is what you gave me,
25 sir. So I'm just trying to identify what high

Page 52

1 school report card you may have been referring
2 to when you wrote the report to the NBME.
3     A. And I believe that also includes
4 what's on the next page which is, you know, the
5 -- you know, described his courses and marks
6 and --
7     Q. Would that be 337?
8     A. That's 337, I believe. And that's
9 Grant Park High. And so I believe I looked at
10 that document as well.
11     Q. All right. So --
12     A. And let me see and make sure I've got
13 all this. That's Winnipeg. I believe I also
14 looked at material on 356.
15     Q. Is that a high school report card?
16     A. Yeah. And maybe 354, so --
17     Q. Okay. Let me get this straight.
18     A. 354, 55, 56 in addition to that
19 examination sheet that we were looking at. I
20 forget the page number.
21     Q. Okay. And just to link back again to
22 your December 19th, 2003 report, sir, it was
23 your conclusion as stated there that these
24 report cards, Bates 354 through '59,
25 demonstrated to you that he did not -- that

13 (Pages 49 to 52)

Page 53

1  Dr. Krolik did not perform as well in high
2 school as you would have expected him to?
3    A. Yes. For instance, there's a specific
4 comment, a special note to parents on 357. And
5 RP makes the comment "too many 50s for a
6 successful beginning." And when you look at
7 Latin, he's got a 45. And there's some
8 unevenness that the teacher is specifically
9 commented on. And there's been an improvement
10 on the third report that's mentioned.
11      And, again, I was looking at that
12 as being a continuation of some of the
13 inconsistent academic performance I saw in
14 elementary school.
15    Q. What made you think, sir, that the
16 grades he got in high school, that he should
17 have gotten higher than he did in terms of his
18 high school grades?
19    A. His teacher comments and the fact that
20 he did do well in some courses on an
21 inconsistent basis.
22    Q. Is it your testimony that someone who
23 does well in one course should do well in all
24 courses?
25    A. No. It's just that people with ADD,

Page 54

1 one of the things I look for is that somebody
2 has inconsistent academic performance.
3    Q. They do well in one course but not
4 well in another?
5    A. They may do well in one course --
6 poorly in one course at one point in time but
7 well in another group at another period of
8 time.
9    Q. And that's --
10    A. So there's inconsistency within a
11 course and across courses. And so if you're
12 looking for a deficit that's based on, let's
13 say, a specific language disability, a specific
14 calculation disability, you would expect to see
15 all Fs, all Ds, let's say, in math, for
16 instance, if they had a math disability. But
17 when you see somebody who achieves well or
18 average and then poorly within the same content
19 domain, that's a beginning of some
20 inconsistencies that doesn't appear to be due
21 purely to ability. It might be --
22    Q. What makes you say that? What makes
23 you think it's not due -- well, what makes you
24 -- how can we tell looking at a report card
25 whether the fact that Dr. Krolik did well in a

Page 55

1 particular class in one semester and not well
2 in that class next semester, how can we tell
3 that was due to ADHD?
4    A. I'm not saying it's due to ADHD. I'm
5 saying that that's a common pattern that you
6 see. And it was specifically present in his
7 case in elementary school where he would have
8 noteworthy problems in the beginning of
9 courses. The teachers would comment on that.
10 And then he would recover from that difficulty
11 within that same course at a later time.
12    Q. So he would do well after the teacher
13 had commented.
14    A. And --
15    Q. Right?
16    A. -- after the teacher intervened.
17    Q. Right. Is that correct?
18    A. Yeah. And so that's a pattern that
19 underachievement in ADHD is not a rare
20 phenomenon. And so it's why, for instance,
21 there are classrooms that --
22    Q. Okay. Let's focus on Dr. Krolik.
23    A. Right.
24    Q. What in his high school report cards,
25 which of these classes should he have done

Page 56

1 better in?
2    A. The point is he had the potential to
3 do well in all of his courses.
4    Q. What makes you say that?
5    A. Because of his report cards leading up
6 to that time. He showed an ability to recover
7 and do better in some of the courses where he
8 had difficulty.
9    Q. Well, isn't it true, sir, that his
10 elementary grade reports were consistently
11 average?
12    A. But if you look carefully, you'll see
13 often in the beginning of a course, sometimes
14 than other times, the teacher is commenting
15 that he's having trouble paying attention,
16 applying himself, capable of doing better work,
17 distracting other students. And then he's able
18 undoubtedly with the teacher's assistance in
19 the classroom to do well in that same course
20 later on. So there's a lot of comments about
21 improvement.
22    So what I'm looking for is a
23 pattern within this individual person of a
24 similar pattern over grades. And I've just
25 described the high school kind of version of

14 (Pages 53 to 56)

35c2eb28-53f8-4191-a040-4b328f127833

**Page 57**

1  difficulties that he had at an earlier stage in
2  his schooling.
3      Q.  So did you see in his high school
4  grade reports what you described you saw in the
5  elementary school which is poor -- relatively
6  poor performance early in year followed by
7  improved performance later in the year?
8      A.  I just cited an example where in the
9  third report the teacher mentioned there's an
10  improvement.  And so that's an example of where
11  he started off low in an area and there was an
12  improvement.  So the teacher is commenting
13  across a number of areas, comparing that first
14  report to a later report.  And that was done at
15  several times in his earlier grades.
16      Q.  Well, look in here at the high school
17  report cards which begin --
18      A.  I did.
19      Q.  -- on page 354.
20      A.  I commented on that earlier.
21      Q.  Well, I think you identified an
22  occasion on Bates No. 3 --
23      A.  57.
24      Q.  -- 57.
25      A.  In that general area.

**Page 58**

1      Q.  Well, let's go back.  Let's look at
2  9th grade, which is 354 and 355.
3      A.  Right.
4      Q.  What do you see here that indicates
5  ADHD?
6      A.  Again, I'm looking at academic
7  performance, and I'm looking to see in this
8  individual whether there's a pattern over time.
9  And so here we have on 355 in the first report,
10  he got an F in geography, a 45.  The next
11  second report, he's improved his scores and he
12  ends up in the final report getting a high 66.
13  So he's showing an ability, not based on
14  deficit or a defect in learning, but an
15  underachievement pattern where he starts off
16  poorly and he's able to recover.  And so that's
17  related to academic performance, living up to
18  one's potential.
19      And so that pattern is what I saw
20  earlier in his elementary school, and it's
21  being replicated here on the very report card
22  that you asked me to examine.
23      Q.  So what you're referring to then, just
24  to make sure I'm understanding what you're
25  saying --

**Page 59**

1      A.  Right.
2      Q.  -- you're seeing a relatively poorer
3  performance in the first report followed by
4  improved performance in these respective
5  classes in the third and final reports?
6      A.  Right.  So on the first report teacher
7  comments:  Ralph is working well.  We are
8  looking for better progress.
9      Second report:  Maybe a little
10  over confident, ability to do grade ten work,
11  too many of his mistakes are borderline, more
12  concentrated effort in his studies should
13  better his standing.
14      Third report:  Ralph's mark
15  indicate the possibility of supplementals in
16  algebra, typing depending on the results of the
17  June exam and so forth.
18      So you're seeing the teacher is
19  working with him to realize his potential, to
20  help him fulfill his potential.
21      Q.  And he did fulfill his potential
22  because his grades you say went up from the
23  first report through the third and final
24  reports?
25      A.  There were numerous incidences in his

**Page 60**

1  report cards where you see that pattern.
2      Q.  Not uniformly though, do you?
3      A.  No, it's inconsistent, which is the
4  point.
5      Q.  Okay.  Now, just looking at this 9th
6  grade report though, when you say he was
7  fulfilling --
8      A.  That's on 355?
9      Q.  Yeah, that's right.  When you say he
10  was fulfilling his potential in the latter part
11  of the year, his grades were in the 50 and 60
12  range which -- well, in the 50 and 60 ranges,
13  correct?
14      A.  Yes.
15      Q.  59, 64, 66, 50 and so forth, correct?
16      A.  Yep.
17      Q.  Now, you don't see that pattern in the
18  next year, do you, grade 10, September 1959
19  through June 1960, Bates 356 to 367?  You don't
20  see that pattern of him beginning poorly in the
21  first report and improving across the board in
22  those respective classes by the final report?
23      A.  The spelling goes down.  It goes from
24  100 down to 88.  Language stays the same it
25  appears.  There's a little drop in the 54 in

ASSOCIATED REPORTERS, INC.
504-529-3355

35c2eb28-53f8-4191-a040-4b328f127833

DR. GRANT J. BUTTERBAUGH          APRIL 26, 2006   RALPH KROLIK, M.D. VS. NAT'L BD OF MED. EXAM

Page 61

1  the second report.  Literature goes down to a
2  59 in the third report.  Math stays constant,
3  but there's a drop down to 51 that's actually
4  underlined, in fact.  We see in science he goes
5  from 55 up to a 71.  We see in Latin, 65 down
6  to a 46 in the final report.
7         So, again, we're seeing a pattern
8  of inconsistent performance.  But his ability
9  to achieve higher type abilities speaks more
10  for his potential.  His ability to realize his
11  potential, to perform optimally up to his
12  potential is the inconsistent activity over
13  time.
14       Q.  Well, I guess what I'm getting at,
15  sir, is how can we tell from looking at these
16  grade reports what his full potential was?
17       A.  Because of the teacher's comment.
18  First report special note to parents: Too many
19  50s for a successful beginning.  The teacher is
20  commenting.
21       Q.  Well, the teacher is commenting he's
22  got low grades.
23       A.  For a successful -- and that goes on
24  in the third report this is an improvement.  So
25  he is realizing more of his potential with the

Page 62

1  teachers and the parents and Ralph, probably at
2  time, addressing more effort towards realizing
3  his potential.
4       Q.  Well, you're just surmising that;
5  aren't you?
6       A.  No, this is commonly typical how
7  teachers communicate with parents and with
8  students.  They say you're capable of doing
9  better, I'd like to see you improve.  They hold
10  up the bar high, and then you look and see
11  whether the child can achieve a better outcome
12  or not.  That's a very typical way that these
13  report cares are used.
14       Remember, this is a report card
15  that would go home to the parents.  So it's a
16  communication between the teacher in the
17  classroom who knows him best to the parents
18  which know him best at home.  So that pattern
19  is evident.  And so if he was not able to
20  improve his low scores, for instance, we'd look
21  at that as being a chronic status disability
22  perhaps, potentially.  We don't know.  It could
23  be a motivational problem.
24       But it could be -- it could be
25  something else we don't know about.  But in his

Page 63

1  particular history, he didn't have things going
2  on that anybody has commented on that, you
3  know, relate to alternative explanations.  So
4  we have uneven performance over many many
5  grades, and that's the concern.  Did he pass?
6  Yes.  Did he flunk?  No.  Did he graduate from
7  school?  Yes.  All of that is a given.
8       Q.  You interviewed Dr. Krolik in
9  connection with your report that was first
10  issued in February of '01?
11       A.  Yes.
12       Q.  How many meetings did you have with
13  him in connection with that report?
14       A.  At least two, maybe three.  I
15  interviewed his wife.
16       Q.  I'm asking about him though.
17       A.  Yeah.  At least two or three.
18       Q.  How many --
19       A.  At least.
20       Q.  How many hours did you spend with
21  Dr. Krolik?
22       A.  I'm sorry.  I didn't record it, but it
23  would have been at least -- personally --
24       Q.  That's my question.
25       A.  Right.  Not my psychometrist.

Page 64

1       Q.  You.
2       A.  Right, right.  Me.  At least four
3  hours.
4       Q.  And that was spaced over two or three
5  times?
6       A.  Yeah, and probably more.  He was a
7  frequent caller.
8       Q.  Have you had occasion to meet with
9  Dr. Krolik for purposes of evaluating him since
10  February of '01?
11       A.  He have kept in touch and how he's
12  doing, and I've tried to help related to
13  treatment planning and stuff like that since
14  that time.  Yes.
15       Q.  How have you tried to assist him with
16  treatment planning?
17       A.  Treatment planning, how do we get you
18  ready to take this step exam.  With your
19  performance, you know, according to the
20  testing, how do we get you ready.  What are
21  some things that other students have found
22  helpful.  What are some resources, you know.
23  What are your -- you know, booster sessions.
24  For instance, look, you came with X number of
25  points of passing the steps.  It means it's

35c2eb28-53f8-4191-a040-4b328f127833

Page 65

1  within your grasp. So trying to motivate him
2  by keeping his hopes up that he can do it if he
3  concentrates his effort in studying. Referral
4  to two different places as a potential
5  remediation type course that could be taken at
6  some expense. Unfortunately, it's very
7  expensive and I believe he didn't have the
8  money to do it. But, you know, recommendations
9  like that that I do with all my students
10  whether they ever be residents or medical
11  students.
12       Q. Look at Bates 27.
13       A. Okay. Just plain 27, right? No
14  hundreds.
15       Q. Yeah. Which is page -- the third page
16  of your December 19, 2003 report.
17       A. Yes.
18       Q. In the second full paragraph there you
19  are reporting Dr. Krolik's WAIS III results?
20       A. Yes.
21       Q. That's something I would call an IQ
22  test.
23       A. Yes. That's correct. Yeah.
24       Q. And average on this WAIS III IQ test
25  is 100 plus or minus the standard deviation,

Page 66

1  correct?
2       A. Yes. That captures about 68 percent
3  of the population.
4       Q. And the standard deviation is 15?
5       A. Yep, 15. So 100, 115 to 85.
6       Q. And Dr. Krolik's scores were -- well,
7  what were they in the verbal? Are they
8  recounted below here?
9       A. Yes. Within an error range, error bar
10  range. They roughly between 111, 120 in
11  verbal IQ score. That's a standard score.
12       Q. What do you mean "standard score?"
13       A. That would be a mean of 100, a
14  standard deviation of 15.
15       Q. So that's within --
16       A. One standard deviation would go from
17  roughly -- you know, this actually gets a
18  little more technical if you want me to digress
19  for just a second. These confidence intervals
20  are based on reliability, confidence intervals.
21  So we know all tests are unreliable to some
22  extent.
23       So if we take into account the
24  error in repeatedly measuring someone with
25  these measures, we then get a standard error of

Page 67

1  measurement. And we can use that to calculate
2  the 68 or, you know, some other competence
3  interval within which we think his true score
4  would likely fall. And these scores are
5  related to intervals within which we think his
6  true score is likely to fall taking into
7  account known measurement error of applying any
8  test.
9       Q. So applying that 95 percent confidence
10  interval --
11       A. Right.
12       Q. -- his verbal score would -- within 95
13  percent confidence level fall between 111 and
14  120?
15       A. Yes, roughly.
16       Q. Which is average or a little above?
17       A. The middle is going to be -- the
18  middle of that is going to be above average.
19       Q. Well --
20       A. Roughly. You know, he --
21       Q. -- the average is 115?
22       A. Right. And so he's somewhere between
23  111 and 120. And so that confidence interval
24  is going to hand him a little bit around 116 or
25  so, yeah.

Page 68

1       Q. And performance, his 95 percent
2  confidence interval was 102 to 115 which is
3  average?
4       A. Right. Average to nearly above
5  average.
6       Q. Well, but --
7       A. Because we don't know where that true
8  score is going to fall in that interval.
9       Q. But, still, even assuming his true
10  score was 115, that would be within one
11  standard deviation?
12       A. It would be smarter than the average
13  person if he was 115 by standard deviation. So
14  that's how you do that. It tells you the --
15  where he is compared to the normal population.
16       Q. But the normal population is between
17  85 and 115, correct?
18       A. Right. 68 percent of it. But there's
19  another percentage point that's below average.
20  And so it ends up being that he's above X
21  number of percent of people in the normal
22  population. He would be considered above
23  average if he got something at 115.
24       Q. All right.
25       A. And then full scale is the average of

17 (Pages 65 to 68)

35c2eb28-53f8-4191-a040-4b328f127833

Page 69

1  those two.
2      Q. Which is 109 to 117?
3      A. Right. And so you can see that he
4  does a little bit better on verbal than the non
5  verbal in terms of those intervals. And then
6  you average it out and you get full scale IQ.
7      Q. You also performed the revised --
8  well, Dr. Hoblet had performed the WAIS III
9  evaluation, correct?
10     A. That's correct. There's no need to
11  repeat it.
12     Q. That's all I asked. I just want to
13  move us through here.
14     A. Right.
15     Q. Did you direct the performance of the
16  revised Woodcock-Johnson test?
17     A. Yes.
18     Q. And reading in the next to the bottom
19  paragraph on Bates No. 27 --
20     A. Yes.
21     Q. -- that test, that listening
22  comprehension subtest put him at -- in the
23  above-average range, correct?
24     A. About half a standard deviation above
25  the mean.

Page 70

1      Q. Now, how --
2      A. The mean is --
3      Q. -- do we see that anywhere? I don't
4  see the score here.
5      A. Dr. Krolik's -- first sentence,
6  reading pooled scaled score.
7      Q. What I'm talking about --
8      A. The mean of 200 and a standard
9  deviation of 25, not 15. So one standard
10  deviation above average is going to be 225.
11  One standard deviation below is going to be
12  175. He is in the middle range of one standard
13  deviation above average for reading
14  compensation.
15     Q. That's the 213?
16     A. 213.
17     Q. And he's --
18     A. Half of 25, his standard deviation is
19  roughly 13.
20     Q. You concluded he was well above
21  average of vocabulary?
22     A. Right. Vocabulary is one of the best
23  indicators of intelligence.
24     Q. And within -- and above average on
25  reading rate as well?

Page 71

1      A. That's correct. And that's using that
2  score that we talked about earlier, which is
3  taking everybody in the norms that had 9th
4  grade education or above --
5      Q. Is that what you -- okay.
6      A. That's the pooled scaled score that I
7  was instructed to use by Mr. Doane.
8      Q. You know, what I started off by asking
9  you though was about the revised
10  Woodcock-Johnson listening comprehension test.
11     A. And I answered that I supervised the
12  administration of that.
13     Q. But then I asked you --
14     A. Right.
15     Q. -- what were his scores on the revised
16  Woodcock-Johnson listening comprehension?
17     A. So if you go to the next page on Bates
18  28, you have Woodcock-Johnson test of
19  achievement were well above average to average
20  on Wood Attack 124, dictation, writing samples,
21  calculation, applied problems. And it gives a
22  standard score for each one of those subtests
23  of the Woodcock-Johnson which is a test that's
24  recommended by the National Board of Medical
25  Examiners.

Page 72

1      Q. I don't see a listening comprehension
2  subtest score. That was my question.
3      A. That's not listed, but it was
4  administered. And he was above average in his
5  listening comprehension.
6      Q. Do you know what his score was?
7      A. It would be somewhere in the raw score
8  type stuff. Do you want me to look now?
9      Q. We'll look for it when we go through
10  it.
11     A. Okay. I've been instructed by the
12  National Board of Medical Examiners to include
13  standard scores for IQ, academic achievement,
14  and the behavorial rating scales. And so
15  that's what I've done.
16     Q. Let's look here at -- moving on to
17  Bates 28.
18     A. Yes.
19     Q. The first full paragraph begins:
20  Thus, graphic-motor and reading comprehension
21  disorders were noted consistent with his
22  self-reported or documented childhood and
23  current history of learning difficulties.
24     A. Right.
25     Q. Well, based on the pooled scores, you

18 (Pages 69 to 72)

35c2eb28-53f8-4191-a040-4b328f127833

Page 73

1 didn't note any reading comprehension
2 disorders, did you, as of December 19th, 2003?
3     A. No, that -- where he was impaired in
4 his reading comprehension was using the other
5 normative table, which was the normative table
6 for people who were seniors in college. And
7 that's what I was referring to.
8     Q. On page 28?
9     A. That's correct. So that's a
10 carry-over from those earlier norms. There's
11 debate in the literature --
12     Q. Okay. Thank you.
13     A. Okay.
14     Q. Going on to the next page, Bates 29,
15 which is page 5 of 8 of your December 19, 2003.
16 All right?
17     A. Yes, ma'am.
18     Q. I see that you report at some length
19 the results of Dr. Krolik's wife's results on
20 various observer indexes, the CAARS Observer
21 version and so forth?
22     A. Yes.
23     Q. I don't see that you reported in your
24 December '03 report to the NBME Dr. Krolik's
25 scores on those same tests.

Page 74

1     A. Below: By contrast, Dr. Krolik
2 appeared to minimize the severity and presence
3 of these same symptoms based on his
4 retrospective childhood and current
5 self-reported rating scale results on parallel
6 forms of the scales that his wife completed.
7 That's my -- I added that.
8         His self-ratings also were
9 discrepant from his behavior as commented on by
10 his teachers, based on comments in his records,
11 as well as discrepant from his current behavior
12 as reported by his spouse in her own clinical
13 observations during the evaluation. He tends
14 to minimize and --
15     Q. Well, sir, I don't see his test scores
16 reported here.
17     A. Right.
18     Q. You characterized them, but you do not
19 report them to the NBME, do you?
20     A. They were not significant. In other
21 words --
22     Q. Well, sir, just answer my question.
23 You do not report them to the NBME, did you?
24     A. They're implied. They're not -- I
25 could have done a better job of stating that.

Page 75

1     Q. They're not reported, are they?
2     A. They're implied.
3     Q. But they're not reported, are they?
4     A. Not the way they want them to. The
5 way I intended was here are here scores, here
6 are his scores. And so he was minimizing them
7 and not acknowledging the abnormal behavior.
8     Q. Why didn't you report the number
9 scores, the T scores and so forth, that
10 Dr. Krolik --
11     A. They were minimized. They were within
12 normal limits.
13     Q. So you didn't think that was as
14 relevant as his wife's report?
15     A. I really felt that was implied, a
16 professional reading these, I assumed would
17 just take it as intended, that his scores were
18 within normal limits, and that I was explaining
19 that that's because he minimized it. I was not
20 asked specifically to give -- provide those
21 scores in my conversations --
22     Q. Sir, weren't you asked to report all
23 test scores?
24     A. This document was reviewed by
25 Mr. Doane. And I said is there anything

Page 76

1 else you need me to change --
2     Q. No, my question to you is: Weren't
3 you -- wasn't Dr. Krolik, in the November 2003
4 letter to him, asked to report all test scores?
5     A. And, again, this was my best faith
6 effort of doing that. And after having direct
7 conversations with Mr. Doane and our arriving
8 at the fact that they had all the information
9 that he needed to reach a determination.
10     Q. Let's --
11     A. I agree with you that -- if you could
12 stay on the record -- I agree with you that I
13 could have made that more clear, but I was not
14 asked to do so when I was asked what else do I
15 need to provide to you to reach a
16 determination.
17     Q. All right. Let's take a short break.
18         (A BREAK WAS TAKEN.)
19 EXAMINATION BY MS. JOHNSEN:
20     Q. Moving on, sir, to Bates 30 which is
21 page 6 of 8 of your January 19th --
22     A. 30?
23     Q. Yes -- January 19, 2003 report.
24     A. Okay.
25     Q. The third paragraph down -- I should

19 (Pages 73 to 76)

35c2eb28-53f8-4191-a040-4b328f127833

Page 77

1  have said the first paragraph under Summary and
2  Recommendations.
3      A. Yes.
4      Q. The last sentence you say there that
5  you're revising your recommendation such that
6  ADHD but not a reading disorder should be the
7  basis for a substantial limitation.
8      A. Yeah.
9      Q. And by that you meant to say that --
10  or you were acknowledging that once you
11  compared Dr. Krolik's reading scores with the
12  pooled scores of the general population above
13  9th grade, he -- because he tested above
14  average cross the board on the reading scales,
15  there was no longer any basis to contend that
16  he suffers from a reading disorder, correct?
17      A. Correct.
18      Q. Now, that's not changed, has it, in
19  your view? That's still the view you have?
20      A. The definitions are still debated
21  about what's the best way to define a learning
22  disability. So I went by the National Board of
23  Medical Examiner's own definition, which is
24  using that those scale scores, that table, to
25  arrive at how he compares to the peer group

Page 78

1  that they want me to compare him to.
2      Q. Well, you're not contending in this
3  lawsuit, are you, that Dr. Krolik suffers from
4  a reading disability which entitles him to
5  accommodation by the ADA?
6      A. No, I -- I am. Testing is reading.
7  And the -- his inattention, his ADHD-related
8  symptoms disrupt the act of reading, but it's
9  not a disruption that's measured by this
10  particular test. And so I am stating that
11  while he doesn't have a disorder by the
12  definition of comparing him to peers with 9th
13  grade education or higher, that he nonetheless
14  has a problem with reading, that it would be
15  encountered by taking the Step exams and have
16  been encountered while taking the Step exams.
17  So it's a little bit complicated, kind of --
18      Q. You're saying --
19      A. -- my opinion that is, you know, that
20  -- it might not be well-stated here, but that's
21  my opinion.
22      Q. You're saying that you believe his
23  ADHD impairs his ability to read?
24      A. Yes.
25      Q. That he'd be a better ready if he

Page 79

1  didn't have ADHD?
2      A. Correct.
3      Q. All right. However, you acknowledge
4  that when you compare his test -- his reading
5  test results with those of the population who
6  received a 9th grade or better or higher
7  education, his reading test scores across the
8  board are average or above average?
9      A. For that kind of belief reading test.
10      Q. Which is all you can give him, right?
11  That's the test that's given?
12      A. But it is different from what a
13  certification licensing test is that goes on
14  for hours. In the Nelson-Denny, as you know,
15  the test is administered for 15 minutes, not
16  for hours.
17      Q. Well, you didn't do a test that
18  measured his ability to read over hours, did
19  you?
20      A. No, I -- I'm not aware of a test that
21  measures that, and that's the problem. So that
22  based on my reading, you know, and
23  understanding of ADHD and his specific
24  individual complaints, that he gets distracted,
25  he feels like he's read it right but makes

Page 80

1  careless mistakes, his college mates, you know,
2  confirmation of that that he's a careless
3  reader on tests in college days, some of the
4  spattered kind of comments of his early
5  teachers related to reading. He's an
6  inconsistent reader that did well on the
7  Nelson-Denny because it's very more shortened
8  than what the certification test is called the
9  Steps.
10      Q. Well, he also did well on the
11  Woodcock-Johnson?
12      A. On the Word Attack which takes under
13  five minutes.
14      Q. Well, in fact, on all the
15  Woodcock-Johnson tests?
16      A. Yes.
17      Q. You understand that the ADA requires
18  that in assessing a reading disability that the
19  person's performance be compared to that of
20  most people?
21      A. My understanding is that there's
22  sometimes been disagreement about what standard
23  is applied. But in some instances the peer
24  group has been peers of a comparable level, and
25  in other cases it has been the general

20 (Pages 77 to 80)

35c2eb28-53f8-4191-a040-4b328f127833