Page 81

1  population, that there's actually, like in the
2  scientific literature, not an absolutely clear
3  answer to the definition of reading disability.
4      Q. The pooled group that you ultimately
5  compared Dr. Krolik's reading scores with under
6  the Nelson-Denny is as close as we can come to
7  the category of most people; isn't it?
8      A. No. It actually has deficient norms
9  when you use it for purposes of trying to
10 compare an individual to the general
11 population. After all, it's based on only
12 those subjects that got between a 9th grade
13 and, you know, senior year in college scores.
14     Q. So if you wanted to really include --
15 well, if you wanted to really include most
16 people, you'd take into account people who
17 didn't go to school at all?
18     A. That's correct.
19     Q. And if you included those people in
20 the pool of norm to which you were comparing
21 Mr. Krolik, Dr. Krolik's score would be even
22 higher; wouldn't it?
23     A. And --
24     Q. Isn't that right?
25     A. Not necessarily.

Page 82

1      Q. If you're comparing him to people that
2  didn't read?
3      A. Because what is also missing from the
4  Nelson-Denny are people that have more than a
5  college education. They are not in the norms
6  of the Nelson-Denny. So you have doctors,
7  lawyers --
8      Q. Well, those people have more than a
9  12th grade education?
10     A. That's correct. They have more than a
11 senior in undergraduate school education.
12     Q. Is your contention that the
13 Nelson-Denny grade 16 does not include people
14 who graduated from postgraduate education?
15     A. It is unclear to me that they
16 represented professionals in their norms well.
17 And so, in other words, the population includes
18 everyone, not just selective people. And many
19 of the norms do not adequately sample these
20 rare populations that we have to deal with.
21         So that it's true what you're
22 saying. Those that have less than a 9th grade
23 education, if they were in the norms, he would
24 look better.
25     Q. Right.

Page 83

1      A. But it's not true necessarily -- we
2  don't know the effect because there are a
3  number of people that have more than a college
4  education that may not have been adequately
5  sampled.
6      Q. What makes you say that? What makes
7  you say that post graduate education recipients
8  were not adequately sampled in the Nelson-Denny
9  that you ultimately used?
10     A. When we do norm of studies, we
11 generally just try to reach out in the
12 community and do everybody. They selectively
13 focused on educational grades as a way of
14 organizing their norm of sampling. So I'm just
15 saying in epidemiology, we just take
16 all-comers. And they didn't do that. They
17 selectively limited their focus to those that
18 were, you know, had a particular education.
19     Q. But are you contending, sir, that the
20 Nelson-Denny norm --
21     A. They're flawed.
22     Q. -- does not include persons with post
23 graduate education?
24     A. It's just flawed.
25     Q. Answer my question. Does that include

Page 84

1  persons with post graduate education or not?
2      A. It was -- I called the test
3  manufacturer and could not get all of the
4  information that I requested about what it
5  included.
6      Q. So you don't know whether it does
7  include post graduate education or not?
8      A. I wasn't able to discern that. I
9  tried to actually do that. The
10 Woodcock-Johnson -- if I could contrast it just
11 briefly -- samples everybody that they could
12 find. And so there was no limitation on
13 education grounds or that kind of thing. So
14 it's a very different way of approaching the
15 norms.
16         That's why I'm hedging in this.
17 There's, therefore, a legal and a clinically
18 professional set of limitations in the norms of
19 the Nelson-Denny that, despite it being
20 recommended by the National Board of Medical
21 Examiners, despite Mr. Doane and I talking
22 about this as being a problem, that was the
23 norm table I was supposed to use. And that's
24 why my objections is that I objected in person
25 in my conversations and tried to contact the

Page 85

1  test manufacturer to find out just who was made
2  up with that, and they wouldn't release that
3  information.
4      Q.  But just to make sure I understand
5  you:  You do not know one way or the other
6  whether the Nelson-Denny pooled norm includes
7  persons who have education in excess of college
8  and an undergraduate college degree?
9      A.  I know it does, but I don't know who
10 those people are, how many there are and what
11 their makeup is.
12     Q.  So it doesn't --
13     A.  Yeah, I think it does.
14     Q.  So it does include post graduate
15 education?
16     A.  But it's just not clear who those
17 people are, how many there are, is it one or
18 two or three or four.  That's not enough for
19 norms.  So that's the problem.
20     Q.  Okay.  Let's go on to page 30 of your
21 production, page 6 of 8 of your December 19,
22 2003 report.
23     A.  Yes, ma'am.
24     Q.  The last paragraph begins:  This
25 report is consistent.  Do you see that

Page 86

1  paragraph?
2      A.  Yes.
3      Q.  The second sentence of that paragraph
4  reads:  Thus Dr. Krolik's chronic complaints of
5  learning problems at the time of his evaluation
6  were not adequately evaluated.  You're saying
7  that Dr. Hoblet did not adequately evaluate
8  Dr. Krolik's complaints?
9      A.  Correct.
10     Q.  What were -- now, the only complaints
11 that Dr. Krolik was raising about learning
12 problems in 1998 was that he couldn't pass the
13 USMLE, correct?
14     A.  He had had problems before in the
15 past.  And so --
16     Q.  In what?
17     A.  In medical school.
18     Q.  Was he complaining to Dr. Hoblet about
19 that?
20     A.  Unfortunately, Dr. Krolik doesn't
21 complain enough about his difficulties.  He
22 minimizes his problems, so it's very difficult
23 to get a history from him that arrives at the
24 nature of his difficulties.
25     Q.  Well, what were the chronic complaints

Page 87

1  of learning problems that Dr. Krolik expressed
2  to you and which are reflected in your December
3  19, 2003 report?
4      A.  Well, one of them I believe was that
5  he wasn't finishing his Step exams.
6      Q.  Couldn't pass --
7      A.  He was having trouble finishing that.
8      Q.  What else?
9      A.  He was having trouble, you know, with
10 technical exams.
11     Q.  What --
12     A.  Studying --
13     Q.  What technical exam was he having
14 trouble with?
15     A.  I believe he had received some sort of
16 accommodation.  I don't know -- remember when I
17 got this information -- but related to medical
18 school, you know, where he got extra time and
19 that kind of thing.
20     Q.  So when you evaluated him in 2001, he
21 was -- among the chronic complaints of learning
22 problems was that he needed and asked for and
23 received accommodations in medical school to
24 pass an exam?
25     A.  I'm sorry.  I misspoke.  He -- more

Page 88

1  specifically, I can't pass these damn tests.  I
2  know the material, but I can't pass them.
3      Q.  Was he --
4      A.  That would have been pretty much --
5  how long have you had -- oh, it's been hard,
6  you know, for some time.  And so that's the
7  nature of the complaints.
8      Q.  Well, I'm trying to get at exactly
9  what the complaint was --
10     A.  That he --
11     Q.  -- other than he couldn't pass the
12 Step exam of the USMLE.
13     A.  Problems sitting down and studying and
14 reading and learning material.  He goes I like
15 doing things with my hands.  He was a hands-on
16 type, concrete-type learner.  And he didn't go
17 into great depth.  That's not his style.
18 That's not his makeup.  He just complained he
19 can't, you know, overcome this difficulty.
20     Q.  Well, what did he -- I'm focusing on
21 your writing here.
22     A.  Right.
23     Q.  Dr. Krolik's chronic complaints of
24 learning problems.  When you examined
25 Dr. Krolik, other than complaining that he

Page 89

1 couldn't pass the Step exams, what learning
2 problems did Dr. Krolik complain about to you?
3   A. It was -- you know, when I saw him, I
4 think he had failed -- I don't know how many
5 Step exams he had failed but numerous. And
6 chronic in this instance is more than six
7 months.
8   Q. Okay. Well --
9   A. And so that's --
10   Q. I understand the Step exams. What
11 other chronic complaints of learning problems
12 did Dr. Krolik have?
13   A. It was hard for him to sit down and
14 study. I said, well, have you studied? Have
15 you done --
16   Q. In connection with the USMLE?
17   A. And also in other areas of education.
18   Q. What other areas of education was he
19 complaining about to you when you interviewed
20 him in 2001 --
21   A. That it was hard on a long technical
22 exam. He made errors in his reading and
23 careless errors and that kind of thing, and
24 that he was frustrated by it. And this would
25 have occurred more than six months before my

Page 90

1 evaluation. It would have encompassed --
2   Q. But it would --
3   A. -- higher education and the Steps, not
4 just the Steps alone.
5   Q. Okay. So --
6   A. Absolutely not the Steps along.
7   Q. You're testifying that he complained
8 to you in 2001 that he'd had difficulty passing
9 tests other than the USMLE?
10   A. Right.
11   Q. Which tests?
12   A. Technical tests -- I forget what they
13 were -- related to technical topics. Sometimes
14 he wouldn't do as well as he thought he should
15 have in his educational course. He is --
16 speaks in broad strokes. He doesn't get
17 terribly specific. And so the idea was that
18 this just wasn't a recent event, but he doesn't
19 elaborate much, unfortunately.
20   Q. Then you go on in this last paragraph
21 on page 30 --
22   A. Yes.
23   Q. -- to talk about IQ subtest patterns.
24 And then you say: No credible alternative
25 motivational, cultural, ESL, instructional,

Page 91

1 sensory, psychiatric, personality or acute
2 medical explanations for Dr. Krolik's childhood
3 and current symptoms could be identified.
4   A. Yes.
5   Q. Could be identified as an explanation
6 for his inability to pass the Step exams and
7 the other technical exams that you referenced?
8   A. For his personal history.
9   Q. But the issue that you're talking
10 about in personal history is his inability to
11 pass the Step exams and the technical exams?
12   A. It says for his childhood and current
13 symptoms, specifically.
14   Q. All right.
15   A. So that's not limited to the Step
16 exams.
17   Q. But, sir, isn't it possible, with due
18 respect to Krolik, he's just not that smart?
19   A. Based on my experience, there are not
20 a few people in medical school that have IQ
21 scores like Dr. Krolik. And they work very
22 very hard. They sometimes are able to pass the
23 Steps and be good doctors who aren't
24 book-learners. They're very much like trade
25 people who work their tail off to get down the

Page 92

1 verbal details, the factual details of
2 medicine. And I've evaluated a number of
3 students that have IQ scores in this range.
4       Remember, the point is, does he
5 have disability compared to the general
6 population. If you enter into -- compared to
7 his potential, his teachers commented that he
8 seemed to have more potential than he realized.
9 His IQ scores are higher than average, you
10 know, the high end of average. And so he's got
11 a number of things, you know, that suggest that
12 he should do get than he's actually done. It
13 shouldn't be quite so hard for him to do that.
14       And there are no real norms on
15 passing the IQ test for ADHD or learning
16 disorders. In other words, there are a people
17 have a variety of patterns on an IQ test, and
18 so we don't even know if IQ adequately measures
19 some people's potential when they have
20 difficulties.
21   Q. Do you know what the average IQ test
22 -- or excuse me -- the average IQ is of medical
23 students?
24   A. It can fall somewhere in the range of
25 high average to above average and higher.

Page 93

1  Q. It's about 125 or better; isn't it?
2  A. Not in my experience. I've evaluated
3  a number of medical students, and I know of no
4  decent study on the topic.
5  Q. Well, you haven't done a study of the
6  IQs of medical students across the board, have
7  you?
8  A. Just in terms of my sample. And I
9  know that many of my students pass even without
10 accommodations.
11 Q. But the students that you've
12 interviewed or have been affiliated with are
13 those who are having difficulties in medical
14 school?
15 A. And I've looked in the literature, and
16 I've not seen a well-conducted study of the
17 average IQ test based on a representative
18 sample of medical students. I think it would
19 vary according to the competitiveness of the
20 medical school and that kind of thing.
21 Q. You've answered my question.
22 A. Thank you.
23 Q. Turn to page 31, 7 of 8 of your
24 December 19, 2003 report.
25 A. Yes.

Page 94

1  Q. In the first full paragraph at the
2  very end there, you're talking about a
3  compensatory capacity for him to deal with his
4  ADHD symptoms. And then you say that does not
5  eliminate his objective limitations in his
6  daily organizational and learning and/or
7  reading comprehension deficit. What are the
8  objective limitations in Dr. Krolik's daily
9  organizational deficits that you identified in
10 this report?
11 A. He has, as we just discussed, high
12 average or above academic skills.
13 Q. I mean, daily organizational skills or
14 tasks.
15 A. He is impulsive, speaks his mind, gets
16 himself in trouble. He does not sit down and
17 carry out a study plan. He does not sit down
18 and get through the textbook or the exams
19 without difficulty.
20 Q. No, I mean, to --
21 A. He makes careless errors.
22 Q. -- not to ask about school or reading
23 or education here --
24 A. He does that on the job. He does that
25 at home. There were numerous, you know,

Page 95

1  difficulties that he got into because of
2  inattention, not listening carefully, impulse
3  control problems.
4  Q. What were those difficulties?
5  A. Not listening to his spouse well. She
6  would have to say things several times, remind
7  him about things, try to encourage him to keep
8  to the studying. He would get off task and
9  roam around. He had a very difficult time
10 sitting down and getting to work in activities,
11 you know. He was more of a hands-on, active
12 kind of person. It was very hard for him to
13 get organized and carry out even a ration study
14 plan because he couldn't stick to it.
15 Q. Isn't it true that the daily
16 organizational deficits that you report on here
17 in your December 19th report were identified by
18 Dr. Krolik's wife?
19 A. And he described some learning
20 difficulties too related to learning.
21 Q. I'm not talking about learning.
22 A. Right.
23 Q. You talked about daily organizational
24 deficits, and I'm trying to get --
25 A. And I consider learning a major life

Page 96

1  activity that occurs everyday.
2  Q. Let me finish. Well, I'm not talking
3  about learning.
4  A. Okay.
5  Q. Separate out learning. Isn't it true
6  that Dr. Krolik identified to you no daily
7  organizational deficits, but that the only
8  daily organizational deficits you identified
9  were reported to you by Dr. Krolik's wife?
10 A. No, he reported them also. But they
11 were -- the focus of my examination was
12 primarily focused on learning. I looked at
13 other major life activities. But this was
14 clearly a specific evaluation for diagnostic
15 purposes and to determine whether he was
16 disabled but hadn't been determined previously.
17 So that's what I focused on. I
18 talked about work-related issues and family,
19 social-related issues that were effected. But
20 the bulk of my -- what I report in this report
21 and the earlier ones was related to learning
22 and the central issue of whether he had a
23 diagnosis and whether he was disabled.
24 Q. You did not analyze, did you, whether
25 Dr. Krolik's ADHD symptoms resulted in a

Page 97

1 substantial limitation in his ability to work?
2   A. We explicitly discussed that and
3 decided to at his request. We were trying to
4 address the issue of learning, which was the
5 primary consideration. We talked about his
6 work difficulties, the prior arguments, prior
7 difficulties that he'd had but not in a lot of
8 depth. And we agreed that we would focus more
9 on the learning things since that was what the
10 issue was at hand, whether or not he had a
11 learning-related disability, whether or not he
12 had ADD which was still, you know, unclear
13 because there had been two different kind of
14 evaluations before that came to different
15 conclusions.
16   Q. All right. But my question focuses on
17 the major life activity of work. I do not see
18 in your December 19th, 2003 report any
19 conclusion expressed about whether Dr. Krolik's
20 ADHD has resulted in a substantial limitation
21 in the major life activity of work.
22   A. I believe that it's here or in the
23 letter that accompanied it in probably a veiled
24 way. My typical way -- and this comes up all
25 the way --

Page 98

1   Q. Show it to me because we need to nail
2 this down.
3   A. Okay.
4   Q. Is it your opinion -- are you going to
5 offer an opinion, sir, at trial of this matter
6 that Dr. Krolik has been substantially limited
7 in the major life activity of work?
8   A. I can because that was discussed. It
9 just wasn't put in this report. And the reason
10 was that, at his request we wanted to keep that
11 information private. But he talked about
12 arguments he would get in, conflicts that he
13 would get in with co-employees. And in keeping
14 with many of my students, if I were to put that
15 in a document that went to their professionals,
16 teachers or supervisors, that might be a
17 career-ender. And --
18   Q. So you chose not to do that in the
19 case of Mr. Krolik?
20   A. I chose not to put it in other than
21 allude to it. And the fact that in my
22 experience the symptoms of ADD effect, you
23 know, many if not all major life activities.
24 And so this evaluation by design is attempting
25 to provide information to the National Board of

Page 99

1 Medical Examiners related to learning-related
2 difficulties because it's, after all, called a
3 test-taking accommodation or, you know, type
4 evaluation to document a disability. And so --
5   Q. And by design was not intended to
6 advocate that Dr. Krolik had been substantially
7 limited in the major life activity of working,
8 correct?
9   A. I would never conduct an evaluation
10 without learning of someone's social and work
11 history.
12   Q. Show me --
13   A. So I did that, but I didn't report it.
14 He had substantial difficulties in both social
15 family and also work-related difficulties that
16 were kept relatively private in this focused
17 evaluation to address the learning
18 disdifficulties.
19   Q. You do not address, do you, in your
20 December 19, 2003 report to the NBME any
21 substantial limitation on the part of Dr.
22 Krolik in the major life activity of working?
23   A. May I have some time to read this
24 because I normally do?
25   Q. Certainly.

Page 100

1   A. Thank you for the time. When I'm
2 referring on Bates 31 to compensatory
3 capacities, unreliable, and objective
4 limitations in daily organizational learning
5 and/or reading comprehension deficits, I'm
6 talking in that broad sense. It could been
7 more explicit.
8   Q. Where else?
9   A. In the next paragraph at the end:
10 Day-to-day organizational and efficient
11 completion of profession demands will continue
12 to be difficult for him -- that's
13 professional -- because of his poor
14 self-control, particularly in settings where
15 he's faced with rapidly changing or demanding
16 reading comprehension and/or learning retrieval
17 demands. So --
18   Q. Where else?
19   A. The next one: In this context,
20 professional exams are but one occasion during
21 which reasonable accommodations are mandated
22 for eligible students or employees with
23 substantial limitations in a major life
24 activity such as learning. These
25 accommodations --

Page 101

1  Q. Where else?
2  A. -- subsequently -- that's on the same
3  paragraph -- are directly related to a
4  attention deficit disorder. Such
5  accommodations would be helpful in his current
6  life-long professional settings where extra
7  reading and memory recall test-taking time
8  would allow him to compensate to some degree
9  for his inefficient and inaccurate
10 attention-related reading and memory retrieval
11 limitations.
12      And the next sentence goes on
13 mostly to talk about test-taking type
14 difficulties. Let me go on. Remediation of
15 reading, on the last Bates 32, remedial reading
16 and professional content review and structural
17 programs. And that's to beef up his grasp of
18 the content of -- the profession content.
19 Q. Okay.
20 A. Not just to take exams but to review
21 that.
22 Q. I'm just asking you in your report
23 tell me where you identify that he is
24 substantially limited in the major life
25 activity of working. Any other locations here?

Page 102

1  A. I think I'm alluding to it. I'm not
2  going to be able to get everything. I'd be
3  happy to go through and detail that if you
4  don't have time here today.
5  Q. If I were to do a word search in the
6  word version of this document for the word
7  "word," would I come up with any
8  identifications of the word word -- or excuse
9  me -- work?
10 A. No, because I code it as professional.
11 Q. In your report that you submitted to
12 the Court, the June -- I think it's July 8th,
13 2005 affidavit --
14 A. Yes.
15 Q. -- that begins on Bates 193, do you
16 address working as the major -- as a major life
17 activity that's effected by Dr. Krolik's
18 symptoms?
19 A. That was my intention, but just to
20 allude to it rather than make that the primary
21 focus. But my intention is always to do that
22 because I actually educate my clients that
23 these issues are going to come up in their work
24 setting and already have frequently.
25 Q. Well, look -- just looking at the

Page 103

1  Table of Contents here that you so kindly
2  provided on Bates 193 --
3  A. Yes.
4  Q. -- where might we find any reference
5  at all to working as a major life activity
6  that's effected by Dr. Krolik's symptoms?
7  A. I would have to go through and pick
8  through it. But that's always my intention
9  clinically to deal with that. But all of my
10 students request that I handle information
11 about their professional developments
12 sensitively because they fear that they will be
13 mistreated if it looks like they have problems,
14 you know, in fairness to them can't really be
15 evaluated to say how great it is compared to
16 the average person.
17 Q. So consistent with that, you did not,
18 did you, in the case of Mr. Krolik assess
19 whether his work in any of the specific jobs he
20 had held had been effected, did you?
21 A. No, I did. I just don't put it in the
22 report. And so on Bates 197, I actually state
23 that disability laws and their definitions of
24 the major life activities, and that's how I
25 conduct my evaluation.

Page 104

1  Q. My question, sir, is: This is the
2  report that went to the Court that tells the
3  defendant in this case and the Judge the
4  matters to which you intend to testify.
5  A. Right.
6  Q. My question is: In here anywhere is
7  there the professional opinion reached by
8  yourself to testify to the Court that
9  Dr. Krolik's symptoms have resulted in a
10 substantial limitation in his major life
11 activity of working?
12 A. And, again, while not stated clearly,
13 my intention is that when I package it as a
14 suitcase type concept, professional, you know,
15 activities, professional settings, I mean by
16 that work and learning.
17 Q. Well --
18 A. Because I don't see how you can work
19 without learning.
20 Q. Exactly. And where --
21 A. And it's a trade --
22 Q. Where in this report, sir, in the
23 report that was served in this litigation and
24 was represented by Dr. Krolik's counsel as the
25 subject matter of your testimony, where do you

26 (Pages 101 to 104)

Page 105

1 engage in any analysis of Dr. Krolik's work
2 history.
3    A. Again, maybe not as adequate as might
4 be desired, I tried to do that here while
5 focusing more on learning. So when I package
6 those two terms, I'm alluding to work problems.
7 And I certainly did assess that as well as
8 social.
9    Q. You don't talk in this report about
10 any particular job Dr. Krolik has ever held, do
11 you?
12    A. At his request. And so I --
13    Q. Just answer my question. Do you talk
14 about any particular job Dr. Krolik has ever in
15 his whole life held?
16    A. No. And that's why I allude to it in
17 the ways that I did. That was by explicit
18 agreement.
19    Q. That's -- I only have a limited number
20 of hours here, sir.
21    A. I know. I know.
22    Q. You don't talk in this report about
23 the multi-million dollar company that he
24 founded and ran for ten years, do you?
25    A. I talked about it in my evaluation.

Page 106

1 And so --
2    Q. Where, sir, do you talk about his
3 multi-million dollar company in your
4 evaluation?
5    A. In my clinical evaluation when I was
6 with Dr. Krolik.
7    Q. In the report that you gave to the
8 NBME?
9    A. No. The report to them was to try to
10 satisfy the definition of disability where
11 there's a limitation in one or more major life
12 activities. And my students routinely want to
13 select learning as the life activity they want
14 commented on and feel that they will be
15 discriminated against if I go into too many
16 personal details about work or social --
17    Q. Okay. You said that a number of
18 times.
19    A. Just so that you're clear on my
20 intention.
21    Q. I'm entirely clear.
22    A. All right. Thank you.
23    Q. Have you indeed performed any analysis
24 of whether Dr. Krolik's ability to work in any
25 one of the number of jobs he's held has been

Page 107

1 effected about his symptoms as you've
2 identified them?
3    A. Yes, not provided in the report. We
4 had a discussion about his internship training
5 over in Europe, in Britain, when he was in a
6 surgery rotation, OB-GYN, we talked about how
7 he performed in that setting, and we compared
8 that to how he had performed on several jobs.
9 Did I list job-by-job, each job and activities
10 and that? No. But I clinically assessed the
11 nature of his success or failure in those
12 different settings and found that he had had a
13 lot of failure experiences -- I didn't itemize
14 it or articulate it -- when he had to work with
15 other people and their work was not up to
16 snuff, so that he actually has difficulty with
17 people who are inept or, you know, is not as
18 patient as others might be when he's working
19 with people that are less qualified than he is.
20         However, in the setting in which
21 he was performing as a doctor, he was gung-ho,
22 wanting to learn and did well, according to his
23 own report, and didn't experience the conflicts
24 that he had had when he's in a setting working
25 for other people.

Page 108

1    Q. His ADHD symptoms didn't effect him
2 then in that capacity, when he was performing,
3 as you say, as a doctor?
4    A. The more he was able to perform as a
5 leader, the better he does. The more he had to
6 fit into the group, the greater his difficulty
7 that way. He's moral, upright, sometimes
8 overly rigid in terms of right and wrong of
9 things. And so that grates on people
10 sometimes. But that was all explored as a
11 routine part of the differential diagnosis and
12 disability evaluation. It wasn't articulated
13 as fully due to the nature of all my students
14 not trusting that this information will be
15 handled sensitively. They fear it will be used
16 against them.
17         Just as a child-abuse -- sexual
18 abuse victim might have been sexually abused, I
19 find out that stuff too. But to put it in a
20 potentially career-damaging type context of an
21 evaluation for disability accommodations, I
22 believe it's unprofessional and insensitive.
23 So I try to avoid that kind of thing.
24    Q. Have you had occasion to read Dr.
25 Krolik's deposition in this matter?

27 (Pages 105 to 108)

Page 109

1  A. No, I don't believe I have.
2  Q. Are you aware that he testified that
3  he has never lost a job due to his ADHD
4  symptoms?
5  A. No. He normally -- his style is he
6  quits. Impulsively quits when he gets
7  frustrated. That's his style. And so we
8  talked about that, that there were more than a
9  few instances in which he walked off the job
10 because he was frustrated and couldn't inhibit
11 his responses as would -- I would think many
12 people in this situation, they would leave a
13 bit more quietly and that kind of stuff than he
14 has and not precipitously.
15         I hope I'm answering your
16 questions. It's hard because it's not in the
17 evaluation. But I want to be clear about what
18 the conduct of my evaluation is even though
19 it's not in the report.
20 Q. Did you talk to Dr. Krolik during your
21 review of him about his multi-million dollar
22 company?
23 A. Yep, knew that, and knew he was a
24 successful collector of sports cars and that
25 kind of thing.

Page 110

1  Q. Did you form any conclusion about the
2  extent to which his -- what you identified as
3  his ADHD symptoms effected his work in that
4  multi-million dollar company that he founded
5  and ran for ten years?
6  A. Yes. And he has trouble working for
7  other people. He's a gung-ho leader type, and
8  it's hard for him to work on a team.
9  Q. Did you see any effect of his ADHD
10 symptoms that you've identified on his working
11 life during the time that he was running his
12 company?
13 A. He talked about problems with impulse
14 control where he would say what's on his mind
15 and that would get him in trouble. And that's
16 one of the classic impulsive type errors in
17 social conversations that adults with ADD have.
18 Q. But my question --
19 A. They speak before thinking about the
20 consequences.
21 Q. But my question is in connection
22 with --
23 A. Yes.
24 Q. -- REK Industries or Enterprises,
25 whichever it is.

Page 111

1  A. We covered a number of different jobs
2  where he was, you know, supposedly successful
3  but there were, you know, difficulties.
4  Q. What specific ADHD effects did Dr.
5  Krolik identify to you in connection with his
6  company, his own company?
7  A. Impulsivity, you know --
8  Q. How? What did he say about
9  impulsivity in connection with that company?
10 A. He would speak his mind too readily,
11 which would sometimes get him in trouble. Even
12 though he was trying to be truthful and
13 constructive and helpful, it would sometimes be
14 a light bit too blunt and might have been able
15 to be said in a more tactful way. And we
16 talked about that. That came up at home. It
17 came up in the work setting. And his learning,
18 that was evident because he wouldn't sit down
19 and get through his study plan.
20 Q. I'm not asking you about studying now,
21 sir.
22 A. I know.
23 Q. We're going to get through this a
24 whole lot easier if you --
25 A. I'm just telling you --

Page 112

1  Q. -- answer my question.
2  A. I'm trying to, ma'am.
3  Q. My question is: What specifically did
4  he tell you about ADHD symptoms in connection
5  with his work at REK Industries?
6  A. We talked about different jobs. I
7  don't know the names of the industries that he
8  worked for. We talked about different jobs --
9  Q. This is the company that he founded
10 and ran for ten years.
11 A. And, again, we talked about jobs. I
12 didn't ask him for the title of every work he
13 had done. We talked in a global sense about
14 problems with impulse control and communication
15 with others and same things that he maybe ought
16 not to say or he ought to say differently. And
17 that is a problem that I found in discussing
18 with him the different jobs.
19 Q. But other than that, other than what
20 you've testimony to, you can't identify any
21 particular effect of his alleged ADHD on his
22 running of that company?
23 A. I've answered that he had problems
24 with impulse control and social communications
25 and work due to his impulse control problems.

28 (Pages 109 to 112)

Page 113

1  Q. Turn next, please, to Bates 35 which
2  is -- it looks like this. This is the
3  examiner's observation sheet. It's a form
4  early on in your Exhibit No. 3.
5  A. Yes.
6  Q. The date of treatment is February
7  23rd, '01.
8  A. Uh-huh (affirmative response.)
9  Q. "Yes"?
10 A. Uh-huh (affirmative response.)
11 Q. I need you to answer "yes" --
12 A. Yes.
13 Q. -- or no.
14 A. Yes. I'm sorry.
15 Q. Now, whose handwriting appears on this
16 form?
17 A. This is my psychometrist.
18 Q. And what is her name?
19 A. Her name is Ms. Marion -- or Ms. Betsy
20 Roquea. Betsy and then R-O-Q-U-E-A.
21 Q. And did she interview Dr. Krolik along
22 with you?
23 A. No.
24 Q. She interviewed him separately?
25 A. No. These are observations -- I don't

Page 114

1  believe that a psychometrist is qualified to
2  interview people. These are observations about
3  test observations during the test that she
4  administered. She's my research associate.
5  And she's a psychometrist at LSU. And also
6  I've worked with her at other jobs as well.
7  Q. Look at the handwriting that appears
8  in the bottom left corner, sir. And I see
9  something that refers to a previous doctor. Do
10 you see that?
11 A. Let me see. I'm having trouble
12 reading it too. I'm sorry.
13 Q. I think it's the bottom line on --
14 A. Bottom line on the left?
15 Q. Maybe look at the one that Jeanne sent
16 you, that might be a little bit better.
17 A. All right. Let me see if -- oh, I
18 think I can find it here.
19     BY MS. WASHBURN:
20        What document are you looking at?
21     BY MS. JOHNSEN:
22        It's a one-page typed Examiner's
23 Observations Form. It's got lines --
24     BY THE WITNESS:
25        Bates 35.

Page 115

1     BY MS. JOHNSEN:
2        Well, she doesn't have the Bates
3  label. It says Patient, Ralph Krolik. And
4  then --
5     BY THE WITNESS:
6        Three pages after my last report.
7     BY MS. JOHNSEN:
8        Yeah.
9  EXAMINATION BY MS. JOHNSEN:
10 Q. Look at the bottom left corner. Are
11 you able to see a reference to a previous
12 doctor, a comment about a previous doctor?
13 A. Admitted letters or something
14 incomplete sentences, quick worker, no
15 attention to detail, something excuses,
16 apologizes for less than adequate performance.
17 And then the bottom is not readable. I'm
18 sorry.
19 Q. You just can't read that? Okay.
20 A. If you have a clearer copy, I'd be
21 happy to look at it.
22 Q. I am told by someone who was looking
23 at a clearer copy that the one note says
24 previous doctor had it in for him. And I'm
25 wondering if you remember --

Page 116

1  A. Oh, absolutely. Oh, yeah.
2  Q. -- Dr. Krolik -- tell me what you
3  remember about hearing that from Dr. Krolik?
4  A. He saw a particular doctor, Wurzlow,
5  was evaluated by Dr. Wurzlow and who attempted
6  to treat him with medication. And he didn't
7  respond well to the medication. He just --
8  some people don't respond well to the
9  medication. And so he kind of took offense, I
10 think, when he went to the second doctor, I
11 think, to get -- solve the problem of not
12 getting accommodations to get further
13 evaluation. That would have been Dr. Hoblet.
14 And Dr. Hoblet didn't find the problems that
15 Dr. Wurzlow found. He specifically commented
16 that Dr. Wurzlow kind of made a comment during
17 the evaluation, you have classic difficulties
18 of hyperactivity because of his behavior in the
19 clinical visit.
20     I found that myself when I was in
21 the room with him. And so he couldn't
22 understand why this second doctor didn't come
23 to the conclusion of the senior psychiatrist.
24 Q. And he concluded that Dr. Hoblet had
25 it in for him?

Page 117

1  A. That -- because I think that there was
2  a dismissive tone that he felt in talking with
3  the second doctor. Whether that's justified or
4  not, I don't know. But I -- that, again, is
5  part of his edge, you know. He sees things
6  black and white. Gray is difficult. At the
7  end of her report, she actually kind of
8  equivocates on whether he does or does not have
9  ADHD. So he was confused because here he is
10 trying to pass this exam, this professional
11 exam to move on. So I think that was an
12 emotional statement expressing his frustration
13 of why there would be two differences of
14 opinion in professionals.
15 Q. Again, let me ask you about that --
16 A. Now, that's the best of my
17 recollection. But we had to deal with that
18 explicitly because I was the one that was going
19 to be the tie-breaker in this. I was the third
20 party to which Dr. Hoblet refers that there
21 might be need to see another expert on this --
22 in this matter.
23 Q. Let me back up.
24 A. Yep.
25 Q. I don't see in the documents that you

Page 118

1  produced any of Dr. Wurzlow's file other than
2  the letter she wrote to the ECFMG or the NBME.
3  A. That's correct. I don't ever see
4  files of psychiatrists sometimes.
5  Q. So you did not obtain her detailed
6  file if they exist?
7  A. They do interviews --
8  Q. Just yes or no. You didn't --
9  A. No.
10 Q. -- you didn't have the benefit of her
11 file?
12 A. No.
13 Q. You did though get Dr. Hoblet's raw
14 data and test results?
15 A. There was no raw data. There were
16 just reports or letters that I included in the
17 copying.
18 Q. Well, there was nothing that she gave
19 you that didn't copy for us, was there?
20 A. That's correct. That's correct. So
21 the total record.
22 Q. What's your recollection on how it was
23 that Dr. Krolik came to you in February of
24 2001?
25 A. That I was -- there was a disagreement

Page 119

1  between two professionals at Ochsner Medical
2  Clinic. And Mary Krolik was a resident at LSU
3  and heard me give grand rounds with two other
4  professors at LSU. And one of the comments
5  that I made, she came up and asked me about
6  after the talk which was, I said, sometimes
7  people with ADHD are the last to know that they
8  have a problem and the nature of their problem.
9     And so she told me that her
10 husband had received mixed messages and didn't
11 know what the truth was and that she had heard
12 through, you know, various people at LSU that I
13 was providing evaluations. And I do so for the
14 deans office, et cetera, and I'd done that for
15 a number of years. And so she wondered if I
16 would be willing to see her husband if he was
17 willing to do that because they didn't know
18 where to turn to next because there had been a
19 difference of opinion.
20    And I was clearly expert enough
21 to give grand rounds on ADHD in adults. So I
22 agreed that I'd be willing to consider things.
23 So that's why I started the case in an
24 unusually thoroughly way, which is to get all
25 the records as part of my initial evaluation

Page 120

1  and include that in the report just to tie
2  things together.
3  Q. Look at Bates 36.
4  A. Yes, ma'am.
5  Q. This is the Nelson-Denny reading
6  test --
7  A. Yeah.
8  Q. -- form? Now, who administered this
9  test to Dr. Krolik?
10 A. This would have been -- my
11 psychometrist would have administered this test
12 to him.
13 Q. That was Ms. Roquea?
14 A. Yes.
15 Q. And so the next couple of pages are
16 his Nelson-Denny test. And then following from
17 that on Bates 38 is his Woodcock-Johnson?
18 A. Yes, ma'am. 38.
19 Q. Yeah.
20 A. Right.
21 Q. I see there are some notes written --
22 handwritten notes on Bates 44. Are those
23 Ms. Roquea's -are those written in Ms. Roquea's
24 handwriting?
25 A. Let me check. Yes.

Page 121

1   Q. And would these be notes that she
2   would have taken of comments that Dr. Krolik
3   made as he took these various test?
4   A. Yeah. My policy is to have a
5   psychometrist record observations as they move
6   along through the test. That's correct.
7   Q. So she's reporting either what she
8   sees or what he says?
9   A. And sometimes I don't believe the
10  comments. Sometimes I do. It depends on my
11  judgment. In other words, my decision is going
12  to be based on my interview with the patient,
13  my experience of the patient, my assessment of
14  the patient. And these comments help me to get
15  context in which the person is producing these
16  results. Are they trying hard enough, not
17  trying hard enough, et cetera.
18      Sorry. I'll try to be brief.
19  I'm trying to get you out of other on time.
20  Q. Well, there are -- there's a lot of --
21  A. A tremendous amount of --
22  Q. -- test scores here.
23  A. I'm detail oriented.
24  Q. Turn, please, to 120 within Exhibit 3.
25  A. Yes, ma'am.

Page 122

1   Q. This is a report of symptoms observed
2   by Dr. Krolik's wife about him, correct?
3   A. Correct. Current symptoms.
4   Q. My only question is, there's some
5   handwriting on No. 7. Do you recognize that
6   handwriting? Is it yours or --
7   A. I believe that's hers.
8   Q. Mrs. Krolik's?
9   A. Yes.
10  Q. Dr. Or Mrs. Krolik?
11  A. And I can't read it on this form. I
12  can't make it out.
13  Q. Let me show you my copy. It's pretty
14  dark, but illegible on mine, I think.
15  A. I don't know the first word. Hardly
16  ever -- I can't. I can't.
17  Q. All right, sir. Bates 128 within
18  Exhibit 3.
19  A. Yes, ma'am.
20  Q. Is this the authorization for release
21  of confidential information that Dr. Krolik
22  filled out for you to send to Ochsner?
23  A. Yes, I believe so.
24  Q. And you're requesting here -- or he's
25  authorizing the release of what?

Page 123

1   A. Psychological tests, all raw data
2   scores. And I can't make it out -- for all
3   tests also --
4   Q. Questionnaires?
5   A. -- questionnaires filled out.
6   Q. All right. Next in this Exhibit 3,
7   sir, beginning at page 129 --
8   A. Yes.
9   Q. -- and I'll just read it:
10  Interpretive report, Theodore --
11  A. Millon.
12  Q. -- Millon, Ph.D. --
13  A. Yes.
14  Q. -- MCMI --
15  A. Yes.
16  Q. -- dash III. Is this a report that
17  you received from Dr. Hoblet's files?
18  A. Uh-huh (affirmative response.)
19  Q. This was a report --
20  A. This entire section from smart -- the
21  smart cover sheet on are Ochsner records that I
22  received in my request.
23  Q. Okay. What's the report that begins
24  at Bates No. 129, sir, what you recognize it as
25  being?

Page 124

1   A. MCMI III.
2   Q. What's the nature of that test?
3   A. It's a bad personality test. It's
4   poorly constructed, poorly designed but used by
5   a lot of psychologists.
6   Q. You don't place much stock in it as a
7   general matter?
8   A. A lot of people look at it, but they
9   think that it over reports pathology. You can
10  see people that, you know, had a bad day and
11  sometimes have elevations. It's -- it changes
12  too much. Personality is supposed to be an
13  endearing trait that lasts for years. And
14  you'll see people scores get up and down as if
15  they're a balloon popping. So I don't believe
16  that it's as reliable or valid as a personality
17  instrument needs to be. And that's not my
18  opinion along. Many people find that too many
19  people end up with five different personality
20  problems, you know, when they might not have
21  one. So it's not measuring true personality
22  traits so much as transient reactions.
23  Q. On the second page of this report,
24  Bates 130 --
25  A. Right.

Page 125

1   Q. -- in the second paragraph,
2   Interpretive Considerations, the reporter says
3   that Dr. Krolik reports that he has recently
4   experienced a problem that involves moodiness.
5   Did Dr. Krolik describe to you issues with
6   moodiness?
7       A. Yes.
8       Q. What did he say?
9       A. He was frustrated, irritated, you
10  know, confused about what was going on, what's
11  his problem, what should he do about it, you
12  know, what am I to believe, two different
13  people reached different conclusions. And so
14  he was mostly moody because of his frustration
15  with having finished medical school, you know,
16  and not being able to pass the Steps and having
17  to take time off from what would normally be
18  the normal career track of training in medicine
19  after completion of medical school.
20      Q. But he didn't describe to you feeling
21  moody about anything else other than the USMLE
22  issue?
23      A. Well, he was frustrated because his
24  wife had passed and he hadn't. And so, you
25  know, he shared with me that they had talked

Page 126

1   about how he new the material better than she
2   did but was having trouble passing the test.
3       Q. When you received this report and
4   Dr. Hoblet's file, did you read it?
5       A. Oh, yeah.
6       Q. Okay. And --
7       A. Oh, yeah. No, I always review the
8   information. There's important issues that are
9   discussed here. I just don't believe that the
10  extreme conclusions that this test generates
11  are accurate.
12      Q. Well, you see that the reporter for
13  Dr. Hoblet said that Dr. Krolik appears to fit
14  the following Axis II classification, and then
15  he goes on to say narcicisstic personality
16  disorder, schizoid personality disorder and
17  paranoid personality disorder. You saw that at
18  the time?
19      A. Absolutely. I see that all the time.
20  You can't give these tests without somebody
21  ending up with a personality disorder. That's
22  the problem with the test.
23      Q. Well, you did identify in your report
24  to the NBME some unspecified personality
25  disorder; did you not?

Page 127

1       A. Absolutely. Oh, yeah. Absolutely.
2       Q. What unspecified personality disorders
3   did you conclude --
4       A. As discussed in court and in my
5   report, there are some tendencies to distrust,
6   to be on edge, to be on guard, you know, to
7   minimize his difficulties thinking he's okay
8   and not understanding why everybody thinks he's
9   got problems, you know. So there's a
10  defensiveness to him and --
11      Q. He's got a quick temper?
12      A. Yeah, because of impulsivity.
13      Q. Well, he's got a quick temper?
14      A. He does, yeah. And not unlike a lot
15  of men that have his background of being
16  gung-ho and in the military and in professional
17  football and a number of other things.
18      Q. Did he tell you he played professional
19  football?
20      A. Yes, uh-huh (affirmative response.)
21      Q. What did he tell you about that?
22      A. Just said that he had done a variety
23  of things in his life, and he kind of itemized
24  it. So, you know, he had a colorful, you know,
25  kind of background and that kind of thing.

Page 128

1       Q. Did he ever tell you how many years he
2   played professional football?
3       A. No. I just -- I just sized it up in
4   the context of I need to know the background of
5   this person, what they do, what the
6   difficulties are and -- but I'm not a
7   vocational rehabilitation specialist. I --
8       Q. I'm just asking. You don't have to
9   explain.
10      A. Right, right. So we talked about all
11  that as a routine part of the evaluation.
12      Q. Did he also tell you that he had a
13  purple heart?
14      A. Uh-huh (affirmative response.)
15      Q. He did?
16      A. And he doesn't like -- he told me he
17  had some decoration. I don't know what it was,
18  some accommodation. I forget what he said.
19  And that he doesn't like to talk about times.
20  And there was -- it led us to a conversation
21  about possible injury in the military. And so
22  in my report I hopefully duly noted that he had
23  reported a possible mild head injury. He
24  didn't say mild head injury. That's my
25  assessment, that he didn't lose consciousness

32 (Pages 125 to 128)

Page 129

1  as far as I could tell from the interview. I'd
2  classify that as a mild injury. And it might
3  potentially, as I know, contribute to
4  inattention and impulsive type problems that
5  are often seen after a head injury.
6      Q. Having concluded that he had some
7  personality disorders -- disorder or
8  disorders --
9      A. Traits. Traits.
10     Q. -- wasn't it your obligation under the
11 DSM IV to rule those out as a cause of the
12 symptoms that you were observing?
13     A. I did. I interviewed him extensively.
14 I had the MMPI at the same time. And I
15 routinely give the MMPI. There was no need to
16 repeat it, you know. And so I had all of these
17 results before me, and I went about trying to
18 assess the nature of his personality, mood,
19 emotional, social, you know, work, learning, et
20 cetera, difficulties.
21     Q. You think the --
22     A. From the evaluation.
23     Q. Now, you take the MMPI over the MCMI?
24     A. They both have their limitations and
25 they both require clinical judgment and

Page 130

1  qualifications to sort out the -- what's true
2  from what is just speculation.
3      Q. Well, his MMPI test results are found
4  in your file beginning at Bates 141, right?
5      A. Yes.
6      Q. And you see this is another test
7  report that you received from Dr. Hoblet's
8  file?
9      A. Absolutely.
10     Q. And you see here on the second page of
11 that report that --
12     A. 142?
13     Q. Well, actually it's 143.
14     A. 143, yeah.
15     Q. -- that Dr. Krolik is said to be
16 insensitive and intolerant of others?
17     A. Uh-huh (affirmative response.)
18     Q. "Yes"?
19     A. Yes.
20     Q. And you also see that he is said to be
21 likely to be closed-minded -- I'm sorry --
22 narrow-minded and a closed person?
23     A. Yes.
24     Q. And he has -- at the bottom of the
25 page, he has unusual thinking and bizarre

Page 131

1  ideas. Do you see that?
2      A. Yes.
3      Q. What conclusions did you draw with
4  respect to Dr. Krolik based on your review of
5  the MMPI report?
6      A. As I stated, I compared the results
7  that I got with the routine evaluation that I
8  was doing in an attempt to comply with the
9  National Board of Medical Examiner's
10 criteria --
11     Q. On what test portion --
12     A. -- on test evaluation. And I thought
13 he had some personality traits that were worth
14 noting under Axis II in my report and that
15 there were traits. And so I listed those and
16 felt that, you know, while there might be some
17 risk to revealing that he had these personality
18 traits that, you know, were clinically
19 significant, you know -- we actually talked
20 about that, and I insisted that we include
21 those traits which I thought were relevant to
22 an accurate assessment of him, and that would
23 indeed be relevant in reaching a determination
24 about his difficulties.
25     Q. Well, what traits, what personality

Page 132

1  traits did you, in fact, list in your report to
2  the NBME.
3      A. Distrustful, compulsive features.
4      Q. And that's on page 29?
5      A. Well, I might be in the wrong report,
6  and I apologize if I have. But I'm looking at
7  Bates 311.
8      Q. What does it say at the top, page 1 of
9  what?
10     A. Seven of eight.
11     Q. Okay.
12     A. And so under Axis II, I have
13 personality disorder not otherwise specified,
14 distrustful, compulsive features. It goes to
15 the intolerance, the distrust, the concern that
16 people might be against him.
17     Q. Well, wait. I don't see those words
18 here. Are they here anywhere?
19     A. Bates 00311.
20     Q. I see --
21     A. And I'm looking --
22     Q. -- distrustful, compulsive features.
23     A. Right. And those features summarize
24 examples that -- the behavorial examples I just
25 gave you.

Page 133

1  Q. Okay. But just to make clear, your
2  report to the NBME just simply says
3  distrustful, compulsive features. It does not
4  go on to explain what you just explained,
5  right?
6  A. Well, I'm talking to other
7  professionals, right? It's reviewed by
8  professionals licensed --
9  Q. Sir, I'm just getting you to
10 acknowledge --
11 A. I know. And I'm just saying --
12 Q. -- it doesn't say that, right?
13 A. This is not a report written for a
14 layperson. This is something that's written
15 for a colleague that is as well trained as I am
16 to know these results. And that's also listed
17 in Bates 309 where it summarizes Hoblet's
18 evaluation results.
19 Q. Where you say Dr. Hoblet's evaluation
20 did not identify the presence of any obvious
21 mood or anxiety disorders?
22 A. Right. Although he has a
23 conscious/unconscious reluctance to admit to
24 having short-comings associated with high
25 self-confidence. So I tried to fairly

Page 134

1  represent the data through my lens of clinical
2  responsibility to arrive at an appropriate
3  independent judgment.
4  Q. And that's why you recounted what was
5  in the MMPI but not in the MCMI?
6  A. I don't -- I prefer to use other
7  instruments besides the MCMI. But I scanned it
8  and looked to see if there were commonalities
9  across both, and what's in my report is a
10 summary of my integration of the data. Sorry
11 for being long-winded.
12 Q. Okay. Sir, you have -- you refer in
13 your July 8th, 2005 report to a series of
14 ever-changing disability evaluation and
15 documentation requirements --
16 A. Right.
17 Q. -- by the NBME.
18 A. Right.
19 Q. What do you mean there?
20 A. Just stating, you know, an observation
21 that it is peculiar that I had to call so many
22 times to get the standards of evaluation, what
23 was required, what was needed to comply with
24 the National Board of Medical Examiners'
25 evaluation guidelines. In other words, there's

Page 135

1  no mention of what normative table for the
2  Nelson-Denny you're supposed to derive the
3  norms from and so forth. So that those details
4  I had to get by personally calling, you know,
5  the program manager. And I've called on other
6  students' behalf on other occasions to make
7  sure that my report was in compliance so they
8  had a fair shot.
9       Now, the student didn't always
10 comply. They didn't always provide me with the
11 documentation I needed to do a --
12 Q. But --
13 A. -- I always warned them what they
14 needed. And I had to frequently call to
15 clarify what the guidelines meant,
16 specifically, to generate a compliant report.
17 Q. Well, what I read though talked about
18 ever-changing --
19 A. That's correct.
20 Q. -- demands. What demands were imposed
21 on Dr. Krolik that were changed later?
22 A. It was the first time -- and I'd
23 evaluated other patients. It was the first
24 time I was told that I was using the wrong
25 normative table. It wasn't on the e-mail. It

Page 136

1  wasn't on the internet. It didn't direct
2  people to the Nelson-Denny manual to find the
3  right table.
4  Q. Okay. We've talked at length about
5  the Nelson-Denny table.
6  A. Right.
7  Q. What other requirements do you contend
8  were changed by the NBME with respect to
9  Dr. Krolik?
10 A. The issues about the DSM, you know,
11 the relevance of DSM, and the need for
12 documentation, you know. What qualifies as a
13 positive finding of ADHD of impairment during
14 childhood regarding ADHD or learning
15 disability, for instance, is not at all clear
16 from the National Board of Medical Examiners'
17 guidelines so that one would provide a general
18 bit of information about -- you know, trying to
19 comply with these guidelines only to find out
20 that that wasn't exactly what was being looked
21 for.
22 Q. Okay.
23 A. And so I thought that their -- the
24 National Board of Medical Examiners, to be fair
25 to people, needs to be able to be more explicit

Page 137

1  about what specifically qualifies as evidence
2  of disability because then the students would
3  be able to go and retrieve that information if
4  indeed it is available.
5      Q. Okay. Speaking of the DSM IV with
6  respect to age of onset --
7      A. Yes, ma'am.
8      Q. -- there's a long discussion in your
9  July 5th report --
10     A. Yes, ma'am.
11     Q. -- about age of onset. Now, you would
12 agree with me, wouldn't you, that the DSM IV
13 does require that an ADHD sufferer experience
14 meaningful impairment since early in that
15 person's life?
16     A. It's still a controversial point. The
17 guidelines explicitly refer 7 years of age for
18 some impairment. And -- but professionally, we
19 go up to 12 years in terms of the onset. But
20 there's considerable debate about whether
21 that's a fair criteria, and there's very little
22 written -- and this is another objection of
23 mine -- very little written about what
24 constitutes some impairment.
25     Q. All right. But my point -- the

Page 138

1  question that I'm getting at and I'm not --
2      A. Right.
3      Q. -- asking about the debate between 7
4  years and 12 years. I'm asking whether you
5  agree that there needs to be some meaningful
6  impairment early in one's life in order for
7  that person to be said to have ADHD?
8      A. That's actually a controversial point
9  because --
10     Q. Do you agree or not?
11     A. I don't think we know enough
12 information to know whether that is
13 appropriate. There is a lot of debate about
14 the reliability of validity of evaluating age
15 of onset. A lot of people are concerned that
16 we don't have, you know, a clear method for
17 determining childhood symptoms or impairment
18 retrospectively. And so I voice that concern.
19 In a sense if I could capsulize it --
20     Q. No, no. I think your report does a
21 good job of that.
22     A. All right.
23     Q. Isn't it true though that the ADHD is
24 a developmental disorder?
25     A. Yes.

Page 139

1      Q. And it concerns the capacity to exert
2  self-control over one's actions?
3      A. It's been described variously. That's
4  one definition.
5      Q. Well, that's not an inaccurate
6  definition, is it?
7      A. It's been described variably. Some
8  people will focus on the self-control. Others
9  will focus on attention and other mental
10 impairments.
11     Q. Or the ability -- okay. Then I'll
12 broaden it to, it involves the capacity to
13 exert self-control or to remain attentive. And
14 those are developmental characteristics; aren't
15 they?
16     A. Yeah. You know, it's a disorder that,
17 you know, is typically been thought to have an
18 early onset and to be chronic in nature. And
19 there's debate about how to diagnose it. And
20 my objection is that I believe that the
21 National Board of Medical Examiners deviates
22 from the DSM's description and criteria on age
23 of onset and the need for documentation and
24 presence of some impairment.
25     BY MS. JOHNSEN:

Page 140

1          Let's take five minutes.
2          (A BREAK WAS TAKEN.)
3  EXAMINATION BY MS. JOHNSEN:
4      Q. I'd ask you to turn within Exhibit 3,
5  Doctor, to Bates 244 which is page 52 of your
6  July 8th, 2005 report.
7      A. Okay.
8      Q. Do you have that page in front of you?
9      A. Yes.
10     Q. The paragraph at the top of the page
11 that begins "Response," that's a response by
12 yourself to a criticism or to a demand about
13 identification of specific functional
14 limitations. Do you see that?
15     A. It's citation 5iv?
16     Q. That's right.
17     A. Got it.
18     Q. Here you're talking about the fact
19 that Dr. Krolik did not complete prior Step
20 exams.
21     A. Yes.
22     Q. And your report -- or the report you
23 received from Mr. Sona that he did not learn by
24 reading. Then you -- then you go on to say and
25 did not achieve academic success consistent

Page 141

1  with his perceived potential according to his
2  elementary school teachers' comments on report
3  cards.
4      A. Yes.
5      Q. Is the not achieving -- do you mean in
6  this sentence to refer to the fact that he did
7  not achieve academic success consistent with
8  his perceived potential in elementary school?
9      A. Yes. I don't mean that that's the
10 basis for disability, just that there were
11 comments like that, that he was an
12 underachiever.
13     Q. And those comments you saw in his
14 elementary school report cards?
15     A. That inconsistent performance.
16     Q. Yes. You didn't -- okay. Then you go
17 on to say Dr. Krolik had requested and received
18 test-taking accommodations in medical school.
19 Did he tell you that?
20     A. At some point, yeah, he did. And so I
21 didn't know the nature of it. We talked about
22 getting the results but thought that it
23 wouldn't be necessary. It was before you-all
24 had a document for documenting past
25 accommodations, you know. In these early

Page 142

1  phases, there wasn't a form in there, so we
2  just discussed it that way.
3      Q. Well now, I just want to be clear. Is
4  it your testimony that Dr. Krolik told you that
5  in medical school he had both requested and
6  received test-taking accommodations?
7      A. Yeah. But I don't remember how
8  exactly he stated it and that kind of thing.
9  But I know he got some extra time on tests, and
10 I don't remember the nature of that.
11     Q. Well, you called them test-taking
12 accommodations, right?
13     A. Well, that's after the fact. I don't
14 know that they were called then, but that's
15 what they appeared to be.
16     Q. Did you know that on his application,
17 on his request form for to receive
18 accommodations in the USMLE he wrote that he
19 had never before received test-taking
20 accommodations?
21     A. I can sympathize I found them
22 inconsistent. That wouldn't surprise me. I
23 found them inconsistent what he was reporting
24 to me.
25     Q. Turn to the very last page of your

Page 143

1  report here, page 254, Bates label 254.
2  Jeanne, it's page 62 of his July 5th, '05
3  report. I'd direct your attention to the first
4  paragraph on the page, sir.
5      A. Yes.
6      Q. And I think I know what you mean by
7  this, but I just want to make certain I
8  understand. You say: It is important to
9  emphasize that Dr. Krolik's reading
10 comprehension remains discrepant from his
11 measured verbal IQ test score if norm
12 referenced Nelson-Denny standard stores are
13 used.
14     A. Right.
15     Q. You mean there to say that if you
16 compare Dr. Krolik with readers who are
17 graduates of profession schools?
18     A. Who have at least a senior year of
19 education undergraduate school.
20     Q. So --
21     A. The top of the norms and the
22 Nelson-Denny.
23     Q. So at least 16 years of education?
24     A. Yes.
25     Q. If you compare him with those people,

Page 144

1  his score under the Nelson-Denny is below
2  average?
3      A. Right.
4      Q. Or at least -- I think you reported
5  that he was above average -- average or above
6  in two of the three and below in the one?
7      A. I think that's right, yeah. That
8  obviously keeps in the information that wasn't
9  entirely updated from the whole use of a
10 different norm table. You're right.
11     Q. I think we're on the same page.
12     A. We are.
13     Q. Now, turn to Bates 280. This is a
14 copy of the NBME's letter to Dr. Krolik dated
15 November 10th, 2003.
16     A. Right.
17     Q. And there are handwritten notes in the
18 margin. Are those your notes?
19     A. Yes.
20     Q. Are those your notes of a call that
21 you had with Dr. Doane, D-O-A-N-E --
22     A. Yes.
23     Q. -- on December 19th, '03?
24     A. Yes.
25     Q. Elsewhere in your report, in this

Page 145

1  file, you refer to phone notes of your
2  conversation with Mr. Doane. Are these the
3  phone notes that you refer to?
4      A. Yes.
5      Q. Are you aware of any other notes that
6  you have of telephone calls that you've had
7  with Mr. Doane?
8      A. No.
9      Q. At least pertaining to Dr. Krolik?
10     A. No.
11     Q. So you testified before that you've
12 had half a dozen calls with Mr. Doane, correct?
13     A. Something -- yeah, something around in
14 there.
15     Q. Have each of those calls concerned
16 Dr. Krolik?
17     A. Most do. I've had calls with
18 Mr. Doane on other students, but most of these
19 I think would. I can't -- you know, I don't
20 have it logged, you know, call-by-call. But I
21 had at least, you know, I thought six calls
22 about this because it was -- at some point he
23 was a new employee of that section. And I was
24 getting to know him and see what his criteria
25 were in terms of what's a compliant report.

Page 146

1  And so we actually had quite a few calls. And
2  his case -- Dr. Krolik's case came up at some
3  point where I was trying to master the
4  guidelines.
5      Q. What's the earliest occasion that you
6  remember speaking to Mr. Doane about
7  Dr. Krolik?
8      A. I don't know. I don't have a note. I
9  don't know whether it was somebody else I spoke
10 to before the first report. I would have
11 spoken to somebody, I believe, around the time
12 of that first report that I generated. But I
13 specifically wanted to note this because we
14 were finally in agreement about what was
15 required regarding his specific case.
16     Q. You've submitted reports on behalf of
17 other USMLE applicants --
18     A. Yes.
19     Q. -- who are requesting accommodations?
20     A. Right.
21     Q. How many have you submitted over time
22 -- or how many applicants have you supported in
23 that nature?
24     A. I don't have an accurate number off
25 the top of my head. I don't have an accurate

Page 147

1  number. It would be more than 25 maybe.
2      Q. More than 25, less than 100?
3      A. Oh, yeah.
4      Q. Less than 50?
5      A. Oh, yeah, I think so. Yeah.
6  Somewhere in that 25 or -- some of them might
7  have gone to other testing agents, you know,
8  like specialty boards or other things like
9  that. It's just a duty I perform at that
10 school. I'm the identified person to do those
11 under most of those circumstances.
12     Q. You're the identified person at the
13 LSU School of Medicine?
14     A. Yeah. I sat on the Student Health
15 Committee and developed and worked with the
16 Dean of Students, Howard Randall, to kind of
17 develop this service, got it covered by the
18 student health insurance as a part of
19 participating on the health committee, student
20 health committee, have consulted, you know,
21 related to specific problems, you know, in
22 accommodations and the like there.
23            So in this instance, I was trying
24 to document specifically what I needed to be
25 compliant so that we could be done and move on

Page 148

1  to the next case and that kind of thing.
2      Q. So just to make sure I understand the
3  arrangement or this -- this task, if you will,
4  that you served at LSU School of Medicine.
5  When a medical student -- when an existing
6  medical student needed assistance in pursuing a
7  request for accommodations, you would be the
8  go-to guy on the faculty who would support that
9  application?
10     A. Or resident. And then I did that in
11 the community as well, so I saw professionals
12 who were licensed already but had difficulties,
13 you know, with learning and working and that
14 kind of thing. So I would see those people as
15 well. They would not come through LSU. They
16 would be a direct referral.
17     Q. I'm speaking here of the LSU
18 occasions.
19     A. Yes.
20     Q. When we talked before about supporting
21 between more than 25 but less than 50, were
22 those more than 25 LSU medical students that
23 you've supported in this matter?
24     A. Some sort of affiliation with LSU.
25 And then sometimes they'd be from other

Page 149

1  institutions or something. Yeah. They would
2  always go through usually prior evaluation,
3  often medical, so that I would be -- they would
4  be narrowed into those that had appeared, you
5  know, sometimes to our medical clinics, student
6  medical clinic, that their disorder was more of
7  learning, professional conduct, test-taking,
8  learning kind of problems rather than those
9  that had obvious social relationship or
10 psychiatric disorders.
11         We worked out a triage where they
12 would -- the ones with psychiatric relationship
13 problems would go directly to counseling or
14 psychiatric services so that we'd save time in
15 serving the students.
16     Q. On the occasions when you wrote
17 reports in support of the students or the
18 residents' request for test-taking
19 accommodations --
20     A. They would actually be coming in to
21 find out what's was wrong, what's going wrong
22 in my life. So they always came with an
23 identified problem.
24     Q. But my question relates to the
25 occasions in which you would at some point

Page 150

1  support that student's request for
2  accommodations --for test-taking accommodations
3  with a report.
4      A. I would ask them how they wanted to
5  handled that.
6      Q. All right. But --
7      A. Are you interested in --
8      Q. But my point is --
9      A. Right.
10     Q. -- the predicate of this question
11 which I've yet to get out is, on those
12 occasions where you would support these
13 students --
14     A. Yeah.
15     Q. -- would they usually be -- would
16 these occasions in which you would write a
17 report, would they usually be head injury
18 victim or epilepsy victims?
19     A. No.
20     Q. What's the percentage -- of the
21 reports that you've written on behalf of
22 students seeking test-taking accommodations,
23 what's the percentage of those that deal with
24 ADHD?
25     A. Well, we wouldn't know. It would

Page 151

1  either be learning disorder, ADHD, or subtle
2  social emotional difficulties not obvious. So
3  that I would be going into it not knowing which
4  of those two things it might be.
5      Q. But my question relates to when you do
6  write a report -- you've identified a disorder,
7  right, when you write this report in support of
8  a student's application for test-taking
9  accommodations?
10     A. Well, if they have mild depression, I
11 don't recommend accommodations.
12     Q. But my question --
13     A. You see that I'm saying? I'm doing an
14 independent evaluation, and they may not have
15 ADD or learning disability.
16     Q. But my question is only aimed at those
17 occasions where you do write a report that goes
18 to an agency like the NBME in support, where
19 you've taken a position I'm going to assist
20 this student if I can in his or her request for
21 test-taking accommodations, what's the
22 percentage of those occasions -- what's the
23 percentage of those occasions where you
24 identified ADHD as the disabling condition?
25     A. Let me think. Probably around half

Page 152

1  because they've gone through a screening
2  procedure before they get to me. So I don't
3  see everybody --
4      Q. That's okay. I'm just asking about
5  the reports you've written. You say about half
6  of them have concerned ADHD?
7      A. And some of them don't want a report
8  written. I don't --
9      Q. Okay. I'm not asking about those.
10 I'm asking you where you have advocated on
11 behalf of a student by writing a report.
12     A. I would put advocate differently.
13     Q. All right then. When you have sent in
14 a report.
15     A. Right.
16     Q. And that's about half you say. Half
17 of those students you have identified ADHD as
18 the disabling condition?
19     A. Uh-huh (affirmative response.)
20     Q. "Yes"?
21     A. Uh-huh (affirmative response.)
22     Q. You need to answer with a word.
23     A. Yes.
24     Q. Okay. And so do I understand
25 correctly that half of the 25 -- more than 25

Page 153

1  but less than 50 students you've identified as
2  having ADHD?
3      A. In concert with the other people who
4  have evaluated them, yeah. They went through
5  screening first. And that's why it's so high.
6  In my normal practice --
7      Q. You know, I don't need to go there.
8      A. Okay.
9      Q. Look at page 45 of -- I'm sorry.
10     A. 280.
11     Q. Yeah, 280.
12     A. Yes, ma'am.
13     Q. Which is the November 10th, 2003
14  letter with your notes.
15     A. Yes, ma'am.
16     Q. Read to me your handwriting, please.
17     A. Starting at the top is the phone
18  number, the date, phone notes to JA Doane,
19  pooled norms for NDRT national Nelson-Denny, in
20  tech manual, GB founded -- that's what he
21  said -- founded in the manual, not the tech
22  manual.
23     Q. In manual you say, not tech manual?
24     A. Right. There are two manuals.
25  National Board of Medical Examiners didn't

Page 154

1  specify in letter or website where -- that this
2  information was required, that this table could
3  be used.
4      Q. Next?
5      A. National Board of Medical Examiners
6  needs to change the website or letter
7  explanation on what to use, and the GB is my
8  initial. Then one change policy re the test --
9      Q. Nelson-Denny?
10     A. -- they call it a test when it's not.
11  You know, it's not an H-based test.
12     Q. Okay.
13     A. Then it's -- is it current. This is
14  my tick list to see if I'm meeting guideline.
15  I did the evaluation within three years, so
16  it's current. I established that with Doane.
17  Provided already, which was historic
18  documentation that I had received from
19  Dr. Krolik. That would be report cards, et
20  cetera. He agreed that that was already in the
21  hopper.
22     Q. Let's talk about that. What do you
23  remember Dr. Doane agreeing -- not doctor.
24  What do you remember Mr. Doane agreeing when
25  you say he agreed that was already in the

Page 155

1  hopper?
2      A. He received objective historical
3  documentation like report cards or other school
4  records that we were able to ascertain.
5      Q. Well, he told you he'd received the
6  report cards?
7      A. Well, again, this is requesting
8  objective historical documentation. Whether
9  it's objective -- it certainly is historical,
10  and so it's documentation. Let's agree to
11  that.
12     Q. What's the next item?
13     A. The next one is cousin and college
14  mates or something and MD spouse. So those are
15  collateral reporters.
16     Q. Now --
17     A. It says I want reports from parents,
18  teachers or others.
19     Q. Let me ask a question.
20     A. Right.
21     Q. You called Mr. Doane to follow up on
22  his November 10th letter to make sure that you
23  understood what he meant in that letter, right?
24     A. That I had provided what was
25  requested.

Page 156

1      Q. Well, you hadn't provided it yet, had
2  you, because your letter --
3      A. This is the second letter. This is
4  the second report. So, in other words, I'm
5  going through the guidelines checking to make
6  sure that he's got everything he needs related
7  to completing this case for evaluation.
8      Q. Well, by December 19th, had he
9  received your December 19th letter?
10     A. No. I'm referring to documentation
11  that I was told by Dr. Krolik he had already
12  sent in before this time. So I can't attest to
13  what you had in your files, what Dr. Krolik had
14  sent in. I was verifying that he had what he
15  needed.
16     Q. That who had what he needed?
17     A. Mr. Doane had these, you know, pieces
18  of information.
19     Q. Well, all --
20     A. So that I made sure I sent it in with
21  the report. And at the end --
22     Q. Wait, wait, wait.
23     A. Right.
24     Q. See, I see a little inconsistency
25  here, because on the one hand you say I'm