Page 157

1  calling to make sure that he's got what he
2  needs and I'm going to send it to him. Now,
3  either he's got it already or you're going to
4  send it to him. Which is the case?
5      A. I've had such bad luck with the
6  National Board of Examines that what I've had
7  to do is go through each guideline to make sure
8  that the file is complete. And so this is a
9  notation to self. The only thing I need to do
10 is put in standard scores, right, and specify
11 subtest scores and then the file is complete.
12      There were already a file on
13 Dr. Krolik that was quite big. So I'm just
14 verifying that he's got the separate categories
15 of information. I'm not alleging that he
16 agreed that that's proof of ADD.
17     Q. Okay. That's my question.
18     A. Right. I'm just saying that I'm going
19 through the checklist to make sure that I have
20 provided everything I need to or Dr. Krolik has
21 to move this case along, because this is now
22 two years in the making to get this case
23 settled, primarily because the National Board
24 of Medical Examiners is not explicit in their
25 guidelines about what is required.

Page 158

1      Q. Well, sir, are you aware that in the
2  spring of '01 the National Board of Medical
3  Examiners instructed Dr. Krolik that it would
4  not process his application -- his request for
5  accommodations until he registered for a test
6  and that Dr. Krolik said, no, I'm not going to
7  register for a test? Are you aware of that?
8      A. I was aware to the conflict going on
9  in that communication, but I wasn't aware of
10 every detail. He was clearly frustrated. He
11 came to me in that state. And so I was aware
12 of it, and I was trying to facilitate --
13     Q. But you're not aware, are you, that it
14 was the -- that the National Board of Medical
15 Examiners --
16     A. Oh, I was aware of pieces of paper
17 that said you were going to do something and
18 you didn't do it. And then Krolik would say I
19 sent you the stuff, what the hell else do you
20 want. I was aware of that controversy. And
21 that's why I was taking an independent charge
22 of verifying at least they've got categories of
23 information. Mr. Doane was very willing to
24 speak to me, and that made it a lot easier to
25 dot the Is and cross the Ts.

Page 159

1      Q. Well, tell me everything you remember
2  Mr. Doane saying during your conversation on
3  the 19th of December.
4      A. He was just simply saying what he
5  needs to complete the file and make it
6  compliant.
7      Q. Well, make it compliant --
8      A. And that's in the letter. In other
9  words, if you follow those letters, you can see
10 that first there's a general request to
11 evaluate test-taking accommodations. And then
12 the last letter ends with I've done these
13 changes and this changes, and this is merely my
14 notes that everything has been taken care of if
15 I take care of those changes to the report.
16     Q. But Mr. Doane wasn't telling you that
17 if you sent to me what you've listed to me that
18 you have and are ready to send, then Dr. Krolik
19 will receive the accommodations he wants?
20     A. No, I'm not alleging that. What I am
21 saying, however, is that we had conversations
22 about how unusual it was to have someone of
23 Dr. Krolik's age not have all the usual
24 educational records, because he's got an MAD,
25 Mr. Doane does. And so we were -- I was making

Page 160

1  a pitch how do I document objective
2  documentation for a disorder that didn't exist
3  them.
4      Q. What did Mr. Doane say in response to
5  that?
6      A. He was very respectful in listening
7  that that's a difficulty. I don't know. In
8  one of his letter he said it may be impossible
9  to document the childhood stuff. That was in
10 one of his letter to Dr. Krolik, I believe. So
11 we both were on the same page, that this was a
12 very difficult situation due to the
13 documentation of impairments that early in life
14 prior to professional recognition of this
15 disorder.
16     He did not say, oh, yeah, he's
17 qualified, I'm going to give him the
18 test-taking accommodations. I haven't had that
19 kind of cooperation from anybody. So, you
20 know, this was a very direct professional
21 conversation about what we need to complete
22 this case file.
23     Q. Did Mr. Doane in this conversation
24 lead you to believe that the NBME would respond
25 positively to Dr. Krolik's request for

Page 161

1 accommodations?
2   A. I didn't ask him to give me a
3 premature judgment. I understood this had to
4 be reviewed by numerous parties, and I was just
5 asking if he had a complete file. I don't know
6 allege anything else.
7   Q. Do you remember any other -- any other
8 statements that Mr. Doane made to you --
9   A. Yes --
10   Q. -- in connection --
11   A. -- I don't need to re-do the IQ test.
12 I don't need to re-do the revised
13 Woodcock-Johnson. These tests -- in somebody
14 that's denying symptoms, you know, in these
15 other tests, I'm providing collateral reports,
16 you know, are the best I can do. Okay. Okay.
17 Okay. He didn't say, oh, that seals the case.
18 But he knew how I was trying to collect the
19 collateral reports, and I could not get any
20 further clarification, as polite as he was,
21 about what exactly was being required.
22       So I was taken aback when I got a
23 letter about school failure and stuff like that
24 being used as a criteria when it's not in the
25 DSM. It's not a professional criteria. It's

Page 162

1 imposed by the National Board of Medical
2 Examiners' policies and some other testing
3 companies for what needs to be the
4 documentation regarding childhood problems. So
5 we had a very frank discussion about what was
6 needed and how unusual this case was.
7   Q. That was your conversation in December
8 of '03?
9   A. Or conversations like that before
10 that, but I don't remember when it first
11 started with Mr. Doane. But we had, again,
12 several conversations about this or other
13 cases.
14   Q. Now, have you told me -- I just need
15 to be comprehensive in my questions here. Have
16 you told me everything that you can remember
17 Mr. Doane telling you about Dr. Krolik or his
18 application process?
19   A. I told Mr. Doane that there had been
20 animosity to the point where there were reports
21 of insults being traded between NBME staff and
22 Dr. Krolik and that I was concerned at some
23 point when he was starting a new job of how
24 hostile some of these communications were
25 between the students I talked to and, you know,

Page 163

1 the staff and that I was just giving him a
2 professional heads-up that I'm glad you're
3 going to come in and try to rectify this,
4 because in my professional opinion, I was
5 concerned when I heard there might be comments
6 about whether or not somebody was smart enough
7 to go to medical school or to graduate as a
8 physician, that that was not falling under the
9 purview of a test accommodation administrator,
10 but that was rather a judgment thing that
11 they're not qualified to make nor is it very
12 helpful to the process of reaching a
13 determination about eligibility for
14 accommodations.
15   Q. Had someone told you that someone from
16 the NBME had made that comment?
17   A. Yes.
18   Q. Who told you that?
19   A. I don't remember the details. It
20 wasn't Dr. Krolik. It was another student who
21 had called, who was frustrated with what do you
22 want, I've had this problem all the time, why
23 are you telling me I'm not smart enough, I just
24 passed all my courses, I'm having trouble with
25 your exam. There were comments like that, and

Page 164

1 I was being respectful and hopefully helpful to
2 let him know that -- true or not, I wasn't
3 there, but that there have been hostile
4 communications between the staff on occasion
5 and some of my students who were just trying to
6 figure out what's not compliant about the
7 report or --
8   Q. But not -- but those communications
9 did not involve Dr. Krolik?
10   A. No. There were different
11 conversations that involved Dr. Krolik.
12   Q. Tell me what conversations you're
13 aware of that involved Dr. Krolik.
14   A. I'm not aware of the entire content,
15 but there were particularly difficult
16 conversations, I think, between -- I think
17 somebody identified as Ms. Kaiser and
18 Dr. Krolik. And I don't know. I wasn't there.
19 I can't testify about this. I can only say,
20 and I did to Mr. Doane, that there were -- I
21 didn't see why it had to get so hostile on the
22 phone, that I thought that there -- he could do
23 some in-servicing to train people to handle
24 these very frayed nerves of these medical
25 students, you know, who are failing sometimes

Page 165

1  for the first time, to handle the
2  communications in a more appropriate
3  professional manner.
4       And so I was trying to help him
5  at some point in his new job to at least know
6  what I had heard. I wasn't alleging that he
7  had done it, and I didn't know all the details.
8  But, you know, I'd been doing it long enough
9  that I had heard a series of complaints. And I
10 believe he was sympathetic to wanting to
11 introduce changes. And, you know, in other
12 words, he didn't outright deny it. And he was
13 appreciative that I had talked to him about
14 some of these past problems. True or not, I
15 don't know.
16      Q. Now, have you now told me everybody
17 you remember Mr. Doane telling you concerning
18 Dr. Krolik or his application?
19      A. To the best of my ability, yeah.
20      Q. Look at Bates No. 294 -- Jeanne, this
21 is the December 19th, 2003 letter from
22 Dr. Butterbaugh to Mr. Doane. And I'm
23 referring to -- actually, the fax line at the
24 top says 15 of 17 or page 3 of 4.
25      A. Got it.

Page 166

1       Q. This is -- I think we identified
2  before that this document beginning on Bates
3  292 is the letter that you wrote to Mr. Doane
4  about your December 19th report.
5       A. Okay.
6       Q. Do you remember that? I think that
7  was one of the first things we covered.
8       A. Oh, yeah, I remember.
9       Q. I'm looking at 294 which is page 3
10 of 4.
11      A. Yes.
12      Q. The firsthand paragraph there begins
13 "as stated in my report."
14      A. Yes.
15      Q. The last sentence of that paragraph
16 says: His reading related difficulties were
17 apparent from an early age and from
18 standardized college graduate and medical
19 school entry exam scores.
20      A. Uh-huh (affirmative response.)
21      Q. What college entry exam scores are you
22 aware of that reflected Dr. Krolik's reading
23 related difficulties?
24      A. I'd have to go through the file. And
25 that might be an overgeneralization regarding

Page 167

1  standardized. But what I was trying to do is
2  make a statement -- and I'd have to examine the
3  record right here -- but that in my review
4  there appeared to be cross-educational level
5  impairment. There might be a record. It might
6  be a collateral report. It might be his
7  self-report. In other words, the source of
8  information might differ --
9       Q. Well --
10      A. -- but that probably might be a
11 misstatement, that the information might not
12 have been all standardized exam scores. So
13 that actually is what I'm trying to clarify
14 with.
15      Q. I'll tell you, sir, I do not find
16 anywhere in these pages produced by you any
17 account of any entry exam score, be it college
18 graduate or medical school. Are you
19 remembering that Dr. Krolik related to you an
20 entry exam score for any of those venues?
21      A. I'm relating that that might be not
22 accurate. I didn't find an entry score for
23 each one of these. This might be a
24 misstatement. I did find grade reports and
25 that kind of thing which are standardized in

Page 168

1  the sense it's A through F. But I'm telling
2  you I think that's inaccurate because I don't
3  believe I received an entry -- a standardized
4  entry score.
5       Q. For either college graduate or medical
6  school?
7       A. In some cases there were standardized
8  scores in high school where there's an exit
9  exam and things like that. And I think I was
10 overgeneralizing what was in the file. So
11 that's not accurate.
12      Q. All right. I see in Dr. Hoblet's
13 report -- and this is on Bates 315 -- that she
14 refers to the Conners' Continuous Performance
15 test.
16      A. Yes.
17      Q. What is that test?
18      A. It's a test of vigilance in which you
19 pay attention to the computer screen for
20 symbols that come up on the screen that you
21 identify or don't identify related to judging
22 your intentional accuracy. And it's a test
23 that takes several minutes as opposed to many
24 other psychological tests that are very brief
25 in duration. So that the idea is it's

42 (Pages 165 to 168)

Page 169

1 sustained attention, you know, and impulse
2 control might be measured more adequately with
3 the CPT test.
4     Q. Is that a valid test in --
5     A. It's not essential under DSM. It's
6 used by some professionals, not others.
7 Sometimes you get false positives. Sometimes
8 you get false negatives. It's one tool that
9 may be used, but it's not a required tool in
10 the --
11     Q. Do you use it sometimes?
12     A. I don't find that it's that helpful.
13 I find that it's -- with sitting right next to
14 somebody, that helps them do a better job than
15 they might do if they were doing something on
16 their own. So I think it lacks equilogical
17 validity related to the difficulties of
18 attention in everyday life.
19     Q. You mean a person will do better on
20 that test, perhaps, than he would do in --
21     A. Testing --
22     Q. -- focusing otherwise?
23     A. That's right. In other words, do we
24 really send around a monitor to monitor what
25 people do on a continuous basis in real life?

Page 170

1 No, we don't. And it's known that having a
2 monitor improves performance. So I don't
3 believe that it's the best test. It is one
4 test that many people use, however. He came
5 within normal limits on that test as do a small
6 number of other people that take it that have
7 ADD.
8     Q. Or ADHD?
9     A. Or ADHD, yeah.
10     Q. Look at Bates 330. This is the
11 transcript of Dr. Krolik's career at the
12 American University of the Caribbean, correct?
13     A. Yes, ma'am.
14     Q. And there's some handwriting on it at
15 the bottom of page, 6H 29P. Is that your
16 handwriting?
17     A. No.
18     Q. Do you know whose handwriting it is?
19     A. No, I don't. That's -- I assumed it
20 was Dr. Krolik, but I don't know for sure.
21     Q. It looks to me as if someone has
22 counted up the number of honors he'd received
23 versus -- and the number of passing scores.
24     A. Right.
25     Q. That's what you understand it to be

Page 171

1 too?
2     A. That was my best guess, but I don't
3 know so I can't comment on it.
4     Q. Do you see any evidences in this -- in
5 Bates 330, his medical school transcript, do
6 you see any evidence here of his ADHD symptoms?
7     A. No. As I mentioned before, I
8 routinely ask about test performance because
9 that's where the difficulties frequently show
10 up most sensitively. And so in that instance,
11 he mentioned that he had received extra time
12 and, you know, didn't have any documentation or
13 anything like that and, you know, hadn't been
14 diagnosed. He was granted the extra time
15 anyway and -- because he hadn't received the
16 diagnosis at that point in his life. That
17 occurred afterwards.
18     Q. Did Dr. Krolik tell you --
19     A. We do that at our medical school. We
20 actually provide people with extra time if they
21 need it rather than fight them tooth and nail
22 over whether they're eligible for disability or
23 not.
24     Q. Did Dr. Krolik tell you how many
25 classes or how many examinations he'd received

Page 172

1 extra time for?
2     A. No. It was just in the context that
3 he was having trouble finishing the Step exam
4 and that kind of thing. History of test-taking
5 is what I call it as part of my history.
6     Q. Page 331 is his -- actually, 331 and
7 332 is Dr. Krolik's transcript from the
8 University of New Mexico, correct?
9     A. Yes.
10     Q. Do you see anything in his -- this is
11 his college transcript, correct?
12     A. I believe so.
13     Q. Do you see anything in his college
14 transcript of Dr. Krolik that reflects, in your
15 judgment, any ADHD symptoms?
16     A. Throwing out the qualification, we
17 don't have a method of evaluating transcripts
18 to determine who has ADD and who doesn't. I
19 was concerned about the Ds that I saw in
20 organic chemistry and was able to rally and
21 pass that in the next semester, go up in his
22 ability. So, in other words, he didn't hit the
23 brick wall of his learning ability. He just
24 was performing poorly and had to re-double his
25 efforts to get through it.

Page 173

And I've seen that in students that I've worked with and recommended that they repeat courses to consolidate learning because they aren't doing well at consolidating the learning their first time through. So that caught my eye, and we talked about that. Organic is a difficult subject.

Q. I was going to ask that. You're aware that -- I mean, from my own personal anecdotal experience, I've heard colleagues tell me that organic chemistry is one of the toughest subjects they'll ever take.

A. And professionally, I find that the most difficult courses is the marker for inattention, sustained attention, impulse control, organizational difficulties. It doesn't come out with the no-brainer courses. It comes out with the courses that are very difficult, that requires sustained effort and organized sustained effort.

So I'm not surprised by that. I see that when they take their courses in my university, anatomy, physiology and the like. Lots of details. You know, pharmacology is another one where they have difficulties in

Page 174

those, but they get through a lot of the other content courses. So it appears to be there's a difficulty level type thing, and that's common in the ADHD literature.

Q. What else do you see from Dr. Krolik's college transcript that, in your opinion, reflects ADHD symptoms?

A. Again, I wouldn't say may reflect ADHD symptoms. I think he did fairly well, you know. In my mind, I'm thinking how difficult is this college at that time compared to other colleges, you know. What was their grading scale? These are answers that we never have, you know. There's no standardization that way across universities. But I was -- clearly noted that he got through it okay. And he enjoyed the topic and did well and went on to be a pharmacist for off and on over his years.

By the way, he said he did fine at the University of New Mexico. So he didn't really acknowledge the organic chemistry problem until I got the transcript.

Q. The DSM IV speaks of functional impairments --
A. Yes.

Page 175

Q. -- in relation to an ADHD diagnosis, right?
A. Any diagnosis.
Q. What functional impairments have you identified in Dr. Krolik as a result of ADHD?
A. Like the criteria I refer to, we're supposed to evaluate broadly across different settings and like activities, although it's called functions in DSM, and I found difficulties that he had in social work and academic.
Q. Social work and academic?
A. And learning, right.
Q. And learning?
A. Right.
Q. What functional impairments did you identify in his social realm?
A. He was having trouble regulating his emotional reactions to stress, coping with this, you know, difficulty of whether he does or does not have a disorder or a disability, what he can do about it. And so he was very emotional, you know, intense in stating these kind of frustrations. And that disrupted, I think, his -- his already compromised

Page 176

attentiveness, as far as I can tell. So I looked at periods in his life when he wasn't under such stress and found that even then without these kinds of challenges that he faced now when I saw him, that he had had inattention and organization and follow-through problems even at times when he didn't have obvious stressors in his life.

Q. Were those the --
A. Elementary school, other educational periods. He was happy at medical school. He was happy in some of his jobs and, you know -- and yet he still had some noteworthy difficulties with impulse control and inattention.

Q. Were these difficulties that Dr. Krolik identified to you or were they difficulties that were identified by his wife?

A. It's like pulling teeth. So I would direct the interview in such a way that I would get the information even if he didn't answer it at first. And that was frequently the case. He really almost was like a person who fakes good, who minimizes any difficulties that he has, any short-comings, wants to be seen as

Page 177

 1  competent, you know, and capable. It's very
 2  hard for him to report, you know,
 3  short-comings. And so he really did not appear
 4  to be aware of his difficulties as people
 5  around him were aware of.
 6       Q. You said that you identified
 7  functional impairments in Dr. Krolik's learning
 8  as a result of his ADHD?
 9       A. Yeah. We talked about that all day
10  today.
11       Q. Your conclusion has been that he
12  hasn't performed as well -- at times he hasn't
13  performed as well as he could due to ADHD?
14       A. But I'm not using that as a basis of
15  disability, but just that's a common associated
16  problem of underachievement that we see. It's
17  not appropriate under ADD. It's not
18  appropriate under DSM. It's just an associated
19  problem that has been remarked upon by others.
20       Q. What functional impairments or
21  impairments have you identified on the part of
22  Dr. Krolik in his work?
23       A. Work would be, again, the social
24  communication required to get along with
25  people, to work in a team-type work

Page 178

 1  environment, to tolerate people whose views or,
 2  you know, skills might be different from one's
 3  own. He's compulsive in his attention to
 4  detail, wanting to do the right thing. And
 5  it's -- frustrated. Maybe speaks his mind too
 6  directly rather than choosing a better, more
 7  diplomatic way of stating things.
 8            So that was pretty clear even if
 9  I didn't know all the details. That appeared
10  to be consistent with what he was reporting in
11  his social area. And so that cuts across two
12  settings there without going into the learning.
13  As I stated, I focused on the learning because
14  of the nature of the evaluation at hand.
15       Q. You've said that you found Dr. Krolik
16  to be fastidious. Is that a term that one
17  commonly associates with an ADHD sufferer?
18       A. There's a difference between one's
19  intent, you know, attention to detail, wanting
20  to be -- being concerned about that level and
21  one's actual performance. He was quite
22  inaccurate at times.
23       Q. Quite --
24       A. Inaccurate. And so while he was
25  concerned about details, there were examples

Page 179

 1  like test-taking and such where he reported he
 2  knew the answer, was concerned about the
 3  details, but he'd make careless mistakes due to
 4  inattention or other things. These are my
 5  words, not his. I was trying to evaluate that.
 6            So, in other words, he was not a
 7  successful compulsive person. He was concerned
 8  about levels of details and control and, you
 9  know, making sure things go right, but he
10  couldn't pull it off because he was error-prone
11  in his performance. So it's actually a
12  contradictory situation.
13            Some people have mentioned in the
14  literature that it's a compensatory attempt to
15  try to be fastidious to make sure you don't
16  make errors in a preventative way. That's been
17  discussed widely, so -- but these are all
18  anecdotal factors and not well-studied as some
19  of the other issues that we look at and
20  research.
21       Q. What makes you think, sir, that
22  Dr. Krolik, with due respect to him, is smart
23  enough to pass the Step exams?
24       A. My experience with evaluating other
25  medical students that pass the exam with

Page 180

 1  similar IQs, so that I don't believe there's
 2  good research on, you know, the necessary IQ
 3  needed to become a physician or pass the Step
 4  exams. I have not seen well-conducted research
 5  on that standpoint that controls or what
 6  institution you're at, are you at a highly
 7  competitive institution or another, because
 8  they all take the same standardized test. So,
 9  you know, clearly the scores differ when I
10  interview residents and fellows for positions
11  at the medical schools. Some will blow the
12  Steps out of the water and others will get by
13  by the skin of their teeth.
14            So the -- you know, the idea is
15  that there's a diversity. It's tending to be a
16  minimal criteria of competence, you know, not
17  that you've mastered the material. And I see
18  scores all over the place for -- when I
19  interview people that were thinking about
20  bringing on as a team for residency or
21  fellowship or something.
22       Q. But your --
23       A. Relating to the Step scores.
24       Q. -- you're relying on the fact that
25  you've seen -- that you have experience with

ASSOCIATED REPORTERS, INC.
504-529-3355

35c2eb28-53f8-4191-a040-4b328f127833

Page 181

1  medical students and medical graduates with
2  comparable IQs who have passed the Steps?
3     A. Or comparable Step tests without an
4  IQ, and they can appear differently in
5  determine of their clinical competence. And so
6  the same when I've evaluated the medical
7  students or the residents who were referred for
8  some sort of potential learning problem, their
9  scores will differ in terms of their IQ, their
10 reading and et cetera. And motivation seems to
11 be a very important factor, you know, being
12 able to -- and certainly intellectual potential
13 is clearly important. But motivation to
14 overcome difficulties is also very important.
15        So I don't think one can predict
16 too well a lot of variance in competence due to
17 IQ alone.
18    Q. Well --
19    A. I just see too many scores. They
20 aren't intended for that. They're intended to
21 identify gifted, retarded and who's in between.
22    Q. IQ scores you're referring to?
23    A. Right. So some people will major in
24 science and have a better preparation than
25 those who have higher IQs that majored in

Page 182

1  literature. They go to medical school. They
2  struggle with the biological sciences because
3  they have a literature background, you know.
4  They did well enough on the MCAT biological to
5  get in. But there's a huge diversity of who
6  enters medical schools these days.
7     Q. Well, particularly at a school like
8  the American University of the Caribbean which
9  doesn't require you to take an MCAT?
10    A. And sometimes people go there because
11 it's easier to get in and it doesn't matter in
12 the long run to your career. You can be just
13 as competitive or desirable and find a position
14 in medicine regardless of what medical school
15 you go to. It makes a difference in research
16 and, you know, highly competitive institutions
17 but not in getting a job.
18        In fact, there's comments that
19 maybe we aren't assessing competence well
20 enough in assessments of physicians. We ought
21 to look more at their performance skills rather
22 than their trivial pursuit knowledge. So
23 there's a lot of debate about these issues.
24    Q. Do you have a view of the quality of
25 the education that one receives at the American

Page 183

1  University of Caribbean Medical School?
2     A. I've seen think more than one person
3  come from them, and there was kind of a range,
4  you know.
5     Q. A range meaning?
6     A. Meaning people that -- you know, how
7  they did on the later Steps or that kind of
8  thing, how they performed. So I've seen a
9  range. I think I've seen about four, but don't
10 know. I can't comment on -- specifically about
11 the adequacy of education.
12    Q. Did you see those four individuals
13 because they were seeking accommodations for
14 the Steps.
15    A. In one case, yeah.
16    Q. And the others you saw --
17    A. The others are just that I'm
18 acquainted with, related to, you know, their
19 performance as residents and maybe their
20 employment package or something, residency
21 package. I just find a lot of diversity. I
22 don't find that the -- I've talked with the
23 Dean of Students about it. We have talked that
24 there may be a difference in measuring
25 competence of those that worked their tail off

Page 184

1  and become a very good doctor, a very
2  consciousness doctor, get through the
3  certification tests and those that it comes
4  easy to, that don't work so hard and aren't so
5  consciousness.
6         So it certainly goes beyond IQ.
7  It goes beyond motivation. It goes to
8  professional conscientiousness. And there are
9  a number of characteristics that you would want
10 to focus on in selecting who makes a good
11 physician ultimately.
12        Dr. Krolik is unusual in that he
13 has a pharmacy degree. A lot of physicians
14 would give their right arm to have a pharmacy
15 degree because they'd understand more of the
16 drugs that are used to treat their patients.
17 So he actually has a leg up in that standpoint.
18    Q. When we were -- when I was asking you
19 before about your role at LSU in evaluating and
20 where appropriate writing reports, seeking --
21    A. I always write a report regardless of
22 my conclusions.
23    Q. Of the students who are referred to
24 you who are seeking testing accommodations,
25 what is the percentage of those where you

Page 185

1  ultimately write a report in which you conclude
2  that testing accommodations would be
3  appropriate because of a disability?
4      A.  I don't know.  But I think because we
5  do not have good research on the effects of
6  accommodations -- test-taking accommodations
7  and measuring competence, it's a difficult
8  problem.  So I think many of those --
9      Q.  Okay.  Stop.
10     A.  I'm going to answer your question.
11 Many of us routinely recommend accommodations
12 for people that have disorders known to disturb
13 learning or working.  And we do so because
14 there's no good research.  And by giving
15 someone the benefit of the doubt, that is, we
16 have no area of priority of identifying who
17 benefits and who doesn't --
18     Q.  Now, what --
19     A.  A priority way of determining who's
20 going to benefit from accommodation and is
21 isn't.  We develop a policy whereby if someone
22 is duly qualified diagnostically and
23 complaining or has a history of problems, that
24 they are a decent candidate for accommodations.
25 And we all, if we're responsible, caution the

Page 186

1  student that they may not be able to pass even
2  with the accommodations.  It may not make a
3  difference.  And I'll recommend that they
4  practice it in virtual reality type
5  circumstances to see if it, indeed, is making a
6  difference or if it's too much time and they
7  start second-guessing themselves.
8          So our field is not as scientific
9  as some would pretend it is.  There's a lot of
10 unknowns.  And the disability literature has
11 required us to make opinions for which we have
12 no scientific evidence.
13     Q.  And is that what you did in the case
14 of Dr. Krolik?
15     A.  That's what everybody does in the case
16 of disability accommodations because we don't
17 have a research literature that meets the
18 highest standards of evidence of science.
19     Q.  How many adult patients, adult
20 patients, including medical students, have you
21 evaluated for the presence of ADHD?
22     A.  Oh, I don't know.  I've been doing it
23 a long time.  I couldn't give you an idea.  A
24 lot.  I specialize in that area.  I teach in
25 terms of childhood and adult disorders of

Page 187

1  learning and other cognitive disorders, some of
2  which are required like TBI and stroke, et
3  cetera.
4      Q.  Do you see ADHD patients at a clinic,
5  in a clinical setting?
6      A.  Yeah.  It depends.  It depends on what
7  phase of my professional life.
8      Q.  Well, can you give me an estimate of
9  the number of adult ADHD patients that you've
10 seen?
11     A.  No, I couldn't.  Actually, quite a
12 few.
13     Q.  More than 100?
14     A.  Yeah.
15     Q.  More than 200?
16     A.  Probably, yeah.  That's why they
17 thought I ought to do that at LSU, because I
18 have that experience with kids and adults.
19     Q.  You know, you make the point that you
20 see evidence that Dr. Krolik has been unable to
21 achieve academically to his potential.
22     A.  Uh-huh (affirmative response.)
23     Q.  How do you measure what someone's
24 potential is in this academic field?
25     A.  As I've mentioned, I think that, you

Page 188

1  know, the record shows that several teachers
2  have mentioned they thought he was capable of
3  doing better work if he paid attention, minded
4  his own business, applied himself.  And he was
5  frequently able to bring his performance up
6  with that kind of attention brought to him when
7  he was younger.
8          And so I use it in a simple way
9  that he has shown that he has periods of
10 difficulty that he's able to recover from with
11 the help of others.  And so that's why I
12 recommended him an accommodation to see if that
13 might too help him, you know, be tested more
14 accurately for whether -- what his competencies
15 are related to medicine.
16     Q.  What the teachers though in your
17 elementary grade report notes say is that he
18 needs to work harder or he needs to pay more
19 attention.
20     A.  That's right.
21     Q.  Is it your testimony that that advice
22 from a teacher was the motivation that he
23 needed to buckle down and work harder and, in
24 fact, achieve to his potential in that
25 particular grade?

47 (Pages 185 to 188)

Page 189

1  A. There's research that shows that
2  teachers can do such a good job of motivating
3  and behavorial management that people with a
4  disability can perform normally under
5  conditions of close teacher support and
6  intervention.
7  Q. Do we have any evidence that -- in the
8  occasions in the elementary grade reports that
9  you refer to that, indeed, his teacher was
10 giving Dr. Krolik, or Ralph, at that age the
11 close attention, close supervision that you
12 just cited?
13 A. We don't. There was no institution of
14 special education at the time that he was going
15 through school. We don't know what his
16 teachers were doing other than the fact the
17 good teaching technique and encouragement --
18 and positive encouragement and redirection and
19 other tools have worked for years with or
20 without a diagnosis.
21     So it's not as if there's a
22 disorder specific motivation that works on ADD
23 and nothing else. You can't use treatment
24 response to make a diagnosis.
25 Q. Is it your view that after being

Page 190

1  spoken to by his teachers in elementary --
2  A. And family.
3  Q. And family -- is it your view that as
4  a result of that, Dr. Krolik as an elementary
5  school student, by the end of those years in
6  elementary school was achieving to his
7  potential?
8  A. Oh, I think there's evidence that he
9  was inconsistent over time, not so much that he
10 failed but that clearly, you know, the
11 spottiness wasn't due to lack of motivation or
12 psychiatric disturbances or the like. It was
13 difficult for him to perform, and yet he was
14 able to pull it out. And I would think that's
15 unfair to hold that against him, that he wasn't
16 severe enough, you know.
17 Q. Well, you've cited instances of
18 where --
19 A. Right.
20 Q. -- early on in a school year he would
21 do less well --
22 A. Right.
23 Q. -- and after a teacher would comment,
24 he would do better, his grade report would
25 improve over that particular year.

Page 191

1  A. That's correct.
2  Q. And is it your view that as a result
3  of the teacher comment and other input,
4  whatever it might have been, that the
5  consequence was he did achieve to his potential
6  in that particular year?
7  A. We don't know. We don't have a way of
8  saying that. All I know is that there appears
9  to be -- if I had seen no evidence of failure
10 and inconsistency, we wouldn't be here. I
11 would say there's no case for ADD. But because
12 we saw inconsistency early on,
13 underachievement, he was able to recover, that
14 is not an IQ deficit. That's a deficit related
15 to, you know, performance, you know, up to
16 one's potential.
17     I don't argue that that's
18 adequate data. It's woefully short. But he
19 went to school in the 1950s, not in the 1980s.
20 So that I made my point explicitly that the
21 same standards don't apply. We didn't know the
22 same amount. And he had a good teacher who
23 could get a kid through with ADD, particularly
24 if it wasn't severe and profound ADD. And they
25 could be successful. But the more you go into

Page 192

1  more difficult areas of education, the more
2  your disability may undermine your ability to
3  perform.
4  Q. What I'm trying to understand, sir, is
5  that your assertion that Dr. Krolik
6  underperformed in school which presumes that he
7  had the potential to do better than he did at
8  least on occasion.
9  A. That's about appears like his teachers
10 said.
11 Q. And what -- and I'm trying to
12 understand the basis for your conclusion that
13 he was underperforming are those occasions
14 where his grade improved over the course of a
15 particular year?
16 A. Right. But I think there's too much
17 emphasis on that. What primarily I was looking
18 for is DSM requires some improvement -- some
19 impairment -- excuse me -- in childhood before
20 7 or 12 if you stretch it. That's all I'm
21 looking for. And if he had not had essentially
22 those initial signs of some impairment, we
23 would not be here.
24     It's kind of icing on the cake
25 that he was able to perform better in some of

Case 2:05-cv-00315-FJM   Document 135   Filed 05/30/06   Page 10 of 11

DR. GRANT J. BUTTERBAUGH          APRIL 26, 2006   RALPH KROLIK, M.D. vs. NAT'L BD OF MED. EXAM

Page 193

1 these areas after awhile. That is secondary
2 consequence to me. The most important thing is
3 finding some objective, historical independent
4 evidence that somebody was concerned about his
5 attention, impulse control, and learning in the
6 classroom. It's not compelling. He got
7 through. But that's all DSM requires. It
8 doesn't require him to meet criteria for below
9 average compared to the average citizen back
10 then. We don't have an adequate measure of
11 that.
12     Q. Well, what I'm getting at is something
13 a little bit different, and I apologize because
14 I'm not --
15     A. I apologize too. I'm trying to
16 answer.
17     Q. And that is that, wouldn't you agree
18 that over time his grades in elementary school,
19 high school, college and medical school have on
20 the whole been average?
21     A. Yes. In fact, a lot of average people
22 couldn't have achieved what he achieved.
23     Q. Because he worked hard and he overcame
24 his symptoms?
25     A. He had good teachers that paid

Page 194

1 attention to him, tried to help him get back on
2 track, that he could do it. They believed in
3 him. He didn't get a lot of punishment. And
4 he was able to learn gradually, despite his
5 denial, you know, that he could do it. He
6 could be successful.
7         The problem is that when you then
8 measure some of his difficulties, like his
9 spouse's observation or his own observation, he
10 looks like he has much worse impulse control
11 than the average citizen. And it dove-tails
12 with his educational history in terms of the
13 nature of the problem.
14         So that's the difficulty. And
15 he's experiencing a real setback related to
16 test-taking. And I don't know whether he'll
17 pass the Steps if he were to receive
18 accommodations, but I know that he is deviant
19 in terms of his disability in learning related
20 to poor impulse control and inattention. And
21 so none of this data is ideal, not the least of
22 which because he doesn't self-report clinically
23 significant levels of problems even though we
24 observed them. His wife does. We observed it.
25 And that's the problem. This is a problem for

Page 195

1 the field, not just for this individual.
2     BY MS. JOHNSEN:
3         Thank you, sir. That's all I
4 have.
5     BY THE WITNESS:
6         Thank you.
7     BY MS. JOHNSEN:
8         Jeanne, do you have any
9 questions?
10     BY MS. WASHBURN:
11         No, I don't have any questions.
12
13     (AT THIS TIME, TESTIMONY WAS
14 CONCLUDED AT OR ABOUT 5:15 P.M. AND
15 THE RECORD WAS CLOSED.)

Page 196

WITNESS' CERTIFICATE

1
2
3     I, DR. GRANT J. BUTTERBAUGH, do hereby
4 certify that I have read or have had read to me
5 the foregoing transcript of my testimony given
6 on April 26th, 2006, and find same to be true
7 and correct to the best of my ability and
8 understanding with the exceptions noted on the
9 amendment sheet;
10
11 CHECK ONE BOX BELOW:
12
13 ( ) Without correction
14 ( ) With corrections, deletions, and/or
15     additions as reflected on the errata
16     sheet attached hereto
17
18
19
20
21         DR. GRANT J. BUTTERBAUGH
22
23
24
25

```
 1                REPORTER'S CERTIFICATE
 2
 3         I, Gail F. Mason, RPR, Certified Court
 4   Reporter in and for the State of Louisiana,
 5   Certificate No. 96004, which is current and in
 6   good standing, as the officer before whom this
 7   testimony was taken, do hereby certify that DR.
 8   GRANT J. BUTTERBAUGH, after having been duly
 9   sworn by me upon authority of R. S. 37:2554,
10   did testify as hereinbefore set forth in the
11   foregoing pages; that this testimony was
12   reported by me in the stenotype reporting
13   method, was prepared and transcribed by me or
14   under my personal direction and supervision,
15   and is a true and correct transcript to the
16   best of my ability and understanding; that I
17   am not related to counsel or to the parties
18   herein, nor am I otherwise interested in the
19   outcome of this matter.
20
21
22
23
             Gail F. Mason, RPR, CCR
             Certificate No. 96004
24
25
```