# Exhibit P

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

———————————

| | | |
|---|---|---|
| RALPH E. KROLIK, | ) | |
| | ) | No.  CV 05-315-PHX-FJM |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | January 13, 2006 |
| NATIONAL BOARD OF MEDICAL | ) | 1:59 p.m. |
| EXAMINERS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE FREDERICK J. MARTONE, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

2

1

2                              **A P P E A R A N C E S**

3

   For the Plaintiff:
4              Domenici Law Firm
               By:  **Pete V. Domenici, Jr.**, Esq.
5              320 Gold Avenue SW, Suite 1000
               Albuquerque, New Mexico 87102
6
   For the Defendants:
7              Osborn Maledon
               By:  **Diane M. Johnsen**, Esq.
8                   **Ronda R. Fisk**, Esq.
               P.O. Box 36379
9              Phoenix, Arizona 85067

10  For the Defendants:
               National Board of Medical Examiners
11             By:  **Shelley Z. Green**, Esq.
               3750 Market Street
12             Philadelphia, Pennsylvania 19104

13

14

15

16

17

18

19

20

21

22

23

24

25

3

**I N D E X**

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GRANT BUTTERBAUGH | | | | |
| By Mr. Domenici | 12 | | | |
| By Ms. Johnsen | | 27 | | |
| By Mr. Domenici | | | 37 | |
| | | | | |
| MICHAEL GORDON | | | | |
| By Ms. Johnsen | 42 | | | |
| By the Court | | 48 | | |
| By Ms. Johnsen | | | 53 | |
| By Mr. Domenici | | 55 | | |
| By Ms. Johnson | | | 62 | |

UNITED STATES DISTRICT COURT

4

1          THE CLERK:  This is civil matter 05-315, Krolik

2    versus National Board of Medical Examiners, set for

3    evidentiary hearing.

4          Counsel please announce.

5          THE COURT:  Would counsel announce?                    13:59:42

6          MR. DOMENICI:  Your Honor, Pete Domenici, Jr. for the

7    plaintiff, Ralph Krolik.

8          THE COURT:  Welcome.

9          MS. JOHNSEN:  And Diane Johnsen and Ronda Fisk of

10   Osborn Maledon, for the National Board of Medical Examiners.  13:59:58

11   With us at counsel table is Shelley Green, general counsel for

12   the NBME.

13         THE COURT:  Welcome, welcome.  Please have a chair

14   and let me tell you what I've looked at and what I think we'll

15   be about today.                                              14:00:09

16         I've read the plaintiff's brief in support of the

17   application for preliminary injunction and the exhibits, and

18   the defendant's prehearing brief in opposition to the

19   application.  I went back and reread the original motion and

20   the response and reply.                                      14:00:29

21         Also before me is, if it's I guess useful and maybe

22   efficient to deal with it today, maybe at the conclusion here,

23   plaintiff's motion to compel the defendant to respond to

24   interrogatory number 7.

25         It looked to me like, in light of the defendant's      14:00:51

UNITED STATES DISTRICT COURT

5

```
1    last filing, that I believe the only remaining part of that
2    objection is to the question of rationale, and there's a
3    dispute there about the burdensome nature of it.
4            So, we have one hour.  This is an application for
5    preliminary injunctive relief.  I think we all know what the          14:01:15
6    standards are, you've each articulated them in your papers.
7            It strikes me that I'd be particularly interested in
8    hearing the plaintiff's views with respect to the conflict
9    here, with respect to whether the -- whether the plaintiff
10   even has ADHD or ADD.                                                  14:01:46
11           And then also I'd be particularly interested in
12   knowing why preliminary injunctive relief would be appropriate
13   to avoid some measure of irreparable injury.
14           I'll be happy to hear witnesses if you think it's
15   necessary, or if you'd prefer to rest on your affidavits, I           14:02:04
16   have those available as well.  In light of the fact that you
17   have one hour, you've got 30 minutes each to use in any way
18   you think would most efficiently present your case so that I
19   could come to a better understanding of it and a better
20   decision.                                                             14:02:24
21           Mr. Domenici.
22           MR. DOMENICI:  Thank you, Your Honor.  May it please
23   the Court.
24           Your Honor, I'd like to make a very brief opening,
25   and then I will call Dr. Butterbaugh, who has been Krolik's           14:02:33
```

UNITED STATES DISTRICT COURT

6

1    treating psychologist and also our expert witness.  He's been

2    working for several years on this matter.

3            Your Honor, very briefly, this is -- for purposes of

4    this request, this is under Title 3 of the Americans With

5    Disabilities Act which is the section of that Act that          14:02:55

6    requires a party offering examinations to offer those

7    examinations in a place and manner accessible to persons with

8    disabilities.

9            So in order for us to prevail on that section of this

10   federal statute we need to show that Mr. Krolik is a person     14:03:08

11   with a disability.  And the two issues we're prepared to

12   address today are exactly the two you mentioned, Your Honor.

13           One is:  Does he have a disability?  And that really

14   goes to the heart of the question of, is his diagnosis of ADHD

15   substantiated?                                                  14:03:28

16           The second issue is:  Is there irreparable harm

17   to -- that the Court should take the action of granting a

18   preliminary injunction.  Dr. Butterbaugh will also address

19   that.

20           To focus the issues, and I know we're both short on     14:03:41

21   time and also we're asking for a relatively unusual remedy,

22   the only basis we are setting forth for irreparable harm is

23   the performance of Dr. Krolik on the test, whether or not that

24   will be affected by a delay and possibly an affirmative

25   decision later in favor of Dr. Krolik, which could not at that  14:04:03

UNITED STATES DISTRICT COURT

7

1    point be repaired.  The delay could not be repaired in terms

2    of his performance on this test.

3            THE COURT:  Is that because of the passage of time

4    and the currency of the -- his studies in medical school?

5            MR. DOMENICI:  That is part of it, and the primary          14:04:23

6    part of it, Your Honor.  The other is that there is a need to

7    study for these tests, and Dr. Krolik has been studying.  He

8    has -- is currently unemployed and has the time to study now.

9    The tests are offered in three month blocks.  So he would have

10   to take the step one test during one three-month block, and          14:04:42

11   step two in another three-month block.

12           So we're talking, depending how this case is tried in

13   September, whether it's a bench trial or a jury trial, and a

14   judgment came down and we're under the scenario that we

15   prevailed at that point, he would be pushed back on both of          14:04:56

16   these two phases of the test eight to ten months.

17           He would also have to take a job and then quit a job

18   to begin studying after the Court rules at that point in time.

19   And it takes him about two months to prepare.  He can try to

20   do it in one month for each of these two tests.  So he would          14:05:19

21   be talking he wouldn't be able to take these tests for

22   probably somewhere from 12 to 14 or 16 months from today.

23           Whereas if there's a ruling in our favor, he's

24   prepared to take one of these tests within the next month

25   during the January through March block.  He would take the          14:05:35

UNITED STATES DISTRICT COURT

8

1   next one during the April through June block.  And they're

2   really two bases --

3        THE COURT:  If he took the test now with a pencil and

4   with twice the time and failed it, would it moot the case?

5        MR. DOMENICI:  I don't know that it would, but I                14:05:53

6   think it could perhaps, Your Honor, yes.  I would have to talk

7   to Dr. Krolik and make sure he's comfortable that he had the

8   chance to prepare and -- and I haven't asked him that

9   question.  There is a possibility of that, yes, Your Honor.

10  Certainly I don't -- I'd have to talk to him on that.                 14:06:09

11       Do you agree with that?

12       MR. KROLIK:  I agree.

13       MR. DOMENICI:  Yes.  Yeah, he agrees with that,

14  Your Honor.

15       And the converse is, we are looking at an extremely              14:06:19

16  difficult burden, if he wins the case and comes close but does

17  not pass the test, to trying to prove that there has been some

18  impact on his performance based on this delay.

19       And these tests are, there's a bright line, you

20  either pass or fail these tests, even if you are one question         14:06:36

21  short.  And so a very small change in performance can have the

22  impact of him failing the test.  It's an objective graded

23  test.

24       And so one of the grounds for irreparable harm, at

25  least in other injunction cases I've presented is, the                14:06:52

9

1    inability for us to prove something later -- in the future,

2    and therefore to go ahead and give us an opportunity to put us

3    in the place we're asking for today.

4            There is no detriment to this.  Particularly given

5    this recent discovery the Court noted.  They have given over                    14:07:06

6    400 accommodations for ADHD, this Board, we just found that

7    out last week, Your Honor.  That's a huge amount of

8    accommodations.  They've been -- and it's almost 50 percent of

9    the requests.  We would have not suspected that.

10           All that's been done in this case, we deposed their                     14:07:22

11   expert, Your Honor.  He testified that he only recommends

12   accommodations for around ten percent of the cases he reviews.

13   And this is the first time they've disclosed any information

14   on how many accommodations they provide.

15           So what we will show at trial, Your Honor, is the                       14:07:37

16   practice of this group is to accommodate ADHD.  And they've

17   cited some case law from the Ninth Circuit that says, when

18   you're in a graduate program, testing almost per se does not

19   give you an accommodation.

20           The trial testimony won't support that, because they                    14:07:52

21   have a national practice, they're not governed by the Ninth

22   Circuit, they're governed -- and they've said this repeatedly

23   to the Court.  They're trying to set a national standard for

24   this exam.  So they can't come in to Arizona and say, you

25   can't get ADHD accomodation here, but you can everywhere else                    14:08:08

10

1    for these other 4 or 500.

2          So as far their national program, there's no national

3    impact of giving this test to Dr. Krolik that's been given so

4    frequently.

5          And the only question, Your Honor, and we will also

6    demonstrate this, and the only reason Dr. Krolik was denied

7    was they didn't agree with the diagnosis.  They don't have a

8    witness, and they don't perform any assessment whether that

9    diagnosis results in a substantial impairment to a major life

10   activity.

11         Their witness will testify every time he agrees with

12   the ADHD diagnosis, he grants the accommodation.  So the only

13   issue we feel that will come up at trial is whether or not the

14   diagnosis is supported and whether his decision to deny it is

15   correct or incorrect.

16         And we feel the practice will establish, if we can

17   demonstrate the diagnosis, we will prevail in the case.

18   Dr. Krolik at that point will have to quit a job and take this

19   test.  Whereas now if you allow the test he will study for it,

20   take the test, we can moot the case out, or we can at least

21   avoid a very difficult burden if he comes extremely close 12

22   months from now.

23         And they've argued different sides of this case, and

24   so have we frankly, Your Honor, it's a difficult case.  But

25   they've argued that we don't have a damage remedy.  So there

14:08:20

14:08:36

14:08:53

14:09:07

14:09:21

UNITED STATES DISTRICT COURT

11

1  is no chance of another remedy other -- there's a strong

2  likelihood that this case will all come down to testing

3  accommodation or not.  And if we at a later date say we should

4  have got that accomodation earlier, Your Honor, and the

5  performance is so close, we may be stuck without any remedy.       14:09:38

6  And even if we have a remedy, we will have an extremely

7  difficult burden of proof that could have been avoided.

8       So with that, Your Honor, I would tender

9  Dr. Butterbaugh.  I would just highlight what he is going to

10  say.                                                              14:09:54

11       He is going to go through -- he has done a systematic

12  analysis of Dr. Krolik versus what the National Board of

13  Medical Examiners has reviewed.  He has spent over 120 hours

14  reviewing Dr. Krolik's case, trying to assist Dr. Krolik in

15  presenting the information that this group asked for on their     14:10:08

16  internet site, asked for in correspondence.  He's tried to

17  meet every requirement.  That's one of the reasons we're in

18  court at this late date, is they've tried to work through and

19  give them information.

20       Their system does not fit a 60-year-old.  Their            14:10:21

21  system does not fit a man who went to school when there was no

22  special education, no ADA, no -- ADHD wasn't even recognized,

23  Your Honor, as a psychological condition when Dr. Krolik was

24  in grade school.  And all of their mechanisms are set up to

25  evaluate 25-year-old people who went through school.  Their       14:10:40

12

1    witness says almost all of the people he evaluates are between

2    25 and 30.  They have criteria, they want objective evidence

3    that's not available.

4         Dr. Krolik went to a medical school in the Caribbean

5    that doesn't have the ADA.  So they're asking for proof of ADA          14:10:56

6    accommodation at medical school at a school that doesn't have

7    it.

8         Their mechanism doesn't fit Dr. Krolik.

9         We will establish at the trial, hopefully by a

10   preponderance of evidence, that the diagnosis is correct.  And          14:11:10

11   therefore we ask for injunctive relief now.

12        So with that introduction I call Dr. Butterbaugh.

13        (GRANT BUTTERBAUGH, PLAINTIFF WITNESS, SWORN)

14        THE CLERK:  Would you state and spell your name?

15        THE WITNESS:  Yes, Dr. Grant, G-R-A-N-T,                           14:11:38

16   B-U-T-T-E-R-B-A-U-G-H.

17        THE CLERK:  Thank you.

18        If you could have a seat over here, please.

19                        DIRECT EXAMINATION

20   BY MR. DOMENICI:                                                        14:11:55

21   Q.  Dr. Butterbaugh, we have less than 20 minutes so I'm going

22   to go right to the heart of it.

23        First, tell the Judge your qualifications as a

24   psychologist and your experience with ADHD.

25   A.  Yes.  I was trained at Western Michigan University in               14:12:04

13

1  clinical psychology.  Went on to University of -- excuse me,

2  Henry Ford Hospital and I internshipped in neuropsychology.

3  Subsequently went on to a fellowship at Henry Ford again, and

4  then went on to the University of Michigan Ann Harbor and

5  another fellowship in neuropsychology.                    14:12:30

6  Q.   And what degrees do you have?

7  A.   Ph.D. in clinical psychology.

8  Q.   And where do you practice, sir?

9  A.   I practice in New Orleans, Louisiana.

10 Q.   Describe to the Court how you practice psychology.   14:12:40

11 A.   Practice psychology as -- I'm currently furloughed, but

12 I'm a faculty member of LSU School of Medicine, Department of

13 Psychology.  I teach residents, medical students and also

14 allied health people in terms of internship and fellowship

15 didactic activities.                                      14:13:00

16        I also conduct research in various areas of

17 neuropsychology and health psychology, and maintain a practice

18 for both forensic reasons and also clinical reasons as well.

19 Q.   And you said you were furloughed.  Why is that, sir?

20 A.   Because of Hurricane Katrina, the medical school was wiped  14:13:18

21 out entirely.

22 Q.   So it has nothing to do with your performance or your

23 career?

24 A.   No, it does not.  I'm due to be hired back within the next

25 month in a position because the buildings have been repaired.  14:13:31

UNITED STATES DISTRICT COURT

14

1    Q.  And do you have any interest in this case other than

2    working for doctor -- with Dr. Krolik as a client/patient

3    relationship?

4    A.  No.  But I do a lion's share of the disability evaluations

5    at LSU School of Medicine, and have done so for a number of          14:13:48

6    years, because of my interest in learning disabilities.

7         And so he happened to be available, and I do these

8    evaluations routinely, including for the National Board of

9    Medical Examiners in terms of trying to fit the evaluation to

10   the format that they have on their internet site.                    14:14:10

11   Q.  And what's your experience with ADHD?

12   A.  I have a long history of working with children and adults

13   that have had ADHD in terms of evaluation, either secondary

14   ADHD after a head injury, or other cases, or primary ADHD that

15   might be more or less a part of someone's developmental            14:14:31

16   picture.

17   Q.  And describe briefly what you've done as far as this case.

18   A.  In terms of this case I tried to conduct all the tests in

19   the different functional neuropsychological categories

20   according to the guidelines of National Board of Medical           14:14:48

21   Examiners.  And particularly focusing in on the issue of ADHD,

22   because Dr. Krolik had received a prior evaluation, two

23   evaluations actually from a Dr. Wurzlow who found that he

24   had -- did have adult ADHD, and treated him for that condition

25   with medication.                                                   14:15:08

15

1        And then he was referred on to see a Dr. Hoblit to be

2   able to look into, I believe, some of the learning aspects of

3   his challenges.

4        This is in the midst of his trying to pass the step

5   exams that are administered by the National Board of Medical          14:15:27

6   Examiners.

7   Q.  And describe to the Court what your diagnosis is of

8   Dr. Krolik and the basis for that diagnosis.

9   A.  Essentially that's changed a little bit.  There were two

10  reports.  And that's a detail we probably won't have time to          14:15:45

11  go into today.

12       But in both reports attention deficit hyperactivity

13  disorder, and a variance of breathing disorder, motor

14  coordination disorder were part of at least one of the most

15  recent evaluations.                                                   14:16:03

16  Q.  And why -- how did you come up with that diagnosis?  Take

17  as much time as you need on this, please.

18  A.  I reviewed all the records as part of my intake and

19  evaluation, evaluated Dr. Krolik's spouse as well as

20  Dr. Krolik.  Administered a test of broad span learning              14:16:22

21  disability and other areas to make sure that ADHD wasn't being

22  prematurely foreclosed on as a diagnosis, and give other

23  diagnoses or none at all a chance to be discovered.

24  Q.  And continuing, describe how you --

25  A.  Basically he already had been given an IQ test.  It's            14:16:47

UNITED STATES DISTRICT COURT

16

1   known not to change much so I didn't re-administer it.  That

2   was done in consultation with the National Board of Medical

3   Examiners as to whether we needed to repeat it within two

4   years of first giving it.

5          Also the MMPI was a -- had been previously given, and          14:17:04

6   so that was not repeated as well.

7          But I gave a battery of neuropsychological tests of

8   language, spatial motor abilities, memory, and motor skills,

9   as well as psychiatric diagnoses, such as anxiety,

10  interviewing for depression, and doing a spousal and          14:17:25

11  self-report -- patient self-report on adult ADHD measures.

12  Q.  And you prepared a detailed affidavit describing what you

13  did for -- how you diagnosed Dr. Krolik?

14  A.  Yes, I did.

15          MR. DOMENICI:  If I may approach, Your Honor?          14:17:45

16          In that affidavit -- and, Your Honor, that is in our

17  record as part of the reply to the response for the

18  preliminary injunction.

19          THE COURT:  Yes.  Do you want these marked by the

20  clerk or are you just going to show these to the witness?          14:17:59

21          MR. DOMENICI:  These are out of his affidavits.

22          THE COURT:  So we already have them and you don't

23  need them.  That's fine.

24          MR. DOMENICI:  So they're in the record.  It's just

25  an easier way to refer to them.          14:18:05

17

1    Q.   BY MR. DOMENICI:   If I could, let me hand you from your

2    affidavit --

3           I have one for the Court, Your Honor, if you'd like

4    it.

5           -- it's your spreadsheet from your affidavit.          14:18:15

6    A.   Yes.

7    Q.   Describe to the Court what that is, please.

8           MS. JOHNSEN:   What page is that?

9           MR. DOMENICI:   44.

10          THE WITNESS:   On the far left column is what I tried    14:18:29

11   to state as accurately as I could the suggested guidelines by

12   the National Board of Medical Examiners on their guidelines

13   for evaluation of people with disabilities, specifically ADHD.

14          The next column from the left is the current DSM-IV

15   criteria.   And there's a comparison in terms of what's the     14:18:50

16   procedure -- what is the relationship between the National

17   Board of Medical Examiners' criteria or recommendations for

18   evaluation and what DSM has to say on topic.

19          The third column then is the research criteria in

20   terms of research practices.   For instance, these would be     14:19:11

21   scientists publishing in peer review journals, how do they

22   handle the evaluation criteria?

23          And then finally I've documented what I found or how

24   I conducted things according to my approach, interpreting the

25   National Board of Medical Examiner guidelines, and trying to    14:19:30

18

1  figure things out in terms of DSM, the current nomenclature

2  for diagnosis.

3  Q.   BY MR. DOMENICI:   Okay.   Let me just try to clarify this.

4          So there's a column for the NBME requirements?

5  A.   Yes.                                                        14:19:45

6  Q.   There's a column for the DSM-IV criteria?

7  A.   Yes.

8  Q.   So that would be the accepted criteria?

9  A.   That would be what they have to say about that particular

10  issue.   In some cases they would have no comment or no opinion   14:19:54

11  whatsoever about National Board of Medical Examiner

12  guidelines.   In other cases it might be similar or it might be

13  contradictory.

14  Q.   And then the third is research criteria that might vary

15  from either of these?                                            14:20:11

16  A.   That's right.   That's a notion of, if you're seeing

17  clinical patients and practicing evidence-based medicine and

18  healthcare, are you staying within the bounds of

19  evidence-based knowledge or are you exceeding -- is the demand

20  from the patient exceeding the demands of research subjects or   14:20:29

21  in a clinical trial, funded trial.

22          So I was trying to get at the rigor by which things

23  are defined and whether they were consistent or contradictory.

24  Q.   Okay.   What I want you to focus on is the DSM-IV criteria.

25  A.   Yes.                                                        14:20:49

19

1   Q.   Did you use the DSM-IV criteria to diagnose Dr. Krolik?

2   A.   Yes, I did.

3   Q.   And can you summarize that item by item to the Court,

4   please?

5   A.   Right.   Dr. Krolik's case is quite exceptional, because          14:21:00

6   normally we expect to see a historical paper trail of possible

7   reactions of the school environment, including teachers or

8   other officials, including perhaps other community kinds of

9   information such as a pediatrician.

10        And those records then can be reviewed at a later            14:21:25

11  date to determine what kind of services, what kind of problems

12  he was perceived to have, and whether or not that fits in with

13  the diagnostic criteria which would be based on a

14  developmental model.   What kind of problems did he have when

15  he was young, when he was old, when he was adult, and so           14:21:45

16  forth.   And so DSM has a lot to say about that.

17  Q.   So how did you address that?

18  A.   I addressed it by essentially keeping in mind what DSM

19  requires to be able to meet diagnostic criteria for this or

20  any other condition.                                                14:22:02

21        And the National Board of Medical Examiners, for

22  instance, requests rigorous documentation of data that's not

23  required by the DSM.   In other words, a clinician operating as

24  a well-qualified, well-trained person would not follow all of

25  these criteria in terms of conducting a competent and adequate     14:22:27

20

1    evaluation.

2    Q.   Are you fully licensed to make this diagnosis?

3    A.   Yes, I am.

4    Q.   And do you consider yourself competent and qualified as

5    you just indicated?                                         14:22:40

6    A.   Yes, I do.

7    Q.   Okay.   Let's go through this.

8    A.   Okay.

9    Q.   What does DSM require and how did you establish that

10   Dr. Krolik met DSM requirements?                            14:22:47

11   A.   Starting off, you have to be qualified person, but after

12   that the childhood onset is an important criteria.   In this

13   case he had an onset prior to the existence of the diagnostic

14   categories and any professional knowledge on the topic by many

15   professionals.                                              14:23:07

16        In other words, pediatricians might not know about

17   ADHD in the early fifties and that kind of thing.   So any

18   records would reflect an ignorance about this condition

19   because it hadn't been named yet.   And also there was no

20   treatment plan or standard of care that was provided as yet. 14:23:23

21        The same would be true for a teacher.   A teacher

22   might see a child with particular problems, but wouldn't have

23   a way of pigeonholing the child to determine the nature of the

24   problem and what kind of treatment needs this child would need

25   to meet their needs.   In fact, there was no such thing as   14:23:43

UNITED STATES DISTRICT COURT

                                                                    21

1    special education.  The Rehab Act of 1973, any number of

2    disability or educational laws had not been passed and would

3    not be passed for almost 25 or more years.

4    Q.   Okay.  On the right side of this document --

5    A.   Yes.                                                         14:24:05

6    Q.   -- under items 3 and 4 -- 3 and 3A you say, documented in

7    reports and records with objections.

8    A.   Right.

9    Q.   So you just indicated there was no --

10   A.   Right.                                                       14:24:16

11   Q.   -- diagnostic criteria for ADHD, but you're also saying it

12   was documented?

13   A.   I could not practice the rigor of my clinical practice and

14   obtain -- it was an absolute impossibility to obtain data that

15   would be compliant with the National Board of Medical            14:24:33

16   Examiners' guidelines.

17        For instance, there is no remedial services that the

18   child could have received.  There were no evaluations that

19   were conducted at that time.

20        I contacted the Winnipeg Special Ed Department, did a       14:24:50

21   search on what special ed services looked like at that time.

22   And basically they were excluding retarded children from the

23   school at that time.  Very few services for kids with

24   disability.

25        So that then I knew that his likelihood of receiving        14:25:07

22

1    any kind of distinctive service that might help him if he did

2    indeed have a problem was slim, because he would have at worst

3    a mild disability compared to something like retardation or

4    severe cerebral palsy, epilepsy or the like.

5    Q.   What did you find in his report cards from that time                14:25:27

6    period?

7    A.   I found a smoldering of comments about attentional

8    behavioral type problems, lack of effort and consistent effort

9    that would routinely be addressed fairly shortly within the

10   school year.  So that he would start off badly in many cases,          14:25:46

11   actually doing better than he was doing worse, and yet the

12   teachers were commenting on it.

13           Of course the significance of that is that teachers

14   have many kids that they're teaching, and they rarely comment

15   on normal behavior in a way that a child needs to try a little         14:26:06

16   bit harder.  They usually are working on a particular

17   intervention or trying to get the most from a kid.  And if the

18   kid were not having problems, they would be taught in the

19   typical way, in my experience.

20           So, grade after grade there were comments by his                14:26:26

21   teacher, subtle comments.  He was basically doing fairly well,

22   that he was having some difficulties with not achieving his

23   fullest potential.

24           MR. DOMENICI:  May I approach, Your Honor?

25   Q.   BY MR. DOMENICI:  And this is also attached to your               14:26:41

23

1  affidavit.   This would be the report cards here?

2  A.   Yes.

3          MR. DOMENICI:  Do you want them, Your Honor?

4          Thank you.

5  Q.  BY MR. DOMENICI:  So these are report cards from the early          14:26:50

6  1960s?

7  A.   Right.

8  Q.   Or fifties.  Let's see, he was born in 1944.  So these

9  would be from the fifties?

10 A.   Early fifties.          14:27:04

11 Q.   And did you use these to confirm or to assist in your

12 diagnosis?

13 A.   I did, because we would not currently -- with a youth of

14 that particular age, six, seven, eight years of age, we would

15 not use these documents in this way.  In other words, it's not          14:27:21

16 considered rigorous enough for purposes of doing the

17 assessment.

18          But since his parents were both deceased and there

19 was only one family member who would have been a child at the

20 time that he was a child, we tried -- I tried to piece          14:27:36

21 together as conscientiously as I could clues about whether or

22 not he indeed had chronic academic problems, however mild they

23 might have been.

24 Q.   And what was your conclusion, based on the assessment that

25 you felt was appropriate?          14:27:51

24

1    A.   Across several grades he had a pattern of problems with

2    achieving his best at the beginning of his school year, and

3    clearly was obtaining support from the teacher who

4    was -- would explicitly respond to how he would respond to the

5    teacher's apparent intervention.                                    14:28:12

6         Again, these are very mild difficulties, but it's

7    known in the literature of ADHD that there's some very bright

8    kids with ADHD that have higher IQs and have a better outcome

9    than the kids with the lower sets of IQ scores.

10        So he appeared to be like many of the other medical        14:28:34

11   students that I see, a talented youngster who was

12   underachieving and did not come to the attention of the

13   educational authorities until later on when the material got

14   more difficult.

15   Q.   Looking down at table 6, the other document, on number 3B,   14:28:48

16   it says, have been chronic and pervasive.

17   A.   Yes.

18   Q.   That is a requirement of the NBME in order to substantiate

19   the diagnosis; is that correct?

20   A.   Right.                                                        14:29:09

21   Q.   And your comment is that's not required, but what is

22   required are persistent symptoms for six months?

23   A.   Yes.   There's another set of criteria about onset, but

24   there needs to be persistent.   But in the case of the National

25   Board of Medical Examiners, they're looking for chronic,          14:29:25

UNITED STATES DISTRICT COURT

25

1   unrelenting symptoms.  And DSM is much more liberal, it only

2   requires symptoms for the past six months to meet criteria.

3   Q.   Okay.  My time is almost up.

4   A.   I'm sorry.

5   Q.   Doctor, I want you to describe how Dr. Krolik's -- why          14:29:39

6   your early reports didn't discuss Dr. Krolik's work history

7   and how his work history fits within your diagnosis.

8   A.   I find my professional students and clients sometimes do

9   not want to hang their dirty linen in public.  And so they

10   frequently will come to me with a request that we evaluate the    14:30:01

11   specific skill of learning without addressing all of the

12   psychiatric issues that might be pertinent to their personal

13   life but not their academic life.

14          In other words, let me be clear, if somebody was

15   depressed, so depressed that they couldn't study, that would      14:30:24

16   be part of the report because that's affecting their

17   performance.  But if they had a history of depression, were no

18   longer depressed, many of my students want me to keep that out

19   of the report, because it might go to a dean, it might go to a

20   supervisor, it might go to other faculty members that are         14:30:42

21   knowing more than they should, according to the student, about

22   their personal life.

23   Q.   Okay.  In light of that, please comment to the Court about

24   Dr. Krolik's work history and characterize it how you would,

25   and then describe how --                                          14:30:57

26

1    A.   I was disappointed.  I would have wanted to know about his

2    work history.  But he really set that as off limits.  And so

3    it was only after the initiation of this trial and the

4    discovery and all of that, and the requests for information

5    that I learned that he's changed jobs about 14 times, and has          14:31:11

6    probably seven or more, you know, short-term jobs where he was

7    fired or quit.

8           And that pattern of instability in employment is a

9    very common finding in adult ADD.  And so it actually came as

10   a surprise, because he had refused to disclose that as part of       14:31:33

11   the original evaluation.

12   Q.   And how does the fact that he ran his own business for a

13   period of time affect your diagnosis?

14   A.   Well, it's controversial.  This is anecdotal.  But

15   frequently we'll find people do better when they set the rules      14:31:48

16   and the procedures around a work setting than when they have

17   to work for somebody else and play by somebody else's rules,

18   that gets to be more difficult for some people.

19   Q.   Okay.  And for my last question since my time is up, can

20   you comment on the possible impact of delay -- additional           14:32:05

21   delay on Dr. Krolik taking this test with accommodations would

22   have on his performance?

23   A.   I'm very concerned, but in a difficult position as an

24   expert to not have a scientific way to say what the harm would

25   be if there were a delay and he was not allowed to take the         14:32:26

1  test.

2         He has taken one of the tests seven times, the other

3  test six times, and I think that that would be tremendously

4  stressful for almost anyone under those circumstances.  And

5  I'm worried that this is really taking its toll on Dr. Krolik         14:32:43

6  and his family after years and years of struggling with trying

7  to get accommodations, trying to, you know, take the next step

8  successfully.  Because he has completed medical school.

9         Those are things I'm quite concerned about.  And I

10  don't think that there's a knowable way to predict, you know,        14:33:07

11  that harm would not be done in the future if he were not

12  granted the opportunity to take the test soon.

13         MR. DOMENICI:  That's all I have.

14         Thank you, Your Honor.

15         THE COURT:  Thank you very much.         14:33:23

16         Miss Johnsen.

17         MS. JOHNSEN:  Thank you.

18                    CROSS-EXAMINATION

19  BY MS. JOHNSEN:

20  Q.  Dr. Butterbaugh, you've heard of Kevin Murphy, Dr. Kevin        14:33:38

21  Murphy?

22  A.  Yes.

23  Q.  He's a recognized expert in ADHD, is he not?

24  A.  Yes.

25  Q.  In fact, your report attached to the reply brief cited to        14:34:00

28

1   literature written by Dr. Murphy --

2   A.   Yes.

3   Q.   -- along with Dr. Barkley; is that right?

4   A.   Yes.

5   Q.   And you would respect Dr. Murphy's opinions on matters          14:34:09

6   having to do with ADHD?

7   A.   Yes.

8   Q.   Do you understand, sir, from Dr. -- from Mr. Doane's

9   affidavit, the fellow with the NBME --

10   A.   Yes.                                                            14:34:25

11   Q.   -- that was attached to the opposition brief to the motion

12   for injunction, paragraph 18, that Dr. Murphy was one of the

13   consultants with whom the NBME consulted upon receipt of

14   Dr. Krolik's application for accomodation?

15   A.   I wasn't sure of who was the consultant.                       14:34:40

16   Q.   Do you understand that Dr. Murphy recommended against

17   granting Dr. Krolik's request for accommodations?

18   A.   Yes.

19   Q.   Your report also cites to a publication by Dr. Gordon.

20   A.   Yes.                                                           14:35:00

21   Q.   One that he wrote with Dr. Irwin?

22   A.   Yes.

23   Q.   You're also aware that Dr. Michael Gordon wrote a chapter

24   in Dr. Barkley's major book on ADHD, aren't you?

25   A.   Yes.                                                           14:35:14

UNITED STATES DISTRICT COURT

29

1  Q.  And would you agree that Dr. Gordon is one of the nation's

2  most highly recognized experts in ADHD as well?

3  A.  Yes.

4  Q.  You would generally respect Dr. Gordon's opinions on

5  matters dealing with ADHD?                                    14:35:26

6  A.  Yes.

7  Q.  Now, I have here your CV, sir.  Your emphasis -- your

8  academic and practice expertise and emphasis is in epilepsy?

9  A.  Epilepsy and developmental disabilities of all kind.

10 Q.  Autism?                                                   14:35:43

11 A.  Um-hum.

12 Q.  I don't see any publications in any refereed publications

13 on ADHD in your CV.  Am I missing any?

14 A.  No.  In terms of ADHD?

15 Q.  That's right, sir.                                        14:35:55

16 A.  Yeah, no.  I'm -- I've spent much of my career as a

17 teacher and trainer.

18 Q.  Doctor -- Dr. Butterbaugh, you take the position in your

19 affidavit that Dr. Krolik is substantially limited in the

20 major life activity of learning, do you not?                  14:36:15

21 A.  Yes.

22 Q.  You reviewed all his report cards, as you just said?

23 A.  As many as we could find, yes.

24 Q.  And in fact, you just testified that you saw, based on

25 those report cards, that he was basically doing fairly well?  14:36:30

30

1   A.   And there was some signs of difficulties that I thought

2   were consistent with what we might see in cases of mild ADD.

3   Q.   But you testified that he was basically doing fairly well?

4   A.   Yep.   But it's hard to know because, as I said, the lack

5   of historical knowledge on the part of the teachers,                    14:36:51

6   administrators, psychologists working for the school, would

7   all mean that they might not recognize the problem when they

8   saw it.

9   Q.   We know he passed all his classes; correct?

10   A.   Yes.                                                                14:37:05

11   Q.   And we know he graduated from high school?

12   A.   Yes.

13   Q.   He passed all the classes he needed to to graduate from

14   high school?

15   A.   Yes.                                                               14:37:10

16   Q.   We know he completed a degree program at the University of

17   New Mexico?

18   A.   Yes.

19   Q.   That degree program is in pharmacy?

20   A.   Right.                                                             14:37:19

21   Q.   We know he passed all the classes that was required to

22   achieve that degree?

23   A.   I believe so, yes.

24   Q.   And then he went to medical school?

25   A.   Yes.                                                               14:37:26

UNITED STATES DISTRICT COURT

31

1   Q.  Most people -- most people don't get that far in their

2   education, do they?

3   A.  Right.

4   Q.  Would you agree with me that less than ten percent of the

5   U.S. population ever makes it into a postgraduate education     14:37:34

6   program of any sort?

7   A.  With or without ADHD, you mean just generally?

8   Q.  The general population, fewer than ten percent of all of

9   us.

10   A.  That sounds about right, but I don't know exactly.     14:37:49

11   Q.  Dr. Krolik graduated from medical school?

12   A.  Yes.

13   Q.  And he never failed a class in medical school, did he?

14   A.  He had difficulty, but I don't believe he did fail; right.

15   Q.  And your report that you submitted to the Court contains     14:38:06

16   no mention, does it, of Dr. Krolik being impaired in any

17   fashion in any work setting?

18   A.  As I said, by contract with Dr. Krolik, the evaluation was

19   conducted in a way that focused, by mutual agreement, on the

20   learning aspects, to explore those most clearly.  Because     14:38:32

21   under the ADA, learning is a major life activity, and one

22   needs substantial impairment only in one major life activity,

23   unlike DSM, to qualify as having substantial limitations.

24   Q.  You knew from reading Dr. Hoblit's report -- you had

25   Dr. Hoblit's report in your possession when you wrote the     14:38:59

32

1  affidavit?

2  A.  Yes, I did.

3  Q.  You knew from reading her report that Dr. Krolik had

4  boasted to Dr. Hoblit that he had founded and run a

5  multimillion dollar company; right?                    14:39:09

6  A.  Yes.

7  Q.  And that he ran that for 15 years?

8  A.  Yes.

9  Q.  By himself?

10 A.  Yes.                                               14:39:16

11 Q.  Most people don't found -- don't begin -- found companies,

12 do they?

13 A.  No.

14 Q.  Most people don't run companies like that?

15 A.  Right.                                             14:39:27

16 Q.  You didn't put any mention of the 15 year multimillion

17 dollar company in your report, did you?

18 A.  It had already been mentioned.  It was part of the record,

19 so I didn't repeat it.

20 Q.  Excuse me, what record was a part --              14:39:39

21 A.  It was already part of the record that included

22 Dr. Wurzlow and also Dr. Hoblit's report, and I reviewed those

23 and requested those prior to my evaluation.

24        I was essentially hired as a second opinion, because

25 there was some uncertainty about the difference between       14:39:59

33

1   Dr. Wurzlow's results and Dr. Hoblit's results.

2   Q.   Well, in fact, Dr. Hoblit found no evidence of AD --

3   ADHD, did she?

4   A.   At the end of the report she states that there is a

5   possibility that he might have ADHD, even though the results          14:40:23

6   were negative, because of his reluctance to admit to

7   shortcomings, either on a conscious or unconscious level.

8          So Dr. Hoblit was seeking to clarify that issue,

9   because there's no definitive acid test for ADHD in terms of

10   being able to determine its presence or absence.                     14:40:50

11   Q.   You knew at the time you wrote your report that Dr. Krolik

12   was a registered pharmacist?

13   A.   Yes.

14   Q.   And that he had taken a test in order to achieve that

15   designation?                                                          14:41:06

16   A.   Yes.

17   Q.   You didn't put that in your report, did you?

18   A.   No.

19   Q.   Now, you are no longer saying, are you, that Dr. Krolik

20   suffers from a learning disability that entitles him to an            14:41:28

21   accommodation under the ADA?

22   A.   No, because there's controversy about how it's defined

23   within the court as well as the professional community.

24   Q.   I just wanted to make sure that's no longer on the table

25   before the Court.                                                     14:41:44

UNITED STATES DISTRICT COURT

34

1   A.   Right.  It still potentially would be, depending on which,

2   you know, comparison you pick.  The original report was based

3   on essentially grades based norms, and so --

4   Q.   All right.  Okay.  I'm sorry, we only have a limited

5   amount of time.  I don't need to talk about something that's          14:42:01

6   not relevant here.

7   A.   I know.  I'm sorry.  All right.

8   Q.   Dr. Butterbaugh, you saw that -- you saw when you read

9   Dr. Hoblit's report that she had administered something called

10  the WAIS-II test?                                                     14:42:14

11  A.   Yes.

12  Q.   And you knew that she concluded from that test that

13  Dr. Krolik's score on that test was inconsistent with the

14  typical ADHD profile; correct?

15  A.   Yes.                                                             14:42:26

16  Q.   And you agreed with her conclusion on that point?

17  A.   I don't really find that there's a definitive profile that

18  is consistent --

19  Q.   Sir --

20  A.   -- routinely.                                                    14:42:40

21  Q.   -- accepting that you don't agree that there's a

22  profile --

23  A.   Right.

24  Q.   -- you did write, did you not --

25  A.   Yep.                                                             14:42:47

UNITED STATES DISTRICT COURT

35

1   Q.   -- that you agreed that Dr. Krolik's score on the WAIS-II

2   was inconsistent with the typical ADHD profile?

3   A.   Yes.

4   Q.   You also concluded in your report that Dr. Krolik's

5   adaptive living skills were relatively strong, did you not?      14:43:04

6   A.   And by that I probably overstated the difficulty.   I was

7   thinking of the adaptive behavior as we measure it in the

8   retarded; which is self care, self dressing, basic

9   communication, basic social function, and motor-related

10   functioning.   Just as it is on the Vineland, which is a test      14:43:28

11   of that.   So that's --

12   Q.   I'll just refer you, please, to page 7 of your December

13   '03 report.

14   A.   Yes.

15   Q.   In which you wrote, Dr. Krolik has reported adaptive      14:43:41

16   living skills.

17   A.   Right.

18   Q.   Now, on that same page of your December '03 report, sir --

19   A.   Right.

20   Q.   -- you give him several diagnoses; correct?      14:43:54

21   A.   Right.

22   Q.   Including you diagnose him, Dr. Krolik, as having a

23   personality disorder not otherwise specified --

24   A.   Yes.

25   Q.   -- correct?      14:44:06

UNITED STATES DISTRICT COURT

36

1      And included within that personality disorder

2  diagnoses is that he is distrustful and has compulsive

3  features; correct?

4  A.   Yes.  Fastidious would be a good term.

5  Q.   Fastidious?                                          14:44:29

6  A.   Yes.  He's very careful, thoughtful, labored in his

7  approach to situations sometimes.

8  Q.   Now, if -- you testified, sir, that someone who has been

9  fired from a job a number of times may suffer from ADHD.  Is

10 that what you said?                                        14:44:53

11 A.   Lots of people can be fired from a job and not have ADHD.

12 Q.   All right.  And in fact, if a person suffers from a

13 personality disorder such as you diagnosed with Dr. Krolik --

14 distrustful, compulsive features -- that may have been a cause

15 for his being fired; correct?                              14:45:13

16 A.   Yes, because he believes in doing things right.  And in a

17 number of his jobs he came across people that were committing

18 fraud or deception and practicing bad pharmacy.  And he's not

19 one to miss an opportunity to point that out.

20 Q.   And in those cases if he was fired because he was acting  14:45:32

21 in that fashion, that wouldn't have been being fired because

22 he had ADHD; right?

23 A.   No, but there are lots of ways to work out those kind of

24 situations, and sometimes Dr. Krolik might, you know, operate

25 more impulsively and quickly than other people would before   14:45:53

UNITED STATES DISTRICT COURT