37

1   gathering all the necessary information.

2   Q.  Have you interviewed Dr. Krolik about each of the

3   occasions in which he was fired from those jobs?

4   A.  No.  Some of them, but not all of them.

5   Q.  So you're not testifying today about why he was fired from       14:46:06

6   each of those jobs?

7   A.  No.  As I said, we --

8   Q.  Okay.  Thank you.

9   A.  Okay.

10           MS. JOHNSEN:  That's all I have for Dr. Butterbaugh.       14:46:16

11           THE COURT:  All right.  Thank you.

12           Mr. Domenici, anything in redirect?  I guess you have

13   half a minute left.

14           MR. DOMENICI:  Just one question, Your Honor.

15                   REDIRECT EXAMINATION

16   BY MR. DOMENICI:

17   Q.  Dr. Butterbaugh, is there some way you could express the

18   certainty or confidence that you have in your diagnosis of

19   Dr. Krolik, and then give support for that to the Court?

20   A.  Yes.  I believe he's the most hyperactive adult I've       14:46:40

21   worked with in my career.  And unfortunately, because of his

22   age, because of the lack of services, diagnostic knowledge,

23   treatment knowledge at the time of his youth, he could not put

24   together the objective documentation to show the nature and

25   severity of his problems as a child.       14:47:08

38

1          But he remains obviously hyperactive and impulsive.

2     He was found that way by Dr. Wurzlow prior to my evaluation.

3     And just as Dr. Hoblit stated, he has an obvious tendency to

4     minimize his shortcomings and not admit to them, so that you

5     have a paradox of someone with impulsive hyperactive behavior          14:47:34

6     who is unable to acknowledge that they have that difficulty.

7          It's actually a fairly well-known and common problem

8     that causes us to have to evaluate parents or spouses or

9     collateral reporters, because the person with ADHD is not

10    aware of their own shortcomings.  So it's a well-known problem          14:47:57

11    that we see in research studies and clinical practice quite a

12    lot.

13          MR. DOMENICI:  Thank you.  That's all I have.

14          THE COURT:  Thank you very much.  You may step down.

15          Miss Johnsen.                                                    14:48:10

16          MS. JOHNSEN:  Thank you.  Let me take 30 seconds,

17    Your Honor, to present a brief oral argument before we ask

18    Dr. Gordon to get on the stand.

19          Under the ADA a person is disabled if he has a mental

20    impairment that substantially limits him in a major life              14:48:34

21    activity as compared to most people.

22          The key is -- the key to this case is, it's not

23    enough for a person to have a diagnosis of a disability.

24    You've seen here today and from reading the papers that we

25    vigorously disagree, the two sides, about whether Dr. Krolik          14:48:53

UNITED STATES DISTRICT COURT

39

1    is accurately and properly diagnosed with ADHD.

2         But beyond that the ADA requires something more.  The

3    ADA requires that the disability substantially limit the

4    person in a major life activity.  That's the teaching of the

5    Toyota case, and that's the teaching of the other cases in          14:49:11

6    which my client, the NBME, has been involved; the Bayer case,

7    392 F.Supp.2d 42 as well.

8         To be sure, the DSM-IV requires impairment.  But

9    impaired is not enough under the ADA.  The ADA requires that

10   you show -- that the impairment substantially limit a major        14:49:33

11   life activity.

12        We've argued in the papers about whether -- about

13   what the major life activity ought to be.  In the complaint in

14   this case and in the motion for injunction, the plaintiff

15   says --                                                            14:49:48

16        THE COURT:  It was -- I think the gist of it was that

17   it was quote, working, unquote.  But today we heard quote,

18   learning, unquote.

19        MS. JOHNSEN:  Exactly.  That's my point, Your Honor.

20        Dr. Butterbaugh talks about impaired in learning,            14:49:59

21   notwithstanding Dr. Krolik didn't fail a class, graduated from

22   high school, and college and medical school, and has only

23   been -- and his only impairment is that he's unable to pass

24   the USMLE medical board, a very challenging test.

25        But the complaint and the motion talk about                  14:50:20

40

1   impairment, substantial limitation in the major life activity

2   of working.  Dr. Butterbaugh says nothing at all that supports

3   the plaintiff's contention that he's been substantially

4   limited in the field of working.  And he didn't say that

5   because the point can't be made.                          14:50:42

6          By his own account, as told to Dr. Hoblit, Dr. Krolik

7   has nothing but a record of success.  He founded and ran a

8   multimillion dollar company.  He flew airplanes and bought and

9   sold expensive cars.

10         THE COURT:  Is it clear there was no accommodation    14:50:58

11  sought or granted in connection with licensing as a pharmacist

12  or licensing as a pilot?

13         MS. JOHNSEN:  We have asked him whether he sought

14  accommodations in any other capacity, and we've received the

15  answer no.                                                  14:51:12

16         In his application for the Medical Board, that form

17  asks whether he's ever been -- he's ever received

18  accommodations in any school setting or any standardized test,

19  and the answer was no to that.  He's not offered any evidence

20  about receipt of accommodation, no testimony or evidence about  14:51:29

21  that at all.

22         In fact, Dr. Krolik's only complaint, despite his

23  record of successes, is that all of a sudden when he started

24  to try to take the medical boards, and as a matter of fact

25  after he failed them a number of times, that's when he noticed  14:51:44

UNITED STATES DISTRICT COURT

41

1    he must have ADHD.

2          Dr. Gordon will tell you that doesn't happen that

3    way.  ADHD doesn't happen that way.  It doesn't just come up

4    on you suddenly.  You're going to notice it, if you have it.

5    You're going to notice it before you're 50.                    14:51:57

6          But beyond that, beyond what Dr. Gordon will say

7    about how to diagnose properly ADHD, the record plainly shows

8    that even if -- even assuming Dr. Krolik has ADHD, it's not

9    limited him in a major life activity of working, and it's not

10   limited him in the major life activity of learning.            14:52:16

11         He's succeeded; high school, college and graduate

12   school.  A very small percentage of the U.S. population even

13   makes it to graduate school.  I think Dr. Gordon says four

14   percent.

15         Dr. Krolik, as compared to most people, as the ADA       14:52:29

16   sets up the test, is doing really well.  He just can't pass

17   this medical board.  That's his only problem.  And that's not

18   enough to justify a diagnosis of ADHD, and it's not enough to

19   justify under the ADA granting him accommodations.

20         Now, on substantial impairment, Your Honor -- and        14:52:48

21   excuse me.  On imminent or irreparable harm, Your Honor, what

22   I hear Dr. Krolik's counsel saying is that it's irreparable

23   harm to have him wait the nine months between now and the

24   conclusion of trial.

25         With due respect, Your Honor, it's been nine years or    14:53:06

UNITED STATES DISTRICT COURT

42

1  ten years since he graduated from medical school.  The delay

2  is his own fault.  He didn't seek accommodations until 1998,

3  three years after -- after starting to try to take the exam

4  and failing it a number of times.

5      He hired a lawyer, Mr. Domenici, in 1999.  He didn't          14:53:27

6  bring a lawsuit until 2004.  He didn't file injunction papers

7  until mid summer of 2004.  Any delay he suffers is his own

8  fault, with due respect.

9      I'd like to call Dr. Gordon.

10     THE COURT:  Yes.                                              14:53:42

11     THE CLERK:  If you could raise your right hand,

12  please.

13     (MICHAEL GORDON, DEFENSE WITNESS, SWORN)

14     THE CLERK:  Thank you.

15     If you could state your name.                                14:53:57

16     THE WITNESS:  Michael Gordon, G-O-R-D-O-N.

17     THE CLERK:  Thank you.

18     Have a seat over there, please.

19     THE COURT:  You'll need to get right to the jugular

20  because of our time.                                            14:54:14

21     MS. JOHNSEN:  Sure.

22              DIRECT EXAMINATION

23  BY MS. JOHNSEN:

24  Q.  Dr. Gordon, you have a doctorate degree from Ohio State in

25  clinical child psychology?                                      14:54:23

43

1    A.   I do.

2    Q.   What job duties briefly do you have that bear on ADHD?

3    A.   I'm director of an ADHD program that's in its 20th year, I

4    run all the clinical services for child and adolescent

5    psychiatry, including ADHD policy and practice guides.  I          14:54:33

6    conduct a great deal of research in the area of ADHD, both for

7    children and for adults.  And I'm also involved in advocacy

8    organizations to help promote rights and services for

9    individuals of all ages with ADHD.

10   Q.   And you publish quite a bit on ADHD?                          14:54:53

11   A.   I have.

12   Q.   You've -- in this particular matter you were retained by

13   the National Board of Medical Examiners to consult upon

14   Dr. Krolik's request for accommodations?

15   A.   That's correct.                                               14:55:09

16   Q.   And you evaluated that request and supporting

17   documentation?

18   A.   That's correct.

19   Q.   You heard Dr. Butterbaugh say that the NBME, and by

20   influence yourself, applied some standard other than the          14:55:17

21   DSM-IV in evaluating Dr. Krolik's application.  Is that true?

22   A.   No, it's not.

23   Q.   What standards did you apply?

24   A.   The standards I apply are the standards that are derived

25   from the DSM-IV that any of the consultants involved in this       14:55:31

44

1    apply.  They have to do with the elements both of identifying

2    the symptoms, but also showing that they have -- did indeed

3    have an early onset.  Because it is a childhood disorder, that

4    by definition requires onset early on.  And that they have had

5    impairment along the way.

                                                                                     14:55:52

6    Q.  Dr. Butterbaugh said that the NBME requires that there

7    be -- I wrote down his adjective, I don't have it in front of

8    me -- constant, across-the-board, ever-present impairment.

9    A.  By inference they do.  I mean, it's true.  For all of the

10   disorders it says for the last six months.  But because it          14:56:14

11   requires a childhood onset, because it requires problems not

12   only in one circumstance or with one individual, but across

13   settings, the inference is that it's over time.

14        It's extraordinarily well documented that this is a

15   neurodevelopmental disorder, it affects people early, often,        14:56:29

16   through their lives.  There's no basis theoretically or in

17   research to explain why somebody would have the disorder, stop

18   having it, and then have it again, when it's a disorder that

19   affects somebody's brain and the way they interact with the

20   world in a way that doesn't change.                                 14:56:46

21   Q.  What does a typical ADHD patient look like?

22   A.  There's extraordinary amounts of data to paint a picture

23   of gross maladjustment in individuals diagnosed as children of

24   having ADHD.  Those research studies point to difficulties

25   just across the board.  And for patients that we have in our        14:56:59

45

1   clinics and in any of the clinics that are appropriately

2   diagnosed, you read the history, you hear of maladjustment all

3   along the way, regardless of when they were born.

4          People had problems with ADHD before this particular

5   label came about.  These are the people who got kicked out of          14:57:15

6   school, who functioned very poorly.

7          Our patients, we're happy if we get them through high

8   school.  It's a great joy for us and for the families to get

9   them through high school, let alone college.  Very few of the

10  individuals who are in studies over time following people with          14:57:29

11  ADHD even make it into college.  And there's been none

12  reported in any of the studies I'm aware of, or talking to

13  those authors, who have even made it into a postgraduate

14  program.

15  Q.  Dr. Gordon, you reviewed the material that Dr. Krolik had          14:57:43

16  submitted and prepared a report that was attached as Exhibit 2

17  to our position brief, in which you reiterated and concluded

18  that Dr. Krolik is not properly diagnosed as ADHD.  Correct?

19  A.  That's correct.

20  Q.  Without belaboring the point I'm going to move on --          14:58:02

21  A.  Okay.

22  Q.  -- to, you did not -- at the time you wrote that report

23  you did not have available to you Dr. Hoblit's report, did

24  you?

25  A.  I did not.          14:58:14

UNITED STATES DISTRICT COURT

46

1   Q.   Is there any information in Dr. Hoblit's report that in

2   your opinion bears on Dr. Krolik's ADHD diagnosis?

3   A.   Absolutely.

4   Q.   What's that?

5   A.   Many things.                                                    14:58:25

6        Number one, it was stated clearly in that report,

7   something that seems clear from his history, that he really

8   did not have problems until he started taking the NBME exams.

9        It also reported that he had been an average student.

10  And that his early history was not characterized by any kind    14:58:39

11  of particular difficulty of the sort associated with ADHD.

12       She indicated that on measures of ADHD and on

13  self-report of ADHD, that he was normal there as well.   In

14  every single regard that's relevant to the diagnosis she

15  describes somebody who is a high achiever, who had done         14:58:58

16  amazingly well for himself.

17       And it did support what I was presuming from reading

18  what I had when I first did the evaluation, is this is a man

19  who's had stellar accomplishments, who's done well.   And that

20  one couldn't do so well if one had a psychiatric disability of  14:59:11

21  the sort he described.

22  Q.   Doctor -- did Dr. Hoblit identify other possible causes

23  for his inability -- for Dr. Krolik's inability to pass the

24  Medical Board?

25  A.   Sure.   She described him as being anxious around testing   14:59:29

47

1  when it involved time.  His hands shook, apparently.  That

2  could well point to test anxiety, which is not a psychiatric

3  disorder, getting in the way.

4       She said that he had been an average student, and

5  that can be an explanation too.  To be a physician and to do                14:59:43

6  all that one needs to do to be a physician, average won't tend

7  to cut it.  And so that's a possible explanation as well.

8       She also described him as an individual who could get

9  angry easy.

10       And fastidious I guess is the term Dr. Butterbaugh                     14:59:56

11  used.  I found that interesting, because if we could get our

12  patients to be fastidious it would be a wonderful thing.

13  Because if you're ADHD, you don't have that capacity to attend

14  and to be that careful.

15       But she described him as somebody who may have had                     15:00:10

16  trouble testing for reasons having nothing to do with his

17  lifelong psychiatric impairment.

18  Q.  Finally, Dr. Butterbaugh relies significantly on a report

19  on his interview with Dr. Krolik's wife at the time, and her

20  report of his -- apparently of his conduct at that time.                    15:00:31

21       Doctor, would you diagnosis a husband based by and

22  large on the wife's report about that husband?

23  A.  No, we don't.  We certainly listen to what a spouse has to

24  say, but we don't want to get to the point where we diagnose

25  husbands based on what wives say regarding their                            15:00:49

UNITED STATES DISTRICT COURT

48

1   organizational skills and attention and all. You do need

2   other sorts of information. If all we had was spousal report

3   of problems.

4        And then the fact that somebody runs into

5   difficulties on a circumscribed test, that's not ADHD.                    15:01:02

6        MS. JOHNSEN:   Thank you, Doctor.

7        THE WITNESS:   Thank you.

8        THE COURT:   Let me ask you a quick question, Doctor.

9                         CROSS-EXAMINATION

10  BY THE COURT:

11  Q.   I think you testified that many people would manifest this

12  disorder early on in life, do poorly in school, and rarely

13  would make it to med school; is that right?

14  A.   I think by definition it would be extraordinary, somebody

15  without amazing types of compensations, and we're talking             15:01:26

16  tutors and life coaches.

17       A lot of our patients have so much difficulty making

18  it through their day that they actually have coaches to help

19  them pay their bills, get their laundry done, et cetera. So

20  to think that somebody with this sort of disability being able        15:01:41

21  to make it into an area where you have to be amazingly

22  attentive.

23       I don't know if you've sat in on a medical school

24  lecture, they go on all day long, and there's all sorts of

25  demands, on your clinical rotations, to organize information,         15:01:53

UNITED STATES DISTRICT COURT

49

1    and to pay attention to your notes, all of that.  To think of

2    one of our patients being able to do that is incomprehensible.

3    Although it's possible.  It's possible.

4    Q.   The defendant filed a supplemental response to the

5    plaintiff's interrogatories indicating that since 1999                15:02:08

6    approximately 900 persons applied for accommodations based on

7    ADHD, and that 50 percent of those were accommodated.  Which

8    suggests to me, now I may misunderstand this answer, but that

9    about -- that there are at least 450 people got to and through

10   med school with ADHD and then were accommodated by the               15:02:32

11   defendant.

12         How do you explain that in light of the suggestion

13   that most of these people don't even get out of high school?

14   A.   A couple of ways.

15         One, if I -- if one of us were to say that somebody          15:02:45

16   had ADHD when they took the first exam, that would show up as

17   a statistic each time.  So if they were accommodated the first

18   time, and they took the test three or more times, that

19   statistic would be inflated for the number.

20         The second part of it --                                       15:03:00

21         Do you understand what I'm saying?  The statistic

22   itself would -- may be inflated given the way --

23   Q.   This says 900 persons rather than 900 tests.

24   A.   Yeah, I think -- as I understand the way the counting

25   system goes, it's each person's time is counted as one time.         15:03:18

50

1    But I don't know the details of that.

2          I can give you an answer that's more relevant to a

3    consultant's role.  We bend over backwards to try to give

4    people accommodations.  If there's any hint that somebody has

5    these kinds of difficulties, if there's a credible diagnosis,          15:03:35

6    that there's not evidence that somebody's been a stellar

7    student and done well, we'll bend over backwards.

8          Now, in the cases that my ten or 15 percent was an

9    estimate, I think probably if you look at the accounting, you

10   know, in some of those I wasn't sure, but I don't want to be          15:03:53

11   in a position where I'm denying somebody accommodations who

12   deserves it, so I'll back off and I will get that

13   accommodation.

14   Q.  Have you personally recommended granting accomodation for

15   the defendant for ADD or ADHD?                                        15:04:06

16   A.  To this defendant?

17   Q.  No, to other persons.

18   A.  Oh, yes.

19          Have I been involved both as a clinician or just as a

20   consultant?                                                           15:04:23

21   Q.  I guess as a consultant for the defendant.

22   A.  I have, during the course of my years working for them,

23   recommended that they grant accommodations to individuals with

24   ADHD.

25   Q.  The plaintiff has asked what rationale you use in granting        15:04:39

UNITED STATES DISTRICT COURT

51

1    or denying a recommendation with respect to accommodation.   Is

2    your answer simply, they either meet the DSM-IV standards or

3    they don't?

4    A.   My answer is that they need to come somewhat close at

5    least to the DSM-IV criteria.   And we stretch those criteria.      15:05:00

6    The actual criteria are that you have to show impairment

7    because of those symptoms before the age of seven.   That's

8    what is actually written in the DSM-IV.

9          We've come to realize that that's too stringent.

10   Then unless you stretch that to ten or 12 you could be missing    15:05:16

11   people who were able to hang in there until that point, which

12   is usually around where homework starts, and then your

13   inability to plan and attend would take forth.

14         So we stretch it a bit, both by bent of the clinical

15   research, and just because we don't want to be denying based      15:05:33

16   on the symptoms.

17   Q.   The report cards that were the subject of the plaintiff's

18   submission do have indications on them that during grammar

19   school the plaintiff had some -- to use the language of these

20   report cards from the Winnipeg Public School System -- habits     15:05:56

21   and attitudes that might be consistent with ADD, such as poor

22   impulse control or self-control, or unsatisfactory in

23   respecting the rights of others, going back 50 years.

24         What -- what weight would you give these kinds of

25   historical data?                                                  15:06:17

UNITED STATES DISTRICT COURT

52

1   A.   If you ask parents and teachers of four to six-year-old

2   children, do they show symptoms of inattention and impulse

3   control difficulty, et cetera, somewhere 40 percent of all

4   mothers will say that their children do, and somewhere around

5   25 to 35 percent of teachers do.                                                15:06:33

6          So the mere fact that in a report card somebody upon

7   occasion may be described by teachers or -- in a position

8   where they should work harder, et cetera, is normative.

9          The difference -- we can all look at -- I can look at

10  my report cards, I think a lot of us can look at our report          15:06:49

11  cards and see where teachers were trying to motivate us to do

12  better.  He could do better if he tried a little harder, if he

13  paid more attention.

14         So ADH -- being able to -- the ability to attend is

15  not like -- it's a part of normal behavior, like height and        15:07:03

16  IQ.  Not everybody is as attentive as they should be, some of

17  us more or less so.  And during the course of one's life one

18  can be more or less attentive.

19         So the fact that somebody shows a sign or symptom or

20  trait of inattention doesn't make them ADHD.  It can make them      15:07:19

21  normal, because it's normal to be so, or there are a whole

22  range of other reasons why people can have trouble organizing

23  themselves, attending, and doing all that on task.

24         So if you were to lay out the tests -- the report

25  cards from the general population, in 100 of them I would bet       15:07:34

53

1    most of us would look at those report cards and see similar

2    comments from time to time.  Eighty-nine percent of the

3    comments regarding Dr. Krolik's his behavior were average.

4          THE COURT:  Thank you.  Thank you very much.

5          Did you want follow-up before we turn to          15:07:50

6    Mr. Domenici?

7          MS. JOHNSEN:  I did on just one of your questions,

8    sir.

9          Your first question I believe about, if ADHD is so

10   incapacitating.  I think you were asking how it could be that  15:08:00

11   there could be 400 or 450 persons with ADHD validly found to

12   have ADHD who had -- who were in a position to be applying for

13   medical boards.  And I just want --

14                    REDIRECT EXAMINATION

15   BY MS. JOHNSEN:                                           15:08:21

16   Q.  Dr. Gordon, in the applications that you've reviewed for

17   the NBME, it's the case, isn't it, that you frequently see on

18   the applications that should be approved a history of

19   accommodations, so that the persons validly diagnosed as ADHD

20   have succeeded but done so because they have received     15:08:42

21   accommodation?

22   A.  Well, that's the point.

23         MR. DOMENICI:  Objection.

24         THE COURT:  Excuse me.

25         MR. DOMENICI:  This is a leading question.  She's  15:08:47

UNITED STATES DISTRICT COURT

54

1   basically testifying for the witness.

2           THE COURT:  It is leading.

3           MS. JOHNSEN:  Let me ask --

4           THE COURT:  Excuse me.  It's a preliminary injunction

5   hearing and time is of the essence.  I will allow it.          15:08:53

6           THE WITNESS:  That's how we make the decision

7   regarding -- if somebody does meet the criteria.  And they can

8   if they've had, by definition, a long history of help.

9   They've been in circumstances where there's extra help

10  afforded to them along the way regardless of their age.        15:09:06

11          And that's how we make that judgment, because we've

12  seen this long history of both difficulties and compensations.

13  They get to this point and say, geez, this is how this person

14  has made it to this point, I'm not going to stand in the way

15  and recommend against them getting those similar kinds of      15:09:23

16  accommodations in the future.

17  Q.  BY MS. JOHNSEN:  Do you require accommodations?

18  A.  No.

19  Q.  When you look at a record, you don't -- do you

20  automatically recommend denial if the applicant doesn't have a 15:09:33

21  history of accommodations?

22  A.  No.

23          MS. JOHNSEN:  That's all I have.

24          THE COURT:  Thank you very much.

25          Mr. Domenici.                                          15:09:41

UNITED STATES DISTRICT COURT

55

1          MR. DOMENICI:   Thank you.

2                    CROSS-EXAMINATION

3    BY MR. DOMENICI:

4    Q.  Mr. Gordon, you gave a deposition to me in Philadelphia

5    probably two months ago; correct?                              15:09:48

6    A.  That's correct.

7    Q.  And at that deposition you testified, after I had

8    questioned you about Dr. Butterbaugh's affidavit, and we went

9    over the diagnostic information he had relied on, you

10   testified that reasonable psychologists could differ regarding   15:10:01

11   whether or not the evidence indicated that Dr. Krolik was

12   properly diagnosed with ADHD; correct?

13   A.  I said people could differ on the diagnosis, yes.

14   Q.  Psychologists.   Not people, psychologists.

15   A.  Yes.                                                        15:10:19

16   Q.  And you agree ADHD is an evolving field; correct, evolving

17   medical field?

18   A.  By definition, sure.

19   Q.  In fact, the NBME, their criteria is evolving; correct?

20   A.  I don't know what plans there are for the future to change   15:10:37

21   those criteria.

22   Q.  Well, as an example --

23   A.  But they have over time.

24   Q.  They have over time.

25          And, in fact, it's possible in the future that those    15:10:46

56

1    criteria could evolve to develop specific requirements for

2    older persons that they don't have now; correct?  There is no

3    distinction based on age in the criteria.

4    A.   I don't know what their plans would be.  It's easier,

5    actually, with an older person because you have more of a life        15:11:02

6    to look at.  So I don't know if they need to do that, because

7    an older person has more life to be able to judge their

8    ability to adjust or not.

9    Q.   Well, in fact, you made a determination for the

10   Veterinarian's Board with Mrs. Ross, who was 47 years old, and        15:11:18

11   a Federal District Court disregarded your opinion in that

12   case; correct?

13   A.   I don't know the legalities of that.  I didn't have the

14   impression that they disregarded the evaluation.  I don't know

15   about that case.                                                      15:11:33

16   Q.   You did evaluate her, she was 47 years --

17   A.   No, I didn't.

18   Q.   Did you review an evaluation for Mrs. Ross?

19   A.   I did.

20   Q.   So you reviewed, similar to what you did in this case?           15:11:41

21   A.   That's correct.  I just want to make clear I did not

22   evaluate her.

23   Q.   You didn't evaluate her.  You were asked by the

24   Veterinarian's Board to review an elderly mid -- sort of

25   elderly.                                                              15:11:52

UNITED STATES DISTRICT COURT

57

1   A.   Please.

2   Q.   I'm 46.

3        But 47-year-old.  And you determined that she did not

4   deserve an accommodation and the Federal District Court

5   disagreed?                                                    15:12:02

6   A.   I don't know that to be the case.  I know what I said is

7   that I didn't feel that she met the criteria.  I don't know

8   the extent to which the Court specifically disagreed with that

9   diagnosis.

10  Q.   In fact, you testified in your deposition, and I don't    15:12:11

11  think you would change that today, that it's very rare that

12  you would evaluate someone of Dr. Krolik's age?

13  A.   Just by nature, there are not that many who at that

14  age -- there are, it's not very rare, but it's less common.

15  Q.   And you've never, to your recollection, agreed to an      15:12:28

16  accommodation for anyone over 40 years old; correct?

17  A.   I didn't remember whether I had or not.  I think I might

18  not have.  But most people who make it to that stage, as I --

19  we've said, find it hard to develop evidence that they do have

20  any impairments associated with the disorder.                 15:12:45

21  Q.   Do you have any evidence that Dr. Krolik had competitive

22  admissions for medical school at the American University at

23  the Caribbean?

24  A.   I had no information presented in the information

25  regarding any of the process by which he was admitted to      15:12:58

UNITED STATES DISTRICT COURT

58

1   medical school.

2   Q.   And the only school prior to that that your records show

3   that he was admitted to was the University of New Mexico in

4   the 1960s; correct?

5   A.   All I knew at the time when I was asked to do the          15:13:07

6   evaluation is that he was a pharmacist by training.

7   Q.   So you made some assumptions I think -- you made some

8   statements about looking at 100 report cards you would see

9   this.   You don't have any evidence of what you'd see on report

10  cards from the 1950s from Winnipeg, Canada, or anywhere in       15:13:22

11  Canada, do you?

12  A.   Well, there is evidence -- well, that's not true.  Because

13  ADHD has been called many different things.   But it was

14  initially identified in 1982 by a pediatrician.   It's had many

15  different names along the time -- when we were younger, those   15:13:36

16  of us elderly over the age of 47, it was called hyperkinetic

17  syndrome, and then it was called minimal brain disorder.

18          So these symptoms have been around a long time.   This

19  particular label is relatively new.

20  Q.   Okay.   My question was report cards.   And I asked you in  15:13:52

21  your deposition if you had done any systematic studies to see

22  how report cards could have done -- or could refer to any

23  systematic studies how report cards in the 1950s might

24  identify ADHD.   And you testified you weren't aware of any and

25  you hadn't done any.                                            15:14:08

59

1   A.   I wasn't aware of any study, that's correct.

2   Q.   So when you just told the judge about 100 report cards,

3   you were talking about a different -- did you have any basis

4   for that, what 100 report cards would show?

5   A.   I had no research to show.  I was trying to illustrate the   15:14:18

6   fact that it's common.  And if you were to look at those

7   behaviors and what would be reflected in report cards, I'm

8   quite confident they would be there.

9   Q.   Based on no evidence?

10  A.   Based on no empirical research evidence.   15:14:30

11  Q.   Okay.  And just to wrap up -- Your Honor -- it is true,

12  that every person that you have agreed with the diagnosis of

13  ADHD has been granted an accommodation by the NBME, according

14  to your testimony at your deposition?

15  A.   What I said is, I don't know what happens after my   15:14:46

16  recommendation.

17  Q.   I don't think --

18  A.   Well, yeah, I refer -- for all I know they approve some

19  that I don't.  I wouldn't know.

20          MR. DOMENICI:  Well, I attached that to my notice of   15:14:57

21  filings, Your Honor.

22  Q.   BY MR. DOMENICI:  I'll ask you, could you recall any

23  circumstance --

24          MS. JOHNSEN:  Page and line, please?

25          MR. DOMENICI:  Quoting on page 22, line 14.   15:15:11

60

```
 1    Q.   BY MR. DOMENICI:   Could you off the top of your head

 2    identify a letter, and you don't need to name the person, but

 3    I'd like to know the circumstances if you can recall one,

 4    where you recommended accommodations.

 5              And you said, are you asking me if I can remember       15:15:26

 6    someone?

 7              And I said, yes.   You're saying you used the same

 8    format whether you recommend or you don't recommend.

 9              And then I go on and say, and then on that form that

10    you use, there's two checklists that we were talking about at   15:15:41

11    your deposition, one is diagnosis and the other is

12    accommodation.

13              And I asked you, can you recall a circumstance where

14    you checked the diagnosis but the accommodation was not

15    checked?                                                         15:15:53

16              Then you said -- this is on page 74, line 17 -- I

17    seem to remember a case where it seemed that ADHD -- no, I

18    can't.   I was thinking there might have been one where there

19    was an accommodation that wasn't at all relative.   But I can't

20    remember the circumstance.                                      15:16:10

21              To the best of your recollection, the circumstances

22    where you indicated the diagnosis is supported, you've also

23    indicated the accommodation is supported?

24              I would say in almost every case that -- any case I

25    can think of.                                                   15:16:23
```

UNITED STATES DISTRICT COURT

61

1          Correct?

2     A.    Right.

3     Q.    That was your testimony?

4     A.    That is.

5     Q.    And that is correct as of today?                          15:16:26

6     A.    Whenever I say that there's a diagnosis, in those

7     instances where there was a diagnosis, and there had been a

8     prior one as best I could remember, I tended to recommend the

9     accommodation.

10    Q.    I think you also testified, just so the record is clear at  15:16:38

11    your deposition, that you did not make a determination in

12    order to grant -- to check that accommodation box, you did not

13    make a determination whether there was an impairment of a

14    major life activity?

15    A.    I was making the determination of whether                15:16:54

16    somebody -- whether in this case Dr. Krolik met criteria for

17    ADHD; that's correct.

18    Q.    So to your knowledge, as a reviewer for the NBME, you

19    don't make any determination whether there's a life -- major

20    life activity affected, you only verify the diagnosis in order  15:17:09

21    to grant the accommodation; correct?

22    A.    I see my role as offering an opinion to the NBME whether

23    somebody's documentation supports the criteria for ADHD.

24    Q.    And do you have any reason -- any information, any actual

25    information that the other 400 people that you were asked       15:17:27

62

1    about by the judge were treated any differently than the ones

2    you testified that you're aware of, where if they meet the

3    diagnosis they obtain the accommodation?

4    A.   I don't know that to be the case.

5    Q.   In fact, at your deposition you -- you didn't have any          15:17:40

6    other data on how many other people --

7    A.   I don't.

8    Q.   And have you studied that since then?

9    A.   No.

10          MR. DOMENICI:   That's all I have, Your Honor.              15:17:48

11          THE COURT:   Thank you.

12          Miss Johnsen, any redirect?

13          MS. JOHNSEN:   One question, Your Honor.

14                      REDIRECT EXAMINATION

15   BY MS. JOHNSEN:

16   Q.   Dr. Gordon, Mr. Domenici started off by asking you whether

17   you remember testifying that it was possible that another

18   psychologist might have come to a different conclusion upon

19   his review -- his or her review of Dr. Krolik's file.  Do you

20   remember that?                                                     15:18:11

21   A.   I do.

22   Q.   You were asked at your deposition later whether it would

23   be reasonable for a professional to come to the conclusion

24   based on Dr. Krolik's file that he indeed suffers from ADHD.

25   A.   I remember being asked that, and saying that I didn't         15:18:24

63

1   think it would be reasonable.

2           MS. JOHNSEN:   Thank you.

3           THE COURT:   Thank you very much.   You may step down.

4           THE WITNESS:   Thank you.

5           THE COURT:   All right.   We've run out of time, but      15:18:32

6   perhaps you could each wrap it up in one minute each.

7           Mr. Domenici.

8           MR. DOMENICI:   Your Honor, I think the testimony is

9   clear that if the diagnosis is ADHD, over 400 people have been

10  granted accommodations.   There's nothing to indicate that      15:18:46

11  anything other than the diagnosis is the basis.   There's a

12  very large amount of accommodations granted for this

13  condition.

14          So I would ask the Court not to give credibility to

15  this legal argument that is not the practice, that somehow      15:18:59

16  there needs to be showing of an impact of a major life

17  activity.   That is undercut by all of their statements that

18  they want to treat everyone the same, that this is a national

19  test.   Now they're treating Dr. Krolik selectively with a

20  legal argument that is not their practice.                      15:19:18

21          So the only question is just as you started, is the

22  diagnosis correct or incorrect?   There's clearly a fact issue

23  on that.   I think that's obvious today.   And I think given the

24  circumstances, that fact issue establishes a likelihood of

25  success, I think the chance of harm to Dr. Krolik in not being   15:19:30

64

```
 1   able to obtain the same performance ten months from now or 12,

 2   plus having to take a job and quit a job, are not -- outweigh

 3   any possible harm to the defendant.

 4          And they haven't stated it, and they really can't,

 5   now that they've finally disclosed the number of                    15:19:50

 6   accommodations they've provided.

 7          And I think also the Court's suggestion that letting

 8   Dr. Krolik take the test would moot this case would be useful

 9   for all the parties.

10          Thank you, Your Honor.                                        15:20:01

11          THE COURT:   Thank you.

12          Miss Johnsen.

13          MS. JOHNSEN:   There's not even close to a substantial

14   likelihood of success on the merits, Your Honor, and that

15   disposes of this motion for injunction.                             15:20:16

16          I don't follow the argument that the NBME is applying

17   in this particular case a standard different than what it has

18   applied in any other case.  There's been no showing of that.

19          What applies here is -- what governs us in this

20   proceeding is the law, the ADA.  There needs to be a               15:20:30

21   disability that substantially limits Dr. Krolik in a major

22   life activity, or he is not entitled to an accommodation under

23   the ADA.  That's the rule of law.

24          There's been no showing by Dr. Krolik that he's

25   substantially limited in a major life activity of working,         15:20:47
```

65

1   which is what his pleading states and what his application is

2   based on.

3          Dr. Butterbaugh talks about being limited in

4   learning, but we don't see that.  We see him being limited in

5   his ability to pass the -- a very challenging medical          15:21:00

6   licensing test.

7          Where accommodations are appropriate, where there is

8   a valid diagnosis, and where it has been shown that as a

9   result of the impairment the applicant has been substantially

10  limited in a major life activity, the National Board of        15:21:20

11  Medical Examiners grants the accommodation as we properly

12  showed on the log.  And it has done so as stated in its

13  interrogatories.

14         That is not what's called for in this case,

15  Your Honor, that showing has just not been made.               15:21:33

16         THE COURT:  Let me ask you this:  In terms of the

17  harm to the defendant if injunctive relief were granted, what

18  would be the harm?  If he passed the test, arguably the harm

19  would be that if he later lost the case there might be some

20  hard feelings.  If he flunked the test the case is likely to   15:21:52

21  be moot.  What would be the harm?

22         MS. JOHNSEN:  Well, the harm -- there's harm in a

23  couple of different ways, Your Honor.

24         Number one, Dr. Krolik is asking for a paper and

25  pencil administration of the test.  That's not done.  The test 15:22:04

UNITED STATES DISTRICT COURT

1    is administered nationwide on a regular basis, based

2    on -- through computers.  You open the document, you read the

3    question, you answer the question.  We don't give paper and

4    pencil examinations.  We just don't do that.

5        So it would be --                          15:22:23

6        THE COURT:  Does that pretty much exclude anybody of

7    my generation who grew up computer illiterate?

8        MS. JOHNSEN:  No.  Well, if you're -- if you would

9    come to the National Board of Medical Examiners and tell them,

10   I'm not disabled, I just can't use a computer, they'd say, you   15:22:39

11   need to learn to use a computer.

12       THE COURT:  Is that because using a computer is

13   essential to practicing medicine?

14       MS. JOHNSEN:  No.  I'm unaware of that, Your Honor.

15       But the fact of the matter is that the test is       15:22:52

16   administered exclusively by the use of a computer.

17       More to the point, Your Honor, is that the solution

18   that you suggest is a nice one.  Let's see what the answer is

19   now.  But if that were the proper application, then in each

20   case that an applicant sought but was denied accommodations,   15:23:15

21   that would be the answer, wouldn't it?  Let's just give them

22   the test with the accommodations and see what happens.  That

23   would undermine -- that would undermine the U.S. Medical

24   Licensing Examination's validity, Your Honor.

25       State licensing boards across the country rely on the   15:23:37

67

1    USMLE to be administered in a standard basis year in, year

2    out.  We just can't get in the business, Your Honor -- because

3    of the significance of the test, we just can't get in the

4    business of allowing accommodations to be given to anyone who

5    hopes he might be able to win a lawsuit later.                    15:23:58

6           And to be perfectly honest, I think it would tend to

7    unfairly and improperly prejudice the outcome of the trial.

8           THE COURT:  All right.  Thank you.  Thank you.

9           I appreciate both of you coming and working under

10   tight time deadlines.  And we'll carefully go through all of    15:24:22

11   this and issue an order promptly.

12          So again, thank you both.

13          MS. JOHNSEN:  Thank you.

14          THE COURT:  Thank you both for coming.

15          Before I let you go, there is that motion to compel.      15:24:33

16   Is there anything left to it that you need of me?

17          MR. DOMENICI:  Yes, Your Honor.

18          THE COURT:  So the question then is, the burdensome

19   nature of providing rationale for the whole 900 or so, was

20   that it?                                                         15:24:48

21          MR. DOMENICI:  Yes.

22          And, Your Honor, I haven't studied that, I got that

23   answer last week.  And I would like to try to fashion

24   something, not as burdensome --

25          THE COURT:  I was just thinking of maybe suggesting       15:24:59

68

1  maybe for the defendant, maybe you could just provide that

2  information for the last 50 cases or so.  Would that be

3  burdensome?

4          MS. JOHNSEN:  The problem is, as you saw from the

5  papers, Judge, that we don't have a box that's checked in the      15:25:16

6  form.  Someone would have to spend a good deal of time, half

7  an hour or so, to read the file and figure out what the

8  rationale was, and then write something that would hopefully

9  be accurate in terms of a rationale, kind of like digesting a

10  case.                                                              15:25:36

11          Fifty -- perhaps we could arrive at a smaller sample.

12  Fifty I would suggest is too many.  Fifty would be, at half an

13  hour a report, or an applicant, that would be 25 hours.

14          But we would be, of course, amenable to providing a

15  digest of some smaller number.                                    15:25:59

16          THE COURT:  Would a smaller number than that be good

17  for openers and then take a look at that?  And then if it

18  indicated a gold mine of information we could go for more?  If

19  it's empty, we avoid the burdensome nature of it?

20          MR. DOMENICI:  Your Honor, a smaller number would be      15:26:17

21  fine.  We would ask that it over -- not just the most recent

22  ones though, because we do want to get --

23          THE COURT:  Like a sample?

24          MR. DOMENICI:  -- a sample.

25          THE COURT:  You want a random sample?                     15:26:24

UNITED STATES DISTRICT COURT

69

1      MR. DOMENICI:  Yes, perhaps something over five years

2  or something like that?

3      THE COURT:  Would that make sense?

4      MS. JOHNSEN:  Judge, well, except for one thing,

5  Judge, which I was neglecting to point out, that only -- we          15:26:33

6  object to the grounds of burdensome, but we also object,

7  Your Honor, on the grounds of relevance.

8          This isn't a class action.  This isn't a test to see

9  where -- how the National Board is examining other people.

10      THE COURT:  I understand that.  But I think it goes          15:26:51

11  to the question of credibility.  And I think it is relevant to

12  that extent, or at least calculated to lead to the discovery

13  of relevant information.

14          And so what we'll do with respect to the motion to

15  compel -- I think all that's left is this issue that we've          15:27:07

16  been discussing -- it's granted in part and denied in part, in

17  this sense, that, do a random sample of say the last 40 -- 40

18  cases, not the last 40 cases.  Do a random sample of 40 cases

19  since 1999, and send it off to the plaintiff.

20          And then if there's anything left to the dispute,          15:27:32

21  file another motion based upon their answer.  All right?

22      MR. DOMENICI:  Yes.

23      MS. JOHNSEN:  All right.  Just to understand, 40

24  applications?

25      MR. DOMENICI:  Forty persons.          15:27:45

UNITED STATES DISTRICT COURT

70

1          MS. JOHNSEN:  Right.

2          Not grants or not denials, but 40 applications?

3          MR. DOMENICI:  That's fine, Your Honor.

4          THE COURT:  Yeah, I think it was, identify the

5     rationale for authorizing or denying the accommodation.          15:28:24

6          MS. JOHNSEN:  Right.

7          THE COURT:  So it's both.  Okay?

8          MS. JOHNSEN:  Thank you, Your Honor.

9          MR. DOMENICI:  Thank you.

10          THE COURT:  Good luck to both of you.          15:28:32

11          (Proceedings concluded at 3:28 p.m.)

12

13                         -oOo-

14

15

16

17

18

19

20

21

22

23

24

25

71

1

2

3

4

5                    C E R T I F I C A T E

6

7        I, CANDY L. POTTER, do hereby certify that I am duly

8  appointed and qualified to act as Official Court Reporter for

9  the United States District Court for the District of Arizona.

10       I FURTHER CERTIFY that the foregoing pages constitute

11 a full, true, and accurate transcript of all of that portion

12 of the proceedings contained herein, had in the above-entitled

13 cause on the date specified therein, and that said transcript

14 was prepared under my direction and control.

15       DATED at Phoenix, Arizona, this 14th day of March,

16 2006.

17

18

19

20                         _____
                           Candy L. Potter, RMR, CRR

21

22

23

24

25